

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

NB:MEM/JAM
F.#2017R00509

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

August 17, 2020

<u>By ECF</u>

The Honorable Lois Bloom
United States Magistrate Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:   United States v. Karl Jordan, Jr., et al.
              <u>Criminal Docket No. 20-CR-305 (LDH)</u>

Dear Judge Bloom:

      The government respectfully submits this letter in support of its motion for permanent orders of detention for defendants Karl Jordan, Jr. and Ronald Washington. A grand jury returned an indictment charging each defendant with one count of murder while engaged in narcotics trafficking, in violation of Title 21, United States Code, Section 848(e)(1)(A), and one count of firearm-related murder, in violation of Title 18, United States Code, Sections 924(j)(1), for the October 30, 2002 murder of Jason Mizell, also known as "Jam Master Jay." Jordan is also charged with one count of conspiracy to distribute cocaine and seven counts of cocaine distribution, in violation of Title 21, United States Code, Sections 846 and 841(a)(1), respectively. For the charged offenses, each defendant faces a statutory mandatory minimum term of imprisonment of 20 years and a maximum of life, or the death penalty. The Attorney General has not yet made a determination as to whether to seek the death penalty.

      Each defendant presents an extreme danger to the community and a substantial risk of flight. For those reasons and the reasons set forth below, the government respectfully submits that the Court should enter permanent orders of detention for Jordan and Washington.

I.  Factual Background and the Instant Offense[1]

The instant indictment arises from an investigation of Mizell's murder conducted by the New York City Police Department ("NYPD"), the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), the Federal Bureau of Investigation ("FBI") and the United States Attorney's Office for the Eastern District of New York. Mizell was a member of the influential hip hop group Run-D.M.C. Mizell, Washington and Jordan are all from Hollis, Queens.

The investigation has revealed that, prior to his murder, Mizell sought to exclude Washington from a multi-kilogram, multi-state, narcotics transaction. In retaliation, Washington and Jordan conspired to murder, and ultimately executed, Mizell.

  A.  The Narcotics Conspiracy

In addition to his music career, in or about and between 1996 and 2002, Mizell was involved in transporting kilogram-quantities of cocaine for retail sale in the Eastern District of New York and elsewhere. In or about July 2002, Mizell acquired approximately ten kilograms of cocaine on consignment from a supplier in the Midwest. The cocaine was intended to be distributed in Maryland by Washington, Jordan and other co-conspirators. A dispute between Washington and one of the co-conspirators resulted in Mizell telling Washington that he would be cut out of the Maryland transaction. Following Washington's dispute with Mizell, Washington and Jordan conspired to murder Mizell.

  B.  The October 30, 2002 Murder of Mizell

On Wednesday, October 30, 2002, Mizell and several others were present at his recording studio, 24/7 Studio, located on Merrick Boulevard in Queens, New York. At approximately 7:30 p.m., Washington and Jordan, armed with firearms, entered the studio. Each brandished a firearm. Washington pointed his firearm at one of the individuals located inside the studio and demanded that the person lay on the floor. Jordan approached Mizell, pointed his firearm at him, and fired two shots at close range. One of those shots struck Mizell in the head, killing him. The second shot struck another individual in the leg.

---

[1] Detailed herein are a proffer of the relevant facts and a discussion of the applicable law pertaining to the pretrial detention of the defendants. See United States v. LaFontaine, 210 F.3d 125, 130-31 (2d Cir. 2000) (government entitled to proceed by proffer in detention hearings). This proffer of facts is not a complete statement of all facts and evidence of which the government is aware or that it will seek to introduce at a detention hearing or trial. Where the content of statements, documents or written communications are described herein, they are done so in pertinent part and in sum and substance, except where quoted or otherwise indicated.

II.     Prior Criminal Histories

      A.     Ronald Washington

Washington has a long and violent criminal history that spans four decades. Indeed, he has three violent felony convictions in New York State, two convictions in Maryland and a federal robbery conviction for a string of gunpoint robberies. Washington's criminal convictions are as follows:

- On February 1, 1982, Washington was convicted of Criminal Use of a Firearm in the First Degree, in violation of New York Penal Law ("N.Y.P.L") § 265.09, and was sentenced to 18-54 months in prison;

- On March 16, 1982, Washington was convicted of Attempted Robbery in the First Degree, in violation of N.Y.P.L. §§ 110/160.15, and was sentenced to 18-54 months in prison to run concurrent with his February 1, 1982 conviction;

- On October 13, 1983, Washington was convicted of Grand Larceny in the Third Degree, in violation of N.Y.P.L § 155.30, and was sentenced to 36 months in prison;

- On November 23, 1987, Washington was convicted of Assault in the First Degree, in violation of N.Y.P.L § 120.05(2), and was sentenced to 60-120 months in prison;

- On July 10, 1990, Washington was convicted in Baltimore, Maryland of Battery, and sentenced 18 months in prison;

- On December 6, 1993, Washington was convicted in Baltimore, Maryland of Possession of Heroin with Intent to Distribute, and sentenced to ten years in prison;

- On April 5, 2007, following a jury trial, Washington was convicted in the Eastern District of New York of Hobbs Act robbery conspiracy and six substantive counts of Hobbs Act robbery, see United States v. Washington, 05-CR-558 (NG). The convictions stem from a string of gunpoint robberies in New York City and Long Island. Washington was sentenced to 210 months in prison and is scheduled to be released in April 2021.

3

B.  Karl Jordan, Jr.

Although Jordan has no adult criminal record, he was arrested for Robbery in the Second Degree in 1999 and was adjudicated a juvenile delinquent. Most notably, in 2003, Jordan was arrested for Criminal Use of a Firearm in the First Degree in connection with a shooting. That case was dismissed when the complainant refused to cooperate with law enforcement.

Moreover, the investigation has revealed that Jordan has been involved in narcotics trafficking for decades. As charged in the indictment, on more than half-a-dozen occasions Jordan sold cocaine to an undercover federal agent. The sales that Jordan made to law enforcement were recorded using both audio and video recording devices.

III.  Legal Standard

A.  The Bail Reform Act

Under the Bail Reform Act, 18 U.S.C. § 3141 et seq., federal courts are empowered to order a defendant's detention pending trial upon a determination that the defendant is either a danger to the community or a risk of flight. See 18 U.S.C. § 3142(e) ("no condition or combination of conditions would reasonably assure the appearance of the person as required and the safety of any other person and the community"). A finding of risk of flight must be supported by a preponderance of the evidence. See United States v. Jackson, 823 F.2d 4, 5 (2d Cir. 1987); United States v. Chimurenga, 760 F.2d 400, 405 (2d Cir. 1985). Similarly, a defendant should be detained if the court finds that release on bail would pose a danger, 18 U.S.C. § 3142(e), though detention based on dangerousness must "be supported by clear and convincing evidence," 18 U.S.C. § 3142(f).

The Bail Reform Act lists four factors to be considered in the detention analysis, whether for risk of flight or dangerousness: (1) the nature and circumstances of the offense charged, (2) the weight of the evidence against the defendant, (3) the history and characteristics of the defendant and (4) the seriousness of the danger posed by the defendant's release. See 18 U.S.C. § 3142(g).

B.  Presumption Cases

Furthermore, in cases such as this one, a rebuttable presumption both of flight and dangerousness arises when there is probable cause to believe the defendant committed a drug offense carrying a maximum sentence of ten years or more, or a firearms offense under 18 U.S.C. § 924(c). 18 U.S.C. § 3142(e)(3)(A), (B); 18 U.S.C. § 924(j) (murder "in the course of a violation of subsection (c)"); 21 U.S.C. § 848(e)(1)(A) (conviction is punishable by "any term of imprisonment, which shall not be less than 20 years, and which may be up to life imprisonment, or may be sentenced to death."). Probable cause may be established by an indictment, such that there is no need for an independent judicial probable cause

4

determination. United States v. Contreras, 776 F.2d 51, 55 (2d Cir. 1985). The presumption requires the Court to initially assume there are "no conditions or combination of conditions that will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(3).

When a presumption of detention is applicable, the defendant bears the burden of rebutting that presumption by coming forward with evidence "that contradicts notions of flight risk or dangerousness." United States v. Mercedes, 254 F.3d 433, 436 (2d Cir. 2001). To be released, a defendant facing this presumption must come "forward with evidence that he does not pose a danger to the community or a risk of flight," though the government must ultimately persuade the court that detention is warranted. Mercedes, 254 F.3d at 436. Even if the defendant were to meet his burden of production, "the presumption favoring detention does not disappear entirely, but remains a factor to be considered among those weighed by the district court." Id. A bail package sufficient to overcome a presumption of flight may not be enough to overcome a presumption of dangerousness. United States v. Rodriguez, 950 F.2d 85, 89 (2d Cir. 1991).

C.  Dangerousness

The concept of "dangerousness" encompasses not only the effect of a defendant's release on the safety of identifiable individuals, such as victims and witnesses, but also "'the danger that the defendant might engage in criminal activity to the detriment of the community.'" United States v. Millan, 4 F.3d 1038, 1048 (2d Cir. 1993) (quoting legislative history); United States v. Leon, 766 F.2d 77, 81 (2d Cir. 1985). This includes "the harm to society caused by [the likelihood of continued] narcotics trafficking." United States v. Leon, 766 F.2d 77, 81 (2d Cir. 1985).

IV. Argument

The defendants cannot overcome the legal presumption in favor of detention. While there is a presumption in favor of detention, even absent that presumption, consideration of the applicable factors discussed below overwhelmingly warrant detention in this case. Washington's significant criminal history demonstrates that he presents an acute danger to potential witnesses in the instant case, a significant danger to the community at large and a substantial risk of flight if released on bond. Similarly, Jordan's propensity for criminal conduct and violence necessitates his detention. Accordingly, the Court should enter a permanent order of detention pending trial for each defendant.

First, the seriousness of the charged offense cannot be overstated: the defendants planned and carried out the brazen ambush and execution of a renowned musician and prominent member of the community in his own music studio. The inherent dangerousness of individuals who would perpetrate such an offense is self-evident. In such circumstances, the safety of the community has led the Second Circuit to repeatedly reject

5

elaborate bail packages for violent defendants, even ones that include "home detention and electronic monitoring," which try to "replicate a detention facility without the confidence of security such a facility instills." Millan, 4 F.3d at 1049. If the government "does not provide staff to monitor compliance extensively, protection of the community would be left largely to the word of [the defendant] that [he] will obey the conditions." Id., 4 F.3d at 1049 (citation and internal quotation marks omitted). See also United States v. Orena, 986 F.2d 628, 632 (2d Cir. 1993) ("electronic surveillance systems can be circumvented by the wonders of science and of sophisticated electronic technology"). In sum, the defendants present an acute danger to the community that no set of release conditions can mitigate.

    Second, there is a significant risk that both Washington and Jordan would seek to threaten or otherwise tamper with witnesses if released. The government is aware of three separate witnesses that Jordan endeavored to silence through threats and coercion, and has also enlisted others to do so on his behalf. Similarly, subsequent to killing Mizell and before being arrested and detained in the aforementioned 2007 Hobbs Act robbery case, another witness reported to law enforcement that Washington made efforts to intimidate the witness and prevent him/her from cooperating with law enforcement. This "serious risk that the [defendants] will ... attempt to obstruct justice, or ... to threaten, injure, or intimidate, a prospective witness or juror" provides an additional basis for detention. 18 U.S.C. § 3142(f)(2)(B); see United States v. Friedman, 837 F.2d 48 (2d Cir. 1988).

    Third, the history and characteristics of the defendants also require detention. With respect to Washington, his extensive criminal history demonstrates that he is both a danger to the community and a flight risk. As set forth above, Washington has five felony convictions, including four violent convictions and one narcotics conviction. Moreover, Washington's prior conduct while under court supervision further warrants detention. Washington has repeatedly violated the conditions of both New York State Probation and Parole, thereby demonstrating that he would ignore this Court's orders regarding possible conditions of release. His criminal history and conduct while under court supervision makes clear that he would be likely to continue to commit crimes while on bail and/or flee the jurisdiction if given the opportunity.

    Likewise, with respect to Jordan, the charged offenses were not aberrational. Although Jordan has no adult criminal convictions, he has a juvenile adjudication for robbery in 1999 and had a firearms possession case dismissed after the complainant refused to cooperate with law enforcement. Further, the fact that Jordan successfully evaded responsibility for that shooting and the instant murder undoubtedly emboldened him to commit additional crimes, including the narcotics offenses charged in the indictment. Indeed, while both Washington and Jordan are equally culpable for planning and carrying out Mizell's murder, the fact that Jordan pulled the trigger evinces such brazen criminality that even the most restrictive bail conditions would be insufficient.

Fourth, the weight of the evidence against the defendants, which is substantial, demands detention. Specifically, eyewitnesses present at the studio when the defendants murdered Mizell have identified both defendants. Moreover, Washington has made various admissions – both to law enforcement and third parties – that corroborate his involvement in both the murder and the underlying narcotics conspiracy. As described above, efforts by both Jordan and Washington to intimidate witnesses and otherwise obstruct justice provide consciousness of guilt evidence that inculpates both defendants. Thus, the strength of the case against both defendants warrant detention, as any bail would allow the defendants to flee or obstruct justice rather than answer for their participation in Mizell's murder. Furthermore, on more than six occasions, Jordan sold cocaine to a federal agent acting in an undercover capacity. Those narcotics sales were captured using both audio and video recording equipment.

Finally, if convicted, the defendants face significant sentencing exposure, including the possibility of the death penalty. Even if the Attorney General does not direct the Office to seek the death penalty, Washington and Jordan each face a statutory mandatory minimum term of imprisonment of 20 years. The defendants' sentencing exposure weighs in favor of detention, as it provides motive and incentive to flee the jurisdiction. See, e.g., United States v. English, 629 F.3d 311, 321-22 (2d Cir. 2011) (affirming detention in part because the defendant faced a presumption against release, and a mandatory minimum sentence that incentivized fleeing); United States v. Henderson, 57 F. App'x 470, 471 (2d Cir. 2003) (citing 18 U.S.C. § 3142(a) and holding that, "[i]n this case, the presumption regarding flight risk has changed because [the defendant] now faces a ten-year mandatory minimum sentence"); United States v. Dodge, 846 F. Supp. 181, 184-85 (D. Conn. 1994) (possibility of a "severe sentence" heightens the risk of flight).

V.        Conclusion

           For the foregoing reasons, the defendants should be detained pending trial. The government respectfully submits that no condition or combination of conditions will reasonably assure the safety of the community, the defendants' return to court, or their compliance with the Court's orders. The Court should therefore enter permanent orders of detention pending trial.

                                              Respectfully submitted,

                                              SETH D. DUCHARME
                                              Acting United States Attorney

                          By:          /s/
                                              Artie McConnell
                                              Mark E. Misorek
                                              Assistant U.S. Attorneys
                                              (718) 254-7000

cc:      Clerk of Court (by ECF)
          Counsel for Defendant (by Email)