

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

CCC:JAM/MEM
F. #2017R00509

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

February 22, 2022

<u>By ECF</u>

The Honorable LaShann DeArcy Hall
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

        Re:    United States v. Karl Jordan, Jr., also known as "Little D" and "Noid,"
                   Criminal Docket No. 20-CR-305 (LDH) (S-1)

Dear Judge DeArcy Hall:

        The government respectfully submits this letter in opposition to defendant Karl Jordan, Jr.'s motion for release on bond, ECF Docket No. 73 ("defendant's motion" or "Def. Mot."). Several of the charged crimes carry a statutory presumption of detention that Jordan cannot rebut – he is a danger to the community and a flight risk that no bail conditions can cure. Accordingly, for the reasons set forth below, the government respectfully submits that the Court deny the defendant's motion and continue the permanent order of detention.[1]

    I.    <u>Procedural History</u>

        On August 13, 2020, a grand jury in the Eastern District of New York returned an indictment charging Jordan and Ronald Washington with one count of murder while engaged in narcotics trafficking, in violation of Title 21, United States Code, Section 848(e)(1)(A), and one count of firearm-related murder, in violation of Title 18, United States

---

    [1]    Detailed herein are a proffer of the relevant facts and a discussion of the applicable law pertaining to the pretrial detention of the defendant. <u>See</u> <u>United States v. LaFontaine</u>, 210 F.3d 125, 130-31 (2d Cir. 2000) (government entitled to proceed by proffer in detention hearings). This proffer of facts is not a complete statement of all facts and evidence of which the government is aware or that it will seek to introduce at a detention hearing or trial. Where the content of statements, documents or written communications are described herein, they are done so in pertinent part and in sum and substance, except where quoted or otherwise indicated.

Code, Sections 924(j)(1), for the October 30, 2002 murder of Jason Mizell, also known as "Jam Master Jay." Jordan was also charged with one count of conspiracy to distribute cocaine and seven counts of cocaine distribution, in violation of Title 21, United States Code, Sections 846 and 841(a)(1), respectively. On August 17, 2020, both Jordan and Washington were arraigned. The Pre-Trial Services Report noted that there were "no combination of conditions to reasonably assure [Jordan's] future court appearance and the safety of the community." On the government's motion, permanent orders of detention were issued for both defendants.

On March 4, 2021, the grand jury returned a superseding indictment, which charged Jordan with additional crimes, including one count of conspiracy to distribute 280 grams or more of cocaine base, in violation of Title 21, United States Code, Sections 846, 841(b)(1)(A)(iii) and 841(b)(1)(C), and one count of use of firearms in connection with a drug trafficking crime, in violation of Title 18, United States Code, Sections 924(c)(1)(A)(i).

For the charged offenses relating to Mizell's killing, Jordan faces a statutory mandatory minimum term of imprisonment of 20 years and a maximum of life.[2] Additionally, both the 21 U.S.C. §§ 846, 841(b)(1)(A)(iii) and 841(b)(1)(C) and the 18 U.S.C. 924(c) charges carry ten and five-year mandatory minimum sentences, respectively, which must run consecutively. The combined statutory mandatory minimum is 25 years.

II.   Factual Background and Offense Conduct

The instant indictment arises from an investigation of Mizell's murder conducted by the New York City Police Department ("NYPD"), the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), and the United States Attorney's Office for the Eastern District of New York. Mizell was a member of the influential hip hop group Run-D.M.C. Mizell, Washington and Jordan are all from Hollis, Queens.

The investigation has revealed that, prior to his murder, Mizell sought to exclude Washington from a multi-kilogram narcotics transaction. In retaliation, Washington and Jordan conspired to murder and ultimately executed Mizell.

A.   The Narcotics Conspiracy

In addition to his music career, in or about and between 1996 and 2002, Mizell was involved in transporting kilogram-quantities of cocaine for retail sale in the Eastern District of New York and elsewhere. In or about July 2002, Mizell acquired approximately ten kilograms of cocaine on consignment from a supplier in the Midwest. The cocaine was intended for distribution in Maryland by Washington, Jordan and other co-conspirators. A dispute between Washington and one of the co-conspirators resulted in Mizell telling

---

[2]   On or about November 6, 2021, that United States Attorney General Merrick B. Garland has authorized and directed the United States Attorney's Office for the Eastern District of New York not to seek the death penalty against either defendant.

Washington that he would be cut out of the Maryland transaction. Following Washington's dispute with Mizell, Washington and Jordan conspired to murder Mizell.

      B.      The October 30, 2002 Murder of Mizell

On Wednesday, October 30, 2002, Mizell and several others were present at his recording studio, 24/7 Studio, located on Merrick Boulevard in Queens, New York. At approximately 7:30 p.m., Washington and Jordan, armed with firearms, entered the studio. Each brandished a firearm. Washington pointed his firearm at one of the individuals located inside the studio and demanded that the person lay on the floor. Jordan approached Mizell, pointed his firearm at him, and fired two shots at close range. One of those shots struck Mizell in the head, killing him. The second shot struck another individual in the leg.

      C.      Jordan's Continued Narcotics Trafficking and Firearm Usage

Subsequent to Mizell's murder, Jordan's involvement in the narcotics trade and firearms offenses continued unabated until his arrest in 2020. Jordan would typically sell cocaine and cocaine base to a variety of different buyers on a weekly basis. He would often be in possession of a firearm while doing so – one witness described the type and color of a firearm that Jordan kept in either the driver's side door pocket or the center console of his vehicle while engaging in narcotics transactions. Another witness described how one of Jordan's young children would be in the car when he would deliver narcotics.

In and around 2017, Jordan made seven separate narcotics sales to an undercover law enforcement agent. These transactions were recorded using both audio and video recording devices. A still frame from one of those sales is below:



3

Subsequent to his arrest in August 2020, law enforcement executed a search warrant on mobile phones seized from Jordan, which yielded the following evidence of narcotics trafficking and firearms use:

- Numerous photographs and videos of Jordan holding stacks of hundred-dollar bills and other denominations of money;

- Photographs and videos of Jordan wearing and examining diamond encrusted jewelry. In one such video, Jordan is rapping that he has "100 pounds on the flip" – a reference to reselling or "flipping" a quantity of narcotics, and "30 in the clip" – a reference to the amount of ammunition in a semi-automatic firearm.

- Music video clips where Jordan references his possession and use of firearms. For example, in one video he raps about "carrying magnums all the time, not just when I get some ass." In another, Jordan raps that "boy I a savage, bullets in my gun gonna keep n-ggas off me…I had them shooters delivered to your crib like the Amazon Prime…I'm from Hollis where I learned from my past so I move around Queens with a gun and a mask."

III.   Criminal History

Although Jordan has no adult criminal record, he was arrested for Robbery in the Second Degree in 1999 and was adjudicated a juvenile delinquent. Despite his lack of record, the government is aware of several incidents where Jordan has used or been in possession of firearms, as described below:

- On February 3, 2003, Jordan was arguing with an individual on 203rd Street in Queens. Jordan produced a semi-automatic pistol and fired one shot in into the air. Responding police officers recovered the spent shell casing and an additional 83 live rounds. Though Jordan was initially charged with a felony firearm offense, the eyewitness refused to cooperate and testify, and the grand jury only indicted Jordan for possession of ammunition, a misdemeanor. Jordan eventually pled guilty to a disorderly conduct violation.

- On May 14, 2003, Jordan fired several shots at an individual on Hollis Avenue in Queens, striking him once in the leg. Jordan was arrested for Criminal Use of a Firearm in the First Degree, but the case was subsequently dismissed when the victim refused to cooperate with law enforcement.

- On November 1, 2004, Jordan was involved in a shootout with another individual on Farmers Boulevard in Queens. Rounds from the exchange went through windows and walls of the surrounding houses, cars and a nearby church. Over 27 pieces of ballistic evidence – including shell casings

and spent projectiles – were recovered by responding officers. The defendant fled the scene in a gold BMW and was later arrested. The case was ultimately dismissed.

- On December 15, 2004, a search warrant was executed at Jordan's residence on 203rd Street in Queens, predicated on Jordan's narcotics sales. During the search, law enforcement recovered a loaded 9mm semi-automatic pistol, a loaded 9mm magazine, a loaded .32 caliber revolver, and a bullet proof vest. Also in the residence were over 150 bags of marijuana, various bags and foil wraps containing cocaine, and hundreds of glassine envelopes used for packaging narcotics. Jordan and six other individuals were inside at the time and arrested. The defendant eventually pled guilty to a disorderly conduct violation. Notably, one of the defendant's alibi witnesses was living with Jordan at the time, was present during the search warrant execution and also arrested.

Prior to his arrest, Jordan also performed rap music under the stage name "Yadi" or "Young Yadi" as part of a group called "Rich Fly Gees." Content from Jordan and "Rich Fly Gees" is publicly available on various internet and social media sites, where Jordan brags about his narcotics dealing and use of firearms. For example:

- In one of Jordan's music videos, titled "Aim for the Head," a series of photographs are shown as Jordan raps in the background. The images include firearms (including semi-automatic pistols and assault weapons, some equipped with what appear to be silencers); pictures of Jordan and the "Rich Fly Gees" logo; individuals pointing guns; and dead bodies with apparent gunshot wounds to the head. In the song, Jordan repeatedly says "we aim for the head, no body shots, and we stick around just to see the body drop." The first verse begins with Jordan saying, "I aim for the head, I ain't a body shooter" and that "the whole team grips [carries firearms]…everybody shoots." The song continues with Jordan describing various acts of violence with firearms, including "put the metal in your mouth like a doctor would, and pull the trigger."

- In one interview, Jordan states, "the motto for 2010 is aim for the head, no body shots…that don't count…ya'll n-ggas that shoot n-ggas in the legs, the stomach and all that, we ain't respecting that…we ARs [AR-15 assault rifles] out the window, that's the new move."

- In another video, the song begins "from the scales to the pots, from the pots then I'm pitching, for that money n-gga, I be on a motherfucking mission," which refers to weighing cocaine ("the scales"), cooking the cocaine into crack cocaine ("the pots") and then selling retail quantities ("I'm pitching"). The song continues with Jordan discussing how he prepares and "slings crack;" handles kilogram quantities ("keys…that's coke talk"). The last image in the video is a

5

sign that says "I'm not a rapper. I'm just a hustler." Images of stacks of money and kilogram quantities of cocaine are frequently depicted.

- Another song, titled "Silver Spoon," features Jordan rapping in front of a mural commemorating Mizell. The chorus of the song is Jordan saying "I wasn't born with no silver spoon…I had to grind, grind and get it out the pot…and get it off the block…get it off the rock, my family won't eat if this phone don't pop...so its 24/7 cause this phone don't stop." In the next verse, Jordan says he "hustles hard," "like the mob," a "dealer serving hands like they cards" and brags how his "whole life" he "never had a job…I do construction, cause I be breaking down bricks."

Notably, in a publicly available interview where Jordan discusses his music, he says "I can speak on real life experiences, and I can make em make sense. I'm not just, like, you know, a drug-dealer rapper or a gangster killer rapper, I rap about reality. So that's what you hear coming through my music, what I'm going through, or what I've been through before."

The defendant's criminal conduct has even continued after his arrest and detention at the Metropolitan Detention Center ("MDC") – on or about August 16, 2021, the defendant was found in possession of a contraband cellular phone while in his cell.

IV. Legal Standard

A. The Bail Reform Act

Under the Bail Reform Act, 18 U.S.C. § 3141 et seq., federal courts are empowered to order a defendant's detention pending trial upon a determination that the defendant is either a danger to the community or a risk of flight. See 18 U.S.C. § 3142(e) ("no condition or combination of conditions would reasonably assure the appearance of the person as required and the safety of any other person and the community"). A finding of risk of flight must be supported by a preponderance of the evidence. See United States v. Jackson, 823 F.2d 4, 5 (2d Cir. 1987); United States v. Chimurenga, 760 F.2d 400, 405 (2d Cir. 1985). Similarly, a defendant should be detained if the court finds that release on bail would pose a danger, 18 U.S.C. § 3142(e), though detention based on dangerousness must "be supported by clear and convincing evidence," 18 U.S.C. § 3142(f).

The Bail Reform Act lists four factors to be considered in the detention analysis, whether for risk of flight or dangerousness: (1) the nature and circumstances of the offense charged, (2) the weight of the evidence against the defendant, (3) the history and characteristics of the defendant and (4) the seriousness of the danger posed by the defendant's release. See 18 U.S.C. § 3142(g).

B.  Presumption Cases

In cases such as this one, a rebuttable presumption both of flight and dangerousness arises when there is probable cause to believe the defendant committed a drug offense carrying a maximum sentence of ten years or more; a firearms offense under 18 U.S.C. § 924(c); or a violation of the controlled substances act for which the maximum penalty is life imprisonment or death. 18 U.S.C. § 3142(e)(3)(A), (B); 18 U.S.C. § 924(j) (murder "in the course of a violation of subsection (c)"); 21 U.S.C. § 848(e)(1)(A) (conviction is punishable by "any term of imprisonment, which shall not be less than 20 years, and which may be up to life imprisonment, or may be sentenced to death."). Here, the defendant is charged with four such offenses. The presumption requires the Court to initially assume there are "no conditions or combination of conditions that will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(3).

When a presumption of detention is applicable, the defendant bears the burden of rebutting that presumption by coming forward with evidence "that contradicts notions of flight risk or dangerousness." United States v. Mercedes, 254 F.3d 433, 436 (2d Cir. 2001). To be released, a defendant facing this presumption must come "forward with evidence that he does not pose a danger to the community or a risk of flight," though the government must ultimately persuade the court that detention is warranted. Mercedes, 254 F.3d at 436. Even if the defendant were to meet his burden of production, "the presumption favoring detention does not disappear entirely, but remains a factor to be considered among those weighed by the district court." Id. A bail package sufficient to overcome a presumption of flight may not be enough to overcome a presumption of dangerousness. United States v. Rodriguez, 950 F.2d 85, 89 (2d Cir. 1991).

C.  Dangerousness

The concept of "dangerousness" encompasses not only the effect of a defendant's release on the safety of identifiable individuals, such as victims and witnesses, but also "'the danger that the defendant might engage in criminal activity to the detriment of the community.'" United States v. Millan, 4 F.3d 1038, 1048 (2d Cir. 1993) (quoting legislative history); United States v. Leon, 766 F.2d 77, 81 (2d Cir. 1985). This includes "the harm to society caused by [the likelihood of continued] narcotics trafficking." United States v. Leon, 766 F.2d 77, 81 (2d Cir. 1985). Indeed, because detention pending trial is considered "regulatory rather than punitive," the decision to detain a defendant pending trial "does not require proof of a threat beyond a reasonable doubt, is not subject to Sixth Amendment jury guarantees, and does not provide for the defendant's right to confront and cross-examine witnesses." United States v. Choudhry, 941 F.Supp.2d 347, 350 (E.D.N.Y. 2013) (Kuntz, J.) (citing United States v. Gallo, 653 F.Supp. 320, 334 (E.D.N.Y. 1986) (Weinstein, J.)).

V.  Argument

The defendant is charged with four separate crimes that each, standing alone, carry a presumption of detention and justify remand. Nothing in the defendant's motion

7

sufficiently rebuts this presumption: he provides no medical records, no verifiable employment history, few specifics of how "home detention" would be implemented and enforced, and no information on the identity of the suretors.[3]

Even absent any presumption, consideration of the applicable factors overwhelmingly warrant detention in this case. Jordan's history and characteristics demonstrate that he has a propensity for criminal conduct and violence, presents a danger to potential witnesses in the instant case and to the community at large, and is a substantial flight risk. See, e.g., United States v. Ferranti, 66 F.3d 540 (2d Cir. 1995). Accordingly, the Court should deny the defendant's motion and continue the permanent order of detention pending trial.

    A.    The Nature and Circumstances of the Charged Offenses Support Detention

The seriousness of the charged offense cannot be overstated: the defendant participated in the ambush and execution of a renowned musician and prominent member of the Queens community in his own music studio. The inherent dangerousness of individuals who would perpetrate such an offense is self-evident. In such circumstances, the Second Circuit has repeatedly rejected elaborate bail packages for violent defendants, even ones that include "home detention and electronic monitoring," which try to "replicate a detention facility without the confidence of security such a facility instills." Millan, 4 F.3d at 1049. If the government "does not provide staff to monitor compliance extensively, protection of the community would be left largely to the word of [the defendant] that [he] will obey the conditions." Id., 4 F.3d at 1049 (citation and internal quotation marks omitted). See also United States v. Orena, 986 F.2d 628, 632 (2d Cir. 1993) ("electronic surveillance systems can be circumvented by the wonders of science and of sophisticated electronic technology"). Indeed, even the confines of the MDC are insufficient to prevent Jordan from committing crimes – his possession of a contraband cell phone in the facility is separate and distinct federal offense. See 18 U.S.C. § 1791. In sum, the defendant presents an acute danger to the community that no set of bail conditions can mitigate.

Beyond this, there is a significant risk that Jordan would seek to threaten or otherwise tamper with witnesses if released. The government is aware of four separate witnesses that Jordan endeavored to identify and silence through threats and coercion and has enlisted others to do so on his behalf. Indeed, the government is aware of one of the defendant's suretors reaching out to and attempting to influence potential witnesses in the case. This "serious risk that the [defendant] will…attempt to obstruct justice, or…to threaten, injure, or intimidate, a prospective witness or juror" provides an additional basis for detention. 18

---

[3] Notably, the proposed $1,000,000 bond – signed by sixteen "financially responsible people" – is only securitized by $20,000 in cash. Def. Mot., p. 5-6. While "Mr. Jordan's father and maternal grandmother" may be willing to "post their properties as collateral," they have not done so, and there is no information about the ownership or represented value of the properties. Id.

U.S.C. § 3142(f)(2)(B); see United States v. Friedman, 837 F.2d 48 (2d Cir. 1988) and United States v. Jones, 566 F.Supp.2d 288, 292 (S.D.N.Y. 2008) (noting that "the release of [the defendant] on bail, thereby allowing him to return to the community where the victim's murder took place, would create a danger for all witnesses, irrespective of whether they have cooperated with the Government."). The fact that Jordan has been in possession of an untraceable and unmonitored contraband cell phone while incarcerated only exacerbates this risk.

Additionally, "when the sentence…upon conviction is likely to be long…a defendant has stronger motives to flee." United States v. Bruno, 89 F. Supp. 3d 425, 431 (E.D.N.Y. 2015). Here, both the 21 U.S.C. §§ 846, 841(b)(1)(A)(iii) and 841(b)(1)(C) and the 18 U.S.C. 924(c) charges – standing alone – carry ten and five-year mandatory minimum sentences, which must run consecutively, and conviction on either count related to Mizell's homicide would require a mandatory minimum sentence of ten or twenty years, respectively. Such significant sentencing exposure weighs in favor of detention, as it provides motive and incentive to flee the jurisdiction. See, e.g., United States v. English, 629 F.3d 311, 321-22 (2d Cir. 2011) (affirming detention in part because the defendant faced a presumption against release, and a mandatory minimum sentence that incentivized fleeing); United States v. Henderson, 57 F. App'x 470, 471 (2d Cir. 2003) (citing 18 U.S.C. § 3142(a) and holding that, "[i]n this case, the presumption regarding flight risk has changed because [the defendant] now faces a ten-year mandatory minimum sentence"); United States v. Dodge, 846 F. Supp. 181, 184-85 (D. Conn. 1994) (possibility of a "severe sentence" heightens the risk of flight); United States v. Benatar, No. 02-CR-99, 2002 WL 31410262, at *3 (E.D.N.Y. Oct. 10, 2002) ("[H]ome detention with electronic monitoring does not prevent flight; at best, it limits a fleeing defendant's head start.").

B. The Defendant's History and Characteristics Warrant Detention

While Jordan has no adult criminal record, the conduct he is charged with is not aberrational. As noted above, Jordan has been involved in narcotics trafficking for decades. He has carried, brandished and used firearms on numerous documented occasions, something he brags about and glorifies in his music. The fact that witnesses and complainants have refused to cooperate with law enforcement in prior cases has undoubtedly emboldened him to commit other crimes and acts of violence. See United States v. Choudhry, 941 F.Supp.2d 347, 349-50 (E.D.N.Y. 2013) (citing United States v. Rodriguez, 950 F.2d 85, 88 (2d Cir. 1991) and noting "the Court may consider uncharged conduct in assessing the degree of danger posed by a defendant's release" and rejecting that "violent conduct…be connected to the activity charged in the indictment"). In sum, Jordan's charged and uncharged conduct evinces such brazen criminality that even the most restrictive bail conditions would be insufficient.

C. The Weight of the Evidence is Considerable

Jordan cites his potential alibi witnesses, a "DNA hit identifying another suspect," and the government's disclosures pursuant to Brady v. Maryland, 373 U.S. 83 (1963),

9

as undercutting the strength of the government's case. This is wholly inaccurate and irrelevant for bail purposes.

First, the mere existence of alibi witnesses cannot justify release on bail, and the government does not credit their proffered testimony. United States v. Jones, 566 F.Supp.2d 288, 293-4 (S.D.N.Y. 2008) (noting that alibi witnesses who testified at a detention hearing had "significant credibility issues" where one witness was a "friend" of the defendant since childhood and the other was "in a relationship" with the defendant and had a prior contact with the criminal justice system.). Here, both witnesses have close familial and financial ties to Jordan. They both also have denied any knowledge of Jordan's narcotics trafficking and claim to be unaware of whether he had a job or how he makes a living. As noted previously, one of the alibi witnesses was living with and arrested with Jordan during the aforementioned December 15, 2004 search warrant execution, where multiple firearms, various quantities of narcotics and drug paraphernalia were recovered. In short, the government does not credit their likely testimony about Jordan's whereabouts.

Second, the fact that a hat recovered from Mizell's recording studio – a place where numerous people, including the defendant, would often congregate – contained a mixture of several other individuals' DNA is not significant or exculpatory. Regardless, it is settled law the indictment "conclusively determines the existence of probable cause" and "a grand jury indictment cannot be undermined by an independent judicial determination…in the context of a detention hearing." United States v. Contreras, 776 F.2d 51, 55 (2d Cir. 1985) (quoting Gerstein v. Pugh, 420 U.S. 103, 117 n. 19 (1975); see also, e.g., United States v. Johnson, 547 Fed.Appx 64, 65 (2d Cir. 2013) (rejecting defendant's argument that the rebuttable presumption provided in § 3142 should not apply because "there is insufficient evidence of his guilt" as "unavailing since an indictment returned by a duly constituted grand jury" conclusively establishes the existence of probable cause.") (internal quotations omitted); see also, United States v. Jones, 566 F.Supp.2d 288, 292 (S.D.N.Y. 2008) (noting that the "weight factor" may be considered "only in terms of the likelihood that the person will fail to appear or pose a danger to any person or the community" and noting that courts generally consider the weight factor the "least important" bail factor). Indeed, the evidence adduced at trial will be substantial, including eyewitness and co-conspirator testimony establishing Jordan's relationship with Washington, his involvement in the underlying narcotics conspiracy, and his role as Mizell's shooter. While Jordan claims that there is little evidence linking him to Mizell's murder, he ignores the fact that a grand jury has heard evidence – twice – and voted an indictment charging him with these crimes. See Contreras, 776 F.2d 51, 55 (2d Cir. 1985) (probable cause and sufficiency of evidence may be established by an indictment, such that there is no need for an independent judicial probable cause determination for bail purposes).

Notably, Jordan does not argue – or even mention – the other charges against him, where the proof is unassailable. As stated previously, the government's narcotics trafficking case is underpinned by seven separate narcotics sales to an undercover law enforcement agent that were both audio and video recorded. See, e.g., United States v. Fishenko, No. 12-CR-626, 2013 WL 3934174, at *2 (evidence of "pertinent recorded

10

conversations" weighed against release). This evidence will be supplemented by witness testimony and other evidence, showing the scope of Jordan's narcotics and firearm-related criminality.

While the Court need not reach any conclusions about the merits of the government's case, the defendant's arguments regarding the likely evidence against him are unavailing and do not support his motion for release.

> D. The COVID-19 Pandemic Does Not Provide a "Compelling Reason" for Release in These Circumstances

In the alternative, the defendant argues that the ongoing COVID-19 pandemic provides a "compelling reason" for his release pursuant to 18 U.S.C. § 3142(i). Specifically, Jordan claims that he is at heightened risk should he contract the virus, and that conditions at the MDC impede his ability to prepare for trial. Neither of these arguments has merit.

First, aside from claiming that he is at "elevated risk of complications from COVID-19 as a result of donating one of his kidneys," Def. Mot., p. 2, Jordan has provided no medical records or other documentation for the Court's consideration. By all accounts, Jordan is a healthy 39-year-old man who is neither in an at-risk category or suffering from any comorbidities.[4] Significantly, Jordan remains unvaccinated, despite widespread availability of the vaccine within MDC for over a year.

Second, while pandemic restrictions at MDC invariably complicate every defendant's ability to prepare for trial, the overwhelming majority of courts in this Circuit have refused to release defendants under Section 3142(i) in the absence of an imminent hearing or trial. See e.g., United States v. Estevez, 18-CR-669-1 (JPO), 2020 WL 1911207, at *2 (S.D.N.Y. Apr. 20, 2020); United States v. Vizcaino, 20-CR-241 (RMB), 2020 WL 1862631, at *3 (S.D.N.Y. Apr. 14, 2020); United States v. Liverman, 19-CR-761-13 (JPO), 2020 WL 1847864, at *2 (S.D.N.Y. Apr. 13, 2020) (denying bail application and finding that "[d]efendant is not likely to be prejudiced by the lack of in-person access to counsel in the near future."); United States v. Eley, 20–CR-78-3 (AT), 2020 WL 1689773, at *1 (S.D.N.Y. Apr. 7, 2020) (denying temporary release under § 3142(i) and stating "with trial scheduled for nine

---

[4] In United States v. Hamilton, No. 19-Cr-54, 2020 WL 1323036 (E.D.N.Y. 2020), Judge Garaufis was confronted with facts similar to those of the instant case. The defendant in Hamilton was indicted for murder while engaged in narcotics trafficking under 21 U.S.C. § 848(e)(1)(A) – one of the offenses Jordan is charged with – for a killing that had occurred approximately 30 years ago. The defendant had minimal contact with the criminal justice system since that time. Id at *1-2. Noting the "rebuttable presumption that [the defendant] poses both a danger to the community and a flight risk," Judge Garaufis denied the defendant's motion for release based on 18 U.S.C. 3142(i)(4), stating that "this provision has been used sparingly to permit a defendant's release where, for example, he is suffering from a terminal illness or serious injuries." Id at *2.

months from now, this case is distinguishable from other instances in which an imminent evidentiary hearing may support a defendant's temporary release"); United States v. Brown, 19–CR-792 (LTS) (S.D.N.Y. Apr. 6, 2020) (denying defendant's application for temporary release because, among other things, the defendant had not identified any specific difficulty in preparing his defense or any imminent need to do so); United States v. Chambers, 20-CR-135 (JMF), 2020 WL 1530746, at *1 (S.D.N.Y. Mar. 31, 2020) (rejecting defendant's argument that temporary release under § 3142(i) was necessary for the preparation of his defense when non-evidentiary initial pretrial conference was still a month away); United States v. Mercado, No. 19-CR-906 (JMF), 2020 WL 2765879, at *1 (S.D.N.Y. May 28, 2020) (finding temporary release unnecessary for the preparation of defense when the "trial [was] unlikely to occur for many months"); United States v. Peralta, No. 19-CR-818 (PGG), 2020 WL 2527355, at *4 (S.D.N.Y. May 18, 2020) (denying release when trial was not imminent, even though defendant spoke with counsel on the phone only once in nearly three months); United States v. Jimenez, No. 20- CR-122 (LTS), 2020 WL 1974220, at *3 (S.D.N.Y. Apr. 24, 2020) (denying release because, inter alia, trial was not imminent). Here, the Court has advised the parties that it is unavailable to conduct hearings or trial in the case prior to September 2022, and the trial schedule remains in flux.[5]

Thus, while there is no doubt that COVID-19 remains a grave public health concern, the defendant has not credibly alleged any heightened risk factors that would expose him to more serious consequences were he to become infected. Nor do the COVID-19 protocols at the MDC justify release, particularly due to the uncertainty of the trial date and Jordan's manifest risk of flight and danger to the community. See, e.g., United States v. Rico, 18 CR. 661 (PGG, 2020 WL 1934989, at *6 (S.D.N.Y. Apr. 21, 2020) (suspension of legal visits does not constitute "compelling reason" under Section 3142(i) for [defendant's] release on bail" given his risk of flight and danger to community).

---

[5] The government notes that conditions at MDC have recently improved. The defendant's unit is not in quarantine and the MDC is now open for in-person legal visitation. To the extent necessary, the government can facilitate in-person meetings between the defendant and his legal team at either the Courthouse or the U.S. Attorney's Office, or to consider other methods to ensure sufficient time to review discovery materials, both individually and with counsel present.

VI.   Conclusion

The defendant's motion should be denied in its entirety. The defendant is charged with multiple offenses that carry a presumption of detention, and the defendant's motion and proffered bail package is insufficient to rebut this presumption. Regardless, there is clear and convincing evidence that the defendant poses a danger to the community if released, and a preponderance of the evidence shows that he is a flight risk. No single condition or combination of conditions can adequately remediate these risks. Finally, the COVID-19 pandemic does not provide a "compelling reason" for release under the present circumstances.

Respectfully submitted,

BREON PEACE
United States Attorney

By:   _____/s/_____
Artie McConnell
Mark E. Misorek
Assistant U.S. Attorneys
(718) 254-7000

cc:   All Counsel of Record (by ECF)