UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

-against-

KARL JORDAN, JR., and
RONALD WASHINGTON,

Defendants.

20 Cr. 305 (LDH)

# RONALD WASHINGTON'S MOTION TO DISMISS: MEMORANDUM OF LAW

Susan G. Kellman
Ezra Spilke
Jacqueline Elaine Cistaro

*Counsel for Ronald Washington*

- i -

**TABLE OF CONTENTS**

**BACKGROUND** ................................................................................................................. 1

**DISCUSSION** .................................................................................................................... 2

**THE INDICTMENT SHOULD BE DISMISSED BECAUSE THE UNJUSTIFIED AND PREJUDICIAL 18-YEAR DELAY IN INITIATING A FEDERAL PROSECUTION FOR THE 2002 MURDER OF JASON MIZELL VIOLATES THE DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT** ........................................................................ 2

    A.   The Memories of Key Witnesses Have Deteriorated and Have Been Contaminated over the Course of the Last Twenty Years .................................................................................. 3

    B.   By Waiting Eighteen Years to Charge Mr. Washington, The Government Recklessly Disregarded the Prejudicial Impact the Delay Would Have on His Ability to Defend Against the Charges .............................................................................................................. 9

## TABLE OF AUTHORITIES

Cases

*Schurman v. Leonardo*, 768 F.Supp. 993 (S.D.N.Y. 1991) ...........................................................2
*State v. Henderson*, 27 A.3d 872 (N.J. 2011).................................................................................7
*United States v. Corona-Verbera*, 509 F.3d 1105 (9th Cir. 2007) .................................................3
*United States v. Lovasco*, 431 U.S. 783 (1977).................................................................. 2, 3, 10
*United States v. Marion*, 404 U.S. 307 (1971) ...............................................................................2
*United States v. Nolan*, 956 F.3d 71 (2d Cir. 2020) .......................................................................7
*United States v. Santiago*, 987 F. Supp. 2d 465 (S.D.N.Y. 2013)...............................2, 3, 4, 10, 11
*United States v. Valentin*, No. 3:14-CR-55 (VLB), 2016 WL 1296903 (D. Conn. Mar. 30, 2016) 3

Other Authorities

Nat'l Research Council, *Identifying the Culprit: Assessing Eyewitness Identification* (2014)...7, 8
The Innocence Project, *DNA Exonerations in the United States*, https://innocenceproject.org/dna-exonerations-in-the-united-states/ ................................................................................................8

**BACKGROUND**

On the evening of October 30, 2002, Jason Mizell was murdered in his recording studio on Merrick Boulevard in Queens, New York. Mizell was shot at close range in the head and died from the injury. Another man sitting next to Mizell was shot in the leg and survived. The murder was highly publicized and an intensive homicide investigation began immediately. However, the murder had gone unsolved for nearly two decades. During that time, theories about the shooting have abounded. The NYPD kept a "tips log" that ran thirty-four handwritten pages.

Mr. Washington first became a subject in the NYPD's investigation into Mizell's murder in or about March 10, 2003. (RW 000018).[1] More than three years later, in June 2006, the United States Attorney's Office for the Eastern District of New York questioned Mr. Washington about the murder. (RW 000021).

Nearly a year later, in April 2007, Mr. Washington was convicted in this district by a jury of seven counts of Hobbs Act robbery. At sentencing, the government argued for an upward departure based on Mr. Washington's alleged participation in Mizell's murder. The government stated that it could prove Mr. Washington's guilt "above and beyond a preponderance." Hearing the government's proffer, the Honorable Nina Gershon, who presided over the trial and sentencing, denied the motion.

Another twelve years passed. Then, on August 13, 2020, a grand jury sitting in this district returned the present indictment charging Ronald Washington and Karl Jordan with Mizell's murder. Mr. Washington had fewer than two years left to serve on the sentence imposed by Judge Gershon. In the course of this case, the government has made numerous *Brady*

---

[1] The Bates-stamped Rule 16 materials provided by the government cited in this motion are attached to counsel's declaration together as Exhibit A. They are filed under seal because they are subject to the protective order entered in this case. Citations are to the Bates number.

disclosures, including a DNA hit from a knit-wool hat found at the crime scene identifying a suspect – who is not Ronald Washington. On November 6, 2021, the government notified the Court and the defense that the Attorney General would not be seeking the death penalty in this matter.

## DISCUSSION

### THE INDICTMENT SHOULD BE DISMISSED BECAUSE THE UNJUSTIFIED AND PREJUDICIAL 18-YEAR DELAY IN INITIATING A FEDERAL PROSECUTION FOR THE 2002 MURDER OF JASON MIZELL VIOLATES THE DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT

The government waited eighteen years to charge Ronald Washington with the 2002 murder of Jason Mizell. The government has known about the crime since 2002 and has been convinced that Mr. Washington committed the murder since at least 2006. This uniquely long pre-indictment delay violates fundamental conceptions of justice and due process. For the following reasons, the indictment must be dismissed. In the alternative, the Court should conduct a hearing on the factual issues raised by the government's delay in prosecuting Mr. Washington.

"[T]he statute of limitations does not fully define a defendant's rights with respect to events occurring prior to indictment." *United States v. Santiago*, 987 F. Supp. 2d 465, 484 (S.D.N.Y. 2013). The Due Process Clause of the Fifth Amendment protects persons against "oppressive delay" in beginning a criminal prosecution. *United States v. Lovasco*, 431 U.S. 783, 789 (1977); *United States v. Marion*, 404 U.S. 307 (1971) (the Due Process Clause requires dismissal of an indictment if pre-indictment delay causes substantial prejudice to a defendant's right to a fair trial and the delay was for an improper purpose). This protection is grounded in "fundamental conceptions of justice which lie at the base of our civic and political institutions and which define the community's sense of fair play and decency." *Schurman v. Leonardo*, 768 F.Supp. 993, 998 (S.D.N.Y. 1991) (cleaned up) (quoting *Lovasco*, 431 U.S. at 790).

For a case to be dismissed for unwarranted pre-indictment delay, a defendant must establish that the delay: (1) has caused him actual prejudice; and (2) resulted from a deliberate effort to gain an unfair tactical advantage over the accused or that the investigatory delay was made in reckless disregard of the probable prejudicial impact on the defendant's ability to defend against the charges. *Lovasco*, 431 U.S. at 795 n.17 (noting the government's concession that "[a] due process violation might also be made out upon a showing of prosecutorial delay incurred in reckless disregard of circumstances, known to the prosecution, suggesting that there existed an appreciable risk that delay would impair the ability to mount an effective defense"); *Santiago*, 987 F. Supp. 2d at 484-485 (collecting cases); *United States v. Valentin*, No. 3:14-CR-55 (VLB), 2016 WL 1296903, at *1 (D. Conn. Mar. 30, 2016) (internal citation omitted) ("As to unfair delay, the Second Circuit has not squarely addressed the question, but district courts in this Circuit have ruled that a defendant satisfies his burden by proving that the Government acted intentionally or recklessly."); *see also Marion*, 404 U.S. at 324 (analogizing the tactical advantage contemplated under *Marion/Lovasco* to that under *Brady/Napue*). The Court's inquiry is fact-specific, *Santiago*, 987 F. Supp. 2d at 489, and "the length of the delay is weighed against the reasons for the delay," *United States v. Corona-Verbera*, 509 F.3d 1105, 1112 (9th Cir. 2007); *see Lovasco*, 431 U.S. at 790 ("[P]roof of prejudice is generally a necessary but not sufficient element of a due process claim, and that the due process inquiry must consider the reasons for the delay as well as the prejudice to the accused.").

Mr. Washington has established both actual prejudice and a delay motivated by improper tactical purposes and with a reckless disregard for his ability to have a fair trial.

A. The Memories of Key Witnesses Have Deteriorated and Have Been Contaminated over the Course of the Last Twenty Years

"Actual prejudice in the context of the *Marion/Lovasco* paradigm generally means the

- 3 -

loss of documentary evidence or the unavailability of a key witness." *Santiago*, 987 F. Supp. 2d at 485. Mr. Washington easily satisfies this test. The eighteen-year delay in initiating the intentional murder charges has deprived him of the objective evidence and witnesses that would permit him to obtain a fair trial on these charges.

The government claims that Washington and Jordan conspired to murder Mizell over a drug dispute. According to the government,

> In or about July 2002, Mizell acquired approximately ten kilograms of cocaine on consignment from a supplier in the Midwest. The cocaine was intended to be distributed in Maryland by Washington, Jordan and other co-conspirators. A dispute between Washington and one of the co-conspirators resulted in Mizell telling Washington that he would be cut out of the Maryland transaction. Following Washington's dispute with Mizell, Washington and Jordan conspired to murder Mizell.

ECF No. 9.

The government will rely in large part on the eyewitness testimony of Lydia High, who worked in the studio at the time of the shooting. The studio was split into two rooms: a sitting room and a recording room. At the time of Mizell's murder, there were three people in the recording room – none of whom witnessed the shooting. They were Mike Rapley, Randy Allen and Yaray Concepcion. *E.g.*, 000657. The only people in the sitting room, where the shooting took place, were Mizell, Lydia High, and Uriel Rincon. *Id.* No statement by Rincon has been provided in the government's Rule 16 productions. High's account, therefore, will carry much weight.

Ms. High has maintained that at approximately 7:15 PM on October 30, 2002, the following occurred:

> [T]wo black males entered the [sitting room] and both men had guns. . . . Upon entering, one man remained in the doorway, the other man, who was wearing a knit wool mask and holding a gun, ordered Lydia [High] to the floor. The man with the mask then ordered Mr. Mizell to the floor, at which time Uriel Rincon

> stood up to assist . . . Mr. Mizell. The man with the mask then shot Mr. Mizell, fired another shot and fled out of the doorway with the other man.

(Bates 000125; *see also* Bates 000059).

According to Ms. High, only the shooter was wearing a mask. (Bates 000059). Ms. High, who was interviewed by the police shortly after the shooting, failed to identify Mr. Washington as a participant – despite the fact that she'd known him for years and despite Mr. Washington's frequent presence in the studio. But nine months after the shooting, Ms. High identified Washington from a photo array. (Bates 000402). In identifying Washington, Ms. High told the police that he was the person who pointed a gun at her and told her to "get on the ground" while the masked person shot Mizell. *Id.* She also stated that she had known Washington for "numerous years." *Id.* Yet, she was failed to include him in her detailed original statement to the police. And perhaps critically, Ms. Hide had more than a passing relationship with Mizell and his business.

Theories about the shooting have abounded over decades. The NYPD kept a "tips log" that ran thirty-four handwritten pages. (Bates 000563-596). One prominent theory was that Lydia High's brother, Randy Allen, had reason to murder Mizell over business disputes. (Bates 000058). Indeed, Randy Allen was a beneficiary of Mizell's life insurance policy. (Bates 000622). Allen, who was vice president of Mizell's recording company, was in the recording room at the time of the shooting.

In support of the theory that one or more of the Allen siblings were involved in Mizell's murder, there was eyewitness evidence that Ms. High accompanied the suspected shooter into the studio. At the time of the murder, Tanya Edwards was employed by Primerica, whose office was on the same floor as Mizell's studio. (000831). On the evening of October 30, 2002, Ms. Edwards was working at the front desk in the Primerica office. *Id.* The front desk had a security

monitor that gave Edwards a clear view of whoever was entering the building. *Id.* From the reception desk, Ms. Edwards could also see anyone who walked past the Primerica office on his or her way to the studio. (000828).

When she was interviewed by law enforcement on November 1, 2002, the day after the murder, Ms. Edwards stated that, between 7:15 and 7:30 the night before, she witnessed a man and a woman walk past the Primerica office on the way to the studio. *Id.* A few minutes after the man and woman passed, Edwards heard two shots and saw the man flee back down the hallway towards the main exit from the building. (Bates 000828-829).

In the same interview the night after the murder, Ms. Edwards told the police that the woman was wearing a brown, floppy hat, and the man was wearing a light-blue, velour jump suit. *Id.* Edwards described the man as "tall [and] solid" with braids to his neck. Id. She estimated that he was in his mid-twenties. *Id.* During a follow-up interview, in August 2003 – only 10 months after the shooting – Ms. Edwards identified Lydia High as the woman who walked in with the shooter. (Bates 000830). But the passage of nearly two decades has affected Ms. Edwards' memory. When law enforcement interviewed her again in 2016, she said that she did not recognize the woman who accompanied the man. (000831).

The passage of time has prejudiced Mr. Washington immensely. Lydia High was the lone eyewitness implicating Mr. Washington in the shooting. In turn, a single eyewitness simultaneously cast doubt on Ms. High's account of the shooting and implicated her in it. But because so many years had passed, Ms. Edwards no longer remembered that she identified Lydia High as a participant in the shooting.

Tanya Edwards' failure of recollection is only one example of the fallibility of human memory. A common misconception is that memory is like videotape, faithfully recording events

without much deterioration or corruption. The opposite is true. Attention and memory are quite selective:

> Light falling on all parts of the retina is available to be sensed . . . but only a small fraction of the information sensed reaches awareness or is used by the observer for recognition, action, or storage in memory. . . . If you are searching for a coffee cup, for example, you may explicitly direct your attention to the table where it was last seen. Attention can be directed to different types of image content, including specific locations in space, specific image features (such as a specific color), or to specific objects (such as the coffee cup).
>
> . . .
>
> Image content *not* falling within the focus of attention is processed with less fidelity. In some cases, unattended content is effectively invisible: It does not reach awareness, it is not perceived, and it is not available for use in guiding decisions or actions, or for storage in memory.

Nat'l Research Council, *Identifying the Culprit: Assessing Eyewitness Identification* at 51-53 (2014) (hereinafter "*Identifying the Culprit*") (internal footnotes omitted).

The amount of attention one pays to specific aspects of an event affects the initial encoding of the memory of that event. *Id.* at 60. A famous example of this phenomenon is "weapon focus," "by which the presence of a weapon at the crime scene tends to draw the eyewitnesses' attention, distracting them from the face of the perpetrator." *United States v. Nolan*, 956 F.3d 71, 80 (2d Cir. 2020); *see also Identifying the Culprit* at 93-94; *State v. Henderson*, 27 A.3d 872, 904-05 (N.J. 2011). Memory is easily tainted,[2] and once contaminated,

---

[2] *See Identifying the Culprit* at 60-62 ("The contents of short-term memory are limited and highly subject to interference by subsequent sensory, cognitive, emotional, or behavioral events; the contents can also be biased by prior knowledge, expectations, or beliefs, resulting in a distorted representation of experience. . . . The stability of stored information is continuously challenged and subject to modification. We forget, qualify, or distort existing [long-term] memories as we acquire new perceptual experiences and encode new content and associations into memory.").

cannot be "untainted."³ A powerful illustration of the contamination of memory by outside influences is that thirty-two percent of the 375 – or 120 people – exonerated by later DNA testing were misidentified by *multiple witnesses*.⁴ This means that even subtle or non-verbal cues by the police or other eyewitnesses often cause a witness to choose the *same wrong person* as the perpetrator.

We understand intuitively that memory deteriorates over time. Research has shown that as the duration between an event and its recall "becomes longer, the opportunity for intervening events to alter the memory also becomes greater, and other variables may interact with the retention interval to impair performance." *Identifying the Culprit* at 99. Also, just because a memory is vivid does not mean that it is accurate. Vivid memories are "just as prone to errors" as less vivid memories. *Identifying the Culprit* at 64.⁵ Emotional memories are often both more vivid and more inaccurate. *Id.* at 63-65. Ironically, because of their vividness, emotional memories "are frequently held with high confidence." *Id.* at 64-65.

Errors in memory like these ensure that any testimony or potential testimony in Mr. Washington's trial will be flawed recreations of distant events. The contamination of witnesses'

---

³ *See id.* at 62f ("Forgetting can be partially mitigated, and memories stabilized, by habits of retrieval (or reactivation) and reconsolidation, which happen whenever we tell the story of our experiences. Reactivation is not perfect. With each implicit retrieval or explicit telling of a story, we may unconsciously smooth over inconsistencies or modify content based on our prior beliefs, the accounts of others, or through the lens of new information. We may add embellishments that reflect opinions, emotions, or prejudices rather than observed facts; or we may simply omit disturbing content and pass over fine details.").

⁴ The Innocence Project, *DNA Exonerations in the United States*, https://innocenceproject.org/dna-exonerations-in-the-united-states/ (last viewed Apr. 7, 2022). Eyewitness misidentification generally was present in sixty-nine percent of such cases. *Id.*

⁵ *See also id.* ("This may reflect, in part, memory enhancements, which accompany frequent re-consolidation or re-telling of the story of the emotional experience, and often include details (some true to fact, some not) learned after the experience.").

memories over the years by the intense media attention to the case and the proliferation of theories about the murder substantially not only operated to decrease the effectiveness of the defense's attempts to interview witnesses but worse, hardens recollections that may, in fact, be nothing more than constructs of the non-stop media attention that has been afforded to this unsolved murder. Aside from the general prejudice to Mr. Washington that these failures of recollection create, the only eyewitness placing Mr. Washington in the studio at the time of the murder, Lydia High, may well have been implicated in the attack. But the only eyewitness implicating Ms. High no longer recalls seeing her with the other attacker. The passage of time has substantially prejudiced Mr. Washington's ability to present a constitutionally sufficient defense.

B. By Waiting Eighteen Years to Charge Mr. Washington, The Government Recklessly Disregarded the Prejudicial Impact the Delay Would Have on His Ability to Defend Against the Charges

As to the reasons for the delay, the government has clearly exhibited a reckless disregard for Mr. Washington's fair trial rights. Mr. Washington first became a subject in the NYPD's investigation into Mizell's murder at least as early as March 10, 2003. (RW 000018). In June 2006, the United States Attorney's Office for the Eastern District of New York first questioned Mr. Washington about the murder. (RW 000021). In April 2007, Mr. Washington was convicted in this district by a jury of seven counts of Hobbs Act robbery. Ex. B at 3.[6] In preparation for sentencing, the government disclosed Mr. Washington's involvement in the Mizell murder to the Probation Department and the Court as "other criminal conduct." *Id.* at ¶ 89. At his sentencing,

---

[6] The Presentence Report prepared after this conviction is attached to counsel's declaration as Exhibit B. A letter from AUSA Sean Haran to the Honorable Nina Gershon dated January 9, 2008, is attached as Exhibit C. A transcript of the April 23, 2008, sentencing of Mr. Washington before Judge Gershon is attached as Exhibit D.

on April 23, 2008, the government urged Judge Gershon to consider Mizell's murder under 18 U.S.C. § 3553(a) and requested an upward departure on that basis. Ex. C at 1-2; Ex. D at 12, 14-16. The government informed Judge Gershon that it possessed proof "above and beyond a preponderance" that Mr. Washington murdered Mizell. Ex. C at 1. Similarly, at sentencing, the government told Judge Gershon Mr. Washington "may very well be" prosecuted for murder:

> THE COURT: . . . [O]ne might think if it was such an overwhelming case someone might have prosecuted this man for it and not left it as murder hanging onto a bunch of robberies in which he used a BB gun.
>
> MR. HARAN: I hear you, Your Honor.
>
> There's two issues. First, whether he should be prosecuted for it, and may very well be. The second is whether the law permits Your Honor to take --
>
> THE COURT: It permits me. I've decided that it's inappropriate in this case. I've made that ruling.

Ex. D at 16.

The passage of time alone – nearly two decades from the time of the murder – and the passage of fourteen years since Mr. Washington's sentencing before Judge Gershon when the government represented that it had proof "above and beyond a preponderance" – is conclusive evidence of its bad faith. Critically, it is not as if the government has discovered some new piece of objective evidence of Mr. Washington's guilt – a DNA hit or a surveillance recording. Rather, the government's prosecution rests on potential witness testimony it has been aware of since 2006 if not 2003. What is worse is that the government, at least in late 2007 or early 2008, was convinced that it could prove Mr. Washington's guilt of the murder "above and beyond a preponderance" and informed Judge Gershon that he "very may well be" prosecuted for it. The government then waited another fourteen years to charge Mr. Washington with this murder. The government knew or should have known that Mr. Washington's ability to present an effective defense would have to deteriorate with each passing year.

Most critically, the government has not given any reason for the delay. *See Lovasco*, 431 U.S. at 790, 795 n.17; *Santiago*, 987 F. Supp. 2d at 484-85. Nor can it identify any new evidence that has come to light that makes it possible to prosecute this case now and not in 2007. Because the Court's inquiry is fact-specific, *Santiago*, 987 F. Supp. 2d at 489, the Court should respectfully hold a hearing. At the hearing, the government should account for its delay, and facts should be developed to permit the Court to determine whether the government delayed charging Mr. Washington to deliberately gain an unfair tactical advantage over him or whether the government recklessly disregarded the risk that delay would impair Mr. Washington's defense.

Dated: Brooklyn, New York
April 10, 2021

                                                Respectfully submitted,

                                                *Susan G. Kellman*
                                                Susan G. Kellman
                                                Jacqueline E. Cistaro, Of Counsel
                                                25 Eighth Avenue
                                                Brooklyn, New York 11217
                                                (718) 783-8200
                                                sgk@kellmanesq.com

                                                 /s/ EMS
                                                Ezra Spilke
                                                Law Offices of Ezra Spilke, PLLC
                                                1825 Foster Ave., Ste. 1K
                                                Brooklyn, New York 11230
                                                (718) 783-3682
                                                ezra@spilkelaw.com

TO: Breon Peace, Esq.
       United States Attorney
       Eastern District of New York
Attn: Artie McConnell, Mark E. Misorek
        Assistant United States Attorneys