1

```
1   UNITED STATES DISTRICT COURT
    EASTERN DISTRICT OF NEW YORK
2   ------------------------------x
                                    20-CR-305(LDH)
3   UNITED STATES OF AMERICA,
                                    United States Courthouse
4                                   Brooklyn, New York

5        -versus-                   February 28, 2022
                                    11:00 a.m.
6   KARL JORDAN,

7        Defendant.

8   ------------------------------x

9        TRANSCRIPT OF CRIMINAL CAUSE FOR BAIL APPLICATION
            BEFORE THE HONORABLE LASHANN DEARCY HALL
10                 UNITED STATES DISTRICT JUDGE

11  APPEARANCES

12  For the Government:      UNITED STATES ATTORNEY'S OFFICE
                            Eastern District of New York
13                          271 Cadman Plaza East
                            Brooklyn, New York 11201
14                          BY:  ARTIE MCCONNELL, ESQ.
                            Assistant United States Attorney
15
    For the Defendant:      BY:  MICHAEL HUESTON, ESQ.
16                               JOHN DIAZ, ESQ.
                                 MONICA NEJATHAIM, ESQ.
17
    Also Present:           ROBERT LONG, Pretrial
18
    Court Reporter:         Rivka Teich, CSR, RPR, RMR, FCRR
19                          Phone:  718-613-2268
                            Email:  RivkaTeich@gmail.com
20
    Proceedings recorded by mechanical stenography.  Transcript
21  produced by computer-aided transcription.

22

23

24

25
```

BAIL APPLICATION

1                    (In open court.)

2          THE COURTROOM DEPUTY:  All Rise.  Criminal cause for

3    bail application.  United States of America vs. Karl Jordan,

4    docket 20-CR-305.

5          Would you all please state your appearances for the

6    record, starting with the Government.

7          MR. McCONNELL:  Good morning.  Artie McConnell for

8    the United States.  I'm joined by Robert Long from Pretrial

9    Services.

10         THE COURT:  Hello.

11         MR. LONG:  Good morning, your Honor.

12         THE COURT:  Good to see you.

13         MR. LONG:  Same.

14         MR. HUESTON:  Good morning, your Honor.  Michael

15   Hueston and John Diaz and Monica Nejathaim for Karl Jordan who

16   is standing next to me.

17         THE COURT:  Good morning.

18         All right, folks, we're here today for a bail

19   hearing determination in this matter.

20         This is your application, counsel, I'm going to ask

21   that you proceed.

22         MR. HUESTON:  Thank you, your Honor, I appreciate

23   the opportunity.

24         THE COURT:  If you could stand.

25         MR. HUESTON:  Yes, your Honor.

BAIL APPLICATION

1      I appreciate the opportunity to address the Court

2  about this issue.  Let me first say that I really want to

3  focus on the strength of the package.  What we propose is a

4  million --

5      THE COURT:  I don't think you should start with the

6  package, that puts the cart before the horse, if I don't know

7  a package is something I'm going to do.  I think you should

8  probably start with the basis for a bail in the first place.

9      MR. HUESTON:  I appreciate that.

10      Looking at the case, clearly this is a presumption

11  case.  The issues that the Court has to consider are

12  dangerousness and flight of risk.

13      We look at it in terms of the analysis in terms

14  of -- I'll talk about dangerousness first.  Clearly we have

15  serious charges.  I'm going to address the strength of the

16  Government's case but I do want to talk about some other

17  issues at well.

18      Let me talk about the strength of the Government's

19  case.  I think that's a critical factor for the Court to

20  consider.  What we pointed out in our investigation and

21  dealing with the Government in the past 18, 19 months, we

22  pressed for information showing that Mr. Jordan was involved

23  in the Mizell homicide.  What we've seen is the absolute

24  absence on that point.  I'm not making an overstatement.  This

25  is not hyperbole.

4

BAIL APPLICATION

1          Our client submitted to DNA testing against evidence

2     at the crime scene.  It was negative.  There has been no

3     surveillance video.  There are no text messages.  There is no

4     cell-site dates, no ballistics, no forensics, no fingerprints.

5     It's the absence of evidence.

6          On top of that, we notified the Court and submitted

7     to the Government notice of alibi.  We believe our alibi

8     witnesses are exceptionally strong.  Granted the Government

9     can take its position, but I'll say this about them.  We've

10    noted in our application that one was a former correctional

11    officer and is a school teacher.  And the other one --

12         THE COURT:  We're talking about, so I'm clear, there

13    are two proposed alibi witnesses, one.  Of whom is

14    Mr. Jordan's mother; is that correct?  And the other is an

15    individual with whom he is in a relationship.  I want to make

16    sure I'm clear about who we're talking about; is that right?

17         MR. HUESTON:  Your Honor, one correction.  I

18    appreciate the question to clarify it.  No, it's not his

19    mother.  It's his girlfriend at the time.

20         THE COURT:  Girlfriend at the time.

21         MR. HUESTON:  Mother of his oldest child and her

22    mother.

23         THE COURT:  And her mother.  I've got it.  Fair

24    enough.

25         MR. HUESTON:  That's the alibi that we presented.

*Rivka Teich CSR RPR RMR FCRR*
*Official Court Reporter*

BAIL APPLICATION

1          THE COURT:  Who is who?  You were describing what

2    they did, et cetera.  The mom was the former correction

3    officer?

4          MR. HUESTON:  Yes, your Honor.  The mother is the

5    former correction officer and current school teacher.  His

6    girlfriend, or former girlfriend, is the mother of his eldest

7    child.

8          THE COURT:  They are prepared to testify at trial

9    that Mr. Jordan was with them at the time of the Mizell

10   homicide?  Are you intending to put them before me today?

11         MR. HUESTON:  No, your Honor.

12         THE COURT:  What am I supposed to use to assess

13   anything with respect to the credibility of the alibi

14   witnesses to give the notion of the alibi witnesses any weight

15   in this hearing at all?  They are not here.

16         MR. HUESTON:  Correct, they are not testifying

17   today.  We are not proffering them to testify.

18         THE COURT:  How am I going to rely on anything about

19   them if you're not going to proffer them so I can have the

20   ability to assess them and what they have to say?

21         MR. HUESTON:  Your Honor, we're proceeding by

22   attorney proffer on this issue.

23         THE COURT:  That's a tough one when this is, in

24   large measure, some credibility determinations that I'd have

25   to assess.  But go ahead.

BAIL APPLICATION

1          MR. HUESTON:  Your Honor, I take your point.  We see

2    it in terms of the broad issue.  If you look at the pieces

3    with the lack of evidence we've been putting together, we

4    submitted the alibi.  The Government is proceeding by proffer

5    in many respects as well.

6          THE COURT:  And an Indictment, which creates itself

7    probable cause.  So Mr. Jordan has been indicted on a number

8    of offenses.  That Indictment itself, right, creates probable

9    cause for the Court to be able to consider.  Yes?

10          MR. HUESTON:  Yes, your Honor.  We're not disputing

11    this is a presumption case.

12          THE COURT:  I get that.

13          MR. HUESTON:  We're locked into that.

14          THE COURT:  You referenced the Government proceeding

15    by proffer, and I'm saying it's a little bit more than that.

16    Because I do have, against the back drop of a Grand Jury

17    Indictment, where there was sworn testimony that was provided

18    to a Grand Jury.

19          MR. HUESTON:  Yes, your Honor.  What I'm referring

20    to is there are many other proffers that the Government is

21    making.  I don't want to belabor the point.  They made

22    proffers about arrests, other issues.  They are proceeding by

23    proffer.  We think it's appropriate also, granted, your Honor

24    can assess our credibility on the issue, but I don't have much

25    more to add on it.

7

BAIL APPLICATION

1              THE COURT:  Right, but for the purposes of this case

2    given the fact that it is a presumption case, it is your

3    burden to come forth with evidence, right, for the Court to be

4    able to assess.  Evidence is the word.

5              MR. HUESTON:  It's a limited presumption, your

6    Honor.  I do take your point.  And it's a number of different

7    factors.

8              The Government has to show by clear and convincing

9    evidence that my client is a danger.  Then also by a

10   preponderance that he's a risk of flight.  And we do have to

11   make an assessment of the package in terms of the strength to

12   overcome the presumption.

13             THE COURT:  Right, but the rebuttal presumption --

14   I'm reading your submission:  To rebut the penalty supposition

15   by coming forth with evidence that he does not pose a danger

16   to the community or risk of flight.

17             Then of course if you're able to do that, then I

18   would be looking to the Government and then asking them what

19   they have in response.  But the starting point is for you to

20   proffer evidence that would rebut that presumption, then I

21   would turn to them and ask them to meet their burden.

22             I want to first assess that you have met yours.

23             MR. HUESTON:  I understand, your Honor.  I

24   appreciate it.  I think it's the correct way to do it.

25             Let me speak to other points that go to the strength

BAIL APPLICATION

1   of the Government's case.  For instance, I pointed out the

2   lack of evidence in terms of forensics.  What we really

3   understand, this case is based on witness testimony.  Another

4   assessment that I think is a fair consideration for the Court,

5   as we mentioned, is the number of Brady disclosures in this

6   case, which is in our view, unprecedented.  Our count, I don't

7   think the Government disputes, is 14 different Brady

8   disclosures that happened in this case.  I think that's a fair

9   assessment for the Court to look at.

10          THE COURT:  Fourteen Brady disclosures with respect

11   to the count which charges Mr. Jordan --

12          MR. HUESTON:  The Mizell homicide.

13          Let me be fair, some of them have to do with issues

14   that have to do with narcotics, but that's the minority, it's

15   really the Mizell homicide.

16          The next issue I want to point out, your Honor, in

17   terms of the Government's strength of the case, in terms of

18   the assessment of -- I guess how the Government appears to

19   want to prove its case.  Reliance on rap lyrics, I want to

20   talk about that.  They said that's part of the mix.

21          THE COURT:  It's not part of the mix for me.  Let's

22   be clear.  Let me make it clear to the Government, because

23   there are a number of pages in the Government's submission

24   that does recount lyrics from rap music that that was

25   performed or produced in this case as proffered by the

BAIL APPLICATION

1   Government by Mr. Jordan.  Certainly the lyrics are

2   particularly violent, but let's be clear, this is a genre of

3   music that encourages and promotes violent language in its

4   lyrics.  And this is, in part, for the profit of the artists

5   as well for the music executives, that my personal estimation

6   is they profit greatly off of the encouragement of violence

7   and misogyny, et cetera, in rap music.  I'm not going to hold

8   any individual accountable for the lyrics in a rap song that

9   is consumed by our community; and in fact, it's consumed by

10  me.  So that's not part of the total mix for this Court.

11          However, there is much other information contained

12  in the Government's submission that is not reliant upon lyrics

13  to rap songs.  There are interviews that they cited to that is

14  not a lyric to a rap song.  There are other violent crimes

15  that Mr. Jordan is at least alleged to have been involved in.

16          And so we can take the rap music out of the mix.

17  This is never going to be a courtroom where I'm going to

18  penalize any individual for participating in that artistic

19  form.

20          MR. HUESTON:  Understood, your Honor.  I'll move on

21  from that portion.

22          One other factor before addressing a couple of

23  points you brought up.  The decision not to seek the death

24  penalty.  I think that's a fair consideration for the Court to

25  look at the strength of the case.

10

BAIL APPLICATION

1        THE COURT:  The strength of the case?

2        MR. HUESTON:  Yes, your Honor.  The decision itself,

3   we do think that draws an inference of regarding the decision.

4   When you look at the mitigating and aggregating factors,

5   that's an assessment the Government makes.  So clearly they

6   made a decision not to seek, and that's an appropriate area

7   for this Court to take note of.

8        THE COURT:  You want me to, A, assume or make the

9   logical leap that if the Government decides not to seek the

10  death penalty in any death eligible case -- I have a number of

11  death eligible cases on my docket -- that that determination

12  in and of itself should suggest that the Government doubts the

13  weight of the strength of its case as to the underlying crime?

14       MR. HUESTON:  Your Honor, in terms of mitigating

15  factors that's an assessment they look at in making that

16  determination.  That's the way --

17       THE COURT:  One of many.  I have no idea what went

18  into the Government's determination why they didn't seek the

19  death penalty in this case.  I suspect if you examine the

20  history of death penalty cases in this district, you would

21  find that it is rare indeed that the Government seeks the

22  death penalty.  I don't believe that that necessarily suggests

23  that the Government does not believe in the weight of the

24  evidence in a particular crime.  God, I hope that that's not

25  what we're saying.  Because then the suggestion should be that

BAIL APPLICATION

1    we should seek the death penalty almost willy nilly just to

2    prove that the case is strong.  And we wouldn't want that.  I

3    wouldn't want that.  You wouldn't want that.  Defendants

4    wouldn't want that.  Rather, we would like for the death

5    penalty determination to be made based on the consideration of

6    a host of factors.  Yes?  As opposed to simply guilt or

7    innocence.

8            MR. HUESTON:  I'm not suggesting otherwise.  I'm

9    not.  I'm sorry if I'm not stating my argument as clearly.  It

10   is a factor -- underlying that decision is the issue about the

11   lack of evidence, the issue of alibi.  And we think it's

12   factor that it vindicates our point regarding the strength of

13   their case.  Nothing more than that.  That's all I'm

14   suggesting.

15           THE COURT:  Okay.

16           MR. HUESTON:  Just to move on, your Honor.  To go to

17   the points in terms of you mentioned about violent criminal

18   past.  What the Government proffered on four different

19   incidents, I would just note that two of them were dismissed

20   and two of them resulted in violations, which are not crimes.

21   So we do not believe it's a fair inference to draw that

22   Mr. Jordan is dangerous based on those incidents.

23           THE COURT:  Let be clear what we're talking about.

24   There are a number of instances that were highlighted in the

25   Government's submission.  You are absolutely correct in your

BAIL APPLICATION

1  recitation of the disposition of those incidents.  At least

2  according to the Government, there were seven occasions, I

3  believe, where Mr. Jordan had made sales of narcotics to an

4  undercover officer.  That's one among the incidents.

5       There is a February 2003 incident where Mr. Jordan

6  was arrested in connection with a dispute that occurred where

7  Mr. Jordan is alleged to have fired a semi-automatic pistol,

8  and one shot into the air, for which he pled guilty to

9  disorderly conduct.

10       There are incidents that it's alleged that

11  Mr. Jordan, again in 2003, fired several shots from a gun and

12  at an individual, one striking the individual in the leg.

13  According to the Government, the witness refused to cooperate

14  and, therefore, the charges were dismissed.

15       Then a 2004 incident where a search warrant was

16  executed at Mr. Jordan's home.  And in his home a 9-millimeter

17  semi-automatic pistol was recovered, a loaded .32 caliber

18  revolver, and a bullet-proof vest, along with 150 bags of

19  marijuana, and various bags and foil wraps containing cocaine,

20  and hundreds of glassine envelopes used for packaging

21  narcotics.  Yes?

22       These are the incidents that you wanted to highlight

23  that the disposition was what in those three in particular?

24       MR. HUESTON:  Your Honor, either dismissals or as

25  you mentioned the disorderly conduct.

BAIL APPLICATION

1          What we're simply saying, your Honor, is that based

2    on those dispositions, this Court cannot make an inference

3    that the conduct itself was proven.  The Government is

4    proceeding by proffer.  It would be different if they had a

5    disposition to the fact.  So that's the point --

6          THE COURT:  Should I discount them all together

7    because of the disposition?  We know how the criminal justice

8    system operates.  We know there are various factors that can

9    sometimes come into a disposition of a matter.  We're not

10   talking about one, but we're talking about many.

11          How should the Court view the numerosity of the

12   alleged violent conduct notwithstanding the disposition?

13          MR. HUESTON:  Your Honor, I think it's the same

14   answer each time, that it should not be considered regardless

15   of the amount.  I don't think there is anything different in

16   terms of the analysis.  The lack of a disposition that ended

17   against Mr. Jordan in a negative way is something that is just

18   a fact.  That's all I want to say about it.

19          THE COURT:  He doesn't have an adult criminal

20   record.

21          MR. HUESTON:  He does not --

22          THE COURT:  He has one juvenile.

23          MR. HUESTON:  That's correct.

24          I'll talk about the 2017 issue which is, there was

25   no arrest in that case.  I do want to distinguish that.  If

*Rivka Teich CSR RPR RMR FCRR*
*Official Court Reporter*

BAIL APPLICATION

1  can you hear me out on this, your Honor.  I'm going to try to

2  explain it as best I can.

3          THE COURT:  Am I striking you as someone who will

4  cut you off?

5          MR. HUESTON:  At times, yes, your Honor.  I

6  appreciate an active judge who is involved.  I appreciate that

7  you keep me thinking.  I appreciate what you're asking.

8          THE COURT:  I'll hear you out.  Go ahead.

9          MR. HUESTON:  The 2017, what I would say is, one, he

10  wasn't arrested for it.  I want to point that out.  That was

11  the basis of the (b)(1)(c) weight in the case, the initial

12  aspect which is not a presumption case.  That's the only solid

13  evidence we have seen.  I say solid in terms of, the

14  Government has something to point to, compared to what I

15  talked about which is general statements about narcotics

16  activity.  Here they are saying we have video, we have audio

17  for 2017.

18          I note, though, they did not arrest him in 2017, or

19  '18, or '19 or '20.  That raises an issue.  One, if the

20  Government believes he's this person who is involved with

21  continuous narcotics activity, the decision not to arrest is

22  perplexing.  It goes towards whether or not this is really an

23  overstatement that he's a person who is involved in so much

24  narcotics activity.

25          Also it goes to in terms of dangerousness.  As well,

BAIL APPLICATION

1    the decision not to arrest in 2017 says something about law

2    enforcement's approach to him.  It seems I think a fair

3    inference to draw that they haven't, the deals happened, from

4    their standpoint there was a lack of concern or bandwidth to

5    address that issue.  It cuts both ways that fact.  So I want

6    to point that out.

7            THE COURT:  Give me a moment.

8            Much of your written submission focuses on your

9    arguments concerning the Indictment as to Mr. Mizell's

10   homicide.  With respect to the remaining charges here, of

11   which there are many, I want to make sure that I'm

12   understanding that the thrust of your argument is that the

13   Court should view the Government's -- if I'm putting words in

14   your mouth you can correct me -- delay in acting upon any

15   supposed belief in criminality here as suggesting that the

16   strength of that case with respect to the other charges is

17   underwhelming.  That's the argument with respect to the

18   remaining charges and that the Court should view the delay in

19   the Government acting as somehow speaking to the strength of

20   those charges?

21           MR. HUESTON:  Yes, your Honor.  Also I'd want to

22   point out in terms of the cases that actually result in an

23   arrest, I do think it's an important issue about the risk of

24   flight.  In those case there is no warrant history.  I think

25   that's a fair assessment.  That Mr. Jordan was arrested on

BAIL APPLICATION

1    charges and there is no issue about him returning to court.  I

2    think that's a fair consideration.

3              I do want to talk a bit about the narcotics aspect

4    of the case.

5              THE COURT:  I want to take a step back.  Mr. Jordan

6    never faced charges that carry the sort of potential

7    consequences as these charges do.  As we've discussed, he

8    doesn't have an adult record.

9              So shouldn't the Court consider isn't it an

10   appropriate consideration for the Court the amount of time

11   that Mr. Jordan could be subject to if found guilty?  I

12   believe the statutory minimums here, and you'll correct me if

13   I'm wrong, if convicted of these charges, 25 years as a

14   minimum.

15             So while I appreciate the arguments you made, how is

16   it that the Court should view that?  Isn't it the case that

17   the Court should view that as a consideration for the purposes

18   of risk of flight?  He didn't previously flee, he didn't have

19   prior charges.  But now he has charges that could subject him

20   to almost as many years in prison as he's been alive.

21             MR. HUESTON:  Your Honor, he was arrested on four

22   occasions.  One, according to the Government, involved a

23   shooting where someone was injured.  I do think they are

24   comparable, that's a serious charge.  Here we have a shooting.

25   The Government is alleging someone was wounded.  He appeared

BAIL APPLICATION

1    and didn't flee.  I think they are comparable to a degree.

2            Clearly, as you recite, your Honor, the amount of

3    time goes into the decision, but that's also one of the

4    reasons I do think this is a fair point to talk about the

5    strength of the package.

6            We have 16 individuals who are family members and

7    friends.  You have the moral suasion.  You have a bond of a

8    million dollars and the absolute financial harm or devastation

9    that would be set upon them if he were to violate his

10   conditions or flee or commit a crime or violate the conditions

11   of release.  We have the issue of -- what we've proposed, is

12   electronic monitoring, house arrest, and obviously where he

13   would live have to be approved by Pretrial Services.  We

14   believe, that residence would be back with his girlfriend and

15   his two children, and his girlfriend is an assistant deputy

16   warden for the New York City Department of Corrections.  We do

17   think that's sufficient to allay -- to deal with the Court's

18   concern, I should say, about a risk of flight.  The package

19   itself buttresses and makes sure that's not going to happen.

20   It's a factor that this Court should look at.

21           For instance, if we came in here with one suretor

22   and no package I think that's a fair consideration for the

23   Court to look at.  We have 16 suretors, financially

24   responsible people and we propose a bond with property and

25   cash.  I do think that's a factor the Court should look at.

BAIL APPLICATION

1        THE COURT:  This is the property of his father in

2    Georgia; is that right?

3        MR. HUESTON:  His father in Georgia.  And my

4    understanding it's not the grandmother it's the aunt, your

5    Honor.

6        THE COURT:  Your footnote three to the submission:

7    They may be willing to post their properties.

8        Words matter.  Why do you caveat that with "may."

9        MR. HUESTON:  Your Honor, my understanding is that

10   they will do it.  It's not may.  We've confirmed that.  We

11   stand by that 100 percent.  They are willing to do it.

12       A couple of other points just to mention, your

13   Honor.

14       THE COURT:  All right.

15       MR. HUESTON:  The other issue I want to point out

16   this goes to our other basis.  We also put forward an

17   alternative argument of temporary release.  On large part he

18   has one kidney.  He donated a kidney; his mother needed kidney

19   transplant.

20       THE COURT:  Which, by the way, is incredibly

21   honorable and commendable on Mr. Jordan's part.  Go ahead.

22       MR. HUESTON:  And so we do think that during the

23   time of COVID there is an issue.

24       THE COURT:  Is there a medical basis to suggest that

25   he's at a higher risk of having a negative COVID outcome by

BAIL APPLICATION

1    virtue of the fact that he has a single kidney?  I understand

2    that if the single remaining kidney were to fail, obviously,

3    that would propose a problem medically.  However, my question

4    to you is, do you have a medical basis to suggest that because

5    he lives with a single kidney, that he is by virtue of that

6    fact, more susceptible to a high-risk outcome as a result of

7    COVID?

8         Mr. Jordan, it's probably better if you don't

9    interrupt your lawyer while I'm asking him a question because

10   then he can't answer my question.

11        MR. HUESTON:  Your Honor, it's our position that

12   yes, because --

13        THE COURT:  Not your position.  I said do you have

14   anything you can offer me from a doctor?  I'm certain you're

15   talented.  I'm certain you're smart.  So am I.  But I'm not

16   medical doctor.  Neither are you.

17        Do you have a medical basis, something that you can

18   provide to me from a medical expert, a doctor of any kind, who

19   can say that the fact that he lives with a single kidney makes

20   him more susceptible to a negative outcome if he were to

21   contract COVID?

22        MR. HUESTON:  The short answer is we have not

23   submitted that application.  But I do want to speak to the

24   issue, your Honor.  This is how we arrive at our conclusion

25   and why we think there is a force to it.

BAIL APPLICATION

1        He has one kidney.  That basis itself puts him at

2   risk if he were to have complications from COVID-19.  That's

3   not our circumstance right now that we're dealing with.  We

4   agree with that.  He's standing next to me.  He's well.  We do

5   see it as a factor in making a determination.

6        Also the issue in terms of lockdown --

7        THE COURT:  Is he, in terms of his health, I

8   understand he has one, any different than any other

9   36-year-old -- I think I got his age right -- healthy man?  I

10  understand if something were to happen to this kidney he would

11  be.  But as he sits here today, isn't he as healthy as any

12  other 36-year-old?  I have nothing reported in your

13  submission, in pretrial's submission, to suggests that he has

14  any medical issues.  So he's just a healthy 36-year-old right

15  now.

16       MR. HUESTON:  He's a little older than that.

17       THE COURT:  Forgive me.

18       MR. HUESTON:  I'm not trying to be facetious.  He's

19  38.

20       THE COURT:  Fair enough.  He was 36 at the time of

21  his arrest.  I lost two years, 38.

22       MR. HUESTON:  The base line itself is he only has

23  one kidney.  He has higher risk if he were to have issues with

24  COVID.

25       THE COURT:  But you don't have a medical basis for

*Rivka Teich CSR RPR RMR FCRR*
*Official Court Reporter*

BAIL APPLICATION

1    that.

2            MR. HUESTON:  We do think that the lack of kidney

3    itself is the medical basis.

4            THE COURT:  And you're basing that on your medical

5    expertise?

6            MR. HUESTON:  No, your Honor, I'm not basing.  I

7    don't have medical expertise.

8            THE COURT:  So you have nothing to offer me that I

9    can look to to rely on to be able to say that the argument

10   that you're making has any teeth.

11           MR. HUESTON:  Your Honor, all I can say is that the

12   lack of kidney is something we feel we had to present to you.

13           THE COURT:  I understand that you have to tell me

14   and I get that.  But you could have told me that and said look

15   at this letter from a doctor.  This doctor has said that as a

16   result of having a single functioning kidney, right, that

17   makes him otherwise healthy right now, there is nonetheless

18   some particular acute, unique risk that he faces different

19   from another healthy 38-year-old.

20           I'm not taking issue with the fact that you raised

21   the fact that Mr. Jordan donated a kidney to his mom; and

22   therefore, is living with a single kidney.  But what I

23   understand is that he is living a healthy life as any other

24   38-year-old man at this time.  And if there was something else

25   beyond that, I would have expected for you to have provided

BAIL APPLICATION

1    that to me.  So that it is not just lawyer argument, but based

2    in evidence of something.

3           MR. HUESTON:  Your Honor, I take your point.  We

4    have no further information on that issue.

5           THE COURT:  But you could have.  You could have.

6    You could have called a doctor.  I don't know what a kidney

7    specialist is called, it's escaping me.  You could have

8    contacted one, you could have given me information.

9           All I have is a healthy 38-year-old man who, again

10   did something incredible for his mom, but nonetheless is a

11   healthy man at 38, functioning with a single kidney with no

12   health issues.

13          MR. HUESTON:  Your Honor, there is nothing further I

14   have to add on the point.  But again, I do think that that

15   statement itself in terms of his physical condition, that's

16   what we proffered to you and told you about.

17          I'm prepared to move on.

18          THE COURT:  That's fine.

19          MR. HUESTON:  I did want to emphasize it, I think

20   it's important --

21          THE COURT:  I don't know how important it can be if

22   you've given me nothing but your argument and no evidence.  If

23   it was that important I think you should have treated it with

24   the importance that you believe it has.  You can't expect me

25   to treat it with that level of importance if you didn't.

23

BAIL APPLICATION

1          Go ahead.

2          MR. HUESTON:  The other issues I want to talk about

3     with respect to COVID-19, your Honor, is in terms of quality

4     of representation in dealing with the consistent lockdowns.

5     That's a factor the Court should look at.

6          Your Honor, is fully aware of the different orders

7     that have gone in and the issues that have occurred at MDC in

8     this case, and we think that's a factor the Court should look

9     at in terms of a temporary release.  We ask your Honor to look

10    at that.

11         THE COURT:  When you say look at that, you're

12    talking about specifically difficulties that you are having in

13    terms of the preparation for any eventual trial in this

14    matter, or are you talking about the conditions that

15    Mr. Jordan has had to endure as a result of the COVID-19

16    virus?  They are obviously related, but different.  Can you

17    tell me what you're referring to specifically with respect to

18    this argument?

19         MR. HUESTON:  We're talking about the conditions

20    that he's had to endure.  That's one part.  The other part is

21    for instance lockdowns, we can't have access to him.  Both of

22    them are part of that determination, your Honor.

23         THE COURT:  Okay.

24         MR. HUESTON:  Your Honor, unless there is specific

25    questions that you have, there is nothing else that I have to

BAIL APPLICATION

1  say.  Obviously I'll wait to hear from the Government, but

2  that concludes my opening remarks.

3         THE COURT:  I'll give you an opportunity when the

4  Government is done.

5         As you can see, I've asked you the questions that

6  I've had for you up until now as they have come to mind, which

7  is my style.  I'm going to hear from the Government.  Thank

8  you.

9         MR. McCONNELL:  Thank you, your Honor.  I'm not

10  going to repeat my whole submission.  I think your Honor's

11  identified some of the relevant points as far as the context

12  that we're operating in, which is a presumption case.  There

13  are four separate counts that Mr. Jordan is charged with, that

14  each standing on their own, carry with them a presumption of

15  detention.

16         Obviously the nature and circumstances of the crime

17  speak for themselves.  This was a premeditated homicide case,

18  20 years old, but nevertheless shooting someone in the head

19  while conspiring with others is such a brazen act of criminal

20  act that I don't think time should matter when considering the

21  severity of the conduct.

22         Also the attendant drug trafficking and 924(c)

23  charges.  These are very serious crimes standing on their own.

24  The case law supports your Honor making the inference that

25  these are both serious in terms of their potential sentencing

BAIL APPLICATION

1   exposure but also in terms of the danger they present to the

2   community.

3           THE COURT:  What do you say to -- putting aside the

4   homicide charge for a moment -- I'm curious to your response

5   to defense counsel's comments regarding the delay or the

6   dilatory nature of the Government's act with respect to

7   pursuing any of the narcotics charges and any attendant 924(c)

8   charges from 2016/2017 time period.

9           MR. McCONNELL:  That's a common argument that we

10  here during any prolonged investigation where the arrest does

11  not occur immediately after the criminal conduct takes place.

12  All I will say about that, is that investigations take time.

13  There are a lot of moving pieces.  As your Honor can see from

14  the Indictment, this was not simply an undercover buy and bust

15  operation.  And I'm going to leave it at that, frankly.  The

16  Court is going to have to draw whatever inference it can.

17          In any case where there is a lapse between the

18  arrest and the criminal conduct, to simply say that the

19  Government is not concerned about the dangerousness of that

20  individual I think is wrong.

21          Let me segue into the strength of the case; counsel

22  did spend a fair amount of time on that.  I want to deal with

23  the idea that the Brady disclosures in this case somehow prove

24  that the evidence is not sufficient to convict Mr. Jordan

25  beyond a reasonable doubt.

BAIL APPLICATION

1          This is 20-year-old murder case.  It involved a very

2   high-profile individual being gunned down in his own music

3   studio, in his own neighborhood, by people that he knew.

4   There has been a tremendous amount of investigation in this

5   case, and for that reason we have given what I consider to be

6   practically open-file discovery to the defense.  Because,

7   frankly, I'm not in a position to tell them what is going to

8   be useful to their defense at trial.

9          So what we have done is virtually provide them with

10  things I think go above and beyond our Rule 16 and Brady

11  obligations.  I strongly disagree with the insinuation that in

12  doing so we are saying something about the strength of our

13  case.

14         This is going to be a case that relies on witness

15  testimony, both eye witnesses and co-conspirator testimony.

16         We do not credit the alibi witnesses.  These are

17  people who have a very close familial and financial

18  relationship with Mr. Jordan that spans years.  One of the

19  alibi witnesses was arrested with Mr. Jordan in 2014.  They

20  were living together --

21         THE COURT:  What was the disposition of that case?

22  It's not in your submission.

23         MR. McCONNELL:  With respect to the alibi witness?

24  I don't know.

25         THE COURT:  With respect to the arrest that took

BAIL APPLICATION

1  place in Mr. Jordan's home with a 9-millimeter recovered, the

2  .32 revolver was recovered.

3          MR. McCONNELL:  Yes, there were several individuals

4  who were present in that house when the search warrant was

5  executed, seven or eight, including Mr. Jordan and one of the

6  alibi witnesses.  I could speculate as to why --

7          THE COURT:  I'm saying, there were no charges that

8  were ever pursued in that case?  Nothing as to the disposition

9  unless I missed it.

10         MR. McCONNELL:  I believe it was a disorderly

11  conduct disposition with respect to this defendant.

12         THE COURT:  The December 2004 --

13         MR. McCONNELL:  '14 -- excuse me, 2004, yes.

14         THE COURT:  It's not in your submission.  The 2003

15  disposition is in your submission where Mr. Jordan pleaded

16  guilty to a disorderly conduct.  I don't see any mention in

17  your submission to the disposition of the --

18         MR. McCONNELL:  That was resolved with a disorderly

19  conduct as well.

20         THE COURT:  As well.  I see.

21         MR. McCONNELL:  Again, there is case law to support

22  this.  I believe in the Jones case there was a hearing where

23  the alibi witnesses were called.  And the mere fact that they

24  had a very close family relationship, obviously motive to be

25  less than truthful about the defendant's whereabouts in that

BAIL APPLICATION

1    case.  The Court for purposes of a detention hearing did not

2    credit their testimony.

3         THE COURT:  I don't have anything to credit or not

4    credit.  I don't have anyone here so.

5         MR. McCONNELL:  Certainly on paper there is a clear

6    motive to fabricate, and we'll save that for trial.  As far as

7    the DNA evidence --

8         THE COURT:  Let me take a step back.  I'm not going

9    to presume a motive to fabricate.  I'm not going to presume

10   anything.  I don't have them here.  I have, at least by

11   defense counsel's account, a woman who was a former correction

12   officer and a school teacher.

13        So I'm not, as I sit here today, going to make a

14   statement to suggest that that woman, who is not the mother of

15   Mr. Jordan, that she would fabricate, has a motive to

16   fabricate.  The Court will make no finding nor rely on any

17   representations in that regard.

18        What I will say is, I don't have an alibi witness

19   who was called to provide evidence in this bail hearing.

20   That's as much as I can say as to the alibi witnesses.

21        Go ahead.

22        MR. McCONNELL:  Moving on to the issue of what the

23   defense as characterized as exculpatory DNA evidence.  It's

24   really nothing of the sort.  This was a crime scene where lots

25   of people are going in and out.  Lots of people stayed there

*Rivka Teich CSR RPR RMR FCRR*
*Official Court Reporter*

BAIL APPLICATION

1    and actually would live there on occasion.  There was a hat

2    that was recovered near Mr. Mizell's body with a mixture of

3    several individual's DNA in that hat, and the defendant was

4    not one of them.  I don't view that as exculpatory.  The

5    defense can use it to make whatever arguments at trial.  The

6    fact an article of clothing containing lots of other DNA in a

7    location where lots of people congregate and occasionally

8    lived, to me is not significant, certainly for our purposes

9    here today.

10          The other thing that I want to say is that the

11   remaining charges, which again carry a presumption of

12   detention, carry substantial sentencing exposure in the form

13   of mandatory minimum sentences.  Those are unassailable.

14          Mr. Jordan is recorded on both audio and video

15   making narcotics sales to an undercover agent of law

16   enforcement.  We have witnesses who are going to testify not

17   only to purchasing narcotics from him but to seeing him with a

18   firearm such that they can even describe the type and the

19   color of it and where he was keeping it in the car.  Which by

20   the way, some witnesses will say that one of his children was

21   in the car while he was conducting this sort of activity as

22   well.  So this is really not an argument that I think should

23   be given much credence.

24          The Grand Jury has heard evidence twice.  He's been

25   indicted for these crimes twice.  That provides in and of

BAIL APPLICATION

1   itself an independent determination of probable cause.  And I

2   don't think that the inquiry needs to go further, certainly in

3   the absence of any evidence proffered by --

4           THE COURT:  You mentioned, you make reference in

5   your submission on page nine, about Mr. Jordan being in

6   possession of an untraceable and unmonitored contraband

7   cellphone while incarcerated.

8           MR. McCONNELL:  Yes.

9           THE COURT:  But that's all that you said.  Can you

10  provide a little bit more color?

11          MR. McCONNELL:  Sure.  Mr. Jordan's cell was

12  searched by members of the MDC.  He was found in possession of

13  a cellphone in his cell.  I can't tell you that much more

14  about it because the SIM card had been removed.  It's not

15  clear who the defendant was calling or what he was using that

16  phone for.

17          It's a good point because, number one, even subject

18  to COVID restrictions, 23-hour lockdowns a day sometimes, he

19  still manages to get his hands on a cellphone, which I'm told

20  can cost several thousand dollars.  It requires coordination

21  with someone not in the facility in order to get it in.  It

22  shows the attitude that he would take towards even the most

23  restrictive conditions that could be imposed in a home

24  detention situation.  This is not an insignificant factor.

25  Even in prison he's committing crimes by possessing a

BAIL APPLICATION

1    contraband cellphone.

2             THE COURT:  Can you speak to -- I'm trying to have a

3    better sense of the bases for the Government's assertions on

4    the bottom of page eight of its submission with respect to --

5    you have it under the nature and circumstance of the charged

6    offense, but it also goes to the question of dangerousness.

7    You talk about the attempts to or efforts to threaten or and

8    tamper with witnesses.  What is the bases for your argument in

9    that regard?

10            MR. McCONNELL:  Witnesses telling us that.

11            THE COURT:  In this case or prior cases?

12            MR. McCONNELL:  No, in this case.  There are lots of

13   reasons, I'll say, that it took 20 years to finally bring this

14   case to the position that it is now.  But a lot of it does

15   have to do with the fear that people have of Mr. Jordan.  It's

16   not just a fear that is without justification or speculative

17   fear.  Mr. Jordan has made it clear to people that they should

18   not testify.  My understanding is that even one of the

19   suretors has reached out to potential witnesses in this case.

20            I think that, to go back to the cellphone, the fact

21   that he's got an unmonitored, untraceable way to communicate

22   with people who can act on his behalf outside of the MDC

23   really puts a fine point on that.

24            I want to be careful because I don't want this to

25   turn into a discovery hearing.  I want to be careful about

*Rivka Teich CSR RPR RMR FCRR*
*Official Court Reporter*

BAIL APPLICATION

1   what I say about particular witnesses.  But that's the context

2   that we're operating in.

3          Can I address a few additional points?

4          THE COURT:  Go ahead.

5          MR. McCONNELL:  Thank you.  With respect to history

6   and characteristics, the point has been made that these crimes

7   were either dismissed or ended in disorderly conduct, which is

8   a non-criminal disposition.  But the case law is clear that

9   your Honor can consider both charged and uncharged conduct

10  when considering the issue of dangerousness.  That's all I'll

11  say on that.  The case law permits the Court to do that.

12         On the COVID issue, I am completely sympathetic to

13  the difficulties that the pandemic has caused, really the

14  entire criminal justice system, in moving cases forward.  I

15  really do feel that defense counsel makes a very good point

16  when he talks about the difficulties in preparing for a trial

17  of this magnitude with these sorts of restrictions.  However,

18  that's not unique to Mr. Jordan, number one.  Number two, the

19  case law is very, very clear that in the absence of sort of an

20  imminent hearing that release is just an extraordinary remedy

21  to consider.

22         As the Court is well aware, we're not going to trial

23  on this case for sometime.  So I think that given the body of

24  case law on this issue out of this courthouse and out of the

25  Southern District of New York to release him on that basis,

BAIL APPLICATION

1    one, distinguishes him in a way that I don't think is

2    justified from other defendants.  And two, is extremely

3    premature.

4              I'll reiterate my offer to defense counsel that we

5    are willing to help make whatever accommodations are necessary

6    in order for them to meet with Mr. Jordan, whether bringing

7    him to the courthouse, bringing him to the United States

8    Attorney's Office, whatever can be done we will make happen.

9    They just have to ask.  But regardless I think this is

10   premature.

11             Your Honor, has already brought out the point that I

12   wanted to make about the defendant's health status.  I think

13   this is really a non-issue.  It's certainly uncorroborated.  I

14   don't have anything else to say about that.

15             Finally, with respect to the strength of the bail

16   package, I really don't have much to say about that either.

17   We haven't been provided any information.  I don't know the

18   identities of the suretors.  I haven't been given anything

19   about the properties that are being put up or their potential

20   value.  We haven't been able to do any due diligence

21   whatsoever beyond what was put in the public filing.  And

22   that's fine, but I think, again in the context of a

23   presumption case, where the charges are this serious, it

24   shouldn't carry the day.

25             Mr. Jordan presents a risk of flight and a danger to

BAIL APPLICATION

1   the community that can really only be addressed by continuing

2   remand and that's what I would ask the Court to do.

3            THE COURT:  Thank you, counsel.

4            MR. HUESTON:  Just a couple of points.  With respect

5   to the narcotics part of the case.  I would note in the 2017

6   controlled buys that the Government is talking about, one

7   thing of note is there is no allegation of any weapons or

8   firearms and use.  Again, I think this goes to the strength of

9   the other allegations.  I just want to point that out.

10           THE COURT:  How dangerous do you think drug

11  trafficking is to our community?  I'm just curious.

12           MR. HUESTON:  Your Honor --

13           THE COURT:  I want to know if you're drawing the

14  line of dangerousness only with respect to guns and only with

15  respect to the murder charge.  Or, do you view the sale of

16  narcotics in our communities as also a danger to our

17  community?  Or, are you asking me not to?

18           MR. HUESTON:  I'm asking you not to, your Honor.

19  The idea of just selling drugs in and of itself, that does not

20  show dangerousness.

21           THE COURT:  Really?

22           MR. HUESTON:  Yes, your Honor.  I think that's a

23  fair view of the case law.

24           What I'm pointing out about the 2017, here the

25  Government is purporting there were controlled buys and in

BAIL APPLICATION

1   those of those buys there is no weapons in use.  That's what

2   I'm bringing up on that, your Honor.  We asked the Government

3   particulars about any weapons used and it's not been

4   forthcoming.  We asked, can you give us a TPO, a date where

5   Mr. Jordan actually used a firearm in relation to narcotics.

6   It's not happened.  We've asked for this information.  I do

7   think that's a fair rebuttal to what the Government said.

8           THE COURT:  If you could repeat that?

9           MR. HUESTON:  We asked the Government for the time

10  place and occurrence of uses of firearms with respect to

11  Mr. Jordan.  It's not in the 2017 controlled buys, it's not

12  there.

13          THE COURT:  Did you look at -- I'm just curious --

14  the authority cited by the Government?  Page seven of the

15  submission speaks specifically to the dangerousness as to

16  narcotics trafficking.  I think you just said to me the case

17  law is clear.  I'm curious how you square your argument to the

18  Court with the Second Circuit's determination in *U.S. vs.*

19  *Millan* 1993 and *U.S. vs. Leon,* which is I believe a 1985 case,

20  it's cited on page seven of the Government's submission, in

21  terms of how it is that I should view narcotics trafficking

22  for the purposes of bail, not for the purposes -- I'm not

23  suggesting that if we were in a sentencing hearing and we were

24  looking at enhancement, et cetera.  But for these purposes,

25  when I'm looking at a dangerousness prong, are you suggesting

BAIL APPLICATION

1   that ongoing narcotics trafficking isn't something that the

2   Court should view as falling under the umbrella of

3   dangerousness?  If not, tell me how I should view this

4   authority that is cited by the Government on page seven of its

5   submission.

6          MR. HUESTON:  Your Honor, I maintain my position

7   about that.  This is my response:  We're looking at

8   dangerousness.  The factors by clear and convincing

9   evidence -- by clear and convincing that Mr. Jordan presents a

10  physical danger to individuals.  I don't see that --

11         THE COURT:  I need you to square it with the case

12  law.  I understand what you're urging me to view it.  And what

13  I'm telling you is that there is authority in this circuit,

14  not in this district but the Court of Appeals, that says that

15  the dangerousness calculation can and should include ongoing

16  narcotics trafficking.  This is not about your opinion or

17  mine.  So against the case law, which you got their submission

18  just like I did, cited at page seven of the Government's

19  submission.

20         MR. HUESTON:  The response is really this, your

21  Honor, so for instance in every case involving narcotics,

22  (b)(1)(c) weight, that is not itself put into the presumption

23  in terms of a person being incarcerated.  As we look at it,

24  it's the weight that is pushing the presumptions in the case.

25  That's really the gravamen of the response.  It's the weights

BAIL APPLICATION

1   drug dealing in and of itself --

2            THE COURT:  When you say the weight, the quantity?

3            MR. HUESTON:  The quantity.

4            THE COURT:  The quantity of drugs involved.

5            MR. HUESTON:  Yes.  So in and of itself the

6   statement "drug dealing itself is danger" --

7            THE COURT:  We have seven controlled buys, so it's

8   the ongoing nature, the potential ongoing nature, right.  So

9   one buy of a small quantity, I hear what you're saying.  But

10  what the Government is urging the Court to see is that we're

11  talking about ongoing activity.  So if you have a number an

12  accumulation of small buys, to your point, you now have moved

13  to a greater weight.

14           What the Government is saying is, your Honor, this

15  is evidence of ongoing narcotics trafficking.

16           So for you to tell me but, Judge, there were no

17  guns, there was no guns in the videos.  But what I'm saying is

18  I need to look at the narcotics trafficking as well.  And you

19  have to address in light of the case law why it is that that

20  is not a consideration for dangerousness that I should

21  undertake here.

22           MR. HUESTON:  What I would add is this, your Honor,

23  as well.  Maybe I didn't say this as clear as I needed to say.

24  Besides the 2017 controlled buys we have no other evidence in

25  terms of invoices, narcotics reports --

BAIL APPLICATION

```
1              THE COURT:  I was about to make a Whitney Houston

2      joke.  No invoices, no receipts on the drug buys?

3              MR. HUESTON:  I'm talking about New York City

4      undercover operations, your Honor.

5              THE COURT:  I see.  Okay.

6              MR. HUESTON:  I apologize if I'm not being as clear

7      as I should be.  That's what I'm talking.  I'm not suggesting

8      drug dealers --

9              THE COURT:  What we do have is an Indictment where

10     there was witnesses testimony, Grand Jury Indictment

11     concerning ongoing drug activity that occurred over a period

12     of some years, not an isolated drug transaction but an ongoing

13     drug trafficking operation.  That's what I have.  That's what

14     I have probable cause for.  The Grand Jury Indictment itself

15     creates probable cause as to those crimes.  And the crimes are

16     not isolated but ongoing drug trafficking.

17             MR. HUESTON:  Your Honor, they have the Indictment.

18     And you're correct in pointing it out.  I don't have much

19     more, other than to say what I was pointing out with the 2017

20     issue is that in those instances there is no guns in play.

21             THE COURT:  I hear you.

22             MR. HUESTON:  That's really all I'm saying about

23     that.

24             I've asked for a particularization about any other

25     guns and it's not been forthcoming from the Government.
```

39

BAIL APPLICATION

1      THE COURT:  I get that.  And for the purposes of the

2  trial and the Government's burden of proof and what they need

3  to prove to sustain the charges.  But for the purposes of my

4  caliculus here and looking dangerousness, guns are not

5  dispositive, is my point.

6      MR. HUESTON:  Your Honor, I don't disagree with what

7  you're saying.  I think it's the accumulation of different

8  issues.  I just point out the issue.

9      Then I'll say this, your Honor, the Government did

10  point out that in December 2004 they mentioned there were

11  eight individuals arrested.  I think that's a complicated mix.

12  He has a disorderly conduct from that.  That's not dispositive

13  with respect to Mr. Jordan.  With respect to the DNA mixture,

14  we went a little bit further than that.

15      They identified an individual with respect to the

16  mixture.  It's not just, it was a mix, they got to a lead and

17  actually got to a person.  We point that fact out, that DNA

18  was recovered.  They tested it.  They tested it against my

19  client.  It came to a different person.

20      That's the point we want to make.  It goes to the

21  quality of the case that they are going to present.

22      No one is saying that the Government has been

23  remised.  They've been giving us, as they must, Brady material

24  in the case.  They are filling their obligation, it appears to

25  us.

BAIL APPLICATION

1          We do point out it's a little bit more than just a

2     mix that it didn't go to anywhere.  It went to a person.

3          THE COURT:  I'm sorry?

4          MR. HUESTON:  It went to a person that they've

5     identified.

6          THE COURT:  I see.

7          MR. HUESTON:  Your Honor, I'll end on this, unless

8     there are other questions that you have.  I think this goes to

9     the risk of flight.  Again we did mention there was this

10    Netflix show in 2018.

11         THE COURT:  I didn't see it, but okay.

12         MR. HUESTON:  They call it a true crime documentary.

13    Mr. Jordan is talked about as taking part in this murder.  I

14    would point out, Mr. Jordan didn't flee or run away or try to

15    leave anywhere.  He's living his life.

16         THE COURT:  You'll forgive me, how does Netflix

17    factor into that?

18         MR. HUESTON:  That folks believe you're responsible

19    for this murder.  He doesn't run away or try to escape.  He

20    lives in the neighborhood.  He lives in Hollis.  Nothing has

21    changed about his life.  That's the point I want to make about

22    that.

23         THE COURT:  He knew that as of the Netflix

24    documentary that there were more than just rumors in the

25    neighborhood that there was focus on him, but nonetheless he

BAIL APPLICATION

1  didn't flee.

2          MR. HUESTON:  Yes, your Honor.  I think that says

3  something about his willingness to participate in this

4  process.

5          THE COURT:  What did Mr. Jordan receive this cash

6  settlement from and when did he get that?

7          MR. HUESTON:  2018, your Honor.

8          THE COURT:  He got a cash settlement in 2018?

9          MR. HUESTON:  Yes, your Honor.

10          THE COURT:  For what?

11          MR. HUESTON:  An accident that he was involved in.

12          THE COURT:  With whom?

13          MR. HUESTON:  Vehicular accident.

14          THE COURT:  When did the accident take place?

15          MR. HUESTON:  April of 2017, your Honor.

16          THE COURT:  He recovered the money when in 2018?

17          MR. HUESTON:  Perhaps about 12 months later, about a

18  year later, your Honor.

19          THE COURT:  I am curious.  To the Government, page

20  four of your submission you talk about interviews and videos,

21  et cetera.  You didn't provide any dates of any of that.

22          MR. McCONNELL:  No, I didn't, your Honor.  They are

23  generally anywhere from 2010 through the offense conduct

24  through 2017, 2018 still publicly available.

25          THE COURT:  I'd like to know whether any of the

BAIL APPLICATION

1   photographs or videos of Mr. Jordan holding stacks of

2   100-dollar bills and other denominations, that diamond

3   encrusted jewelry, predated 2018.  Can you find that out for

4   me?

5                 MR. McCONNELL:  I can.

6                 THE COURT:  Give me a moment, folks.

7                 Mr. Jordan has four daughters, correct?

8                 MR. HUESTON:  Yes, your Honor.

9                 THE COURT:  They each reside with their moms?

10                MR. HUESTON:  Yes, your Honor.

11                THE COURT:  They have for how long since

12  Mr. Jordan's arrest or were they residing with their mothers

13  prior to his arrest?

14                MR. HUESTON:  Prior to his arrest, your Honor.

15                Your Honor, take note, he was living with the two

16  youngest with the mother.

17                THE COURT:  Mr. Jordan has had songs purchased?

18                MR. HUESTON:  Yes, your Honor.

19                THE COURT:  By whom?

20                MR. HUESTON:  Dead Set and Geony (ph).

21                THE COURT:  Is that a single company entity or is

22  that two?

23                MR. HUESTON:  It's two artists, your Honor.

24                THE COURT:  Dead Set and the other one is Geony(ph?)

25                MR. HUESTON:  Sorry, G-Unit.

BAIL APPLICATION

1           THE COURT:  G-Unit.

2           MR. HUESTON:  That's my mispronunciation.

3           THE COURT:  When was that?

4           MR. HUESTON:  2010 and 2011.  Your Honor, it's Dip

5    Set and G-Unit.  It's the mask, your Honor, I didn't hear the

6    information.  I apologize.  And maybe my lack of knowledge.

7           THE COURT:  I have what I need for now.

8           Anything that Pretrial Services would like to add?

9           MR. LONG:  No, your Honor.  We stand by our

10   recommendation --

11          THE COURT:  I know you're not talking in my

12   courtroom without standing up.  Has it been that long?

13          MR. LONG:  We stand by our report and our

14   recommendation.  Of course we're available to your Honor any

15   time to conference.

16          THE COURT:  What I'd like to do is take an

17   opportunity to digest the information that we have gone over

18   here today.  I think that the most prudent course is, or would

19   be for the Court, to make a determination on the record as

20   opposed to in writing which takes longer and belabors the

21   point.  Will I need to set a day and time this week to do so?

22   I'd like to reconvene on Thursday at 1:00 o'clock.

23          MR. McCONNELL:  Your Honor, I'm actually going to be

24   out of town on work travel.

25          THE COURT:  That's all right.  The good thing it's a

BAIL APPLICATION

1    big old Government, you can have someone come in your place,

2    right?

3                Defense counsel, Thursday at 1:00 o'clock?

4                MR. HUESTON:  That's fine, your Honor.

5                THE COURT:  We're going to continue this over to

6    Thursday at 1:00 o'clock.  Is there anything that you wanted

7    to add?

8                MR. HUESTON:  Yes, your Honor.  I did want to

9    mention that we've been provided with information from

10   Mr. Jordan's family that there has been a petition, 2400

11   individuals have signed a petition about him expressing their

12   support for him.  We think that's an important factor for the

13   Court to take into consideration.

14               THE COURT:  I do see that he has support in the

15   courtroom today.  It is not lost on me.

16               Anything else before we adjourn, folks?

17               MR. McCONNELL:  Not from the Government, your Honor.

18   Thank you.

19               MR. HUESTON:  Nothing from the defense.  Thank you.

20               THE COURT:  Thank you.  I appreciate your time.  I

21   appreciate the diligence with which you approached this

22   hearing.  I'll see you on Thursday.

23               Of course, I will not have the benefit of seeing

24   you.

25               MR. McCONNELL:  I'm going to try to get here.

*Rivka Teich CSR RPR RMR FCRR*
*Official Court Reporter*

45

BAIL APPLICATION

1          THE COURT:  We're adjourned.

2              (Whereupon, the matter was concluded.)

3                    *     *     *     *     *

4    I certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.

5

6    /s/ Rivka Teich
     Rivka Teich, CSR RPR RMR FCRR
7    Official Court Reporter
     Eastern District of New York

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25