NB:JAM/MEM
F. #2018R00082

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

     - against -

KARL JORDAN, JR.,
       also known as "Little D"
       and "Noid," and
RONALD WASHINGTON,
       also known as "Tinard,"

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

Docket No. 20-CR-305 (S-1) (LDH)

MEMORANDUM OF LAW IN SUPPORT OF THE
GOVERNMENT'S MOTIONS IN LIMINE TO ADMIT CERTAIN
EVIDENCE AT TRIAL, PRECLUDE CERTAIN EVIDENCE AT TRIAL,
AND REQUIRE THE DEFENDANTS TO COMPLY
WITH DISCOVERY OBLIGATIONS

BREON PEACE
UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Artie McConnell
Mark E. Misorek
Assistant U.S. Attorneys
    (Of Counsel)

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .............................................................................................IV

PRELIMINARY STATEMENT ...................................................................................... 1

    Motion to Admit Defendant Admissions and Coconspirator Statements ................................. 2

      I.    Legal Standard ................................................................................. 2

          A.    Defendant Admissions ................................................................... 2

          B.    Statements Against Penal Interest ................................................. 2

          C.    Third-Party Coconspirator Statements ......................................... 4

      II.    Argument ........................................................................................ 7

    Motion to Admit Uncharged Acts as Direct Proof of the Charged Crimes or as Rule 404(b) Evidence .............................................................................. 7

      I.    Overview of the Evidence the Government Seeks to Admit Pursuant to This Motion ................................................................................. 8

          A.    Jordan and Washington's Relationship, Narcotics Activity and Access to Firearms ...................................................................... 8

          B.    August 9, 2022: Washington's Gunpoint Robbery and Discharge of a .40 Caliber Firearm .......................................................... 9

          C.    January 2003: The Conspirators Connection to ███████ ........ 9

          D.    February 3, 2003: Jordan Possesses and Fires a .40 Caliber Pistol .......... 10

          E.    May 14, 2003: Jordan Shoots Mizell's Nephew with a .40 Caliber Firearm ........................................................................ 11

          F.    December 15, 2004: Firearms, Ammunition and Narcotics Paraphernalia Recovered From Jordan's Residence ................. 11

      II.    Analysis ........................................................................................ 12

          A.    The Proffered Evidence Is Admissible Because It Is Direct Proof of, Completes the Story of and Provides Essential Background to the Charged Crimes, Including About the Development of the Relationships of Trust Among the Coconspirators .................................. 13

              1.    Legal Standard .......................................................... 13

i

2.     Argument ............................................................ 15

B.     The Proffered Evidence Is Also Admissible Pursuant to Rule 404(b)
       .................................................................................... 18

1.     Legal Standard .................................................. 18

2.     Argument ............................................................ 21

a.     Certain of the Proffered Evidence Is Admissible to
       Establish the Development of the Criminal
       Relationships of Trust Among the Coconspirators .......... 21

b.     Evidence of Certain of the Other Acts, Particularly
       Access to Firearms and Ammunition, Evinces
       Knowledge, Intent, Identity, Motive, Plan,
       Opportunity, Lack of Accident and Absence of
       Mistake ........................................................................ 21

c.     The   Proffered   Evidence   Is   Admissible   to
       Corroborate Crucial Witness Testimony ........................ 23

C.     The Probative Value of the Proffered Evidence Far Outweighs Any
       Prejudicial Effect ........................................................................ 25

Motion to Admit Evidence of Witness Intimidation and Tampering ..................................... 26

I.     Overview of the Evidence the Government Seeks to Admit Pursuant to
       This Motion .................................................................................... 26

II.    Legal Standard .................................................................................... 29

III.   Argument ............................................................................................. 30

Motion to Admit Recorded Prison Calls as Admissions of a Party Opponent ...................... 32

I.     Legal Standard .................................................................................... 32

II.    Argument ............................................................................................. 34

Motion to Admit Jordan's Interview Videos and Selected Rap Lyrics ................................... 34

I.     Overview of the Evidence the Government Seeks to Admit Pursuant to
       This Motion .................................................................................... 35

II.    Legal Standard .................................................................................... 36

III.   Argument ............................................................................................. 37

Motion to Admit Certain Documents as Past Recollection Recorded ..................................... 38

Motion to Treat Exhibits, 3500 Material and Giglio Material Relating to Civilian
    Witnesses as Subject to the Protective Order ............................................................ 40

Motion to Preclude Any "Alternative Perpetrator" Argument Without Evidence
    Establishing a Sufficient Nexus to the Charged Crimes ........................................... 41

    I.      Legal Standard ......................................................................................... 41

    II.     Argument .................................................................................................. 43

CONCLUSION ........................................................................................................................ 45

TABLE OF AUTHORITIES

Federal Cases

Anderson v. United States,
 417 U.S. 211 (1974).................................................................................. 15
Dibenedetto v. Hall,
 272 F.3d 1 (1st Cir. 2001)......................................................................... 43
East Africa,
 552 F.3d 93 (2d Cir. 2008) ......................................................................... 6
Lutwak v. United States,
 344 U.S. 604 (1953)................................................................................... 15
Mandal v. City of New York,
 No. 02-CV-1234 (WHP), 2006 WL 3405005 (S.D.N.Y. Nov. 26, 2006) ............ 39
Parker v. Reda,
 327 F.3d 211 (2d Cir. 2003) ...................................................................... 39
United States v. Alcaide,
 112 F.3d 505, 1997 WL 225121 (2d Cir. 1997) ....................................... 23
United States v. Alvarez,
 584 F.2d 694 (5th Cir. 1978) ...................................................................... 3
United States v. Amato,
 15 F.3d 230 (2d Cir. 1994) .......................................................................... 6
United States v. Arline,
 660 F. App'x 35 (2d Cir. 2016) ................................................................. 31
United States v. Arrington,
 867 F.2d 122 (2d Cir. 1989) ..................................................................... 31
United States v. Arroyo,
 600 F. App'x 11 (2d Cir. 2015).................................................................. 16
United States v. Barret,
 No. 10-CR-809 (S-3) KAM, 2011 WL 6704862 (E.D.N.Y. Dec. 21, 2011) .......... 14, 22
United States v. Barris,
 377 F. App'x 93 (2d Cir. 2010) ................................................................. 22
United States v. Basciano,
 No. 03-CR-929 (NGG), 2006 WL 385325 (E.D.N.Y. Feb. 17, 2006) ......... 18, 24, 30
United States v. Bourne,
 No. 08-CR-888 (NGG), 2011 WL 4458846 (E.D.N.Y. Sept. 23, 2011) ................ 18
United States v. Bruno,
 873 F.2d 555 (2d Cir. 1989) ...................................................................... 23
United States v. Bumagin,
 13 F.Supp.3d 361 (E.D.N.Y. Sept. 29, 2015) ........................................... 22
United States v. Cacace,
 796 F.3d 176 (2d Cir. 2015) ........................................................................ 4
United States v. Carboni,
 204 F.3d 39 (2d Cir. 2000) ........................................................................ 13
United States v. Carpenter,
 372 F.Supp.3d 74 (E.D.N.Y. Feb. 25, 2019) ............................................ 37

United States v. Check,
   582 F.2d 668 (2d Cir. 1978) ............................................................... 32
United States v. Cicale,
   691 F.2d 95 (2d Cir. 1982) ................................................................... 6
United States v. Cirillo,
   468 F.2d 1233 (2d Cir. 1972) ............................................................. 30
United States v. Clark,
   489 F. App'x 558 (3d Cir. 2012) ........................................................ 15
United States v. Colon,
   880 F.2d 650 (2d Cir. 1989) ............................................................... 19
United States v. Coonan,
   938 F.2d 1553 (2d Cir. 1991) ........................................................ 13, 24
United States v. Cummings,
   858 F.3d 763 (2d Cir. 2017) ............................................................... 32
United States v. Daly,
   842 F.2d 1380 (2d Cir. 1988) ............................................................. 14
United States v. Davidson,
   308 F. Supp. 2d 461 (S.D.N.Y. 2004) .............................................. 2, 34
United States v. DeLuna,
   763 F.2d 897 (8th Cir. 1985) .............................................................. 33
United States v. Desena,
   260 F.3d 150 (2d Cir. 2001) ................................................................. 4
United States v. DeVillio,
   983 F.2d 1185 (2d Cir.1993) ................................................................. 5
United States v. Diaz,
   176 F.3d 52 (2d Cir. 1999) ................................................................. 14
United States v. Dore,
   No. 12-CR-45, 2013 WL 3965281 (S.D.N.Y. July 31, 2013) ................ 36
United States v. Dupre,
   462 F.3d 131 (2d Cir. 2006) ............................................................... 32
United States v. Dupree,
   870 F.3d 62 (2d Cir. 2017) ................................................................... 4
United States v. Egipciaco,
   287 Fed. Appx. 119 (2d Cir. 2008) ....................................................... 6
United States v. Everett,
   825 F.2d 658 (2d Cir. 1987) ...................................................... 20, 23, 24
United States v. Foster,
   939 F.2d 445 (7th Cir. 1991) ......................................................... 36, 37
United States v. Garcia,
   282 F. App'x 14 (2d Cir. 2008) .......................................................... 39
United States v. Garcia,
   291 F.3d 127 (2d Cir. 2002) ............................................................... 18
United States v. Gibbs,
   739 F.2d 838 (3d Cir. 1984) ................................................................. 5
United States v. Gigante,
   166 F.3d 75 (2d Cir 1999) ................................................................. 4, 5

United States v. Gonzalez,
   110 F.3d 936 (2d Cir. 1997) ................................................................. 13
United States v. Graziano,
   558 F. Supp. 2d 304 (E.D.N.Y. 2008) ................................................. 17
United States v. Guang Ju Lin,
   505 F. App'x 10 (2d Cir. 2012) ........................................................... 33
United States v. Guerrero,
   882 F. Supp. 2d 463 (S.D.N.Y. 2011) ................................................. 21
United States v. Harris,
   733 F.2d 994 (2d Cir. 1984) ................................................................. 20
United States v. Hendricks,
   921 F.3d 320 (2d Cir. 2019) .............................................. 41, 42, 44
United States v. Herron,
   762 Fed.Appx. 25 (2d Cir. 2019) ........................................................ 36
United States v. Herron,
   No. 10-CR-0615 (NGG), 2014 WL 1871909 (E.D.N.Y. May 8, 2014) ..... 38
United States v. Inserra,
   34 F.3d 83 (2d Cir. 1994) ..................................................................... 13
United States v. Ivanova,
   19 F. Supp. 3d 511 (S.D.N.Y. 2014) ................................................... 30
United States v. Jadusingh,
   No. 18-CR-257 (KAM), 2020 WL 207950 (E.D.N.Y. Jan. 14, 2020) ...... 34
United States v. James,
   712 F.3d 79 (2d Cir. 2013) .................................................................... 6
United States v. Johnson,
   469 F. Supp. 3d 193 (S.D.N.Y. 2019) ................................................. 31
United States v. Jones,
   716 F.3d 851 (4th Cir. 2013) ............................................................... 33
United States v. Kahale,
   789 F. Supp. 2d 359 (E.D.N.Y. 2009) ................................................. 14
United States v. Langford,
   990 F.2d 65 (2d Cir. 1993) ............................................................ 13, 14
United States v. Levy,
   731 F.2d 997 (2d Cir. 1984) ......................................................... 18, 19
United States v. Livoti,
   196 F.3d 322 (2d Cir. 1999) ......................................................... 25, 38
United States v. Lombardozzi,
   No. 02-CR-273 (S-1) (PKL), 2003 WL 1907969 (S.D.N.Y. Apr. 17, 2003) ..... 17
United States v. Maldonado-Rivera,
   922 F.2d 934 (2d Cir. 1990) ................................................................... 5
United States v. Malpiedi,
   62 F.3d 465 (2d Cir. 1995) ................................................................... 29
United States v. Marin,
   669 F.2d 73 (2d Cir. 1982) .......................................................... 2, 33
United States v. McVeigh,
   153 F.3d 1166 (10th Cir. 1998) .................................................... 42, 44

United States v. Mejia-Velez,
  855 F. Supp. 607 (E.D.N.Y. 1994) ...................................................... 18, 23
United States v. Mendez,
  165 F.3d 15, 1998 WL 802127 (2d Cir. 1998) ........................................ 15
United States v. Mickens,
  926 F.2d 1323 (2d Cir. 1991) .................................................... 19, 25, 30
United States v. Mitchell,
  502 F.3d 931 (9th Cir. 2007) ........................................................... 33
United States v. Monahan,
  633 F.2d 984 (1st Cir. 1980).............................................................. 30
United States v. Morillo-Vidal,
  547 Fed. App'x 29 (2d Cir. 2013) ...................................................... 20
United States v. Moten,
  564 F.2d 620 (2d Cir. 1977) .............................................................. 20
United States v. Mulder,
  273 F.3d 91 (2d Cir. 2001) ................................................................. 6
United States v. Ortiz,
  857 F.2d 900 (2d Cir. 1988) ......................................................... 18, 19
United States v. Paulino,
  445 F.3d 211 (2d Cir. 2006) ......................................................... 22, 25
United States v. Perez,
  387 F.3d 201 (2d Cir. 2004) ......................................................... 29, 30
United States v. Persico,
  645 F.3d 85 (2d Cir. 2011) ................................................................. 3
United States v. Pierce,
  785 F.3d 832 (2d Cir.), cert. denied, 136 S. Ct. 172, 193 L. Ed. 2d 139 (2015) .................... 36
United States v. Pipola,
  83 F.3d 556 (2d Cir. 1996) .......................................................... 19, 21
United States v. Pitre,
  960 F.2d 1112 (2d Cir. 1992) .................................................. 18, 25, 38
United States v. Poulsen,
  655 F.3d 492 (6th Cir. 2011) ............................................................ 30
United States v. Reed,
  576 F. App'x 60 (2d Cir. 2014) ........................................................ 33
United States v. Rivera,
  22 F.3d 430 (2d Cir. 1994) ................................................................. 6
United States v. Rivera,
  No. 13-CR-149 (KAM), 2015 WL 1757777 (E.D.N.Y. Apr. 17, 2015) ................................ 38
United States v. Rivera,
  No. 13-CR-149 (KAM), 2015 WL 1875658 (E.D.N.Y. Apr. 22, 2015) ........................... 15, 17
United States v. Robinson,
  560 F.2d 507 (2d Cir.1977) ............................................................. 16
United States v. Robinson,
  635 F.2d 981 (2d Cir. 1980) ............................................................. 29
United States v. Roldan-Zapata,
  916 F.2d 795 (2d Cir. 1990) ......................................................... 25, 31

vii

United States v. Rosa,
  11 F.3d 315 (2d Cir. 1993) .................................................................. 19

United States v. Russo,
  302 F.3d 37 (2d Cir.2002) ......................................................... 5, 32, 33

United States v. Saget,
  377 F.3d 223 (2d Cir. 2004) .................................................................. 3

United States v. Sakoc,
  2014 WL 7336079 (D. Vt. Dec. 22, 2014) ........................................ 31

United States v. Santiago,
  199 F. Supp.2d 101 (S.D.N.Y. 2002) ................................................ 23

United States v. Sasso,
  59 F.3d 341 (2d Cir. 1995) .................................................................... 4

United States v. Serrano,
  192 F. Supp.3d 407 (S.D.N.Y. 2016) ................................................ 43

United States v. Slaughter,
  248 Fed. Appx. 210 (2d Cir.2007) ..................................................... 16

United States v. Smith,
  629 F.2d 650 (10th Cir. 1980) ............................................................ 29

United States v. Sorrentino,
  72 F.3d 294 (2d Cir. 1995) ................................................................. 33

United States v. Stewart,
  433 F.3d 273 (2d Cir. 2006) .................................................................. 5

United States v. Stuckey,
  253 F. App'x 468 (6th Cir. 2007) ....................................................... 37

United States v. Taylor,
  767 F. Supp. 2d. 428 (S.D.N.Y. Dec. 1, 2010) ................................. 17

United States v. Thai,
  29 F.3d 785 (2d Cir. 1994) ................................................................. 14

United States v. Towne,
  870 F.2d 880 (2d Cir. 1989) ............................................................... 13

United States v. Tramunti,
  513 F.2d 1087 (2d Cir. 1975) ............................................................. 15

United States v. Triumph Capital Group, Inc.,
  544 F.3d 149 (2d Cir. 2008) ............................................................... 29

United States v. Waters,
  138 F. App'x. 460 (3d Cir. 2005) ....................................................... 33

United States v. Weir,
  575 F.2d 668 (8th Cir. 1978) ............................................................. 32

United States v. Wexler,
  522 F.3d 194 (2d Cir. 2008) .................................................................. 3

United States v. White,
  692 F.3d 235 (2d Cir. 2012) ............................................................... 41

United States v. Williams,
  205 F.3d 23 (2d Cir. 2000) ................................................................. 19

United States v. Williams,
  506 F.3d 151 (2d Cir. 2007) .................................................................. 3

United States v. Williams,
  585 F.3d 703 (2d Cir. 2009) ......................................................... 14
United States v. Williams,
  No. 13-CR-419 (S-2) (DLI), 2016 WL 4536864 (E.D.N.Y. Aug. 30, 2016) ......................... 15
United States v. Wilson,
  493 F. Supp. 2d 484 (E.D.N.Y. 2006) ............................................... 37
United States v. Young,
  561 F. App'x 85 (2d Cir. 2014) ..................................................... 31
United States v. Zappola,
  677 F.2d 264 (2d Cir. 1982) ........................................................ 16
Wade v. Mantello,
  333 F.3d 51 (2d Cir. 2003) ............................................. 41, 42, 43, 44
Willcock v. Martuscello,
  No. 17-CV-454 (KAM) (LB), 2020 WL 2748031 (E.D.N.Y. May 27, 2020) ......................... 43
Williamson v. United States,
  512 U.S. 594 (1994) ................................................................. 3

## Federal Statutes

18 U.S.C. § 3500 ........................................................................ 40

## Federal Rules

Fed. R. Crim. P. 12.1 ................................................................... 48
Fed. R. Crim. P. 16 .................................................................... 47
Fed. R. Crim. P. 16(b) ................................................................. 50
Fed. R. Crim. P. 16(b)(1)(A) ........................................................... 49
Fed. R. Crim. P. 16(b)(1)(C) ........................................................... 47
Fed. R. Crim. P. 16(d)(2)(A)-(D) ....................................................... 47
Fed. R. Crim. P. 26.2 .................................................................. 51
Fed. R. Evid. 402 ..................................................................... 45
Fed. R. Evid. 403 ..................................................................... 45
Fed. R. Evid. 404(b) .................................................................. 26
Fed. R. Evid. 404(b)(2) ............................................................... 18
Fed. R. Evid. 801(a) .................................................................. 36
Fed. R. Evid. 801(d)(2)(A) ..................................................... 2, 33, 36
Fed. R. Evid. 801(d)(2)(E) ............................................................. 5
Fed. R. Evid. 803(5) .............................................................. 38, 39
Fed. R. Evid. 804(b)(3) ................................................................ 2

PRELIMINARY STATEMENT

The defendants Karl Jordan, Jr. and Ronald Washington are charged with the narcotics-related murder of Jason Mizell, also known as "Jam Master Jay," as alleged in Counts One and Two of the Superseding Indictment.  Trial is scheduled to commence on February 20, 2023.

The government respectfully submits this memorandum of law in support of its motions in limine to permit the government to introduce at trial: (1) coconspirator statements, including statements of the decedent; (2) certain acts committed by the defendants as direct proof of the charged crimes or, in the alternative, as "other crimes, wrongs or acts" pursuant to Rule 404(b); (3) evidence of witness intimidation and tampering; (4) recorded prison calls as admissions of a party opponent; (5) Jordan's relevant statements in selected interviews and lyrics; (6) certain documents as offered as past recollection recorded; and (7) to treat certain materials as subject to the September 17, 2020 Protective Order.

The government also moves to preclude evidence of, or argument purporting to show, an "alternative perpetrator" that does not have a sufficient nexus to the crimes charged.

For the reasons set forth herein, the government's motions in limine should be granted.

1

<u>Motion to Admit Defendant Admissions and Coconspirator Statements</u>

The government seeks to admit statements by the defendants as admissions. The government also seeks to admit statements by third parties—including the decedent—as coconspirator statements and statements against penal interest.

I.  <u>Legal Standard</u>

A.  <u>Defendant Admissions</u>

Statements made by a defendant that are relevant to the charged conduct are admissible and not hearsay if "offered against an opposing party and . . . made by the party in an individual or representative capacity." Fed. R. Evid. 801(d)(2)(A). By contrast, a defendant is generally prohibited from introducing his own out-of-court statements at trial. <u>See</u> <u>United States v. Marin</u>, 669 F.2d 73, 84 (2d Cir. 1982) ("When the defendant seeks to introduce his own prior statement for the truth of the matter asserted, it is hearsay, and it is not admissible."). A defendant may not elicit his own statements as an "attempt to get [his] side of the . . . story in front of the jury without him[self] testifying and opening him[self] up to cross-examination." <u>United States v. Davidson</u>, 308 F. Supp. 2d 461, 480 (S.D.N.Y. 2004).

B.  <u>Statements Against Penal Interest</u>

Where a declarant is unavailable, statements made against the declarant's penal interest are admissible under Fed. R. Evid. 804(b)(3). Rule 804(b)(3) excepts from the hearsay rule a statement that "a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, it . . . had so great a tendency . . . to expose the declarant to civil or criminal liability; and . . . is supported by corroborating circumstances that clearly indicate its trustworthiness, if it is offered in a criminal case as one that tends to expose the declarant to criminal liability."

Admission of such statements "hinges on whether the statement was sufficiently against the declarant's penal interest that a reasonable person in the declarant's position would not have made the statement unless believing it to be true." United States v. Williams, 506 F.3d 151, 155 (2d Cir. 2007) (quoting Williamson v. United States, 512 U.S. 594, 603-04 (1994) (quoting Rule 804(b)(3))) (internal quotation marks omitted).   "Whether a challenged statement is sufficiently self-inculpatory can only be answered by viewing it in context" and "[t]hus, this determination must be made on a case-by-case basis." Id. (citations omitted).   To qualify as a statement against penal interest under Rule 804(b)(3), the statement need not be sufficient, standing alone, to convict the declarant.   See United States v. Persico, 645 F.3d 85, 102 (2d Cir. 2011).   Instead, Rule 804(b)(3) "encompasses disserving statements by a declarant that would have probative value in a trial against the declarant." United States v. Alvarez, 584 F.2d 694, 699 (5th Cir. 1978); see also Persico, 645 F.3d at 103 (statements that are probative in a trial against the declarant qualify as statements against penal interest under Rule 804(b)(3)).   While "non-self-inculpatory statements . . . made within a broader narrative that is generally self-inculpatory" are not admissible as statements against penal interest, Williamson, 512 U.S. at 600-01, a statement describing inculpatory acts committed by the declarant and a co-defendant are admissible in full as statements against the declarant's penal interest, especially where the context of the statement demonstrates that the declarant was not attempting to "minimize his own culpability, shift blame onto [the co-defendant], or curry favor with authorities." Williams, 506 F.3d at 155; accord United States v. Wexler, 522 F.3d 194, 203 (2d Cir. 2008) (affirming admissibility of statements that implicated both declarant and defendant); United States v. Saget, 377 F.3d 223, 231 (2d Cir. 2004) (affirming admissibility of taped conversations implicating both the declarant and the defendant in joint criminal activity).

In <u>United States v. Sasso</u>, the Second Circuit set forth several factors to consider in determining whether a statement against penal interest carries sufficient indicia of reliability, finding that such statements are likely to be trustworthy where: (1) the declarant equally inculpates himself along with the defendant and does not engage in blame-shifting or role-minimizing; (2) there is no apparent self-interested motive for the declarant to inculpate the defendant; (3) there is no coercion present; and (4) there is no apparent attempt to curry favor with the authorities (<u>i.e.</u>, the statement was made in a private setting and/or to a friend or ally). 59 F.3d 341, 349-50 (2d Cir. 1995). A witness's lack of detailed knowledge about the declarant's criminal activity or concerns about a witness's credibility do not weigh against reliability; such concerns can be addressed through cross examination of the witness. <u>United States v. Dupree</u>, 870 F.3d 62, 80-81 (2d Cir. 2017) (citing <u>United States v. Cacace</u>, 796 F.3d 176, 192 (2d Cir. 2015)).

C.    <u>Third-Party Coconspirator Statements</u>

Rule 801(d)(2)(E) excludes from the definition of hearsay "statement[s] by a coconspirator of a party during the course and in furtherance of the conspiracy." To be admissible under Rule 801(d)(2)(E), the Court must make two findings by a preponderance of the evidence, "'first, that a conspiracy existed that included the defendant and the declarant; and second, that the statement was made during the course of and in furtherance of that conspiracy.'" <u>United States v. Desena</u>, 260 F.3d 150, 157-58 (2d Cir. 2001) (quoting <u>United States v. Gigante</u>, 166 F.3d 75, 82 (2d Cir 1999)).

Regarding the first prong, "[i]n determining whether a conspiracy existed, the district court may consider the hearsay statement itself, but there must be some independent corroborating evidence of the defendant's participation in the conspiracy." <u>Id.</u> at 158 (internal citations and quotation marks omitted). This preponderance standard merely requires the Government "to present sufficient proof so that the trial judge may find 'that the existence of the

4

[conspiracy] is more probable than its nonexistence.'" United States v. Gibbs, 739 F.2d 838, 843 (3d Cir. 1984).  The law also has long provided that "[t]he conspiracy between the declarant and the defendant need not be identical to any conspiracy that is specifically charged in the indictment." Gigante, 166 F.3d at 82; see also United States v. Russo, 302 F.3d 37, 45 (2d Cir.2002).  In fact, the Second Circuit has held that it is not even necessary that the Government charge a conspiracy to take advantage of Rule 801(d)(2)(E). United States v. DeVillio, 983 F.2d 1185, 1193 (2d Cir.1993); United States v. Maldonado-Rivera, 922 F.2d 934, 962 (2d Cir. 1990) (collecting cases).

"As to the second requirement, statements made during the course and in furtherance of a conspiracy must be such as to prompt the listener . . . to respond in a way that promotes or facilitates the carrying out of a criminal activity." Gigante, 166 F.3d at 82.  "This can include those statements that provide reassurance, or seek to induce a coconspirator's assistance, or serve to foster trust and cohesiveness, or inform each other as to the progress or status of the conspiracy." Gigante, 166 F.3d at 82; see also Russo, 302 F.3d at 46  (statements designed to reassure a coconspirator, maintain trust and cohesiveness among them or inform each other of the status of the conspiracy are in furtherance of the conspiracy within the meaning of 801(d)(2)(e)); Maldonado-Rivera, 922 F.2d at 958  (further explaining that the statement should "provide reassurance, or seek to induce a coconspirator's assistance, or serve to foster trust and cohesiveness, or inform each other as to the progress or status of the conspiracy") (citation omitted).  The statement need not actually further the conspiracy, but instead need only be made with the intent to further some objective of the conspiracy.  United States v. Stewart, 433 F.3d 273, 293 (2d Cir. 2006).  Thus, a status update is sufficient to satisfy the "in furtherance" requirement of Rule 801(d)(2)(E). United States v. Amato, 15 F.3d 230, 234 (2d Cir. 1994).  In United States v. Mulder, for example, the Second Circuit upheld the admission of a coconspirator's statements

even though they appeared to merely narrate conversations between members of the conspiracy because it kept fellow coconspirators apprised of the arrangements for their extortion scheme. 273 F.3d 91, 103 (2d Cir. 2001). See also United States v. Rivera, 22 F.3d 430, 436 (2d Cir. 1994) (a statement is "in furtherance of a conspiracy" if it was "in some way . . . designed to promote or facilitate achievement of the goals of that conspiracy, as by, for example . . . communicating with a person who is not a member of the conspiracy in a way that is designed to help the coconspirators to achieve the conspiracy's goals"); United States v. James, 712 F.3d 79, 106 (2d Cir. 2013) ("The ways in which a statement might 'promote or facilitate' the conspiracy include . . . prompting a non-coconspirator to respond in some way that 'promotes or facilitates the carrying out of a criminal activity.'") .

Moreover, "[t]hough [Rule 801(d)(2)(e)] requires that both the declarant and the party against whom the statement is offered be members of the conspiracy, there is no requirement that the person to whom the statement is made also be a member." In re Terrorist Bombings of U.S. Embassies in East Africa, 552 F.3d 93, 139 (2d Cir. 2008); see also, e.g., United States v. Egipciaco, 287 Fed. Appx. 119, 121-122 (2d Cir. 2008) (coconspirator statement made to a confidential informant admissible as coconspirator statement made in furtherance of the conspiracy).  Proof that an individual is a coconspirator is satisfied "by a fair preponderance of the evidence that the defendant was in fact a member of the conspiracy," which means "a likelihood of an illicit association between the declarant and the defendant."  United States v. Cicale, 691 F.2d 95, 103 (2d Cir. 1982) (internal quotation marks omitted).

II.     Argument

The drug conspiracy that precipitated Mizell's murder involved numerous participants located both in the Eastern District of New York and elsewhere.  Accordingly, in addition to the defendants' own statements showing involvement in the conspiracy, much of the government's evidence will consist of coconspirator statements and statements against penal interest offered into evidence for their truth.  These statements were made by and between coconspirators, to each other and other witnesses, including statements from the decedent, where he disclosed to witnesses on several occasions that he was dispatching the defendants to Baltimore to assist with the cocaine distribution and to serve as security for the operation.  Such evidence will also include coconspirator statements regarding Washington being excluded from the transaction due to Washington's conflict with another coconspirator.

At trial, the government will lay the appropriate foundation for these statements through witnesses in accordance with the legal precepts and precedent set forth above.

<u>Motion to Admit Uncharged Acts as Direct Proof of the Charged Crimes or as Rule 404(b)
Evidence</u>

The government seeks to admit evidence of certain acts committed by the defendants.  As set forth below, the evidence is admissible as direct proof of the charged crimes, such as the defendants' access to and use of .40 caliber firearms and ammunition, which were used in Mizell's killing.

In the alternative, the evidence is admissible as "other crimes, wrongs or acts" under Rule 404(b) because it tends to establish a defendant's knowledge, intent, motive, plan, lack of accident and absence of mistake with respect to the charged crimes, and would be offered for other permissible purposes such as to explain the development of the relationships between the

defendants and other coconspirators, to corroborate other witnesses and to elicit impeachment material as to government witnesses.

I.      Overview of the Evidence the Government Seeks to Admit Pursuant to This Motion

The government seeks by this motion to admit the following categories of evidence at trial through witness testimony, all of which is based on the respective witnesses' personal knowledge and observations.

A.      Jordan and Washington's Relationship, Narcotics Activity and Access to Firearms

The government will elicit testimony from mutual associates of Washington and Jordan to help explain the nature of their relationship.  Specifically, Washington was feared in Hollis, Queens and was known for possessing firearms, committing armed robberies and engaging in narcotics trafficking, often as an enforcer or security for traffickers.  Indeed, one of the government witnesses who was with Washington on the day of Mizell's murder ("Witness 1") aided and abetted armed robberies committed by Washington.  Younger individuals in the neighborhood who were becoming involved in criminal activity, such as Jordan, respected and looked up to Washington as a "big homie" due to his reputation.  Shortly before Mizell's murder, and after Washington returned to Hollis after serving a ten-year sentence in Baltimore, Maryland for narcotics trafficking, he and Jordan would work out and otherwise consort together.  Notably, in a September 5, 2020 phone call, Washington laments that he and Jordan were charged together and notes that Jordan "was [his] little man."

Witness testimony will also establish that Jordan was involved in narcotics trafficking and firearms offenses at that time, and that Jordan had previously asked that Mizell "put him on," or allow Jordan to participate in narcotics trafficking with Mizell.  Mizell had subsequently provided Jordan with a small quantity of cocaine to determine if Jordan could handle selling larger quantities.

8

Per the testimony of one of Jordan's associates that was privy to Jordan's narcotics trafficking around the time of Mizell's murder ("Witness 2"), Jordan was selling approximately 20-30 grams of cocaine per day and frequently carried a firearm.  Both Jordan and Witness 2 would secrete drugs and firearms in a van parked outside of ███████████ in Queens, where Jordan lived.  Per Witness 2, a .40 caliber pistol used to be hidden in the van, and that same firearm went missing around the time of Mizell's murder—notably, Mizell was shot with a .40 caliber pistol. Witness 2 also noted that Washington and Jordan were not "cool" after Mizell's murder based on Witness 2's personal observations of the two of them together.  Washington also stole a pellet gun from Witness 2 that Witness 2 believed Washington used to commit robberies, and Witness 2 saw Washington with firearms on numerous occasions around the time of Mizell's murder.  Notably, Witness 1 will also testify that Witness 1 observed Washington procure a pellet gun from Witness 2 prior to Mizell's killing.

The government will also introduce evidence that Washington asked another mutual associate of Washington and Mizell ("Witness 3") if Witness 3 could get Washington .40 caliber rounds—the same recovered from the scene of Mizell's murder—shortly before the killing.

B.      August 9, 2022: Washington's Gunpoint Robbery and Discharge of a .40 Caliber Firearm

On August 9, 2022, Washington committed a gunpoint robbery in the vicinity of 204-19 Hollis Avenue.  Washington struck the victim on the head with a firearm, demanded money and jewelry and fired at the victim when he tried to chase Washington.  One spent .40 caliber shell casing was recovered, which was different from the casings later recovered at the murder scene.

C.      January 2003: The Conspirators Connection to ███████████

Jordan, Washington and another participant in the murder conspiracy ("Coconspirator 1") had a mutual associate (the "Mutual Associate") who, in 2002, resided at ███

9

███████████.  A family member of the Mutual Associate was involved with a nationwide narcotics syndicate that also supplied Mizell with cocaine.  Jordan and Coconspirator 1 were both close with the Mutual Associate and frequented ███████████, which was used by neighborhood narcotics traffickers as a hang out and as a location to exchange firearms.  Witness 1 stated that Washington had visited ███████████ in the days preceding Mizell's murder.  Notably, in a recorded phone call from the Metropolitan Detention Center ("MDC") on November 29, 2020, Washington discussed knowing the Mutual Associate and the Mutual Associate's father.

In or about January 2003, a witness ("Witness 4") who was present inside ███████ ███████ observed the Mutual Associate and several other individuals in possession of firearms, including a .40 caliber handgun that was on the kitchen table.  There was discussion about "getting rid" of the weapons, and Witness 4 was told to leave by the Mutual Associate and others.  When Witness 4 queried why the Mutual Associate and others were so tense, he was told, inter alia, "[Mutual Associate] and them boys have something to do with Jay's [Mizell's] murder."  While Witness 4 was not sure if Jordan was inside the house at this time, he had seen both Jordan and Coconspirator 1 at ███████████ previously, and that Coconspirator 1 was in possession of a firearm on at least one such occasion.  Witness 4 also has also seen Washington at ███████ ███, but not on that day.

Based on information provided by Witness 4, a search warrant was executed at ███ ███████████ on or about February 1, 2003.  No weapons or drug paraphernalia were recovered.

D.   <u>February 3, 2003: Jordan Possesses and Fires a .40 Caliber Pistol</u>

On February 3, 2003, Jordan was arguing with one of defendant Washington's family members ("Washington's Relative") in front of Jordan's residence at ███████████.  Jordan struck Washington's Relative in the face, produced a .40 caliber semi-automatic pistol, fired one shot into the air, and secreted the weapon inside his home.  Responding police officers

10

recovered a spent .40 caliber shell casing—the same make and model as the casings recovered from Mizell's murder—and an additional 83 live .40 caliber rounds, along with two live shotgun rounds, from inside the residence.  Witnesses on the scene identified Jordan as the shooter.  Jordan made a post-Miranda statement admitting to the offense and was initially charged with a felony, but Washington's Relative refused to cooperate and failed to respond to a subpoena to testify before the grand jury.  As a result, the grand jury indicted Jordan for possession of ammunition, a misdemeanor.  Jordan eventually pled guilty to a disorderly conduct violation.  The pistol Jordan used was eventually recovered from Jordan's friend incident to a subsequent, unrelated arrest.

      E.     <u>May 14, 2003: Jordan Shoots Mizell's Nephew with a .40 Caliber Firearm</u>

On May 14, 2003, Jordan fired several shots at Mizell's nephew in the vicinity of 203-11 Hollis Avenue, striking him once in the leg.  Two .40 caliber discharged bullets were recovered from the scene.  Jordan was arrested for Criminal Use of a Firearm in the First Degree, but the case was subsequently dismissed when the victim refused to cooperate with law enforcement.  The dispute between the two involved Mizell's nephew accusing Jordan of Mizell's murder in a rap song.

      F.     <u>December 15, 2004: Firearms, Ammunition and Narcotics Paraphernalia Recovered From Jordan's Residence</u>

In or about December 2004, Jordan lived at ███████████, a residence owned by Jordan's father.[1]  Another individual who lived at ███████████ during that period ("Witness 5") frequently purchased narcotics from Jordan, assisted Jordan in trafficking narcotics and observed Jordan carrying firearms at that location and elsewhere, with Jordan often using the aforementioned van in the driveway to secrete narcotics and firearms.  Jordan would often

---

    [1]    One of Jordan's noticed alibi witnesses also lived at this location with Jordan at the time and was arrested with Jordan pursuant to the search warrant execution described herein.

comment to Witness 5 that he had killed people, including Jordan insinuating that he had killed Mizell.  On one occasion, Jordan threatened Witness 5 with a gun and stated in substance that he would kill Witness 5 like he had killed Mizell.

Predicated on Jordan's narcotics sales and based in part on information provided by Witness 5, a search warrant was executed at ███████████ on or about December 15, 2004.  During the search, law enforcement recovered a loaded 9mm semi-automatic pistol, a loaded 9mm magazine, a loaded .32 caliber revolver, and a bullet proof vest.  Also in the residence were over 150 bags of marijuana, various bags and foil wraps containing cocaine, and hundreds of glassine envelopes used for packaging narcotics.  Jordan and six other individuals were inside at the time and arrested, and the case resulted in a plea to disorderly conduct.

II.    Analysis

All of the foregoing evidence is direct proof and completes the story of, and provides essential background to, the charged crimes.  As such, the evidence is not "crime[s], wrong[s], or other act[s]" subject to Federal Rule of Evidence 404(b).  Even assuming arguendo that it constitutes such evidence, the proffered evidence is admissible under Rule 404(b) to show knowledge, intent, motive, plan, identity, absence of mistake and lack of accident, and for other permissible purposes, including to explain the relationships of trust amongst the defendants and the decedent – who, before his murder, was a coconspirator in the underlying drug conspiracy – and to corroborate the testimony of other witnesses.  Finally, all of the evidence identified above passes Rule 403's balancing test.

A.   The Proffered Evidence Is Admissible Because It Is Direct Proof of, Completes the Story of and Provides Essential Background to the Charged Crimes, Including About the Development of the Relationships of Trust Among the Coconspirators

1.   Legal Standard

It is well established that if an event arises "out of the same transaction or series of transactions as the charged offense, it is inextricably intertwined with the evidence regarding the charged offense, or it is necessary to complete the story of the crime on trial," that event is admissible subject to the balancing test of Federal Rule of Evidence 403 and is not considered "other crimes" evidence under Rule 404(b).  See United States v. Carboni, 204 F.3d 39, 44 (2d Cir. 2000); United States v. Towne, 870 F.2d 880, 886 (2d Cir. 1989).  The Second Circuit has interpreted this category of evidence to include acts that provide necessary background or context for the charged crimes.  See United States v. Gonzalez, 110 F.3d 936, 941-42 (2d Cir. 1997) (uncharged burglary admissible in trial for felon in possession of a firearm because, inter alia, it provided "crucial background evidence that gave coherence to the basic sequence of events that occurred on the night" of defendants' arrest); United States v. Inserra, 34 F.3d 83, 89 (2d Cir. 1994) (noting that evidence of other "bad acts" may be admitted "to provide the jury with the complete story of the crimes charged by demonstrating the context of certain events relevant to the charged offense"); United States v. Langford, 990 F.2d 65 (2d Cir. 1993) ("It is within the court's discretion to admit evidence of acts committed prior to the time charged in the indictment to prove the existence of the alleged conspiracy as well as to show its background and history."); United States v. Coonan, 938 F.2d 1553, 1561 (2d Cir. 1991) ("The trial court may admit evidence that does not directly establish an element of the offense charged, in order to provide background for the events alleged in the indictment.  Background evidence may be admitted to show, for example, the circumstances surrounding the events or to furnish an explanation of the understanding or

13

intent with which certain acts were performed." (quoting United States v. Daly, 842 F.2d 1380, 1388 (2d Cir. 1988)).

Further, as pertains here, because of the charges involve a drug-related murder conspiracy, it is "well settled in the Second Circuit that where an indictment contains a conspiracy charge, '[a]n act that is alleged to have been done in furtherance of the alleged conspiracy' is considered to be 'part of the very act charged.'" United States v. Barret, No. 10-CR-809 (S-3) KAM, 2011 WL 6704862, at *4 (E.D.N.Y. Dec. 21, 2011) (quoting United States v. Diaz, 176 F.3d 52, 79 (2d Cir. 1999)); see also Diaz, 176 F.3d at 80 (other bad acts evidence admitted to show how "drug conspirac[y] evolved, and how illegal relationships and mutual trust developed between coconspirators"); United States v. Thai, 29 F.3d 785, 812 (2d Cir. 1994) (stating that, in conspiracy cases, "uncharged acts may be admissible as direct evidence of the conspiracy itself"). Such acts are therefore inextricably intertwined with, and direct evidence of, the charged conspiracies and not subject to Rule 404(b). See Barret, 2011 WL 6704862, at *4, *6-*7 (concluding that evidence of, inter alia, uncharged attempted murder and contract for murder was "direct evidence" of drug distribution conspiracy). "'To be relevant, evidence need only tend to prove the government's case, and evidence that adds context and dimension to the government's proof of the charges can have that tendency.'" United States v. Kahale, 789 F. Supp. 2d 359, 381 (E.D.N.Y. 2009) (quoting United States v. Williams, 585 F.3d 703, 707 (2d Cir. 2009)).

Uncharged conduct may be admissible even if it occurred prior to the charged conspiracy if it allows the jury to understand the origin of the defendants' participation in the charged conspiracy, as well as relationships between the coconspirators. See Langford, 990 F.2d at 70 ("It is within the court's discretion to admit evidence of acts committed prior to the time charged in the indictment to prove the existence of the alleged

14

conspiracy as well as to show its background and history."); United States v. Williams, No. 13-CR-419 (S-2) (DLI), 2016 WL 4536864, at *7 (E.D.N.Y. Aug. 30, 2016) (quoting Carboni, 204 F.3d at 44)); United States v. Rivera, No. 13-CR-149 (KAM), 2015 WL 1875658, at *3 (E.D.N.Y. Apr. 22, 2015) (finding that acts by coconspirators prior to the start of the conspiracy elaborate the relationship between the defendants).  Similarly, the law does not require that the only evidence of a conspiracy or other crime be from the period of the conspiracy or other crime. See, e.g., Lutwak v. United States, 344 U.S. 604, 617 (1953) (defendants' post-conspiracy acts admissible to help show existence of immigration scheme); United States v. Mendez, 165 F.3d 15, 1998 WL 802127, at *2 (2d Cir. 1998) ("Evidence of postconspiracy conduct is admissible where, as here, it had real probative value regarding [the defendants'] willingness and intent to enter into the proven conspiracy." (internal quotation marks omitted)).  This principle has equal application when the post-conspiracy act is of a conspirator rather than the defendant. See, e.g., United States v. Tramunti, 513 F.2d 1087, 1116 (2d Cir. 1975) (citing Anderson v. United States, 417 U.S. 211, 218-19 (1974)) ("Conduct of a conspirator, not consisting of a hearsay declaration, is admissible to prove the existence of the conspiracy even though occurring after the termination of it."). In short, consistent with common sense, "[e]vidence is not irrelevant merely because it occurs after a conspiracy has ended."  United States v. Clark, 489 F. App'x 558, 561 n.4 (3d Cir. 2012).

2.    Argument

Nearly all of the evidence proffered constitutes direct proof of the charged crimes. The entirety of the evidence the government seeks to introduce occurred within two years of Mizell's murder and is inextricably intertwined with and necessary to complete the story of the

crimes on trial.[2]

       For example, Jordan and Washington's repeated access to and use of .40 caliber firearms and ammunition of the same type used in the murder—including, most significantly, Jordan's possession and use of .40 caliber ammunition from the same manufacturer as used in Mizell's killing on February 3, 2003—is unquestionably direct, probative evidence on which the government intends to prove the murder charges in its case-in-chief.  See, e.g., United States v. Arroyo, 600 F. App'x 11, 13–14 (2d Cir. 2015) ("[E]vidence that [defendant] possessed a firearm less than seven months after the September 2011 drug sales is certainly relevant to show that he had an opportunity to possess a gun at the time of those sales."); United States v. Zappola, 677 F.2d 264, 270 (2d Cir. 1982) (concluding "it was not error to admit testimony that [witness] had seen a handgun at Zappola's house six months before Zappola fired a handgun in [witness' presence] . . . such evidence was properly admitted as probative of [Zappola's] access to such a weapon"); United States v. Slaughter, 248 Fed. Appx. 210, 212 (2d Cir.2007) (finding that at trial for possession of a firearm, admission of evidence relating to defendant's two prior incidents of possession of similar semiautomatic handgun was relevant to show defendant's opportunity to be in possession of such firearms at time of charged offense); United States v. Robinson, 560 F.2d 507, 513 (2d Cir.1977) (en banc) (finding that defendant's subsequent "possession of the gun [on another occasion] was also admissible . . . since he had access to an instrument similar to that used

---

    [2]    It is also notable that the government has narrowly tailored its motion to admit such evidence.  Washington has a long and violent history involving the use of firearms, yet the government has dramatically restricted the proposed evidence to avoid even the possibility of undue prejudice.  Similarly, the government is not seeking to elicit evidence about other acts of violence committed by Jordan—including a November 1, 2004 shooting on Farmers Boulevard in Queens where over 27 pieces of ballistic evidence were recovered—as it is not directly pertinent to his access to firearms of the same character as the murder weapon or corroborative of other witness testimony.

to commit [the charged offense]."); United States v. Taylor, 767 F. Supp. 2d. 428, 438 (S.D.N.Y. Dec. 1, 2010) (government "fulfilled its obligation to identify a similarity or some connection between the prior and current acts" when admitting evidence of uncharged gun possession, and the prior conduct was not any more sensational or disturbing than the crimes with which defendant was charged).

Additionally, testimony regarding the nature of Jordan and Washington's relationship, including their connection to the ███████████ location, provides critical context and background for the conspiracy charged in the indictment. This evidence will serve to inform the jury of the background of the narcotics conspiracy charged, how the murder conspiracy formed and how the relationships between the defendants and others originated and was structured. Such testimony is necessary, direct evidence to demonstrate the development and criminal nature of the relationships between the defendants and Coconspirator 1, as well as to establish plan, intent, knowledge and absence of mistake with regard to the specific conduct comprising the charged crimes. See e.g., United States v. Graziano, 558 F. Supp. 2d 304, 319 (E.D.N.Y. 2008) (holding that prior interactions between the defendant and the victims, including an alleged assault, were admissible as background evidence to show the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed); Rivera, 2015 WL 1875658, at *5 (admitting a witness' testimony about the defendant's prior drug trafficking with associates in his criminal organization as necessary background information to complete the story of the racketeering enterprise, the charged offenses and the relationships between the defendants and other members of his criminal organization); United States v. Lombardozzi, No. 02-CR-273 (S-1) (PKL), 2003 WL 1907969, at *2 (S.D.N.Y. Apr. 17, 2003) (admitting evidence of the defendant's prior criminal acts with victim because it provided relevant

17

background evidence regarding the development and nature of parties' relationship and interactions with the defendant and a coconspirator).

Moreover, the proffered evidence corroborates the expected testimony of the government's witnesses and is additionally admissible for that purpose. See, e.g., United States v. Mejia-Velez, 855 F. Supp. 607, 611 (E.D.N.Y. 1994); United States v. Bourne, No. 08-CR-888 (NGG), 2011 WL 4458846, at *12 (E.D.N.Y. Sept. 23, 2011) ("Other acts testimony is also admissible to corroborate other testimony"); United States v. Basciano, No. 03-CR-929 (NGG), 2006 WL 385325, at *4 (E.D.N.Y. Feb. 17, 2006) (admitting evidence of uncharged crimes— including, gambling, loansharking/extortion, murder, conspiracy/attempted murder, and solicitation to murder—to corroborate the testimony of cooperating witnesses).

B.     The Proffered Evidence Is Also Admissible Pursuant to Rule 404(b)

In the alternative, to the extent the Court finds that the evidence described above constitutes "other acts" under Federal Rule of Evidence 404(b), all of the evidence is admissible pursuant to that Rule for several permissible, non-propensity purposes.

1.     Legal Standard

Evidence of uncharged crimes or "other acts" may be admitted pursuant to Rule 404(b) for a number of permissible purposes, including to prove motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident. Fed. R. Evid. 404(b)(2); see United States v. Ortiz, 857 F.2d 900, 903 (2d Cir. 1988). The Second Circuit has emphasized that Rule 404(b) is a rule of broad reach and liberal application, and applies an "inclusionary or positive approach" to admitting "other acts" evidence. See United States v. Garcia, 291 F.3d 127, 136 (2d Cir. 2002) (citing United States v. Pitre, 960 F.2d 1112, 1118 (2d Cir. 1992)); see also United States v. Levy, 731 F.2d 997, 1002 (2d Cir. 1984) ("We have adopted the inclusionary or

18

positive approach to [404(b)]; as long as the evidence is not offered to prove propensity, it is admissible.").

A party must satisfy three requirements in order for evidence of "other crimes, wrongs or acts" to be admitted under the rule.  First, the evidence must be offered for a purpose other than to prove a defendant's bad character or criminal propensity.  United States v. Mickens, 926 F.2d 1323, 1328 (2d Cir. 1991); United States v. Colon, 880 F.2d 650, 656 (2d Cir. 1989). Second, the evidence must be relevant under Rules 401 and 402 and not run afoul of Rule 403. See Mickens, 926 F.2d at 1328; Ortiz, 857 F.2d at 903; Levy, 731 F.2d at 1002.  Third, if the defendant requests that the jury be instructed as to the limited purpose for which the government's evidence is being admitted, the court must furnish such an instruction.  See Mickens, 926 F.2d at 1328-29; Levy, 731 F.2d at 1002.

The Second Circuit repeatedly has held that evidence of uncharged crimes may be admitted at trial to establish the existence and evolution of a relationship of trust between coconspirators.  See, e.g., United States v. Williams, 205 F.3d 23, 33-34 (2d Cir. 2000) (upholding admission of evidence relating to the defendant's prior criminal activities with coconspirators in charged drug conspiracy as relevant evidence to inform jury of the background of the conspiracy charged, to complete the story of the crimes charged, and to help explain to the jury how the illegal relationship between the participants in the crime developed); United States v. Pipola, 83 F.3d 556, 565-66 (2d Cir. 1996) ("One legitimate purpose for presenting evidence of extrinsic acts is to explain how a criminal relationship developed; this sort of proof furnishes admissible background information in a conspiracy case.");[3] United States v. Rosa, 11 F.3d 315, 333-34 (2d Cir. 1993)

---

[3]        Several Second Circuit decisions appear to analyze other acts evidence pertaining to the relationship of trust among coconspirators under the rubric of Rule 404(b).  Others,

(holding that co-defendants' relationship over a 14-year period, during which stolen property and narcotics crimes were committed, "was properly admitted to explain how the illegal relationship between the two [defendants] developed and to explain why [one defendant] . . . appointed [the other defendant] . . . to a leading position in the Organization"); United States v. Harris, 733 F.2d 994, 1006-07 (2d Cir. 1984) (upholding admission of evidence of defendant's previous narcotics transactions with informant who posed as prospective narcotics customer in connection with charged conspiracy, even though informant was not a member of the charged conspiracy, because the evidence "tended to show the basis for Harris's trust of [the informant]").

Additional bases for admitting other acts evidence under Rule 404(b) include "corroborat[ing] crucial prosecution testimony," such as the testimony of cooperating witnesses, if the corroboration is "direct and the matter corroborated is significant," United States v. Everett, 825 F.2d 658, 660 (2d Cir. 1987) (internal quotation marks omitted), and, where extensive cross-examination into a government witness's criminal history for impeachment purposes is anticipated, allowing the government to elicit the witness's testimony about such acts on direct

---

however, have suggested that relationship of trust evidence, at least in conspiracy cases, is synonymous with direct proof of a charged conspiracy or evidence that completes the story of or provides crucial background to the charged offenses, and thus may be admitted without regard to Rule 404(b).  See, e.g., United States v. Moten, 564 F.2d 620, 628 (2d Cir. 1977) ("[P]roof of prior drug dealing by individual defendants with Brown at a time previous to commencement of the conspiracy charged was clearly admissible to show the basis for the existence of the conspiracy charged and the mutual trust which existed between Brown and his customers.  It was therefore admissible against all the defendants to show the nature and existence of the conspiracy charged."); United States v. Morillo-Vidal, 547 Fed. App'x 29, 30-31 (2d Cir. 2013) (testimony regarding other crimes was admissible because it was "relevant background information" that, inter alia, "explained [a coconspirator's] relationship to his coconspirator [] and his knowledge of [the coconspirator's] role in a national drug conspiracy," evidence that qualifies as "highly probative when the charged conduct covers a conspiracy") (unpublished decision).  Under either analysis, an important basis for admitting the evidence discussed herein is that it proves the existence and development of the relationships of trust among the defendants and their coconspirators in the charged conspiracies.

examination so as to avoid the appearance that the government is concealing such purported impeachment evidence from the jury, see, e.g., United States v. Guerrero, 882 F. Supp. 2d 463, 492 (S.D.N.Y. 2011).

    2.    <u>Argument</u>

        a.    <u>Certain of the Proffered Evidence Is Admissible to Establish the Development of the Criminal Relationships of Trust Among the Coconspirators</u>

The proffered evidence is all admissible to establish access to the murder weapon and similar firearms and ammunition, and the development of the relationships of trust among the conspirators, namely Washington, Jordan and Coconspirator 1.  Moreover, the proffered evidence will be critical to establishing the credibility of certain witnesses—the stories of how the witnesses came to know the defendants, commit crimes with them and earn their trust would be incomplete without testimony about the aforementioned uncharged crimes and other acts.  Accordingly, even if the evidence of uncharged acts is not admitted as direct evidence of the charged crimes, such evidence should be admitted pursuant to Rule 404(b).  See, e.g., Pipola, 83 F.3d at 565-66 (evidence that the defendant and his coconspirators made usurious loans, as well as other uncharged crimes of armed robbery, burglary and using stolen and counterfeit credit cards, admissible to explain the evolution of the defendant's relationship with his coconspirators in robbery conspiracy trial).

        b.    <u>Evidence of Certain of the Other Acts, Particularly Access to Firearms and Ammunition, Evinces Knowledge, Intent, Identity, Motive, Plan, Opportunity, Lack of Accident and Absence of Mistake</u>

Certainly, evidence of the defendants' possession, use of, and ready access to firearms while engaged in narcotics distribution is probative of opportunity, and the absence of mistake or accident with respect to the charged murder.  Such evidence demonstrates the

defendants' and their coconspirators' ready access to, and facility with, firearms, and the inextricable connection between their possession of firearms and the management of their drug dealing operation in the time immediately preceding and following Mizell's murder. See, e.g., Barret, 2011 WL 6704862, at *18-*19 (evidence of prior firearms possession convictions admissible as evidence of "opportunity, absence of mistake and access to firearms"); United States v. Bumagin, 13 F.Supp.3d 361, 369-70 (E.D.N.Y. Sept. 29, 2015) (finding "non-propensity purpose" in testimony that the defendant possessed "numerous firearms in furtherance of his criminal activities . . . discussed accepting a firearm from an associate. . .described providing a firearm to another associate for that associate's use during a crime, and detailed his numerous instances of pas disposals of firearms"); United States v. Barris, 377 F. App'x 93, 95-96 (2d Cir. 2010) (evidence of the defendant's prior conviction for firearms possession "was not contrary to Federal Rule of Evidence 404(b)" because it was "relevant to the firearms possession charged here and to [defendant's] relationship with [his] alleged coconspirator" and had "obvious probative value" to the firearms possession charge). This is especially true where the defendants are in possession of firearms and ammunition of the same caliber and type used in Mizell's murder.

Beyond this, other than Jordan's noticed alibi witnesses, the contours of any defense are presently unknown. The defendants may argue at trial that they did not knowingly join the predicate narcotics distribution conspiracy, were not involved in any illegal drug trafficking, and lacked knowledge with respect to the drug-related murder of Mizell. As such, the evidence of the defendants' access to and distribution of narcotics prove their knowledge and intent with respect to participating in the charged offenses, and his opportunity to do the same. See, e.g., United States v. Paulino, 445 F.3d 211, 223 (2d Cir. 2006) (prior arrest for small amount of cocaine base street-level distribution sufficiently similar to prove knowledge and intent for charged crime

of possession of large amount of powder cocaine in residence); United States v. Bruno, 873 F.2d 555, 561-62 (2d Cir. 1989) (proper to admit prior bad acts when defendant admitted to being in apartment where drug sale occurred but denied participating in it); United States v. Santiago, 199 F. Supp.2d 101, 109-110 (S.D.N.Y. 2002) (defendant's involvement in a prior narcotics transaction is probative of his intent or knowledge in connection with the charged conspiracy, especially to rebut his claim of innocent association with individuals in the area where the conspiracy operated).

The evidence of narcotics possession and distribution in the time preceding and, in Jordan's case, following the charged murder is admissible to demonstrate the defendants' knowledge and intent with respect to the predicate narcotics conspiracy and probative of their motive to murder Mizell. The defendants undoubtedly will not concede knowledge and intent with respect to the charged murder. Faced with eyewitness testimony regarding the murder itself, the defendants presumably will advance the defense that they lacked knowledge and intent with respect to Mizell's killing. The proffered evidence of other narcotics trafficking will help refute such a defense. See, e.g., United States v. Alcaide, 112 F.3d 505, 1997 WL 225121, at *2 (2d Cir. 1997) (other narcotics trafficking-related evidence properly "admitted to demonstrate Chaves' knowledge of the nature of the charged conspiracies and his intent to participate," and, "[c]onsidering that Chaves' defense was 'mere presence,' the government was allowed to rebut that claim by demonstrating that Chaves had engaged in narcotics dealings before").

c.      The Proffered Evidence Is Admissible to Corroborate Crucial Witness Testimony

The proffered evidence also will serve the permissible purpose of corroborating the testimony of the aforementioned witnesses and others expected to testify, which will be crucial to the government's proof of the charged crimes. See, e.g., Everett, 825 F.2d at 660; Mejia-Velez, 855 F. Supp. at 611; Basciano, 2006 WL 385325, at *4  (admitting evidence of uncharged crimes

– including, gambling, loansharking/extortion, murder, conspiracy/attempted murder, and solicitation to murder – to corroborate the testimony of cooperating witnesses); Everett, 825 F.2d at 660 (other crimes evidence directly corroborating testimony on an important matter of cooperating witness whose credibility was under attack admissible).

Further, eliciting criminal activity that involves one or both of the defendants is necessary, as such testimony constitutes impeachment material that witnesses may be cross-examined about by the defense.  See, e.g., Coonan, 938 F.2d at 1561  ("[S]ince the witnesses were participants in the events about which they testified, it was appropriate for the prosecution to elicit testimony during direct examination that exposed details damaging to their credibility.  In this manner, the prosecution was able to avoid the appearance that it was concealing impeachment evidence from the jury.").  Everett, 825 F.2d at 660 (other crimes evidence directly corroborating testimony on an important matter of cooperating witness whose credibility was under attack admissible).

For these reasons, the "other acts" evidence discussed herein would not be offered to establish the defendants' criminal propensities and is admissible for various permissible purposes under Rule 404(b).

C.    The Probative Value of the Proffered Evidence Far Outweighs Any Prejudicial Effect

Finally, the proffered evidence is highly relevant and probative of the charged murder, and the defendants will not be unfairly prejudiced by the admission of such evidence. There is accordingly no basis to exclude the evidence under Federal Rule of Evidence 403.

Evidence of other crimes must be analyzed under Rule 403, but it is admissible so long as the evidence "'[does] not involve conduct any more sensational or disturbing than the crime[] with which [the defendant has been] charged.'"  Pitre, 960 F.2d at 1120 (quoting United States v. Roldan-Zapata, 916 F.2d 795, 804 (2d Cir. 1990)).   Where the uncharged crimes are similar in nature to the charged crimes, Rule 404(b) evidence is generally admissible under the Rule 403 balancing test.   United States v. Livoti, 196 F.3d 322, 326 (2d Cir. 1999) (upholding admissibility of evidence that the defendant, a police officer charged with engaging in excessive use of force with an arrestee, choked another arrestee, on the basis that "the evidence did not involve conduct more inflammatory than the charged crime, and the district court gave a careful limiting instruction"); Paulino, 445 F.3d at 223 (prior cocaine convictions admissible as proof that the defendant was aware that substance in his closet was cocaine; observing that evidence admissible pursuant to Rule 404(b) should not be excluded on grounds of unfair prejudice where the evidence does not "involve conduct more inflammatory than the charged crime[s]").   Even where there is a risk of undue prejudice, such risk can be mitigated effectively by a cautionary instruction limiting the jury's consideration of the evidence to the purposes for which it is offered. See Mickens, 926 F.2d at 1329.

Because the proffered evidence does "not involve conduct any more sensational or disturbing" than the offenses charged, and certainly nothing more disturbing than the charged murder, Pitre, 960 F.2d at 1120, there is no risk of unfair prejudice with respect to that evidence.

Moreover, the jury could be given an appropriate limiting instruction as to any and all of the proffered evidence to minimize any potential unfair prejudice, and the government does not oppose such an instruction.

Finally, as noted previously, the government has narrowly tailored its motion to admit such evidence, either as direct evidence or Rule 404(b) evidence, and is not seeking to admit other, unrelated criminal acts committed by Washington or Jordan to avoid the possibility of undue prejudice.

<u>Motion to Admit Evidence of Witness Intimidation and Tampering</u>

Since Mizell's murder, the defendants and those acting on their behalf have sought to silence potential witnesses.  These efforts have continued through the pendency of the instant case.

I.   <u>Overview of the Evidence the Government Seeks to Admit Pursuant to This Motion</u>[4]

At trial, the government will seek to introduce witness testimony, recorded telephone calls and other evidence of witness intimidation and tampering, including:

- One of the individuals present in the studio when Mizell was killed ("Witness 6") has repeatedly expressed fear of reprisal from Jordan and Jordan's father.  Jordan's father called Witness 6 shortly after the murder in a manner that Witness 6 interpreted as threatening.  Witness 6 has refused to speak with police, view photo arrays, or view a lineup with Jordan previously, despite telling third parties that Jordan shot Mizell.  Witness 6 has also expressed a generalized fear of Washington due to his reputation for violence.

---

[4]     The government is not seeking to admit all threats received by witnesses in this case, and is limiting its motion to those from or directly attributable to a defendant.  For example, shortly after the unsealing of the indictment, Witness 7 received a series of threatening text messages and photographs, one depicting an individual shot in the head, and another depicting an individual with his throat cut, along with Witness 7's address and that of a family member.  The government has been unable to connect this threat to the defendants and thus is not seeking its admission.

- At Mizell's funeral, Jordan approached another individual ("Witness 7") who was in the studio when Mizell was murdered.  Jordan and a group of individuals approached Witness 7 and one of Witness 7's family members and repeatedly asked Witness 7 if Witness 7 knew who shot Mizell in a threatening manner.

- Later in 2003, Jordan, Jordan's father and several other individuals—including a coconspirator in the Mizell homicide ("Coconspirator 2")—confronted Witness 1, with Jordan's father asking if Witness 1 had spoken to anyone about the murder; what Witness 1 had told the police; and reminding Witness 1 that they knew where Witness 1's family lived.

- Washington has also repeatedly threatened Witness 1.  Witness 1 testified against Washington during Washington's Hobbs Act robbery trial, United States v. White, 05-CR-558.  During the pendency of the case, Washington sought to intimidate Witness 1 by sending Witness 1 a letter reading, "Happy Birthday. I Never Stopped Loving You. Strength and Honor."[5]  Since then, Washington has had third parties repeatedly attempt to reach out to Witness 1 on Washington's behalf.  In recorded phone conversations, including a call on December 1, 2020, Washington has instructed a third party to reach out to Witness 1, including over Facebook.  During the pendency of the instant case, Witness 1 has received numerous anonymous unsolicited friend requests over Facebook, including at least two messages from one of Washington's family members.  One of the messages featured a photograph of two wolves eating a bloody animal carcass with the message "Hey its Tinard I'd like to talk."  Washington attempted to minimize possible ramifications for this, telling an individual on August 31, 2021 that reaching out to Witness 1 "wouldn't be to no benefit of mine" because if "[Witness 1] goes back and tells them people [law enforcement] that you approached [Witness 1], that's tampering with witnesses."

- In recorded jail conversations, both Jordan and Washington have repeatedly speculated about the possible witnesses who will testify against them and who may be "snitching."  In these conversations, both Washington and Jordan use codes and nicknames to frustrate law enforcement that may be monitoring their calls.  For example, Washington has relayed to Coconspirator 2 that he believes Witness 6 is one of the witnesses that will testify against him.  In a November 23, 2020 call, Jordan states that Witness 6 "put me at the scene."  Additionally, both Jordan and Washington have discussed possible damaging testimony that Witness 2 could provide at trial and have taken steps to prevent Witness 2 from testifying.  For example, in an October 28, 2020 call, Washington instructed Coconspirator 2 to get Witness 2 on a "three way call."  In a February 10, 2021 call Jordan and the counterparty discuss Witness 2 being in "paperwork" for another case, indicating that Witness 2 is cooperating with law enforcement, and noting that Witness 2's "statement" to law enforcement has been seen by multiple people.  In a March 21, 2021 call, Jordan's associate reported to Jordan that "shit looking like [Witness 2] is a liar . . . the worst type. . . trying to figure it out now."

---

[5]       A copy of this letter has been disclosed as part of the Government's discovery.

On June 19, 2021, Jordan asked if anyone had spoken to Witness 2, and on August 4, 2021, Jordan is told by the counterparty that "the lawyer spoke about [Witness 2]" and that "its him [cooperating]" for "one part of the case, but for the other he's not sure." Jordan responds that he will pray on it and that its going to fix itself.

- Per other recorded jail calls, Jordan uses one individual as a go-between himself and an associate incarcerated for murder in a state facility (the "State Inmate"), primarily to share information about Witness 2's possible cooperation.  Notably, in the State Inmate's email communications, Witness 2 is frequently mentioned as being a cooperating witness against Jordan and the State Inmate.  For example, in one July 14, 2021 email, the State Inmate states "this guy made some shit up about me 2 so he could try n save himself especially after that she he did to [Jordan] . . . if he'll throw [Jordan] under the bus then I shoudve known."  In another email on July 14, 2021, the State Inmate wrote that [Witness 2] was doing some bullshit b4 n i didn't wanna believe them but 4 them 2 come at me with some bullshit like that he's 4sure n there just tryna do any and everything possible 2 save himself."  In still another email on July 14, 2021, the State Inmate explicitly referenced Witness 2's possible testimony in the instant case, writing "I know 4 a fact this n-gga [Witness 2]. . . is tryna put my name n some bullshit 2 try n save himself from the time he's facing cause he's 2 weak 2 do his own time smh from what i heard he already agreed 2 testify against his ▮▮▮▮▮▮ [Jordan] for that jmj shit which is a total lie."  On July 14, 2021 alone, the State Inmate sent at least nine emails to different people discussing Witness 2's possible cooperation with law enforcement.

Exacerbating these concerns is that Jordan and Washington have been in contact through "kites" while incarcerated, something that Washington acknowledges in a September 5, 2020 call with Coconspirator 2.  In that call, Coconspirator 2 asks if Washington and Jordan were "charged together" and Washington responds that he "was just talking to that little n-gga [Jordan] too."  Coconspirator 2 instructs Washington to give Jordan Coconspirator 2's number.  Additionally, Jordan clearly has access to contraband forms of communication at the MDC.  For example, Jordan repeatedly asks people to "text" him rather than discuss things over monitored phone calls.  In a November 15, 2020 call, Jordan comments that he "got a cellie."  In a November 16, 2020 call, Jordan instructs an individual to "find out the name and just text it to me."  In a March 1, 2021 call, Jordan states that "the CO lady is going mad hard today. . . Hopefully she don't go back to my cell. I snuck out to jump on the jack [a contraband cell phone]."  In a December

2, 2021 call, Jordan says that he will "Facetime" an individual later.  After being caught with a contraband phone on or about August 16, 2021, Jordan has exercised even more discretion when discussing alternative, unauthorized means of communication.  In an August 15, 2022 call, Jordan reprimands an individual for repeatedly referencing Jordan texting people from jail, screaming, "I never texted you. How could I text you? What are you talking about?"  The counterparty then replaces Jordan's name for the name of a third party, claiming that third party, not Jordan, sent the text.  Similarly, in an August 31, 2021 call, Washington states he "sold his phone" because he "doesn't have a job" at the MDC.

II.     Legal Standard

"Evidence of consciousness of guilt is admissible if the Court: (1) determines that the evidence is offered for a purpose other than to prove the defendant's bad character or criminal propensity, (2) decides that the evidence is relevant and satisfies Rule 403, and (3) provides an appropriate instruction to the jury as to the limited purposes for which the evidence is introduced, if a limiting instruction is requested."  United States v. Perez, 387 F.3d 201, 209 (2d Cir. 2004). The Second Circuit has repeatedly held that "evidence of obstructive conduct is admissible to show consciousness of guilt."  See, e.g., United States v. Triumph Capital Group, Inc., 544 F.3d 149, 160 (2d Cir. 2008) ("[Defendant's] efforts to obstruct the investigation evidence a consciousness of guilt that further supports the jury's verdicts."); United States v. Malpiedi, 62 F.3d 465, 467 (2d Cir. 1995) ("This testimony was direct evidence of [defendant's] obstruction of justice and of his consciousness of guilt of the other charges); United States v. Robinson, 635 F.2d 981, 986 (2d Cir. 1980) ("This evidence [of obstruction] was also admissible as evidence of the appellants' consciousness of guilt.").  Attempts to tamper with or otherwise intimidate a witness have been recognized as quintessential obstructive conduct throughout the country.  See, e.g., United States

29

v. Smith, 629 F.2d 650 (10th Cir. 1980) (defendant had made intimidating remarks and gestures towards the witness prior to trial); United States v. Poulsen, 655 F.3d 492 (6th Cir. 2011) (evidence of witness tampering admissible as consciousness of guilt in securities fraud trial); United States v. Monahan, 633 F.2d 984 (1st Cir. 1980) (evidence of threats to witnesses can be relevant to show consciousness of guilt where it showed that defendant was willing to take extreme measures to exclude evidence from trial, and evidence implicated no irrelevant or collateral matters).

Similarly, evidence that a witness has been intimidated or feared reprisals is admissible to explain inconsistencies between a witness's testimony and prior statements. See, e.g., United States v. Cirillo, 468 F.2d 1233, 1240 (2d Cir. 1972) ("[t]he general rule . . . and one that is eminently logical, is that an "impeached witness [who feared retaliation from the defendant] may always endeavor to explain away the effect of [a] supposed inconsistency by relating whatever circumstances would naturally remove it. . . The rule is followed in this Circuit.").

III.    Argument

The Second Circuit has routinely affirmed admission of similar "evidence of attempted witness . . . tampering as probative of a defendant's consciousness of guilt." Perez, 387 F.3d at 209; Mickens, 926 F.2d at 1329 ("The testimony was relevant since an effort to intimidate a key prosecution witness was probative of [the defendant's] state of mind."); United States v. Ivanova, 19 F. Supp. 3d 511, 516 (S.D.N.Y. 2014) (holding admissible "evidence that [the defendant] tampered with witnesses as relevant toward her consciousness of guilt"). For example, in United States v. Basciano, the government sought to introduce evidence of the defendant's threats to family members of cooperating witnesses in order to show consciousness of guilt. 2006 WL 385325, at *5. Judge Garaufis admitted the evidence because "threatening family members of witnesses or an associate for fear he may become a cooperating witness is . . . admissible to

show consciousness of guilt." <u>Id</u>.  So too here with respect to the concealment of the conspiracy and obstructive efforts outlined above—approaching key witnesses and their family members, both in person and through cryptic phone calls and letters, fit squarely within applicable precedent. The fact that some of these obstructive efforts are effectuated or communicated in jail calls where code and nicknames are utilized is of no moment.  See <u>United States v. Sakoc</u>, 2014 WL 7336079, at *6 (D. Vt. Dec. 22, 2014) (finding that "vague" conversations recorded in jail calls that "could be interpreted to potentially refer to witness tampering" were admissible to show consciousness of guilt and defendant's objections to such evidence "go to weight rather than admissibility").

It is well settled that a conspiracy does not necessarily end when its members have been arrested.  See, <u>e.g.</u>, <u>United States v. Arrington</u>, 867 F.2d 122, 130 (2d Cir. 1989).  And a coconspirator's "plot to silence witnesses furthers the goals of the conspiracy, in that the [conspiracy] would be facilitated by the acquittal of all the defendants." <u>Id</u>.; <u>see</u> <u>also</u> <u>United States v. Arline</u>, 660 F. App'x 35, 40 (2d Cir. 2016) (recognizing that one coconspirator's statement to another coconspirator "to make sure [he] did not consider turning against the conspiracy" is admissible under Rule 801(d)(2)(E)); <u>United States v. Young</u>, 561 F. App'x 85, 88 (2d Cir. 2014) (holding that statements "furthered the charged narcotics conspiracy insofar as they referenced a plot to retaliate against [a co-defendant] for providing a statement to law enforcement"); <u>Roldan-Zapata</u>, 916 F.2d at 804  ("Coconspirator statements may include attempts to cover up an ongoing conspiracy after the participants have been arrested."); <u>United States v. Johnson</u>, 469 F. Supp. 3d 193, 213 (S.D.N.Y. 2019) (admitting coconspirator's statements designed to silence a witness against the conspiracy).  As such, the obstructive conduct of Jordan, Washington and those acting on their behalf outlined above—both after the murder and after the defendants' indictment and

arrest—is admissible, as they necessarily furthered the goals of the conspiracy by seeking to ensure key witnesses would not cooperate with law enforcement.

Notably, these statements are not highly graphic threats or acts of physical violence, and are certainly no more inflammatory than the charged acts.  See United States v. Check, 582 F.2d 668, 685-86 (2d Cir. 1978) (recognizing the "severe prejudice" that can result from testimony of death threats); United States v. Weir, 575 F.2d 668, 669-71 (8th Cir. 1978) (threats of three assassinations, plus account of attempted killing resulting in bullet wound, held to be reversible error).  As such, there is no concern of undue prejudice, particularly with an appropriate limiting instruction.  See United States v. Cummings, 858 F.3d 763, 774-75 (2d Cir. 2017) (nature of hearsay death threat was admitted in error with no limiting instruction, risking that the jury would use such testimony as impermissible propensity evidence).

<u>Motion to Admit Recorded Prison Calls as Admissions of a Party Opponent</u>

During the course of the prosecution, the government has obtained recordings of telephone calls that the defendants made while incarcerated at MDC.  During discovery, the defendants were served with copies of these recordings, and the government's review of the recordings is ongoing. The Court should rule that the government is entitled to enter these recordings as admissions of a party opponent under Federal Rule of Evidence 801(d)(2)(A).  Conversely, the Court should also rule that the defendant is precluded from entering these recordings should he elect to present evidence at trial.  The government will identify any recordings that it seeks to introduce to allow for motions on those specific calls.

I.    Legal Standard

"Statements made by the defendant may be introduced by the government in a criminal trial to prove the truth of the facts stated in them because they are admissions of an adverse party." Russo, 302 F.3d at 43 . Under Rule 801(d)(2)(A), the defendant's statements can be offered

for the truth, while the statements of others can be admitted to provide necessary context to the defendant's statements. See United States v. Dupre, 462 F.3d 131, 137 (2d Cir. 2006) (email messages properly admitted not for truth of matters asserted, but rather to provide context for defendant's messages sent in response); United States v. Sorrentino, 72 F.3d 294, 298 (2d Cir. 1995) (recorded statements of a confidential informant were properly admitted as non-hearsay to render intelligible defendant's recorded, responsive statements).

It is well settled in the Second Circuit and beyond that a defendant's recorded prison calls, where relevant, are admissible against the defendant as party opponent admissions pursuant to Rule 801(d)(2)(A). See, e.g., United States v. Reed, 576 F. App'x 60, 61 (2d Cir. 2014) (summary order) (district court did not err in admitting recordings of the defendant's recorded prison calls because the "conversations were admissible as a statement of a party opponent under Federal Rule of Evidence 801(d)(2)(A)"); United States v. Guang Ju Lin, 505 F. App'x 10, 13 (2d Cir. 2012) (summary order) (same); Russo, 302 F.3d at 43 (same); United States v. Jones, 716 F.3d 851, 855 (4th Cir. 2013) ("[The defendant] concedes that his statements on the [prison] phone calls were admissible under the party opponent exception to hearsay, see Fed. R. Evid. 801(d)(2)(A)"); United States v. Waters, 138 F. App'x. 460, 462 (3d Cir. 2005) ("[The defendant] objects because the statements were made while he was incarcerated and not involved with any conspiracy and because the individuals to whom he was speaking were not members of the conspiracy. The statements, however, are [the defendant's] own admissions and are admissible under Federal Evidence Rule 801(d)(2)(A) regardless of who was on the other end of the line or when they were made. Thus, the District Court did not abuse its discretion in admitting the tapes."); United States v. DeLuna, 763 F.2d 897, 917 (8th Cir. 1985) (same).

Conversely, it is well established that "[w]hen the defendant seeks to introduce his own prior statement for the truth of the matter asserted, it is hearsay, and it is not admissible." Marin, 669 F.2d at 84; see also United States v. Mitchell, 502 F.3d 931, 964 (9th Cir. 2007) (defendant was properly precluded from eliciting, on cross-examination of government agents, exculpatory statements that he had made during interviews with agents, since those statements were inadmissible hearsay); United States v. Jadusingh, No. 18-CR-257 (KAM), 2020 WL 207950, at *2 (E.D.N.Y. Jan. 14, 2020) (precluding defendant "from introducing her own post-arrest statements to prove the truth of the matter(s) asserted" (emphasis omitted)); Davidson, 308 F. Supp. 2d at 480 (a defendant may not "attempt to get his side of the . . . story in front of the jury without himself testifying and opening himself up to cross-examination").

II.    Argument

Here, the government has provided the defendants with their recorded jail calls, some of which contain admissions highlighted above that the government may wish to introduce at trial.  As such, the government should be permitted to introduce these admissions and others made by the defendants in recorded prison calls.  Conversely, the Court should preclude the defendants from offering such calls in evidence because when offered by him, they constitute inadmissible hearsay. Should the defendant wish to present his statements to jury, he should take the witness stand and subject himself to cross-examination.

<u>Motion to Admit Jordan's Interview Videos and Selected Rap Lyrics</u>

Prior to his arrest, Jordan also performed rap music under the stage name "Yadi" or "Young Yadi" as part of a group called "Rich Fly Gees," ██████████████ Content from Jordan and "Rich Fly Gees" is publicly available on various internet and social media sites, where Jordan brags about his narcotics dealing and use of firearms.  See Government Response in Opposition to Bond, ECF Dkt. No. 74, pp. 5-6 (describing some of Jordan's lyrics).

34

As a threshold matter, the government acknowledges the Court's sentiments during Jordan's February 28, 2022 bail application, namely that "this is a genre of music that encourages and promotes violent language in its lyrics. And this is, in part, for the profit of the artists as well for the music executives, that my personal estimation is they profit greatly off of the encouragement of violence and misogyny, et cetera, in rap music.  I'm not going to hold any individual accountable for the lyrics in a rap song. . .that's not part of the total mix for this Court. Transcript of Bond Hearing, 8:21-9:10.  However, the evidence that the government seeks to introduce is narrowly tailored, temporally proximate and relevant to specific facts at issue to the case.

I.   <u>Overview of the Evidence the Government Seeks to Admit Pursuant to This Motion</u>

The government seeks to admit the following evidence, which can be provided to the Court:

- In one of Jordan's music videos, titled "Aim for the Head," a series of photographs are shown as Jordan raps in the background.  The images include firearms (including semi-automatic pistols and assault weapons, some equipped with what appear to be silencers); pictures of Jordan and the "Rich Fly Gees" logo; individuals pointing guns; and dead bodies with apparent gunshot wounds to the head.  In the song, Jordan repeatedly says "we aim for the head, no body shots, and we stick around just to see the body drop."  The first verse begins with Jordan saying, "I aim for the head, I ain't a body shooter" and that "the whole team grips [carries firearms]…everybody shoots."  The song continues with Jordan describing various acts of violence with firearms, including "put the metal in your mouth like a doctor would, and pull the trigger."

- Another song, titled "Silver Spoon," features Jordan rapping in front of a mural commemorating Mizell.  Jordan says he "hustles hard," "like the mob," a "dealer serving hands like they cards" and brags how his "whole life" he "never had a job…I do construction, cause I be breaking down bricks," referring to kilogram quantities of cocaine.

- In one publicly-available videotaped interview, Jordan states, "the motto for 2010 is aim for the head, no body shots…that don't count…ya'll n-ggas that shoot n-ggas in the legs, the stomach and all that, we ain't respecting that."

- In another publicly available interview where Jordan discusses his music, he says "I can speak on real life experiences, and I can make em make sense.  I'm not just, like, you know, a drug-dealer rapper or a gangster killer rapper, I rap about reality.  So that's what you hear coming through my music, what I'm going through, or what I've been through before."[6]

## II.    Legal Standard

As a threshold matter, the lyrics and videos are not excludable as hearsay.  Both are comprised of the defendant's statements, which are not hearsay under Fed. R. Evid. 801(d)(2)(A) and are admissible against the defendant.  Fed. R. Evid. 801(a) defines a "statement" as including a person's oral and written statements.  See also United States v. Dore, No. 12-CR-45, 2013 WL 3965281, at *8 (S.D.N.Y. July 31, 2013) ("The music video featuring [the defendant] might also be admissible as a 'statement' made by and then offered against an opposing party"); see also United States v. Foster, 939 F.2d 445, 455 n.13 (7th Cir. 1991) (noting that rap lyrics written by defendant into his notebook, which were admissible under Rule 404(b), also 'could have [been] categorized . . . as an admission by a party opponent'").  Specifically, the Second Circuit has held that that "[r]ap lyrics . . . are properly admitted . . . where they are relevant and their probative value is not substantially outweighed by the danger of unfair prejudice."  United States v. Pierce, 785 F.3d 832, 841 (2d Cir.), cert. denied, 136 S. Ct. 172, 193 L. Ed. 2d 139 (2015); see also United States v. Herron, 762 Fed.App'x. 25, 30 (2d Cir. 2019) ("videos—offered as evidence of Herron's participation in the charged conspiracies and crimes, his position as a [gang] leader, his familiarity with firearms and the drug trade, and his relationship to certain cooperating witnesses—are plainly relevant.").  Indeed, "[f]ederal courts across the country . . . have found rap lyrics or videos to be relevant evidence in criminal trials based on the content of the evidence and

---

[6]    Notably, in these videos, Jordan is clearly right-handed, which is relevant to the angle and direction of the bullets fired during Mizell's killing.

the issues in the case." United States v. Carpenter, 372 F.Supp.3d 74, 77 (E.D.N.Y. Feb. 25, 2019) (collecting cases).

III.     Argument

The proposed evidence speaks directly to issues in the case and are not simply "rap videos or lyrics with merely a tenuous connection to the defendant or issues in the case." Carpenter, 372 F.Supp.3d at 77.  First, the two proposed interviews are not even lyrics or music videos, and simply feature Jordan speaking into the camera.  In those videos, Jordan acknowledges that the narcotics and violence featured in his music are his "real life experiences" and his "reality." This is plainly relevant to the narcotics-related murder conspiracy charged, and exceeds the threshold typically applied to such evidence.  Foster, 939 F.2d at 456  (defendant's rap lyrics relevant where he was charged with possession of narcotics with intent to distribute and lyrics demonstrated his knowledge of the drug trade and certain drug code words).  Even more specifically, the defendant's professed motto "aim for the head, no body shots…that don't count…ya'll n-ggas that shoot n-ggas in the legs, the stomach and all that, we ain't respecting that," describes the modus operandi of Mizell's killing—a gunshot wound to the head.  See United States v. Wilson, 493 F. Supp. 2d 484, 488-89 (E.D.N.Y. 2006) (defendant's rap lyrics relevant where they described activity that resembled aspects of the crime alleged); United States v. Stuckey, 253 F. App'x 468, 482 (6th Cir. 2007) (defendant's rap lyrics relevant where they described shooting and disposal of bodies in a manner that mirrored the charged crime).  While Jordan's admission that he "never had a real job . . . cause I be breaking down bricks" does occur in the context of a music video, this is what the evidence will show Jordan's contemplated role was in the Baltimore transaction that precipitated Mizell's murder.  This evidence is admissible under the same Rule 404(b) rationales described above.

While the videos and lyrics contain profanity and other language to which observers might object, the probative value of this evidence far outweighs any potential prejudice to which it may give rise.  See United States v. Rivera, No. 13-CR-149 (KAM), 2015 WL 1757777, at *8 (E.D.N.Y. Apr. 17, 2015) (probative value of video excerpts depicting guns and drug in a case charging narcotics trafficking and weapons charges outweighed the risk of unfair prejudice under Rule 403 and, therefore, were admissible).  Indeed, "[i]n this circuit, evidence is not unduly prejudicial when it is not 'more inflammatory than the charged crime[s]'" United States v. Herron, No. 10-CR-0615 (NGG), 2014 WL 1871909, at *4 (E.D.N.Y. May 8, 2014) (quoting Livoti, 196 F.3d at 326); see also Pitre, 960 F.2d at 1120 (noting that the challenged evidence did not involve conduct "any more sensational or disturbing" than the charged crimes").  Certainly, an appropriate limiting instruction and jury charge will alleviate any possibility of prejudice.

<u>Motion to Admit Certain Documents as Past Recollection Recorded</u>

The government expects to call several law enforcement witnesses who may not have a present recollection of events that occurred at or around the time of the charged murder, such as recovering a particular item, vouchering a piece of evidence, etc.  Should this occur, the government will seek to admit evidence of the recorded recollections of the testimony that were made while the matters that were recorded were fresh in the witnesses' minds, but about which the witnesses currently lack sufficient recollection to testify accurately.  Such testimony is admissible under Federal Rule of Evidence 803(5), which exempts recorded recollections from Rule 802's general exclusion of hearsay and allows a document that meets the foundational requirements to be read into the record. See Fed. R. Evid. 803(5).

Rule 803(5) defines a recorded recollection as: "A record that: (A) is on a matter the witness once knew about but now cannot recall well enough to testify fully and accurately; (B) was made or adopted by the witness when the matter was fresh in the witness's memory; and (C)

accurately reflects the witness's knowledge." Fed. R. Evid. 803(5).  If admitted under Rule 803(5), a writing may be read into evidence, but may not itself be received as an exhibit unless offered by an adverse party.  Id.  Before any document can be read into evidence under Rule 803(5), the proponent of the document must make a showing that: (i) the witness' "memory of the events detailed in the memorandum was sufficiently impaired"; (ii) the witness had "prepared or adopted the memorandum at or near the time of the events" at issue; and (iii) at the time the witness "prepared or adopted [the memorandum], it correctly reflected his knowledge of the events." Parker v. Reda, 327 F.3d 211, 213 (2d Cir. 2003) (per curiam) (citations omitted); see also United States v. Garcia, 282 F. App'x 14, 23 (2d Cir. 2008) (holding that the district court did not abuse its discretion in permitting two police officers to read from arrest reports and booking sheets under Rule 803(5) where the government made the required showings under Parker).  Courts in the Second Circuit have not only admitted evidence under the recorded recollections exception where the documents were created within days or even hours of the time of the event in question, see Parker, 327 F.3d at 213 (admitting a memorandum under Rule 803(5) that "bore the signature of [the witness] and was dated the day of the incident"); Garcia, 282 Fed. App'x at 23 (admitting arrest reports and booking sheets under Rule 803(5) in part because they were prepared or adopted within a few hours of the event), but have also admitted evidence under Rule 803(5) where the witness testified that he made or adopted the document "when the subject was fresh in [his] memory," even though the timing between the event in question and the creation of the document was unclear, see Mandal v. City of New York, No. 02-CV-1234 (WHP), 2006 WL 3405005, at *4 (S.D.N.Y. Nov. 26, 2006) (admitting recorded recollections after two reporters testified that they wrote the articles when the subject was fresh in their memory).

To fulfill Rule 803(5)'s requirements, before offering the witnesses' recorded recollections into evidence, the government expects to show that the witnesses contemporaneously recorded their activities and observations in formal written reports and other documents, which, depending the witness, may include field notes, a memo book, a criminal complaint, grand jury testimony and arrest processing and evidence collection paperwork.  The government will establish that the reports and other documents were prepared or adopted by the testifying witness while the events recorded were fresh in the witnesses' memories and accurately reflected the witnesses' knowledge at the time, as required by Rule 803(5)(B)-(C).  The government will also establish that, years later, the witnesses cannot recall the events or specific details that they recorded well enough to testify fully and accurately about the events, as required by Rule 803(5)(A). With this foundation these recorded recollections will satisfy Rule 803(5)'s requirements and are admissible for their truth.

### Motion to Treat Exhibits, 3500 Material and Giglio Material Relating to Civilian Witnesses as Subject to the Protective Order

The government also requests that the Court treat exhibits, 18 U.S.C. § 3500 and Giglio materials with respect to civilian witnesses (the "Civilian Witness Material") to be provided for the upcoming trial as subject to the September 17, 2020 Protective Order currently in force, ECF Dkt. No. 22.  Specifically, under the terms of the Protective Order, defense counsel, or anyone acting under the direction of defense counsel, should not reproduce, distribute or otherwise disseminate the Civilian Witness Material to be provided for the defendants' upcoming trial, and that the defendants not be permitted to bring the Civilian Witness Material back to the institution where they are incarcerated.

The Civilian Witness Material in this case will reveal, inter alia, the identity of witnesses that have cooperated with law enforcement authorities.  These materials also contain

40

personal identifying information of civilian witnesses, as well as their family and friends.  As outlined, <u>supra</u>, the defendants' history and characteristics, prior efforts to intimidate witnesses and the nature of this case raise concerns for the safety of testifying witnesses.  Any inappropriate disclosure of the Civilian Witness Material in this case will endanger the safety of government witnesses and their families.  Accordingly, the government submits that such materials be treated as "sensitive" under the terms of the September 17, 2020 Protective Order.

<u>Motion to Preclude Any "Alternative Perpetrator" Argument Without Evidence Establishing a Sufficient Nexus to the Charged Crimes</u>

The government moves to preclude the defendants from introducing evidence or eliciting testimony in support of speculative theories of an alternative perpetrator unless he first establishes a sufficient nexus to the charged crimes.[7]

I.    <u>Legal Standard</u>

A criminal defendant may not introduce evidence tending to show that another person committed the charged crime unless the evidence "sufficiently connects the other person to the crime."  <u>United States v. Hendricks</u>, 921 F.3d 320, 331 (2d Cir. 2019) (quoting <u>United States v. White</u>, 692 F.3d 235, 244 (2d Cir. 2012)).  This results from the fact that "the potential for speculation into theories of third-party culpability to open the door to tangential testimony raises serious concerns."  <u>Id.</u> (quoting <u>Wade v. Mantello</u>, 333 F.3d 51, 61 (2d Cir. 2003)).  As explained by the Tenth Circuit in <u>United States v. McVeigh</u> and applied by the Second Circuit in <u>Wade</u>, courts "must be sensitive to the special problems presented by alternative perpetrator evidence" when balancing probative value and adverse dangers of its presentation to the jury.  <u>Wade</u> 333

---

[7]      As part of its discovery, the government has turned over voluminous materials concerning tips, leads and other information, including the entire New York City Police Department's "Tip Log."

41

F.3d 51 at 61 (quoting United States v. McVeigh, 153 F.3d 1166, 1191 (10th Cir. 1998) (internal quotations omitted)).

Although a defendant "has a right to attempt to establish his innocence by showing that someone else did the crime, a defendant must still show that his proffered evidence on the alternative perpetrator is sufficient, on its own or in combination with other evidence in the record, to show a nexus between the crime charged and the asserted alternative perpetrator." Id. (internal quotations omitted).  It is not sufficient for a defendant to offer up "unsupported speculation that another person may have done the crime" as such "speculative blaming intensifies the grave risk of jury confusion, and it invites the jury to render its findings based on emotion or prejudice." Id.

In Hendricks, the Second Circuit held that a defendant had failed to show the required nexus to present evidence that his codefendant had committed the charged crime with the assistance of a third party despite: (1) evidence that the proposed alternate perpetrator was a close friend of the codefendant; (2) eye-witness testimony better fitting a description of the proposed perpetrator than the defendant; (3) records of telephone calls between the codefendant and the proposed perpetrator before and after the robbery in question; and (4) the codefendant's testimony that he went shopping with the proposed perpetrator after the robbery. Hendricks, 921 F.3d at 331. The Hendricks court elaborated that the evidence presented by the defendant failed to create a sufficient nexus because it tended to prove only that the alternative perpetrator was aware of the robbery, not that he himself had participated in it rather than the defendant. Id.

The Second Circuit has held that a showing that an alternative perpetrator had motive to commit the crime is insufficient to meet the nexus requirement on its own. Wade, 333 F.3d at 60-61.  In Wade, the trial court had excluded testimony that a homicide victim was a member of a gang and had been involved in both a general feud and a specific shootout with

another gang shortly before his death, holding that these facts were irrelevant in the absence of evidence tying a specific third party to the killing.  Id. at 54-55.  The Second Circuit affirmed, holding, "[t]hat a third party may have borne animus towards the victim, standing alone, does little to establish that the third party committed the crime."  Id. at 60 (citing Diaz, 176 F.3d at 82 (finding that claim that court erroneously excluded evidence that murder victim had assaulted inmate while in jail, which suggested motive by a third party, "was creative conjecturing and the court properly exercised its discretion in excluding such speculative evidence")).

Wade further held that even if the defendant had proffered evidence that an alternative perpetrator had both the motive and opportunity to commit the crime charged, a nexus could not exist without evidence connecting that alternative perpetrator to the specific crime in question.  Id. (citing Dibenedetto v. Hall, 272 F.3d 1, 8 (1st Cir. 2001) ("Evidence that tends to prove a person other than the defendant committed a crime is relevant, but there must be evidence that there is a connection between the other perpetrators and the crime, not mere speculation on the part of the defendant.")); see also Willcock v. Martuscello, No. 17-CV-454 (KAM) (LB), 2020 WL 2748031, at *3 (E.D.N.Y. May 27, 2020) (disallowing evidence that the defendant's twin brother had committed past stabbings because, "in order to introduce evidence of an unrelated stabbing to prove the existence of an alternative perpetrator, the modus operandi must be so unique as to conclude the same person did it"); United States v. Serrano, 192 F. Supp.3d 407, n.2 (S.D.N.Y. 2016) (allowing alternative perpetrator evidence where third-party had made self-inculpatory statements which were corroborated by evidence admitted by the government).

II.    Argument

The Court should preclude the defendants from introducing evidence or questioning witnesses for the purpose of eliciting testimony regarding speculative alternative perpetrators.  The

defendants had the motive and opportunity to commit the murder and have been identified by witnesses as the gunmen.  While other presently uncharged members of the conspiracy have asserted their Fifth Amendment right against self-incrimination—including Coconspirator 1, Coconspirator 2 and the cocaine supplier for the Baltimore narcotics transaction—their participation is separate and distinct from that of the charged defendants. The defendants cannot proffer any evidence that would create a sufficient nexus between any other particular individual and the defendants' roles in the charged crimes.  Therefore, the defendant cannot propose to the jury an alternative perpetrator of the crimes.  See Wade 333 F.3d 51, 61; Hendricks, 921 F.3d at 331 .

To the extent either defendant seeks to proffer credible evidence of an alternative perpetrator, the government respectfully asks the Court to decide its admissibility in a pretrial hearing.  First, the Second Circuit has explained that the purpose of requiring a sufficient nexus before offering alternative perpetrator evidence is to respond to the "grave risk of jury confusion" posed by such evidence.  Wade, 333 F.3d at 61-62 (quoting McVeigh, 153 F.3d at 1191). Allowing a defendant to present a speculative theory of an alternative perpetrator may result in jurors becoming distracted by irrelevant testimony, "turning attention away from issues of [the defendant's] culpability to those of [the victims] character," and issuing a verdict based on emotion or prejudice.  Id.

Second, the interest of judicial efficiency is better served by deciding the issue prior to the empanelment of the jury.  Leaving the issue open may later result in a lengthy "trial within a trial" to determine whether the defendants can demonstrate the required nexus.  Pretrial determination eliminates the risk that jurors will be exposed to speculative testimony and precludes the need to "unring the bell" during the trial itself.

<u>CONCLUSION</u>

For the foregoing reasons, the Court should grant the government's motions <u>in limine</u> in their entirety.

Dated:     Brooklyn, New York
           October 19, 2022

                                   Respectfully submitted,

                                   BREON PEACE
                                   UNITED STATES ATTORNEY
                                   Eastern District of New York
                                   271 Cadman Plaza East
                                   Brooklyn, New York 11201

By:             /s/
                                   Artie McConnell
                                   Mark Misorek
                                   Assistant United States Attorney
                                   (718) 254-7000