NB:JAM/MEM/MG
F. #2017R00509

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – – – – –X

UNITED STATES OF AMERICA

   - against -                              Cr. No. <u>20–305 (S-1) (LDH)</u>

KARL JORDAN, JR.,
    also known as "Little D"
    and "Noid," and
RONALD WASHINGTON,
    also known as "Tinard,"

Defendants.
              Defendants.

– – – – – – – – – – – – – – – – –X

### THE GOVERNMENT'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR AN ANONYMOUS AND PARTIALLY SEQUESTERED JURY

                                        BREON PEACE
                                        UNITED STATES ATTORNEY
                                        Eastern District of New York
                                        271 Cadman Plaza East
                                        Brooklyn, New York 11201

Artie McConnell
Mark E. Misorek
Miranda Gonzalez
Assistant U.S. Attorneys
    (Of Counsel)

PRELIMINARY STATEMENT

The government respectfully submits this memorandum of law in support of its motion for an anonymous and partially sequestered jury in this case. Specifically, the government requests that: (1) the names, addresses and workplaces of members of both the venire and petit juries not be revealed to either party or their attorneys; and (2) the jurors eat lunch together and be accompanied in and out of the courthouse by members of the United States Marshals Service each day so that they do not mingle in the courthouse with the public or any potential trial spectator. These measures are necessary to assure the public's right to a fair trial by protecting the jury from improper influence or intimidation. These precautions would neither deprive the defendants of meaningful jury selection nor diminish the presumption of innocence.

BACKGROUND

I. The Charged Crimes

On August 13, 2020, a grand jury in the Eastern District of New York returned an indictment charging the defendants Ronald Washington and Karl Jordan, Jr. with one count of murder while engaged in narcotics trafficking, in violation of Title 21, United States Code, Section 848(e)(1)(A), and one count of firearm-related murder, in violation of Title 18, United States Code, Section 924(j)(1), for the October 30, 2002 murder of Jason Mizell, also known as "Jam Master Jay." Jordan was also charged with one count of conspiracy to distribute cocaine and seven counts of cocaine distribution, in violation of Title 21, United States Code, Sections 846 and 841(a)(1), respectively. On March 4, 2021, the grand jury returned a superseding indictment, which charged Jordan with additional crimes, including one count of conspiracy to distribute 280 grams or more of cocaine base, in violation of Title 21, United States Code, Sections 846, 841(b)(1)(A)(iii) and 841(b)(1)(C), and one count of use of firearms in connection

with a drug trafficking crime, in violation of Title 18, United States Code, Sections 924(c)(1)(A)(i).

The Court severed the two counts related to the murder of Mizell from the other counts on September 19, 2022. Trial on those two counts is scheduled to begin on February 13, 2023. Each defendant faces a statutory mandatory minimum term of imprisonment of 20 years and a maximum of life.[1]

II. The Defendants

    A. Ronald Washington

Washington has a long and violent criminal history that spans four decades. Indeed, he has three violent felony convictions in New York State, two convictions in Maryland and a federal robbery conviction for a string of gunpoint robberies. Washington's criminal convictions are as follows:

- On February 1, 1982, Washington was convicted of Criminal Use of a Firearm in the First Degree, in violation of New York Penal Law ("N.Y.P.L") § 265.09, and was sentenced to 18-54 months in prison;

- On March 16, 1982, Washington was convicted of Attempted Robbery in the First Degree, in violation of N.Y.P.L. §§ 110/160.15, and was sentenced to 18-54 months in prison to run concurrent with his February 1, 1982 conviction;

- On October 13, 1983, Washington was convicted of Grand Larceny in the Third Degree, in violation of N.Y.P.L § 155.30, and was sentenced to 36 months in prison;

- On November 23, 1987, Washington was convicted of Assault in the First Degree, in violation of N.Y.P.L § 120.05(2), and was sentenced to 60-120 months in prison;

---

[1] On or about November 6, 2021, that United States Attorney General Merrick B. Garland has authorized and directed the United States Attorney's Office for the Eastern District of New York not to seek the death penalty against either defendant.

2

- On July 10, 1990, Washington was convicted of Battery in Baltimore, Maryland, and was sentenced to 18 months in prison;

- On December 6, 1993, Washington was convicted of Possession of Heroin with Intent to Distribute in Baltimore, Maryland, and was sentenced to ten years in prison; and

- On April 5, 2007, following a jury trial, Washington was convicted of Hobbs Act robbery conspiracy and six substantive counts of Hobbs Act robbery, see United States v. Washington, 05-CR-558 (NG) in the Eastern District of New York. The convictions stem from a string of gunpoint robberies in New York City and Long Island. Washington was sentenced to 210 months in prison.

B. Karl Jordan, Jr.

Although Jordan has no adult criminal record, he was arrested for Robbery in the Second Degree in 1999 and was adjudicated a juvenile delinquent. Despite his lack of record, the government is aware of several incidents where Jordan has used or been in possession of firearms, as described below:

- On February 3, 2003, Jordan was arguing with one of defendant Washington's relatives on 203rd Street in Queens. Jordan produced a semi-automatic pistol and fired one shot in into the air. Responding police officers recovered the spent shell casing and an additional 83 live rounds. Although Jordan was initially charged with a felony firearm offense, the eyewitnesses refused to cooperate and testify, and the grand jury indicted Jordan only for possession of ammunition, a misdemeanor. Jordan eventually pled guilty to a disorderly conduct violation.

- On May 14, 2003, Jordan fired several shots at Mizell's nephew on Hollis Avenue in Queens, striking him once in the leg. Jordan was arrested for Criminal Use of a Firearm in the First Degree, but the case was subsequently dismissed when the victim refused to cooperate with law enforcement.

- On November 1, 2004, Jordan was involved in a shootout with another individual on Farmers Boulevard in Queens. Rounds from the exchange went through windows and walls of the surrounding houses, cars and a nearby church. Over 27 pieces of ballistic evidence – including shell casings and spent projectiles – were recovered by responding officers. Jordan fled the scene in a gold BMW and was later arrested. The case was ultimately dismissed.

3

- On December 15, 2004, a search warrant was executed at Jordan's residence on 203rd Street in Queens, predicated on Jordan's narcotics sales. During the search, law enforcement recovered a loaded 9mm semi-automatic pistol, a loaded 9mm magazine, a loaded .32 caliber revolver, and a bullet proof vest. Also in the residence were various bags and foil wraps containing cocaine, over 150 bags of marijuana, and hundreds of glassine envelopes used for packaging narcotics. Jordan and six other individuals were inside at the time and arrested. Jordan eventually pled guilty to a disorderly conduct violation.

Jordan's criminal conduct has even continued after his arrest and detention at the Metropolitan Detention Center ("MDC"). On or about August 16, 2021, Jordan was found in possession of a contraband cellular phone while in his cell.

III. The Defendants' Tampering, Intimidation and Obstruction Efforts

As described in the government's omnibus motion in limine, see ECF No. 113, there is significant evidence of witness tampering and intimidation directly attributable to the defendants and those acting on their behalf. These include:

- One of the individuals present in the studio when Mizell was killed ("Witness 6") has repeatedly expressed fear of reprisal from Jordan and Jordan's father. Jordan's father called Witness 6 shortly after the murder in a manner that Witness 6 interpreted as threatening. Witness 6 has refused to speak with police, view photo arrays, or view a lineup with Jordan previously, despite telling third parties that Jordan shot Mizell. Witness 6 has also expressed a generalized fear of Washington due to his reputation for violence.

- At Mizell's funeral, Jordan approached another individual ("Witness 7") who was in the studio when Mizell was murdered. Jordan and a group of individuals approached Witness 7 and one of Witness 7's family members and repeatedly asked Witness 7 if Witness 7 knew who shot Mizell in a threatening manner.

- Later in 2003, Jordan, Jordan's father and several other individuals—including a coconspirator in the Mizell homicide ("Coconspirator 2")—confronted Witness 1, with Jordan's father asking if Witness 1 had spoken to anyone about the murder; what Witness 1 had told the police; and reminding Witness 1 that they knew where Witness 1's family lived.

- Washington has also repeatedly threatened Witness 1. Witness 1 testified against Washington during Washington's Hobbs Act robbery trial, United States v. White, 05-CR-558. During the pendency of the case, Washington

4

sought to intimidate Witness 1 by sending Witness 1 a letter reading, "Happy Birthday. I Never Stopped Loving You. Strength and Honor."[2] Since then, Washington has had third parties repeatedly attempt to reach out to Witness 1 on Washington's behalf. In recorded phone conversations, including a call on December 1, 2020, Washington has instructed a third party to reach out to Witness 1, including over Facebook. During the pendency of the instant case, Witness 1 has received numerous anonymous unsolicited friend requests over Facebook, including at least two messages from one of Washington's family members. One of the messages featured a photograph of two wolves eating a bloody animal carcass with the message "Hey its Tinard I'd like to talk." Washington attempted to minimize possible ramifications for this, telling an individual on August 31, 2021 that reaching out to Witness 1 "wouldn't be to no benefit of mine" because if "[Witness 1] goes back and tells them people [law enforcement] that you approached [Witness 1], that's tampering with witnesses."

- In recorded jail conversations, both Jordan and Washington have repeatedly speculated about the possible witnesses who will testify against them and who may be "snitching." In these conversations, both Washington and Jordan use codes and nicknames to frustrate law enforcement that may be monitoring their calls. For example, Washington has relayed to Coconspirator 2 that he believes Witness 6 is one of the witnesses that will testify against him. In a November 23, 2020 call, Jordan states that Witness 6 "put me at the scene." Additionally, both Jordan and Washington have discussed possible damaging testimony that Witness 2 could provide at trial and have taken steps to prevent Witness 2 from testifying. For example, in an October 28, 2020 call, Washington instructed Coconspirator 2 to get Witness 2 on a "three way call." In a February 10, 2021 call Jordan and the counterparty discuss Witness 2 being in "paperwork" for another case, indicating that Witness 2 is cooperating with law enforcement, and noting that Witness 2's "statement" to law enforcement has been seen by multiple people. In a March 21, 2021 call, Jordan's associate reported to Jordan that "shit looking like [Witness 2] is a liar . . . the worst type. . . trying to figure it out now." On June 19, 2021, Jordan asked if anyone had spoken to Witness 2, and on August 4, 2021, Jordan is told by the counterparty that "the lawyer spoke about [Witness 2]" and that "its him [cooperating]" for "one part of the case, but for the other he's not sure." Jordan responds that he will pray on it and that its going to fix itself.

- Per other recorded jail calls, Jordan uses one individual as a go-between himself and an associate incarcerated for murder in a state facility (the "State Inmate"), primarily to share information about Witness 2's possible cooperation. Notably, in the State Inmate's email communications, Witness 2 is frequently mentioned as being a cooperating witness against Jordan and the

---

[2] A copy of this letter has been disclosed as part of the Government's discovery.

5

State Inmate. For example, in one July 14, 2021 email, the State Inmate states "this guy made some shit up about me 2 so he could try n save himself especially after that she he did to [Jordan] . . . if he'll throw [Jordan] under the bus then I shoudve known." In another email on July 14, 2021, the State Inmate wrote that [Witness 2] was doing some bullshit b4 n i didn't wanna believe them but 4 them 2 come at me with some bullshit like that he's 4sure n there just tryna do any and everything possible 2 save himself." In still another email on July 14, 2021, the State Inmate explicitly referenced Witness 2's possible testimony in the instant case, writing "I know 4 a fact this n-gga [Witness 2]. . . is tryna put my name n some bullshit 2 try n save himself from the time he's facing cause he's 2 weak 2 do his own time smh from what i heard he already agreed 2 testify against his own brother [Jordan] for that jmj shit which is a total lie." On July 14, 2021 alone, the State Inmate sent at least nine emails to different people discussing Witness 2's possible cooperation with law enforcement.

Exacerbating these concerns is the fact that Jordan and Washington have been in contact through "kites" while incarcerated, something that Washington acknowledges in a September 5, 2020 call with Coconspirator 2. In that call, Coconspirator 2 asks if Washington and Jordan were "charged together" and Washington responds that he "was just talking to that little n-gga [Jordan] too." Coconspirator 2 instructs Washington to give Jordan Coconspirator 2's number. Additionally, Jordan clearly has access to contraband forms of communication at the MDC. For example, Jordan repeatedly asks people to "text" him rather than discuss things over monitored phone calls. In a November 15, 2020 call, Jordan comments that he "got a cellie." In a November 16, 2020 call, Jordan instructs an individual to "find out the name and just text it to me." In a March 1, 2021 call, Jordan states that "the CO lady is going mad hard today. . . Hopefully she don't go back to my cell. I snuck out to jump on the jack [a contraband cell phone]." In a December 2, 2021 call, Jordan says that he will "Facetime" an individual later. After being caught with a contraband phone on or about August 16, 2021, Jordan has exercised even more discretion when discussing alternative, unauthorized means of communication. In an August 15, 2022 call, Jordan reprimands an individual for repeatedly referencing Jordan texting

6

people from jail, screaming, "I never texted you. How could I text you? What are you talking about?" The counterparty then replaces Jordan's name for the name of a third party, claiming that third party, not Jordan, sent the text. Similarly, in an August 31, 2021 call, Washington states he "sold his phone" because he "doesn't have a job" at the MDC. More recently, Jordan's cellmate recently had a cell phone confiscated from him.

## ARGUMENT

I.   Legal Standard

The Second Circuit has long recognized that anonymous juries are often necessary to protect the integrity of a trial and to ensure an impartial jury. See, e.g., United States v. Napout, 963 F.3d 163, 189 (2d Cir. 2020); United States v. Prado, 634 F. App'x 323, 325 (2d Cir. 2016); United States v. Kaziu, 559 F. App'x 32, 38 (2d Cir. 2014); United States v. Ibrahim, 529 F. App'x 59, 65 (2d Cir. 2013); United States v. Kadir, 718 F.3d 115, 120-21 (2d Cir. 2013); United States v. Pica, 692 F.3d 79, 81 (2d Cir. 2012); United States v. Quinones, 511 F.3d 289, 291 (2d Cir. 2007); United States v. Gotti, 459 F.3d 296, 345 (2d Cir. 2006); United States v. Aulicino, 44 F.3d 1102, 1116 (2d Cir. 1995); United States v. Wong, 40 F.3d 1347, 1376-77 (2d Cir. 1994); United States v. Thai, 29 F.3d 785, 800-01 (2d Cir. 1994); United States v. Amuso, 21 F.3d 1251, 1264-65 (2d Cir. 1994); United States v. Locascio, 6 F.3d 924, 946-47 (2d Cir. 1993); United States v. Paccione, 949 F.2d 1183, 1192 (2d Cir. 1991); United States v. Vario, 943 F.2d 236, 239 (2d Cir. 1991); United States v. Tutino, 883 F.2d 1125, 1132 (2d Cir. 1989); United States v. Persico, 832 F.2d 705, 717 (2d Cir. 1987); United States v. Thomas, 757 F.2d 1359, 1364-65 (2d Cir. 1985); United States v. Barnes, 604 F.2d 121, 133-43 (2d Cir. 1979).

The Second Circuit has adopted a two-step process for district courts to follow in connection with empaneling an anonymous jury. First, a district court should determine whether there is strong reason to believe that the jury needs protection. Second, if the court determines that anonymity is necessary to protect the jury, the court should take reasonable precautions to minimize any prejudice that might arise from an anonymous jury. See Paccione, 949 F.2d at 1192. Importantly, "the use of an anonymous jury does not infringe a defendant's constitutional rights, so long as the court conducts a voir dire designed to uncover any bias as to the issues or the defendant[] and takes care to give the jurors a plausible and nonprejudicial reason for not disclosing their identities." Aulicino, 44 F.3d at 1116. Thus, "the decision whether or not to empanel an anonymous jury is left to the district court's discretion." Paccione, 949 F.2d at 1192.

To determine whether there is reason to believe the jury's safety and impartiality needs protection, courts in this circuit have considered various factors: (1) the dangerousness of the defendants, (2) whether the defendants or their associates have engaged in past attempts to interfere with the judicial process, (3) whether the defendants have access to the means to harm the jury, and (4) whether the trial is likely to attract media attention and publicity. See United States v. Wilson, 493 F. Supp. 2d 397, 398 (E.D.N.Y. 2006) (Garaufis, J.) (citing Paccione, 949 F.2d at 1192; Vario, 943 F.2d at 240; Tutino, 883 F.2d at 1132-33 (2d Cir. 1989)). Notably, all of these factors need not be present; "anonymity is appropriate when some combination of these factors is present." United States v. Ashburn, 13-CR-0303 (NGG), 2014 WL 5800280, at *3 (E.D.N.Y. Nov. 7, 2014) (internal quotation marks omitted).

Courts assess defendants' dangerousness by the seriousness of the charged crimes, including whether the defendants are charged with participating in a large-scale criminal enterprise. See, e.g., Gotti, 459 F.3d at 346 (noting defendants were charged with membership in

8

an organized crime family); Wilson, 493 F. Supp. 2d at 399-401 (noting defendant was charged with murdering two police officers and was a member of a violent gang).

As for defendants' past attempts to tamper with the judicial process, courts look for evidence of previous intimidation, bribing, or violence toward witnesses or jurors. See, e.g., Aulicino, 44 F.3d at 1116 (noting defendants had an associate threaten a witness's life and offer $50,000 for the witness's silence); Paccione, 949 F.2d at 1192-93 (noting government witness had received anonymous, middle-of-the-night phone calls advising him to "remember[] nothing" and a defendant had threatened others with a baseball bat and pistol); Vario, 943 F.2d at 240 (noting co-conspirator had approached grand jury witness).

When defendants are under pretrial detention, whether they have means to harm the jury often hinges on the extent of their connections outside of prison. See, e.g., Wilson, 493 F. Supp. 2d at 400 (granting a motion for an anonymous jury in part because defendant was "a member of the Stapleton Crew and . . . this organization has other members and associates who are currently, and will be, at large at the time of the trial").

Finally, whether the trial is likely to attract media attention may be illustrated by the nature and degree of pretrial publicity. See, e.g., Paccione, 949 F.2d at 1193 (noting the case had already been "front-page news"); Vario, 943 F.2d at 240 (citing a single New York Newsday cover story).

Two procedures adequately protect defendants' right to an unbiased jury during the use of an anonymous jury. First, the court should "conduct a voir dire designed to uncover bias as to issues in the cases and as to the defendant himself." Paccione, 949 F.2d at 1192. Second, to reduce the possibility that the jury will infer that the defendant is dangerous, the court should give the jurors "a plausible and nonprejudicial reason for not disclosing their identities or

9

for taking other security measures." Id.; see also Aulicino, 44 F.3d at 1116. In many cases, courts instruct the jury that the additional safeguards are to protect against intrusion by the media. See, e.g., Thai, 29 F.3d at 801; Paccione, 949 F.2d at 1191-92; Thomas, 757 F.2d at 1363.

II.  There is Strong Reason to Believe that the Jury's Impartiality Needs Protection in This Case

Applying the standards and considering the factors set forth above, the interests of justice would best be served in this case by protecting the identities of the jurors. First, the defendants are dangerous and, based on the evidence to be presented at trial, they are likely to be perceived by the jurors as dangerous. In these circumstances, the fact that jurors are aware that their identities are publicly known may subtly and unconsciously impair their impartiality. Indeed, this is precisely the type of criminal conduct that "would cause a juror to reasonably fear for his own safety." Vario, 943 F.2d at 241. In Barnes, the Second Circuit explained one of the important reasons for empanelling anonymous juries in cases like this:

> If a juror feels that he and his family may be subjected to violence or death at the hands of a defendant or his friends, how can his judgment be as free and impartial as the Constitution requires? If the anonymous juror feels less pressure as a result of anonymity, . . . this is as it should be – a factor contributing to his impartiality.

604 F.2d at 140-41 (internal quotation marks and citation omitted) (affirming district court's use of an anonymous, sequestered jury because it "comported with its obligation to protect the jury, to assure its privacy, and to avoid all possible mental blocks against impartiality").

Similarly, in Thomas, the Second Circuit found that the protection of jurors is vital to the function of the criminal justice system and further articulated the importance of using jury anonymity as a mechanism to ensure a jury's fair and impartial verdict free from fear or intimidation:

10

> As a practical matter, we cannot expect jurors to "take their chances" on what might happen to them as a result of a guilty verdict. Obviously, explicit threats to jurors or their families or even a general fear of retaliation could well affect the jury's ability to render a fair and impartial verdict.

757 F.2d at 1364.

Moreover, the defendants and their associates have engaged in attempts to obstruct justice. As set forth herein and in the government's motion in limine, the defendants sought to silence potential witnesses against them almost immediately after committing the charged murder. They continue to try to identify and tamper with potential witnesses while incarcerated, enlisting third parties and using contraband cell phones and other prohibited forms of communication to do so.

Notably, the government has not described—nor seeks to admit—all threats received by witnesses in this case. For example, shortly after the unsealing of the indictment, Witness 7 received a series of threatening text messages and photographs, one depicting an individual shot in the head, and another depicting an individual with his throat cut, along with Witness 7's address and that of a family member. More recently, a family member of another witness ("Witness 8") was approached by an unknown individual at Witness 8's place of business. The individual asked if Witness 8 was working that day and if Witness 8 would be testifying for the government in the case, remarking that "you know what happens to snitches" before walking out. On another occasion, Witness 8 received a series of threatening text messages that Witness 8 was "on paper" and cooperating with the government. The government has been unable to connect these threats to the defendants and thus is not seeking their

11

admission, but they are nevertheless relevant to the instant motion for an anonymous jury and partial sequestration.[3]

Finally, based on the pretrial publicity thus far, the trial is likely to attract significant media attention and publicity. Mizell's celebrity and murder garnered significant and sustained attention from both national and international media sources for over twenty years. The case has spawned numerous documentaries, books, podcasts and commentary from journalists and celebrities alike, which can only be expected to increase during trial.

The expected media attention may put significant pressure on jurors to reach a verdict based on considerations other than the evidence presented at trial, for example to either avoid the notoriety associated with the defendants or to seek out fame. Notably, courts have ordered anonymous juries in cases with substantial media coverage, even where neither the defendant nor his associates had any documented history of jury tampering. See Kadir, 718 F.3d at 121 (affirming court's decision to empanel an anonymous jury where defendants were charged with violent crime and there was extensive media coverage of the case (citing United States v. Wong, 40 F.3d 1347, 1377 (2d Cir. 1994)); see also United States v. Shiomos, 864 F.2d 16, 17 (3d Cir. 1988) (affirming decision to sequester jury in trial of judge accused of extortion on ground that trial would generate "significant amounts of publicity" that would interfere with the jury's ability to remain impartial). In Barnes, the Second Circuit upheld the empaneling of an anonymous jury and noted that "in a case that generated as much pretrial

---

[3] Notably, in a documentary about Mizell's murder, Jordan's father threatened a former police officer for publicly identifying Jordan as a suspect in the killing, stating in substance that he would "break [the police officer's] jaw . . . get him wired. . . he thinks because he is a police officer he can't get got."

publicity as [Barnes] and in which allegations of dangerous and unscrupulous conduct abounded, precaution was best taken so that fears would not become realities." 604 F.2d at 141.

For all of these reasons, an anonymous and partially sequestered jury is warranted in this case.

III. An Anonymous Jury Will Not Prejudice the Defendants

Once a district court determines that there is strong reason to believe that the jury needs protection, it may empanel an anonymous jury provided it takes reasonable precautions to minimize any potential prejudice to the defendants. See, e.g., United States v. Bellomo, 263 F. Supp. 2d 557, 559 (E.D.N.Y. 2003) (granting motion for anonymous jury and noting the requirement "that a balance be struck between the government's interest in the judicial process and the defendant's interest in preserving and safeguarding the presumption of innocence"); Thai, 29 F.3d at 801; Amuso, 21 F.3d at 1264-65; Paccione, 949 F.2d at 1192; Vario, 943 F.2d at 239; Tutino, 883 F.2d at 1132; Persico, 832 F.2d at 717-18; Thomas, 757 F.2d at 1365. A defendant has two legitimate concerns that are potentially affected by a decision to empanel an anonymous jury: (a) the right to make informed choices during the jury selection process, and (b) the right to be tried by jurors who are not prejudiced by reason of their anonymity. Both of these concerns can be readily addressed.

    A.    An Anonymous Jury Will Not Burden the Defendants'
          Ability To Make Informed Choices During Jury Selection

Although a defendant has the right to a meaningful voir dire of potential jurors, see Rosales-Lopez v. United States, 451 U.S. 182, 188 (1981), the decision as to the questions to be asked in voir dire largely rests within the informed discretion of the trial judge. See United States v. Silva, 715 F.2d 43, 50 (2d Cir. 1983) (absent a clear abuse of discretion, trial court's ruling on questions to be asked will not be disturbed); United States v. Barnes, 604 F.2d 121,

13

137-40 (2d Cir. 1979) (noting that "as long as a defendant's substantial rights are protected by a voir dire designed to uncover bias as to issues in the case and as to the defendant himself, then reasonable limitations on the questioning should not be disturbed on appeal").

The information that will be kept from the parties and counsel if this motion is granted – namely, the names, addresses and places of employment of prospective jurors – is not crucial to the jury selection process. In selecting jurors, the parties will learn, among other things, the geographic area where prospective jurors reside, the general nature of their employment, their age and the level of their formal education. The names of prospective jurors, to the extent they provide information about ethnicity, are not needed for a meaningful voir dire. See Georgia v. McCollum, 505 U.S. 42 (1992) (rule articulated in Batson, prohibiting use of peremptory challenges in racially discriminatory manner, applies to defendants).

B. An Instruction Will Diminish the Risk of Prejudice to the Defendants

Numerous courts have recognized that, where anonymity is necessary, the Court can instruct the jury as to why anonymity is appropriate in a neutral manner that minimizes any risk of prejudice to the defendants. Although the due process clause of the Fifth Amendment protects the presumption of innocence, "there is no per se rule that it may not be burdened." Thomas, 757 F.2d at 1364; see also United States v. Scarfo, 850 F.2d 1015, 1026 (3d Cir. 1988). Here, the burden is slight compared to the interests in safeguarding the integrity of the judicial process and can be minimized through a proper jury instruction.

Most commonly, courts have explained to jurors that their privacy and their identities require protection from the media and the public. See, e.g., Memorandum & Order, United States v. Basciano, 03-CR-929 (E.D.N.Y. Nov. 17, 2005), ECF No. 354 at 5; United States v. Amato, 306 F. App'x 630, 634 (2d Cir. 2009); Thai, 29 F.3d at 801; Amuso, 21 F.3d at

14

1265; Tutino, 883 F.2d at 1133. In some cases, the court has explained the jury's partial anonymity by telling prospective jurors that anonymity would allow them to feel more comfortable in giving candid answers to the personal questions asked in voir dire. Either of those examples would provide a credible explanation to prospective jurors in this case.

As for partial sequestration, the government proposes that the jurors be told that they are being escorted in and out of the courthouse to protect their privacy and in order to ensure a timely start to each day of trial. This practice has been routinely followed in this District in recent years, and should be followed here as well. See, e.g., United States v. Shelton, No. 18-CR-609 (RJD), Tr. of July 12, 2022 Status Conference at 6:5-14, 7:8-9; United States v. Kelly, No. 19-CR-286 (AMD), 2020 WL 8482693, at *4 (E.D.N.Y. Oct. 9, 2020), reconsideration denied, No. 19-CR-286 (AMD), 2021 WL 431030 (E.D.N.Y. Feb. 8, 2021); United States v. Dervishaj, No. 13-CR-668 (ENV), 2015 WL 13842838, at *5 (E.D.N.Y. Mar. 19, 2015); United States v. Basciano, 05-CR-060 & 03-CR-929 (NGG); United States v. Stone, 05-CR-401 (ILG); United States v. McGriff, 04-CR-966 (FB); United States v. Wilson, 04-CR-1016 (NGG); United States v. Aguilar, 01-CR-1367 (RJD); United States v. Nelson, 94-CR-823 (DGT); United States v. Orena, 93-CR-1366 (ERK); United States v. Malpeso, 93-CR-1365 (RJD); United States v. Cutolo, 93-CR-1230 (EHN); United States v. Thai, 91-CR-838 (CBA).

      C.     A Jury Questionnaire Is Unnecessary Here

The government respectfully submits that use of a questionnaire in the selection of an anonymous jury is not necessary in this case because the Court can conduct "thorough and probing" voir dire without the use of a written questionnaire. United States v. Salameh, 152 F.3d 88, 120-21 (2d Cir. 1998) (holding that district court did not abuse its discretion in declining to use defense questionnaire).

It is well-settled that the questioning of potential jurors on voir dire is "quintessentially" a matter for the discretion of the district court.  United States v. Lawes, 292 F.3d 123, 128 (2d Cir. 2002); see also Rosales-Lopez, 451 U.S. at 189 (holding that district courts have "ample discretion in determining how best to conduct the voir dire"); United States v. Treacy, 639 F.3d 32, 47 (2d Cir. 2011) (holding that the district judge's personal policy against using a questionnaire is "well within his bailiwick as a trial judge so long as he conducts adequate voir dire by some other means").  It is also well-settled that the use of a written questionnaire, even where an anonymous jury is empaneled, is not mandatory.  See Treacy, 639 F.3d at 46; Quinones, 511 F.3d at 300 n.8 ("In approving the use of questionnaires as part of voir dire, we do not hold that district judges are ever obligated to make use of this procedure in selecting juries.") (emphasis added).

An appellate court will not interfere with the manner in which voir dire has been conducted absent a clear abuse of discretion.  See Treacy, 639 F.3d at 46  Restrictions on voir dire will be upheld "unless a defendant has been precluded from obtaining an impartial jury." Barnes, 604 F.2d at 138.  The Second Circuit has noted that it has apparently never reversed a conviction because of the trial court's refusal to ask a particular question in voir dire.  See Treacy, 639 F.3d at 47; United States v. Diaz, 854 F. App'x 386, 389 (2d Cir.), cert. denied sub nom. Felton v. United States, 142 S. Ct. 473 (2021).  Furthermore, even in cases where questionnaires have been used, the Second Circuit has strongly recommended that the court conduct some oral voir dire before granting challenges for cause, unless irrevocable bias is so evident from the juror's responses on the questionnaire "as to render superfluous further oral inquiry about the juror's ability to follow legal instructions and to serve impartially." Quinones, 511 F.3d at 302.

16

District courts within this circuit have frequently refused requests to use questionnaires in the jury selection process. As the court explained in Treacy:

> The[re are] many problems with questionnaires, but the single biggest problem [ ] is that there is no one in the world who can draft a question that will not have ambiguities that will be, as I learned the one time [I] tried it, that will be picked up on by various prospective jurors. And thus during the voir dire, a huge amount of time will be spent explaining to a juror why he or she misunderstood the question in the questionnaire or finding out that . . . the way he interpreted it was not the way the lawyers interpreted it.

Id. (quoting Tr. of Jan. 30, 2009 Hearing at 12-13). In Treacy, the Second Circuit found that the district court did not abuse its discretion in declining to use a written juror questionnaire, given that he offered a rational, non-arbitrary reason for his policy, and as long as he conducted adequate voir dire by some other means. Id. at 47.

Moreover, in United States v. Tomero, 486 F. Supp. 2d 320, 324 (S.D.N.Y. 2007), the defendants requested the use of a jury questionnaire so that they could obtain more complete information about jurors in the event an anonymous jury was empaneled. There, the district court granted the government's motion for an anonymous jury, but denied the defendants' request, finding that the use of a questionnaire was unnecessary. Id. at 325. The district court noted that the government's request for an anonymous jury would "not limit inquiry into the occupations of the jurors, only information about their specific places of employment." Id. Moreover, although the jurors' names and addresses would remain confidential, the court would inquire as to the neighborhood in which each potential juror resides. Id. The court concluded that the defense would have no problem in assessing the possible bias of potential jurors. Id. The same holds true in this case.

As set forth above, the only information the parties will not be privy to concerning the potential jurors is their names and precise addresses and workplaces, none of

17

which is relevant to meaningful voir dire. The government does not object to the Court asking the jurors their neighborhood of residence and how each juror is employed (without mentioning the employer name and precise location). Thus, in terms of gaining information about the potential jurors, the fact that the jurors are "anonymous" does not affect the quality of the information that can be learned about each potential juror through thorough voir dire in any relevant way. As long as the Court conducts a "thorough and probing" oral voir dire – to which the parties can contribute through voir dire requests prior to jury selection and consultation with the Court during jury selection – the parties will be able to assess the possible bias of potential jurors and the defendants' rights will be protected, without the use of a questionnaire. See Tomero, 486 F. Supp. 2d at 325.

## CONCLUSION

For the foregoing reasons, the government respectfully submits that the venire and petit juries in this case be anonymous and partially sequestered.

Dated: Brooklyn, New York
January 2, 2023

Respectfully submitted,

BREON PEACE
United States Attorney
Eastern District of New York

By: /s/
Artie McConnell
Mark E. Misorek
Miranda Gonzalez
Assistant United States Attorneys
(718) 254-7000

cc: All counsel (by ECF)

18