Exhibit A

Law Offices of Ezra Spilke

1825 Foster Avenue, Suite 1K
Brooklyn, New York 11230
t: (718) 783-3682
e: ezra@spilkelaw.com
www.spilkelaw.com

January 11, 2023

**By Email**
Artie McConnell
Mark E. Misorek
Miranda Gonzalez
U.S. Attorney's Office
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Re:     Ronald Washington First Expert Notice

Dear Mr. McConnell, Mr. Misorek and Ms. Gonzalez:

        We write pursuant to Federal Rule of Criminal Procedure 16(b)(1)(C) to provide notice that the defense intends to offer testimony at trial from Dr. Geoffrey Loftus.

        Dr. Loftus is an experimental psychologist with expertise in human memory, visual perception, and eyewitness identification. He has researched and written on these subjects for approximately fifty years. Dr. Loftus received his B.A. in Experimental Psychology from Brown University in 1967 and his Ph.D. in Experimental Psychology from Stanford University in 1971. He has been on the faculty of the University of Washington Department of Psychology since 1972. Dr. Loftus is a member of several professional associations, including the American Psychological Society and the Association for Research in Vision and Ophthalmology. He has been qualified to testify as an expert on the subjects of memory, perception, and the reliability of eyewitness testimony more than 400 times in numerous state and federal courts. His research has been published in many books and journals, including the *Journal of Experimental Psychology*, *American Psychologist*, *Memory & Cognition*, and the *Psychonomic Bulletin & Review*. He has served as an editor or on the editorial boards of several journals— *Memory & Cognition*, *Cognitive Psychology*, the *Journal of Experimental Psychology*, *Psychological Science*, and *Psychological Review*. During his career, Dr. Loftus has received more than $3.5 million in continuous grant funding from the National Science Foundation, the National Institute of Mental Health, the University of Washington, and the Institute for Learning and Brain Science for his research on visual perception and human memory. Dr. Loftus's curriculum vitae is enclosed as Exhibit A.

        The defense expects that Dr. Loftus will testify generally about the science of human perception and memory, the reliability of eyewitness identifications, and the dependability of eyewitness identification procedures. The defense anticipates that Dr. Loftus will explain how an eyewitness's memory of an incident might be affected by various factors, including the effect of environmental conditions such as attention, weapon focus, stress, and duration. We also expect him to testify, based on his review of the discovery materials listed below, that those

environmental conditions could have had an impact on identifications made in this case. We further expect him to testify about concepts related to his research in the field of human memory and perception, including the effect of pre- and post-event information. Prior testimony on these subjects by Dr. Loftus in the Cook County, Illinois case *People v. Marco Lopez* is attached for your reference as Exhibit B.

Dr. Loftus's opinions are based on his training and experience, his extensive research in this field, and on information the government has produced to the defense in this case, specifically, Bates 000001 to Bates 000405.

Dr. Loftus is also expected to testify about the potential unreliability of a photo array procedure including a set of strangers and one person familiar to the witness. His testimony on this subject will be based on fundamental findings in recognition memory research, including his own. *See, e.g.* Reinitz, M.T., Séguin, J.A., Peria, W., &. Loftus, G.R. (2012), Confidence-accuracy relations for faces and scenes: Roles of features and familiarity, *Psychonomic Bulletin & Review, 19,* 1085– 1093.

During the previous four years, Dr. Loftus has testified as an expert in the following matters:

*People v. Jabulani Williams* 595677 – Oakland, CA

*People v. Josef Oakes* SJPD 12-226-0462 – San Jose, CA

*State v. Mustafa Mohamud Arteh* 518031290 – Seattle, WA

*People v. Gabriel Schroeder* – Martinez, CA

*People v. Carl Krenkowski* 17CR1292601 – Chicago, IL

*State v. Brent Walsh* 1CPC-17-0001816 – Honolulu, HI

*State v. Jordan Smith* 17-350730-001 – Honolulu, HI

*State v. Shane Patano* 19-1-00022-31 – Everett, WA

*State v. Angel Franco* 188015610 – Seattle, WA

*People v. Hector Cosme* 18CR015728 – Oakland, CA

*People v. Silas Hesselberg* 19MI003026 – Sacramento, CA

*People v. Tony Thao* 18FE007345 – Sacramento, CA

*State v. Cory Wade* 18-1-00533-3 SEA – Seattle, WA

*People v. Odell Jones* 17-CR-005837A, B – Oakland, CA

*People v. Stefawn Taylor* 19FE014699 – Sacramento, CA

*Shawn Williams v. State of New York* 132581 – New York, New York

*People v. Damien Bolden* 19CR6478 – Chicago, IL

*Weichel v. Commonwealth of Massachusetts* – Boston, MA

*People v. Roban Ludford* CR1703460B – Eureka, CA

*State v. Kilani Derego* 1PC101001469 – Honolulu, HI

*State v. Robert Harrison* 20-1-00852-1 SEA – Seattle, WA

*People v. Will Watson* 17-CR-003246 – Oakland, CA

*State v. Benjamin Woody* 21-1-01209-1 – Everett, WA

*U.S. v. Murray Hooper,* CV-98-2164-PHX-SMM – Phoenix, AZ

*State v. Jonathan Fisher* 20 1 00904 31 – Everett, WA

Very truly yours,

/s/ Ezra Spilke
Susan G. Kellman
Ezra Spilke
Jacqueline E. Cistaro
*Counsel for Ronald Washington*

encl.

**Expert Approval**:

The disclosures contained in this letter are true and correct.

Geoffrey Russell Loftus, Ph.D.

Exhibit A

# Geoffrey Russell Loftus
## CV (Revised November 7, 2022)

**Biographical Data**

| | |
|---|---|
| **Born:** | 1945 |
| **Address:** | Department of Psychology, Box 351525 |
| | University of Washington |
| | Guthrie Hall, Room 222 |
| | Seattle, WA 98195-1525 |
| | USA |

**Communication channels**

| | |
|---|---|
| Office phone: | (206) 543-8874 |
| Cell phone: | (206) 605-1974 |
| Skype: | gloftus45 |
| email: | gloftus@uw.edu |
| Web site: | http://faculty.washington.edu/gloftus |

**Education**

| | |
|---|---|
| **B.A.:** | Brown University, Experimental Psychology, 1967 |
| **Ph.D.:** | Stanford University, Experimental Psychology, 1971 (Adviser: Richard C. Atkinson) |
| **Postdoctoral:** | New York University, 1971-72 (Sponsor: George Sperling) |

**Employment**

**Warm-up**

Honeywell Corporation: computer programmer (machine-code and assembly-language), summers, 1966, 1967

Stanford University, Department of Psychology: research assistant/teaching assistant, 1967-1971

New York University: postdoctoral research fellow, 1971-72

**Permanent**

University of Washington: assistant, associate, full, emeritus professor, 1972-present

**Visiting**

Stanford University, Department of Psychology: visiting professor, summers, 1972, 1979

National Institutes of Health: National Institute on Aging: visiting scholar, autumn, 1986

MIT, Department of Brain and Cognitive Sciences: 1995-1996

**Awards and Honors**

**Fellowships**

University Fellow, Stanford University: 1967-70

NSF fellowship, New York University: 1971-72

Visiting Scholar, Stanford University: autumn, 1978, summers, 1979, 1980

**NIMH MERIT Award 1989-1999**

**Research Grants**

| | | | |
|---|---|---|---|
| National Science Foundation | $31,000 | 6/73-5/75 | Eye fixations |
| National Science Foundation | $43,500 | 6/75-12/77 | Short-term memory |
| National Science Foundation | $37,660 | 1/78-5/79 | Picture memory |

| National Science Foundation | $101,03 | 6/79-9/82 | Picture memory |
| UW Grad School Research Fund | $4,962 | 10/79-6/80 | Picture memory |
| National Science Foundation | $167,362 | 10/82-5/86 | Visual perception |
| NIMH | $202,096 | 6/86-5/89 | Visual perception |
| UW Royalty Research Fund | $24,000 | 3/96-2/97 | Attention |
| NIMH | $1,082,187 | 6/89-8/99 | Visual perception (MERIT award) |
| NIMH | $650,570 | 9/99-2/05 | Visual perception |
| Institute for Learning and Brain Science | $75,202 | 3/01-6/02 | Developmental perception |
| NIMH | $1,227,220 | 3/05-2/11 | Visual perception (.pdf) |
| UW Royalty Research Fund | $35,000 | 3/13-2/14 | Visual perception |

## Professional Memberships

American Association for the Advancement of Science (Fellow)
American Psychological Society (Fellow)
Association for Research in Vision and Ophthalmology
Psychonomic Society (Publications Board 1997-2001)
Society for Computers in Psychology (President 1983-84)
Society of Experimental Psychologists

## Other Professional Experience

**Grant reviewing**

NIMH Basic Behavioral Processes Study Section (1983-1987)
NIMH Cognition and Perception Study Section (2003-2007)
Ad hoc reviewer for numerous other granting agencies in the U.S. and elsewhere

**Journal editorships**

Editor: *Memory & Cognition* (1993-1997)
Associate Editor, *Cognitive Psychology* (1975-1996; 1999-2006)

**Journal editorial boards:**

*JEP: Learning, Memory, and Cognition* (1977-1988; 2000-2002)
*JEP: General* (1977-1990)
*Psychological Science* (1999-2004)
*Psychological Review* (2004-2011)

**Consulting work**

Permitted to testify as an expert witness on perception, memory, statistics, and video-game behavior in approximately 490 civil and criminal cases (1980-present). Testimony admitted in,

**Superior Courts**: 64 counties in Alaska, Arizona, California, Colorado, Illinois, Indiana, Hawaii, Massachusetts, Michigan, Montana, Nevada, New Jersey, New York, Oregon, Washington, Wyoming

**Federal Courts**: Anchorage, AK; Chicago, IL; El Paso, TX; Kansas City, MO; Newark, NJ; Philadelphia, PA; Sacramento, CA; San Francisco, CA; Tacoma WA; Tucson, AZ; Yakima, WA

**U.S. Military Court:** U.S. Navy, Sigonella, Italy

**Canada:** Winnipeg, Manitoba

## Publications

**Books**

Loftus, G.R., & Loftus, E.F. (1976). *Human Memory: The Processing of Information.* Hillsdale, NJ: Lawrence Erlbaum Associates.

Loftus, G.R., & Loftus E.F. (1982). *Essence of Statistics.* Monterey: Brooks-Cole.

Loftus, G.R., & Loftus, E.F. (1983). *Mind at Play: The Psychology of Video Games.* New York: Basic Books.

Loftus, G.R., & Loftus, E.F. (1987). *Essence of Statistics, 2nd Edition.* New York: Random House.

Savageau, D. & Loftus, G.R. (1997). *Places Rated Almanac.* New York: McMillan.

Smith, E.E., Nolen-Hoeksema, S., Fredrickson, B., & Loftus, G.R. (2003). *Hilgard's Introduction to Psychology, Fourteenth Edition.* Belmont, CA: Wadsworth.

Nolen-Hoeksema, S., Fredrickson, B., Loftus, G.R., & Wagenaar, W. (2009). *Hilgard's Introduction to Psychology, Fifteenth Edition.* London, UK: Cengage.

Nolen-Hoeksema, S., Fredrickson, B., Loftus, G.R., & Lutz, C.I., (2013). *Hilgard's Introduction to Psychology, Sixteenth Edition.* Andover, UK: Cengage.

## Articles and Chapters

Freund, R.D., Loftus, G.R., & Atkinson, R.C. (1969). Applications of multiprocess models for memory to continuous recognition tasks. *Journal of Mathematical Psychology, 6*, 576-594. (pdf)

Klatzky, R.L., & Loftus, G.R. (1969). Recognition memory as influenced by number of reinforcements and type of test. *Psychonomic Science, 16*, 302-303. (pdf)

Loftus, G.R., & Wickens, T.D. (1970). Effect of incentive on storage and retrieval processes. *Journal of Experimental Psychology, 85*, 141-147. (pdf)

Rundus, D.J., Loftus, G.R, & Atkinson, R.C. (1970). Immediate free recall and three-week delayed recognition. *Journal of Verbal Learning and Verbal Behavior, 9*, 684-688. (pdf)

Loftus, E.F., Freedman, J.L., & Loftus, G.R. (1970). Retrieval of words from subordinate and superordinate categories in semantic hierarchies. *Psychonomic Science, 21*, 235-236. (pdf)

Loftus, G.R. (1971). Comparison of recognition and recall in a continuous memory task. *Journal of Experimental Psychology, 91*, 220-226. (pdf)

Loftus, G.R. (1972). Eye fixations and recognition memory for pictures. *Cognitive Psychology, 3*, 525-551. (pdf)

Loftus, G.R. (1973). Man as an information processor. Textbook chapter in M.S. Gazzaniga, *Fundamentals of Psychology,* New York: Academic Press.

Loftus, E.F., & Loftus, G.R. (1974). Changes in memory structure and retrieval over the course of instruction. *Journal of Educational Psychology, 66*, 315-318. (pdf)

Loftus G.R. (1974). Acquisition of information from rapidly presented verbal and nonverbal stimuli. *Memory and Cognition, 2*, 545-548. (pdf)

Loftus, G.R. & Loftus, E.F. (1974). The influence of one memory retrieval on a subsequent retrieval. *Memory and Cognition, 2*, 467-471. (pdf)

Loftus, G.R., & Bell, S.M. (1975). Two types of information in picture memory. *Journal of Experimental Psychology: Human Learning and Memory, 104*, 103-113. (pdf)

Loftus, G.R., Mathews, P., Bell, S.M., & Poltrock, S. (1975). General software of an on-line eye-movement recording system. *Behavior Research Methods and Instrumentation, 7*, 201-204. (pdf)

Loftus, G.R., & Patterson, K.K. (1975). Components of short-term proactive interference. *Journal of Verbal Learning and Verbal Behavior, 14*, 105-121. (pdf)

Dark, V.J., & Loftus, G.R. (1976). The role of rehearsal in long-term memory performance. *Journal of Verbal Learning and Verbal Behavior, 15*, 479-490. (pdf)

Loftus, G.R. (1976). A framework for a theory of picture memory. In J. Senders & R. Monty (Eds.). *Eye Movements and Psychological Processes.* Hillsdale, N.J.: Lawrence Erlbaum Associates. (pdf)

Loftus, G.R., & Levy, R.L. (1977). Statistical evaluation of clinical effectiveness: A reply to Bloom & Block. *Social Work, 22*, 504-506. (pdf)

Loftus, G.R. (1978). On interpretation of interactions. *Memory and Cognition, 6*, 312-319. (pdf)

Loftus, G.R. (1978). Comprehending compass directions. *Memory and Cognition, 6*, 416-422. (pdf)

Loftus, G.R. & Mackworth, N.H. (1978). Cognitive determinants of fixation location during picture viewing. *Journal of Experimental Psychology: Human Perception and Performance, 4*, 565-572. (.(pdf)

Palmer, J.C., MacLeod, C.M. & Loftus, G.R. (1978) PLE: A high-level programming language for psychology. *Behavior Research Methods and Instrumentation, 10*, 764-772. (pdf)

Loftus, G.R. & Kallman, H. (1979). Encoding and use of detail information in picture recognition. *Journal of Experimental Psychology: Human Learning and Memory, 5*, 197-211. (pdf)

Loftus, G.R., Dark, V.J. & Williams, D. (1979). Short-term memory factors in ground controller/pilot communication. *Human Factors, 21*, 169-181. (pdf)

Loftus, G.R. (1979). On-line eye-movement recorders: The good, the bad, and the ugly. *Behavior Research Methods and Instrumentation, 11*, 188-191. (pdf)

Loftus, E.F., & Loftus, G.R. (1980). On the permanence of stored information in the human brain. *American Psychologist, 35*, 409-420. (pdf)

Loftus, G.R. & Loftus, E.F. (1980). Visual perception: The shifting domain of discourse. *The Behavioral and Brain Processes, 3*, 391-392. (pdf)

Nelson, W.W. & Loftus, G.R. (1980). The functional visual field during picture viewing. *Journal of Experimental Psychology: Human Learning and Memory, 7*, 369-376. (pdf)

Loftus, G.R. (1981). Tachistoscopic simulations of eye fixations on pictures. *Journal of Experimental Psychology: Human Learning and Memory, 7*, 369-376. (pdf)

Loftus, G.R. (1982). Top-down guidance from a bottom-up theory. (Review of Lumsden, C., & Wilson, E.O., Genes, Mind, and Culture.) *The Behavioral and Brain Sciences*. (pdf)

Loftus, G.R. (1982). Picture memory: Data and methodology. In C.R. Puff (Ed.) *Handbook of Research Methods in Human Memory and Cognition* (pp. 257-285). New York: Academic Press.

Loftus, G.R. (1983). Eye fixations on scenes and text. In K. Rayner (Ed.), *Eye Movements in Reading: Perceptual and Language Processes* (pp. 359-376). New York: Academic Press.

Loftus, G.R. (1983). The continuing persistence of the icon. *The Behavioral and Brain Sciences, 28*. (pdf)

Loftus, G.R., Nelson, W.W. & Kallman, H.J. (1983). Differential acquisition of different kinds of information from pictures. *Quarterly Journal of Experimental Psychology, 35*, 187-198. (.pdf)

Loftus, G.R. & Loftus, E.F. (1983). The 25-cent addiction. *Science Digest*, December, 82-83.

Levy, R.L., & Loftus, G.R. (1984). Compliance and memory. In J.E. Harris (Ed.) *Everyday Memory, Actions and Absent-Mindedness* (pp. 93-112). New York: Academic Press.

Loftus, E.F., Loftus, G.R., & Hunt, E.B. (1984). Something old, something new, something borrowed, something missing. *Behavioral and Brain Sciences, 7*, 73-74. (pdf)

Loftus, G.R. & Ginn, M. (1984). Perceptual and conceptual processing of pictures. *Journal of Experimental Psychology: Learning, Memory and Cognition, 10*, 435-441. (.pdf)

Loftus, G.R., Gillispie, S., Tigre, R.A., & Nelson, W.W. (1984). A computerized slide-projector laboratory. *Behavior Research Methods, Instruments and Computers, 16*, 447-453. (pdf)

Loftus, G.R. & Nelson, W. W. (1985). Video games as teaching tools: The computer connection. *Computers in Schools.*. (pdf)

Loftus, G.R. (1985). Size illusion, distance illusion and terrestrial passage. *Journal of Experimental Psychology: General, 114*, 121-123. (pdf)

Loftus, G.R., Johnson, C.A., & Shimamura, A.P. (1985). How much is an icon worth? *Journal of Experimental Psychology: Human Perception and Performance, 11*, 1-13. (pdf)

Loftus, E.F., Schooler, J., Loftus, G.R., & Glauber, D.T. (1985). Memory for events occurring under anesthesia. *Acta Psychologica, 59*, 123-128. (pdf)

Loftus, G.R. (1985). Evaluating forgetting curves. Journal of Experimental Psychology: Learning, Memory and Cognition, 11, 396-405. (pdf)

Loftus, G.R. (1985). Consistency and confoundings: Reply to Slamecka. *Journal of Experimental Psychology: Learning, Memory and Cognition, 11, 817-820*. (pdf). See original Slamecka commentary here.

Loftus, G.R. (1985). Picture perception: Effects of luminance level on available information and information-extraction rate. *Journal of Experimental Psychology: General, 114*, 342-356. (pdf)

Loftus, G.R. (1985). Johannes Kepler's computer simulation of the universe: Some remarks on theory in psychology. *Behavior Research Methods, Instrumentation and Computers, 17*, 149-156. Reprinted as, Computer simulation: Some remarks on theory in Psychology. In G. Kerens and C. Lewis (eds)

*Methodological and Quantitative Issues in the Analysis of Psychological Data* (Potomac: Lawrence Erlbaum). (pdf)

Loftus, G.R. (1985). On worthwhile icons: Reply to Di Lollo and Haber. *Journal of Experimental Psychology: Human Perception and Performance, 11*, 384-388. (pdf). See original Di Lollo commentary here. See original Haber commentary here.

Loftus, G.R. (1985). Say it ain't Pittsburgh. *Psychology Today*, June, pp. 8-10. (.pdf)

Loftus, G.R., Nelson, W.W. & Truax, P.E. (1986). Age-related differences in visual information processing: Quantitative of qualitative? In C. Schooler and W. Schaie (Eds.) *Cognitive Functioning and Social Structure over the Life Course*. Norwood, NJ: Ablex. (pdf)

Loftus, G.R. (1986). Information acquisition rate, short-term memory and cognitive equivalence. *Reply to Sperling. Journal of Experimental Psychology: General, 115*, 295-29; (pdf). See original Sperling commentary here.

Loftus, E.F., Loftus, G.R., & Messo, J. (1987). Some facts about "weapon focus." *Law and Human Behavior, 11*, 55-62. (pdf)

Loftus, G.R., Hanna, A., & Lester, L. (1988). Conceptual masking: How one picture steals attention from another picture. *Cognitive Psychology, 20*, 237-282. (pdf)

Loftus, G.R., & Hogden, J. (1988). Picture perception: Information extraction and phenomenological appearance. In G.H. Bower (Ed.). *The Psychology of Learning and Motivation, Vol. 22* (pp. 139-191). New York: Academic Press. (pdf)

Loftus, G.R. (1988). A research framework for investigating information acquisition and loss. *Canadian Psychology, 29*, 379-380. (pdf)

Stoddard, P.K., & Loftus, G.R. (1988). An IBM XT-compatible, computer-based, slide-projector laboratory. *Behavior Research Methods, Instruments, & Computers, 20*, 541-551. (pdf)

Loftus, G.R., & Hanna, A.M. (1989). The phenomenology of spatial integration: Data and models. *Cognitive Psychology, 21*, 363-397. (.pdf)

Reinitz, M.T., Wright, E., & Loftus, G.R. (1989). The effects of semantic priming on visual encoding of pictures. *Journal of Experimental Psychology: General 118*, 280-297. (pdf)

Loftus, G.R. (1989). The joy of secondary sources. *Contemporary Psychology, 34*, 813-814.

Loftus, G.R. (1989). The rating game. *Los Angeles Times* Sunday Op-Ed page, Dec. 24 (reprinted in various newspapers around the country).

Loftus, G.R. & Bamber, D. (1990) Weak models, strong models, unidimensional models, and psychological time. *Journal of Experimental Psychology: Learning, Memory, and Cognition, 16*, 916-926. (pdf)

Loftus, G.R. (1991). On the tyranny of hypothesis testing in the social sciences. *Contemporary Psychology. 36*, 102-105. (pdf)

Christianson, S., Loftus, E.F., Loftus, G.R., & Hoffman, H. (1991). Eye fixations and accuracy in detail memory of emotional versus neutral events. *Journal of Experimental Psychology: Learning, Memory, and Cognition, 17*, 693-701. (pdf)

Loftus, G.R. (1991). Postdiction of twenty-year-old predictions about the state of computers in psychology (and one or two other matters). *Behavior Research Methods, Instrumentation, and Computers. 23*, 112-113. (pdf)

Loftus, G.R., Duncan, J. & Gehrig, P. (1992). On the time course of perceptual information that results from a brief visual presentation. *Journal of Experimental Psychology: Human Perception and Performance, 18*, 530-549. (pdf)

Loftus, G.R. & Busey, T.A. (1992). Multidimensional models and iconic decay: Reply to Di Lollo and Dixon. *Journal of Experimental Psychology: Human Perception and Performance, 18*, 356-361. (pdf). See original Di Lollo and Dixon commentary here.

Loftus, G.R. , Kaufman, L., Nishimoto, T., & Ruthruff, E. (1992). Why it's annoying to look at slides with the room lights still on: Effects of visual degradation on perceptual processing and long-term visual memory. In K. Rayner (Ed) *Eye Movements and Visual Cognition: Scene Perception and Reading*. New York: Springer-Verlag (pp. 203-226). (pdf)

Hanna, A. & Loftus, G.R. (1992) The effect of expectation and available processing time on recognition of sequences of naturalistic scenes. *Bulletin of the Psychonomic Society, 30*, 251-254. (pdf)

Loftus, G.R. (1993). Editorial Comment. *Memory & Cognition, 21*, 1-3. (pdf)

Loftus, G.R. (1993). Computer simulation: Some remarks on theory in Psychology. In G. Kerens & C. Lewis (eds.) *Methodological and Quantitative Issues in the Analysis of Psychological Data*. Potomac Md: Lawrence Erlbaum (pp. 477-492). (pdf)

Loftus, G.R. (1993). A picture is worth a thousand p-values: On the irrelevance of hypothesis testing in the computer age. *Behavior Research Methods, Instrumentation and Computers, 25*, 250-256 . (pdf)

Loftus, G.R., Busey, T.A., & Senders, J.W. (1993). Providing a sensory basis for models of visual information acquisition. *Perception & Psychophysics, 54*, 535-554. (pdf)

Hanna, A. & Loftus, G.R. (1993). A model for conceptual processing of naturalistic scenes. *Canadian Journal of Psychology, 47*, 548-569. (pdf)

Loftus, G.R. & Ruthruff, E.R. (1994). A theory of visual information acquisition and visual memory with special application to intensity-duration tradeoffs. *Journal of Experimental Psychology: Human Perception and Performance, 20*, 33-50. (pdf)

Busey, T.A. & Loftus, G.R. (1994). Sensory and cognitive components of visual information acquisition. *Psychological Review, 101*, 446-469. (pdf)

Loftus, G.R. & Masson, M.E.J. (1994) Using confidence intervals in within-subjects designs. *Psychonomic Bulletin & Review, 1*, 476-490. (pdf)

Loftus, G.R. (1995). Data analysis as insight. *Behavior Research Methods, Instrumentation and Computers, 27*, 57-59. (pdf)

Massaro, D. & Loftus, G.R. (1996). Sensory storage: Icons and echoes. In E.L. Bjork and R.A. Bjork (eds.) *Handbook of Perception and Cognition, Vol. 10*. New York: Academic Press, pp. 68-101.

Loftus, G.R. (1996). Psychology will be a much better science when we change the way we analyze data. *Current Directions in Psychological Science*, 161-171. (pdf)

Loftus, G.R. & McLean, J.E. (1997). Familiar old wine: Great new bottle. *American Journal of Psychology*, 146-153. (pdf)

Kahana, M. and Loftus, G.R. (1997). Response accuracy and latency in human cognition: Two sides of the same coin? In R. Sternberg (Ed.) *The Concept of Cognition*, Cambridge: MIT Press.

Busey, T.A. & Loftus, G.R. (1998). Binocular Information acquisition and visual memory. *Journal of Experimental Psychology: Human Perception and Performance, 24*, 1188-1214. (pdf)

Loftus, G.R. & Irwin, D.E. (1998). On the relations among different measures of visible and informational persistence. *Cognitive Psychology, 35*, 135-199. (pdf)

Loftus, G.R. & McLean, J.E. (1999). A front end to a theory of picture recognition. *Psychonomic Bulletin & Review, 6*, 394-411. (pdf)

Busey, T.A., Tunnicliff, J., Loftus, G.R. & Loftus, E.F. (2000). Accounts of the confidence-accuracy relation in recognition memory. *Psychonomic Bulletin & Review, 7*, 26-48. (pdf)

Harley, E.M., & Loftus, G.R. (2000). MATLAB and graphical user interfaces: Tools for experimental management. *Behavior Research Methods Instrumentation & Computers, 32*, 290-296. (pdf)

Loftus, G.R. (2002). Analysis, interpretation, and visual presentation of data. *Stevens' Handbook of Experimental Psychology, Third Edition, Vol 4*. New York: John Wiley and Sons, 339-390. (pdf)

Loftus, G.R. (2003). What do We Know about Facial Cognition? What Should We Do With this Knowledge? *Contemporary Psychology, 48*, 503-507. (pdf)

Masson, M.E.J. & Loftus, G.R. (2003). Using confidence for graphically based data interpretation. *Canadian Journal of Experimental Psychology, 57*, 203-220. (pdf)

Loftus, G.R. & Harley, E.M. (2004). How different spatial-frequency components contribute to visual information acquisition. *Journal of Experimental Psychology: Human Perception and Performance, 30*, 104ï¿½118. (pdf)

Bernstein, D.M., Atance, C., Loftus, G.R, & Meltzoff, A.N. (2004). We saw it all along: Visual hindsight bias in children and adults. *Psychological Science, 15*, 264-267. (pdf)

Harley, E.M., Dillon, A.M., & Loftus, G.R. (2004). Why it's difficult to see in the fog: How contrast affects visual perception and visual memory. *Psychonomic Bulletin & Review, 11*, 197-231. (pdf)

Loftus, G.R., Oberg, M.A., & Dillon, A.M. (2004). Linear theory, dimensional theory, and the face-inversion effect. *Psychological Review, 111*, 835-863. (pdf)

Harley, E.M., Carlson, K.A., & Loftus, G.R. (2004). The "Saw-it-all-along" effect: Demonstrations of visual hindsight bias. *Journal of Experimental Psychology: Learning, Memory, & Cognition, 30 , 960-968. (pdf)

Bernstein, D.M., Loftus, G.R., & Meltzoff, A.N. (2004). Object identification in preschool children and adults. *Developmental Science*, 8. 151-161. (pdf)

Loftus, G.R. & Harley, E.M. (2005). Why is it easier to recognize someone close than far away? *Psychonomic Bulletin & Review*, 12, 43-65. (pdf)

Loftus, G.R. (2006). Elizabeth F. Loftus: The early years. In Garry, M., & Hayne, H. (Eds.). *Do Justice and Let the Sky Fall: Elizabeth Loftus and her Contributions to science, law, and academic freedom*., Hillsdale NJ: Erlbaum. (pdf)

Bernstein, D.M., Atance, C., Meltzoff, A.N., & Loftus, G.R. (2007). Hindsight bias and developing theories of mind. *Child Development*, *July/August, 78*, 1374-1394. (pdf)

Busey, T.A. & Loftus, G.R. (2007). Cognitive science and the law: Moving science from the laboratory to the courtroom. *Trends in Cognitive Science*, *11*, 112-117. (pdf)

Fidler, F. & Loftus, G.R. (2009). Why hypothesis testing is misunderstood: Hypotheses and Data. *Zeitschrift fuer Psychologie*, *217*, 27-27. (pdf)

Loftus, G.R. (2010). The null hypothesis. *Encyclopedia of Research Design*: Sage Publications. (in press) (pdf)

Loftus, G.R. (2010). What can a perception-memory expert tell a jury? *Psychonomic Bulletin & Review*, 17, 143-148. (pdf)

Loftus, G.R. (2010). Processi Cognitive, testimonianza dell'esterto e teorie su eventi di pertinenza legale. *Sistemi Intelligenti a. XXII, n. 2, Agosto 2*. (pdf) (English Translation: Cognition, expert testimony, and theories of legally relevant events). (pdf)

Bernstein, D.M., Erdfelder, E., Meltzoff, A.N. Peria, W. &. Loftus, G.R. (2011). Hindsight bias from 3 to 95 years of age. *Journal of Experimental Psychology: Learning, Memory, & Cognition*, *37*, 378-391.(.pdf)

Reinitz, M.T., Peria, W., & Séguin, J.A., &. Loftus, G.R. (2011). Different confidence-accuracy relationships for feature-based and familiarity-based memories. *Journal of Experimental Psychology: Learning, Memory, & Cognition* (in press). (pdf)

De Cesarei, A. &. Loftus, G.R. (2011). Global and local vision in natural scene identification. *Psychonomic Bulletin & Review DOI 10.3758/s13423-011-0133-6*. (.pdf)

Franz, V. &. Loftus, G.R. (2012). Standard errors and confidence intervals in withi-subject designs: Generalizing Loftus & Masson (1994) and avoiding biases of alternative accounts.*Psychonomic Bulletin & Review, DOI 10.3758/s13423-012-0230-1*. (pdf)

Reinitz, M.T., Séguin, J.A., Peria, W., &. Loftus, G.R. (2012). Confidence-accuracy relations for faces and scenes: Roles of features and familiarity. *Psychonomic Bulletin & Review, 19,* 1085-1096.

Reinitz, M.T. &. Loftus, G.R. (2016). Conjunction faces alter confidence-accuracy relations for old faces. *Journal of Experimental Psychology: Learning, Memory & Cognition*.

De Cesarei, A., Loftus, G.R., Mastria, S., & Dodispoti, M. (2017). Understanding natural scenes: Contributions of image statistics. *Neuroscience & Biobehavioral Reviews* (in press)

De Cesarei, A., Marzocchi, M., & Loftus, G. R. (in press). VISTO: An Open-Source Device to Measure Exposure Time in Psychological Experiments. *MethodsX*.

## Invited Addresses

### 1972

University of Oregon, Eugene, OR

New York University, New York, NY

Bell Telephone Laboratories, Murray Hill, NJ

State University of, New York, Oswego, NY

Brown University, Providence, RI

University of Pennsylvania, Philadelphia, PA

**1974**

National Academy of Sciences Specialists Meeting, Princeton, NJ

**1975**

University of California, Irvine, CA

University of Wisconsin, Madison, WI

Temple University, Philadelphia, PA

University of California, Los Angeles, CA

University of Toronto, Toronto, ON, Canada

**1976**

Simon Fraser University, Burnaby, BC, Canada

University of Oregon, Eugene, OR

Interdisciplinary Conference, Jackson Hole, WY

Advanced Projects Research Agency Conference on C3 Systems, Cambridge, MA

Advanced Projects Research Agency Conference on Cartography, San Francisco, CA

**1977**

University of California, San Diego, La Jolla, CA

University of Rochester, Rochester, NY

Simon Fraser University, Burnaby, BC, Canada

University of California, Irvine, CA

**1978**

Center for Advanced Studies in the Behavioral Sciences, Stanford, CA

University of Michigan, Ann Arbor, MI

Swarthmore College, Swathmore, PA

University of California, Berkeley, CA

NASA/Ames, Mountain View, CA

**1980**

University of Denver, Denver, CO

**1981**

University of Lethbridge, Lethbridge, Alberta, Canada

Stanford University, Stanford, CA

British Psychology Society, Plymouth, England

Craik Society, Cambridge University, Cambridge, England

Copenhagen University, Denmark

Sloan Conference on Reading, Amherst, Mass.

Yale University

**1982**

University of Utah

Max Planck Institute, Berlin, Germany

NASA/Ames, Mountain View

**1983**

University of California, Santa Cruz, CA

Max Planck Institute, Berlin, Germany

Case 1:20-cr-00305-LDH   Document 140-1   Filed 08/27/23

**1984**

    Stanford University, Stanford, CA

    University of Toronto, Toronto, CA

    Society for Computers in Society (Presidential address), San Antonio, TX

    Arizona Public Defender's Office, Tucson, AZ

    California State College System, Courseware Conference, San Francisco, Ca

    Concordia University, Montreal, Canada

    Hebrew University, Jerusalem, Israel

**1985**

    Western Psychological Association, San Francisco, CA

    Williams College, Williamstown MA

    U.S. Army Conference on C3 Systems, Fort Walton Beach, FL

    University of Toronto, Toronto, Canada

    Institute for Perception, Amsterdam, the Netherlands

    Leiden University, Leiden, the Netherlands

    University of North Carolina, Chapel Hill NC

**1986**

    Brown University, Providence, RI

    Duke University, Durham, NC

    IBM Research Labs, Yorktown Heights, NY

    John Hopkins University, Baltimore, MD

    National Institute on Aging, Bethesda, MD

    Northwest Courseware Conference, SeaTac, WA

    Simon Fraser University, Burnaby, BC, Canada

    SUNY, Stony Brook, Stony Brook, NY

    University of Delaware, Newark DE

    University of Maryland, College Park, MD

**1987**

    Association of Federal Public Defenders, Seattle, WA

    New York University, New York, NY

    Society for the Visually Impaired

**1988**

    University of Alberta, Edmonton, Alberta, Canada

    Banff Conference on Cognitive Science, Banff, Alberta, Canada

    University of Illinois, Champaign, IL

    New York University, New York, NY

**1989**

    New York University, New York, NY

**1990**

    Amherst conference on eye movements, Amherst, MA

    Ann Arbor conference on human/machine vision, Ann Arbor, MI

    Boston University, Boston, MA

    Leiden University, Leiden, the Netherlands

    National Research Council meeting on vision, Irvine, CA

    Stanford University, Stanford, CA

University of Padua, Italy

**1991**

National Center for Geographic Information and Analysis Conference on Visualization and Spatial Quality, Castine, Maine

Nuclear Regulatory Commission conference on systems for regulatory research, Livermore, CA

**1992**

Child Guidance Center, Tacoma, WA

Western Psychological Association, Portland, OR

Free University, Amsterdam, The Netherlands

Max Planck Institute, Berlin, Germany

Tucson Public Defender's Office, Tucson, AZ

Spokane WA Public Defender's Office, Spokane, WA

**1993**

Harvard University, Cambridge, MA

Smith-Kettlewell Institute, San Francisco, CA

University of California, Santa Barbara, CA

University of California, Santa Cruz, CA

University of Texas, Austin, TX

Washington Defender's Association, Winthrop WA

**1994**

American Psychological Association

Applied Psychology Unit, Cambridge, UK

Brown University, Providence, RI

Stanford University, Stanford, CA

University of St. Andrews, St. Andrews, Scotland

University of Toronto, Toronto, Canada

**1995**

American Psychological Society, New York, NY

Boston University, Boston, MA

Boston VA Medical Center, Boston, MA

Brown University, Providence, RI

Massachusetts Institute of Technology, Cambridge, MA

Society of Experimental Psychologists, Phoenix, AZ

Tufts University, Medford, MA

Wellesley College, Wellesley, MA

**1996**

Brandeis University, Waltham, MA

Dartmouth College (Kohler Memorial Lecturer), Hanover, NH

Indiana University, Bloomington, IN

Japanese Educational Psychology Society, Tokyo, Japan

National Institute of Bioscience and Human Technology, Tsukuba Japan

Northeastern University, Boston, MA

Tsukuba University,, Tsukuba, Japan)

University of Massachusetts, Amherst, MA

Waseda University, Tokyo, Japan

**1997**

American Psychological Association, Chicago, IL

Birkbeck College, London, UK

Brandeis University, Waltham, MA

City University, London, UK

University of East London, London, UK

**1998**

American Psychological Association, San Francisco, CA

City of Chicago Corporation Counsel's Office, Chicago, IL

Military Prosecutors Conference, Everett Naval Base, Everett, WA

Princeton University, Princeton, NJ

Seattle Forensic Institute, Seattle, WA

**1999**

Cities conference, Rutgers University, New Brunswick, NJ

**2000**

Alaska Trial Lawyers Convention, Anchorage, AK

Arizona Trial Lawyers Convention, Long Beach CA

Microsoft Corporation, Redmond, WA

**2001**

Society of Counsel Representing Accused Persons, Seattle, WA

University of Puget Sound, Tacoma, WA

National Science Foundation Conference on Augmented Cognition, Washington DC

Society of Counsel Representing Accused Persons (Kent, WA)

Public Defender's Office, Seattle, WA

**2002**

Society for the Quantitative Analysis of Behavior, Toronto (Invited Preeminent Tutorial)

Northwest Defenders Association, Seattle, WA

Inns of Court, Puget Sound Chapter, Tacoma WA

**2003**

Henry Art Gallery, Seattle, WA

University of Victoria, Victoria, BC, Canada

**2004**

University of Alberta, Edmonton, Alberta, Canada

Washington State Trial Lawyers Association, Seattle, WA

**2005**

Society for Applied Research in Memory and Cognition, Wellington, New Zealand

Honolulu Public Defender's Association, Honolulu HI

Western Psychological Association, Portland OR

**2006**

Santa Clara, San Mateo, San Francisco Public Defender Seminar, San Mateo, CA

**2008**

MIT Symposium on object recognition, Cambridge, MA

Giessen University, Giessen, Germany

**2009**

Society for Applied Research in Memory and Cognition, Kyoto, Japan

Università di Bologna, Bologna, Italy

**2010**

NOWCAM Conference, Bellingham, WA (Keynote speaker)

Cook County Public Defender's conference, Oakbrook, IL

**2011**

Washington Association of Criminal Defense Lawyers, Annual Conference, Chelan, WA

Society for Applied Research in Memory and Cognition, New York, NY

**2012-2013**

Inns of Court, Puget Sound Chapter, Seattle WA

Roosevelt University, Chicago, IL

University of Washington Edwards Lecture, Seattle, WA

**2014**

Syracuse University, Syracuse, NY

Kwantlen Polytechnic University, Vancouver, BC, Canada

**2015**

Contra Costa County Public Defender's Office, Martinez, CA

District of Hawaii Federal Courts Conference, Honolulu, HI

**2016**

Canadian Psychological Association, annual meeting, Victoria, BC, Canada

**2017**

National Seminar on Forensics Evidence and The Criminal Law, Seattle WA

Università di Bologna, Bologna, Italy

**2018-2021**

University of Melbourne, School of Psychological Science, Melbourne, Victoria, Australia

University of Melbourne, History and Philosophy of Science, Melbourne, Victoria, Australia

University of Sydney, School of Psychology, Sydney, NSW, Australia

Illinois Association of Criminal Defense Lawyers, Chicago, IL

Exhibit B

1    A.   He was not 100 percent sure it was Marco.

2    Q.   Nothing about Marco being a shooter?

3    A.   No.

4    MS. GLENNON: I have nothing further.

5    THE COURT:  Anything else?

6    MS. LOITERSTEIN: Nothing based on that.

7    THE COURT:  Ms. Dupes, you may step down.

8                         (Witness excused.)

9    THEE COURT: Defense, call your next witness.

10    MS. GLENNON: Judge, I would call Dr. Loftus.

11                         (Witness duly sworn.)

12    THE COURT: You may have a seat.  That microphone

13    does not do anything.  Ignore it.  Please keep your

14    voice up loud and clear so everyone can hear you.

15                    DR. GEOFFREY LOFTUS,

16    called as a witness on behalf of the defendant,

17    having been first duly sworn, was examined and

18    testified as follows:

19                    DIRECT EXAMINATION

20                    BY

21                    MS. GLENNON:

22    Q.   Dr. Loftus, would you please introduce

23    yourself to the ladies and gentlemen.

24    A.   My name is Geoffrey Loftus.  My first name

1   is spelled G-e-o-f-f-r-e-y, last name L-o-f-t-u-s.

2       Q.   And, Dr. Loftus, what do you do for a

3   living?

4       A.   I am a professor in the department of

5   psychology at the University of Washington out in

6   Seattle.

7       Q.   How long have you been a professor in

8   Seattle?

9       A.   Since 1972, so a lot of years.

10      Q.   What is your educational and professional

11  background?

12      A.   I got a Bachelor of Arts degree in

13  experimental psychology from Brown University, a

14  doctorate and Ph.D in experimental psychology from

15  Stanford University, then I went to New York for a

16  year of post-doctoral work at New York University,

17  University of Washington as a faculty member in

18  1972.

19          And apart from a year in the mid '90s that

20  I spent teaching at MIT, I pretty much been at the

21  University of Washington ever since.

22      Q.   Doctor, as a faculty member of the

23  University of Washington, do you do research?

24      A.   Yes, I do.

64

1      Q.   And what is your general area of research?

2      A.   So my main research area has to do with

3  human perception.  That's the study of how people

4  get information from the world into their brain by

5  their sense organs, ears, eyes and so on.

6           The associate study of human memory.

7  That's the study of how information, once it's

8  gotten into the brain, is stored there, transformed

9  in various ways and then eventually used for any

10 task that requires memory which is most things that

11 we do.

12          I also have a secondary research interest

13 that takes up maybe 20 percent of my time that has

14 to do with applications of mathematics and

15 statistics to science in general and to psychology

16 in particular.

17     Q.   Doctor, can you explain the difference

18 between experimental psychology and/or clinical

19 psychology?

20     A.   Sure.  As your question sort of suggests,

21 the field of psychology is broadly divided into

22 clinical psychology on the one hand and experimental

23 psychology on the other.

24          So a clinical psychologist is probably, you

1   know, like most people's, I imagine, of a

2   psychologist.  A clinical psychologist is a

3   practitioner, somebody who sees clients with the

4   intent of dealing with some sort of psychological

5   problem, fear of snakes, marital difficulties,

6   whatever.

7          Experimental psychologists like me, on the

8   other hand, isn't a practitioner.  I never seen

9   clients.  I never will.

10          Instead, an experimental psychologist is

11   fundamentally a scientist, somebody whose main jobs

12   are to go out and do experiments, collect data, and

13   develop theory in an effort to understand how normal

14   people operate.

15          In my case, to understand how normal people

16   get information from the world into their brains,

17   store it there, and use it later on.

18   Q.   Have you published research with respect to

19   experimental psychology?

20   A.   I have.  I have authored and co-authored

21   maybe eight books being somewhere around 100 book

22   chapters in journal articles.  Most of them have to

23   do with my main research area of human perception

24   memory.  There are a bunch of others that I have

1   written that have to do with my minor research area

2   of applications of mathematics and statistics.

3        Q.   Dr. Loftus, do you also lecture and do

4   other various things with respect to your expertise

5   for your field?

6        A.   Apart from teaching, I lecture all the

7   time.  I have been invited over the years maybe 150

8   times by various universities and other

9   organizations to talk about the research that I have

10  done and applications of it to various practical

11  issues like eyewitness memory, for instance.

12       Q.   Have you also, through your experience in

13  experimental psychology, testified before in court?

14       A.   Yes.

15       Q.   Can you estimate for me the number of

16  times you testified in court?

17       A.   Maybe 400.

18       Q.   When I say testified in court, were you

19  qualified as an expert in each and every one of

20  those instances?

21       A.   Yes.

22       Q.   You were qualified as an expert in what?

23       A.   Human perception and memory.

24       Q.   Have you always testified for the defense?

1      A.   Well, my general practice is to work for
2   whoever asks me to work for them and not work for
3   people who don't.  Over the years, I mostly in
4   criminal cases, been called by defense attorneys.  I
5   have been called by the State four times; and three
6   of those times, the cases settled before I had a
7   chance to do anything about them.

8           The fourth case, which was a murder case,
9   are in Anchorage Alaska.  Last year I did wind up
10  testifying on behalf of the State.

11     Q.   And are you being paid for your time here
12  today?

13     A.   I am.   I charge Cook County $250 an hour
14  for any casework that I do, including legal casework
15  like this.

16     Q.   Have you ever testified in civil matters?

17     A.   I have.  Many fewer times civil matters
18  seem to settle before trial; but, yes, I have
19  testified in civil matters.

20     Q.   Have you ever worked on behalf of police
21  departments?

22     A.   I have.  I worked on behalf of police
23  departments actually in criminal cases in New York
24  City and in New Jersey and Las Vegas as well.

1          I have worked for prosecutors or offices

2    that in one way or another defend police officers

3    who were accused of various misdeeds.  I have done

4    that here in Cook County and also in Kane County

5    where Seattle is.

6          MS. GLENNON:  Judge, at this time I would seek

7    to qualify Dr. Loftus as an expert in the field of

8    experimental psychology.

9          THE COURT: State, any objection?

10          MR. CROWE: No.

11          THE COURT:  Dr. Loftus will be received in the

12    field of experimental psychology.

13    BY MS. GLENNON:

14          Q.   Doctor, have you brought various notes and

15    or a report with you today?

16          A.   Yes.

17          Q.   Would those aid you at all in your

18    testimony?

19          A.   I don't think so.  Thanks.

20          Q.   I have an easel set up.  Was that at your

21    request?

22          A.   It was.

23          Q.   Would you like to explain some of your

24    testimony through a visual demonstration with the

69

1  jury?

2      A.   Well, what I was planning to do with this

3  easel, as I have discussed, is to provide for the

4  jury sort of a general depiction of how memory

5  works.

6           Would that be okay if I stepped down and

7  did that, your Honor?

8      THE COURT: Well, if the defense lawyer asks a

9  question and if the other side objects, I will.

10     MS. GLENNON: If the State has no objection, I

11  will ask that Dr. Loftus be allowed to step down to

12  the easel that I have set up for him.

13     THE COURT:  State, any objection?

14     MR. CROWE:  No.

15     THE COURT:  You may position yourself where you

16  could see the easel.

17  BY MS. GLENNON:

18     Q.  Dr. Loftus, could you describe to the

19  ladies and gentlemen how perception and memory work?

20     A.   It's a bit complex.  I could lecture on it

21  for weeks.  I am sure you don't want me to do that.

22           What I could do instead is to provide sort

23  of a simple depiction of some of the main aspects of

24  human perception and that I think are most relevant

1    to the legal issues you guys are dealing with here.

2        Q.    Before you begin, you have actually

3    reviewed police reports, interviews, and all sorts

4    of documents with respect to Marco Lopez?

5        A.    Yes, which provided me a general sense of

6    what aspects of perception and memory are relevant

7    here.

8        Q.    Could you describe for us how memory works?

9        A.    So what I will do is two things.   The first

10   is that I will intend to draw sort of a box and

11   diagram a box and diagram providing a general idea

12   of things that are relevant here and then to make it

13   a little more comprehensible to the jury.

14           I make up a hypothetical example to

15   illustrate what I have drawn.

16       MR. CROWE: Your Honor, I will object.   I believe

17   that the testimony in the form --

18       THE COURT:   How we work here is a lawyer asks a

19   question and the witness gives an answer.   So if we

20   could proceed on that basis, please.

21   BY MS. GLENNON:

22       Q.    Doctor, what is an original event?

23       A.    An original event is any event at issue

24   that is experienced by a witness.   It could be a

1   crime like the one that's at issue here.  It could

2   be a wedding, basketball game.  It could be a car

3   accident.  It could be anything.

4       Q.  What is an eventual memory for the event?

5       A.  At the end of the line, any witness to this

6   event has a memory for the event.

7       Q.  Are events and memories of the event both

8   forms of information?

9       A.  Yes.  So as you say, you could think of the

10  event as being an information, lots and lots of

11  information.  The information takes on different

12  forms.  The visual information sound waves carry

13  auditory information and so on, but it's all

14  information.

15          Likewise, any eventual memory the witness

16  has is also made up of information.  It's

17  information that's represented differently.  It

18  takes the form of neuro connections and electrical

19  activity, but it's still information.

20      Q.  What is different between reliable and

21  unreliable information?

22      A.  Well, in order to describe that, I have to

23  talk a little bit more about how information is

24  relevant to the original event, gets into memory, if

72

1    I could do that.

2        Q.   Is eventual memory made up of two types of

3    information?

4        A.   Yes, it is.

5        Q.   Could you describe what two types of

6    information that is?

7        A.   Sure.   The first kind of information is

8    based on what I will call conscious experience.

9        Q.   What is conscious experience?

10        A.   Conscious experience means just what

11    everybody thinks it means.   When you're

12    experiencing something like everybody in this

13    courtroom is experiencing, something now based on

14    sensory data coming in through your sense organs,

15    you form a conscious experience of what it is that's

16    going on.

17            And based on this conscious experience, you

18    could transfer some information from the conscious

19    experience into memory.

20        Q.   And what is pre-event information?

21        A.   Pre-event information is information that

22    people already have about the way the world works.

23    Pre-information could consist of things like general

24    knowledge about what happens in the world, how the

73

1   world normally works.  It could consist of things
2   like biases or expectations about how the world
3   might work.  All of these things could cause
4   pre-event information.
5       Q.   Can pre-event information affect memory?
6       A.   Yes.
7       Q.   How so?
8       A.   So the way I have depicted things here,
9   information is transferred from event to memory by a
10  conscious experience, as I have just described it.
11          This root I am going to get to the answer
12  in your question in a second.  I have to provide
13  some pre-information.  I have depicted this in green
14  as sort of a reminder --
15      MR. CROWE: Objection, narrative.
16      THE COURT: Sustained.
17  BY MS. GLENNON:
18      Q.   When you're talking about event information
19  becomes a memory, is there two kinds of information
20  that make up that memory?
21      A.   Yes.  There is a conscious experience
22  information that I have depicted in green which is
23  usually correct information reflecting what actually
24  happened in the original event what I have called

74

1    pre-event information.

2          However, bias can alter what your conscious

3    experience is that results from the event.  In other

4    words, if you believe that an event you're

5    experiencing is going to happen in a certain way,

6    your perception, your conscious experience of what

7    is happening, can be affected by pre-event

8    information in the form of knowledge or expectations

9    or whatever.

10         Q.   Doctor, can you give an example of how

11   pre-event information would affect memory?

12         A.   Sure.  I could do that by describing an

13   experiment that was done a while back in the

14   laboratory.

15         So in this experiment, people were very

16   quickly shown pictures of playing cards, standard

17   issue playing cards.  So they will see of jack of

18   diamonds, ace of spades and so forth and so on.

19         Their job is to report the color of the

20   cards are that they see even though those cards are

21   shown very quickly, maybe hundreds of a second.

22   When you see jack of diamonds, it's red and so on.

23         However, in this experiment, the trick was

24   that some of those cards were in the incorrect

1    color. So the ace of spades might be shown in red.

2    The jack of diamonds might be shown in black every

3    now and then one of those off color cards would show

4    up.

5        Q.   What did that do with respect to the

6    persons that were the subject of this study?

7        A.   So the result of that is that the subjects

8    in this experiment did not see those off colored

9    cards either as the color they actually were read.

10       Let's say in the case of a red ace of

11   spades or the color that they thought should be

12   black, in that case, red of ace of spades.

13       What they saw was sort of a blend reported

14   seeing a sort of brownish.  What that demonstrates

15   is that their actual conscious experience was a

16   mixture of the actual sensory data coming in a red

17   ace of spades on the one hand and what they expected

18   the color of this card to be, namely, black because

19   it was ace of spades.  So that is an example and

20   there are others of how pre-event information can

21   bias what you are.

22       Q.   Is there something called post-event

23   information that could also affect a person's

24   memory?

76

1      A.   Yes.   Post-event information, as the term

2   suggests, is information that comes along after the

3   event itself is over that is one way or another

4   relevant to the event.

5      Q.   Can you give an example of a post-event

6   piece of information that would affect memory?

7      A.   Sure.   I could do it by describing briefly

8   an experiment back in the laboratory.

9           So in this experiment, subjects were shown

10   a movie of a car accident, two cars colliding with

11   one another.   After the film was over, they were

12   asked a lot of questions about this accident that

13   they had just witnessed.

14           So as is often done in scientific

15   experiments, the group of subjects who had seen the

16   film were randomly divided into two groups.   Those

17   two groups were treated identically except for one

18   phrase in one of the many questions they were asked.

19           So one of the groups was asked with respect

20   to the speed of the cars, how fast were the cars

21   going when they hit each other.   The other group was

22   treated identically except they were asked how fast

23   were the cars going when they smashed into each

24   other.

77

1          The first sequence of this difference

2     between two groups is that people asked about speed

3     using the word smashed gave a higher speed estimate.

4     It's interesting.  It tells you the fact about

5     leading questions.

6          Q.  So, for example, if a police officer asked

7     leading questions of a witness as opposed to an open

8     ended question, could that create a post-event

9     information or post --

10         A.   Right.  It could certainly and does

11    affect --

12         MR. CROWE: Objection.

13         THE COURT: Overruled.

14         THE WITNESS:  -- the leading questions of this

15    sort that I have just described certainly can affect

16    the answer that a witness or a subject in the

17    experiment will give; but I have not described what

18    post-event information comes into play yet.

19          In this experiment that I have just

20    described, there was a second case.  A week later

21    everybody came back to the laboratory and they were

22    asked some additional questions about --

23         MR. CROWE: Objection, narrative.

24         THE COURT: Sustained.

1    BY MS. GLENNON:

2        Q.   When you say they were all brought back,

3    are you saying the two separate groups were brought

4    back to the laboratory?

5        A.   Yes.

6        Q.   The ones that were asked the leading

7    questions, the smash versus the ones that were not?

8        A.   Yes.

9        Q.   When all those witnesses came back into the

10   lab, what, if anything, did you notice?

11       A.   Well, they were asked additional questions.

12       Q.   Such as?

13       A.   The accident that they had seen.  One of

14   the questions, the key one was, did you see any

15   broken glass?

16            Now, as it turns out, there hadn't been any

17   broken glass in the original experiment.  So the

18   correct answer to this question would have been no;

19   but the subjects who had originally been asked about

20   speed using the verb smash, were considerably more

21   likely to falsely report that there was broken

22   glass than were subjects who were asked about speed

23   using the word hit.

24

79

1          So the explanation is that way back at the

2     beginning, the verb smashed acts as a source of

3     post-event information.  It was subtle. It was

4     embedded within a question; but, nevertheless, it

5     provided information to the people who heard it that

6     this had been a violent accident in which two cars

7     smashed together which then led them to add to their

8     memory details that were consistent with a violent

9     accident in which two cars smashed together, details

10    like broken glass which is how that broken glass

11    showed up --

12         MR. CROWE: Objection, narrative.

13         THE COURT: Sustained.

14    BY MS. GLENNON:

15         Q.   Dr. Loftus, are there or have you seen in

16    your clinical or your experimental laboratory

17    examples of post and pre-event information tainting

18    someone's memory of an event?

19         A.   Sure.  I have just given you two examples

20    of it.  Such examples have been in the scientific

21    laboratory and they happen in real life.

22         Q.   Is it possible, in your experience, for

23    people under the right circumstances to confidently

24    remember things that differ from an actual event?

1      A.   Yes.

2      MR. CROWE: Objection, form.

3      THE COURT: That's overruled.

4  BY MS. GLENNON:

5      Q.   How could a person confidently remember

6  something that's different from reality?

7      A.   This brings us back to post-event

8  information, which I said a couple minutes ago, and

9  it often is entered into the witness's memory to

10 supplement the often small amount of conscious

11 experience information that was there to begin with.

12     Q.   Could that subsequently cause a witness to

13 confidently misidentify the perpetrator of a crime?

14     A.   Yes.  Part of what post-event information

15 is by definition is that --

16     MR. CROWE: Objection, narrative.

17     THE COURT: So the record should reflect that Dr.

18 Loftus is back on the witness stand.

19         Counsel, are you done with the easel?

20     MS. GLENNON:  Yes, Judge.

21     THE COURT: Are you going to mark that as an

22 exhibit?

23     MS. GLENNON:  I would like to.  It would be

24 Defense No. 22.

1        THE COURT:  Why don't you re-ask your question.

2   BY MS. GLENNON:

3        Q.   Is it a real life consequence that a

4   witness could competently misidentify the

5   perpetrator of a crime?

6        A.   Yes.

7        Q.   Based on the information you just gave to

8   the jury about pre and post events affecting memory?

9        A.   Yes.  What's critical in terms of your

10  answering your question is that post-event

11  information is information that is of --

12       MR. CROWE: Objection, narrative.

13       THE COURT: Overruled.

14       THE WITNESS:  Due to accuracy, most of that

15  information could be true.  It could also be false.

16  So in a situation like this, the witness in my

17  example has a memory that has an enormous amount of

18  information in it about the event.

19            Based on all this information, the witness

20  could make a very confident description about what

21  they remember happening; but unbeknownst to the

22  witness, this confident description is based on a

23  memory that although details strong and reel seeming

24  is a memory that is potentially false in important

82

1  respects because it is largely made up of post-event

2  information whose accuracy is, as I said, dubious.

3      Q.  Can you give examples of when memory tends

4  to be inaccurate?

5      A.  There are three circumstances under which

6  somebody's memory, or at least their report of what

7  happened, can be inaccurate.  I could go through

8  those one by one.

9      Q.  What is the first one?

10      A.  So the first set of circumstances has to do

11  with what's going on at the time that the original

12  event is taking place.  There are often factors at

13  play that diminish the amount of generally accurate

14  green root conscious experiment information that a

15  person could get into their memory.

16      Q.  Is lighting?

17      A.  Yes.

18      Q.  Duration?

19      A.  How long the event takes would be such a

20  factor.

21      Q.  What about a lack of attention on the part

22  of a witness to a particular appearance?

23      A.  That would also be relevant.

24      Q.  Is there a kind of initial memory that can

1   change into, or morph into, an eventual memory that

2   is inaccurate?

3        A.   Given some of those factors and other that

4   are at play, a witness can begin with a memory, an

5   original memory that is hazy.  It's filled with

6   holes, and it is exactly this kind of memory that

7   can eventually morph into the kind of memory I just

8   described, that is very complete, very detailed,

9   real seeming and confidence evoking and a memory

10  that is potentially false.  So that's the first set

11  of circumstances.

12       Q.   Is there also a second set of circumstances

13  dealing with the retention interval that a person

14  has when an event ends and when they're asked to

15  recall about it?

16       A.   Yes.

17       Q.   Is that also a factor?

18       A.   Yes.

19       Q.   How so?

20       A.   Two things that could happen.  There's

21  normal forgetting.  So any generally green root

22  conscious experience information originally in

23  memory can decay away.

24       Q.   Can you talk about a time frame for that?

84

1     A.   Yes.   Decay of information is a relatively

2   slow process.   It's generally about a year before

3   all the well learned visual information in memory is

4   forgotten.

5     Q.   You're aware in this case that it was

6   within 24 hours that the eyewitness made an

7   identification?

8     A.   Yes.   The other thing that could go on

9   during that interval, however, is that during that

10   time, that the witness can supplement their original

11   memory with potentially incorrect post-event

12   information to the degree that that post-event

13   information is false.

14        Then as the witness integrates it, their

15   memory becomes more stronger, more detailed, more

16   complete; but at the same time less accurate.   So

17   that's the second set of circumstances.

18     Q.   I believe you talked about procedures or

19   the process of gaining the information.   For

20   example, leading questions, the examiner's bias,

21   those kinds of things.

22        Is there an impact that those leading

23   questions and a biased interviewer that would affect

24   the final --

1          A.   Yes, there is.  We already talked about

2     that in conjunction with the car crash experiment

3     that I described.

4          THE COURT:  Ms. Glennon, is this number three?

5          MS. GLENNON:  That was number three.

6          THE COURT: This is number three.

7     BY MS. GLENNON:

8          Q.   The nature of the process?

9          A.   So, right, the nature of the process used

10    to extract information from the witness's memory can

11    both, under some circumstances, bias the witness in

12    terms of what they say happened.

13          Like if you ask how fast were the cars

14    going when they smashed, and the bias in such

15    procedures can also act as a source of post-event

16    information as we saw the verb smash do in the

17    experiment that I described a couple minutes ago.

18          Q.   I can anticipate questions about proceeding

19    acquaintance versus a stranger.

20          How does that impact a person's memory of

21    an event if they're acquainted with the person

22    they're asked to recall information about as opposed

23    to the stranger?

24          A.   So when you see a stranger, you, of course,

86

1  have to construct a memory of what the stranger
2  looks like from scratch.  When you see a person that
3  you know or you believe you do, all you have to do
4  to recognize them is match the appearance of the
5  person who you're looking at with a pre-stored
6  representation of what they looked like in long-term
7  memory.

8          So that is an easier process.  It's more
9  efficient than constructing a memory from scratch of
10  a stranger, but those two processes are processes
11  that are subject to error.

12      Q.   Just because an individual is attempting to
13  recognize someone versus identify a stranger, is it
14  your testimony that that doesn't make it any less
15  accurate?

16      A.   Well, what I am saying is that it is
17  perfectly possible in most people have the
18  experience of misrecognizing a stranger as somebody
19  that you know only to discover very quickly that the
20  person you have misrecognized is, in fact, a
21  stranger and coming to the conclusion that you have
22  made a mistake.

23      Q.   But doesn't that scenario that you have
24  just given the ladies and gentlemen deal more with

1   factors like distance, lighting, duration, all of

2   those factors?

3       A.   So misrecognizing a stranger is more likely

4   to take place under the kind of circumstances that

5   we've talked about over here.  So if the lighting

6   isn't good, if the time is short, if the witness is

7   not paying attention to exactly what the person

8   looks like and so on, those are the circumstances

9   under which a witness could potentially misrecognize

10  a stranger as being somebody they know.

11      Q.   So with respect to the case of Marco Lopez,

12  you were given witness information from Jose Angel

13  Herrera, correct?

14      A.   Yes.

15      Q.   And through your review of the information

16  that I provided you, did you learn whether or not

17  Jose Angel Herrera knew Marco Lopez?

18      A.   Yes, he did.

19      Q.   What did you learn?

20      A.   That he, in fact, knew him.

21      Q.   Did you learn about any pre-event

22  information with respect to this case, events that

23  happened before the shooting on March 18th of 2014

24  shortly after midnight that may have impacted Jose

1    Angel Herrera's memory?

2        A.   Yes.

3        Q.   Can you tell the ladies and gentlemen what

4    you learned?

5        A.   Well, my understanding is that there were

6    conversations in which the witness had either

7    engaged in or had overheard that suggested that the

8    defendant, Mr. Lopez, had it in for the --

9        MR. CROWE:  Objection.

10       THE COURT: I suppose we need a side bar.

11                            (Whereupon the

12                            followings proceedings

13                            were had in a side-bar

14                            conference):

15       THE COURT: What's the basis for the objection?

16       MR. CROWE: He's testifying as to -- he's making

17   conclusions regarding evidence that isn't in

18   evidence.  He's testifying.  He's making a

19   conclusion about something that he has no direct

20   knowledge of.

21       THE COURT: Well, that's what experts do.

22           What's your position?

23       MR. CROWE: It's not in evidence.

24       MS. GLENNON:  I believe he was provided

89

1    information that there was a conversation that

2    occurred between Marco Lopez and Jose Angel Herrera

3    regarding whether Luis was a snitch.  If so, then

4    he was going to get something.  That's the

5    conversation they introduced in their case in chief

6    as their motive in this matter.  I am trying to

7    ascertain from this witness if that could be a

8    pre-event piece of information that could affect

9    Jose Herrera.

10        THE COURT: Experts are regulated.  They could

11   rely on hearsay and things that are not admissible

12   in evidence so long as it's the type of data that an

13   expert in the field ordinarily relies upon.

14        So if you establish that foundation, I will

15   allow it.

16        MS. LOITERSTEIN: The witness said he had it out

17   for him.

18        THE COURT: If it's something that he relied upon

19   and it's something that would affect his opinion,

20   then he could testify to it.  If it is something he

21   did not rely upon, then it shouldn't be asked about.

22   If it's asked about, you could cross-examine on it.

23

24

1                    (Whereupon the following

2                    proceedings were held in

3                    open court:)

4        THE COURT: The objection is overruled.

5            Please ask your next question.

6    BY MS. GLENNON:

7        Q.   Dr. Loftus, through your review of this

8    case, were you aware that my client, Marco Lopez,

9    had a conversation with Jose Angel Herrera about

10   snitching?

11       A.   Yes.

12       Q.   Did that event occur prior to this murder?

13       A.   That's my understanding, yes.

14       Q.   Would you characterize that as one of those

15   pre-event pieces of information that impacts a

16   person's memory?

17       A.   Yes.

18       Q.   Specifically, Angel Herrera's memory?

19       A.   Yes.

20       Q.   And were you also provided information in

21   this case with respect to where Angel Herrera was

22   when he made his identification?

23       A.   Yes.

24       Q.   What did you learn about the place that he

1    was when he made this identification?

2        A.   My understanding was that he was inside his

3    apartment looking through a window out onto an area

4    that was close to the entryway of the apartment

5    building.

6        Q.   Were you actually shown photographs of the

7    building?

8        A.   Yes.

9        Q.   Doctor, I am showing you what I have marked

10   as Defense No. 23 for identification.

11            Do you recognize what I am showing you in

12   that photograph?

13       A.   Yes.

14       Q.   Is that the building where this homicide

15   occurred?

16       A.   That's my understanding, yes.

17       Q.   Do you see the window that you're referring

18   to when you said Angel Herrera looked out a window?

19       A.   Yes.  As you look at this photograph, the

20   window is over to the left mostly out of the

21   picture.

22       Q.   Would you circle with my pen the area that

23   you're referring to.

24       A.   Where the window is?

1       Q.   Yes.

2       A.   (Indicating. )

3       THE COURT: Did you identify the exhibit?

4       MS. GLENNON: He did.

5       THE COURT: The number.

6       MS. GLENNON: Defendant's No. 23.

7       THE WITNESS:  So the window in question is now

8    what I am circling in black.

9    BY MS. GLENNON:

10       Q.   In the center of the picture, would that be

11   the front entrance of the building in question?

12       A.   That's my understanding.

13       Q.   When you made your observations of this

14   photograph, with respect to Angel Herrera's ability

15   to observe the front door, what did you notice?

16       A.   Well, there were obstacles that would have

17   prevented anybody on the inside of the apartment

18   looking through the window in question from being

19   able to see the front door.

20       Q.   Could you give me an example of the

21   obstacles you're referring to?

22       A.   A brick wall that I assume to be pretty

23   permanent.  There were also some trash bags and a

24   tree, as I recall.

93

1          Q.   Were you provided any information with

2     respect to the lighting either outside of 1948 North

3     Green or in Jose Angel Herrera's apartment?

4          A.   I was, but the information I got was a

5     little bit ambiguous.  My best understanding was

6     that at some point that the light inside the

7     apartment was turned on.

8          Q.   What significance would that have or might

9     that have?

10         A.   Well, in terms of being able to perceive

11    the answers of somebody outside?

12         Q.   Yes.

13         A.   It's a two-edge sword, and it depends

14    partly on where the light is situated, what the

15    light's illumination is, are we talking about 60

16    watt bulb or whatever but generally speaking there

17    are two consequences.

18              The first sequence is good for being able

19    to perceive.  In other words, there is an additional

20    source of light above and beyond what there was

21    before that would illuminate the person outside that

22    would provide the witness to some degree the

23    wherewithal to be able to see what he looks like.

24

1          But when light goes through a window -- and
2     my understanding, by the way -- there is not only a
3     window but an additional piece of plastic.
4          Q.   Were you shown photographs of a plastic
5     covering over that sliding glass door that you
6     circled in Defense Exhibit 23?
7          A.   Yes.  So the light was going through the
8     window and a piece of plastic.  So in order for the
9     light inside the apartment to be useful for the
10    witness inside to perceive the appearance of the
11    person outside the light from the lamp, first of
12    all, has to go through both the window and the
13    plastic.
14          It has to bounce off the person's face
15    let's say outside and then the light that bounces
16    off the person's face, that is going to be the light
17    relevant to being able to see what he looks like to
18    the witness and has to make a return journey back to
19    the plastic bag to the window into the witness's
20    eyeball.
21          Q.   Now, does the placement of that light
22    inside the apartment matter for what you have just
23    described?
24          A.   Sure.  Light from a source like a light

1    bulb falls off fairly quickly.

2        Q.   How about a floor lamp by the door?

3        A.   To the degree that the light is close to

4    the window or the door that the witness is looking

5    out at, it will be the closer.  It will be to the

6    relevant object.

7        Q.   How about if it were closer to the front

8    door of the apartment versus the sliding glass door

9    that the witness is making his observations?

10       A.   Further then it will be worse.

11       Q.   Were you provided any information with

12   respect to the lighting outside the apartment?

13       A.   I was.  I hadn't quite finished about the

14   lighting inside.

15       Q.   Go ahead.

16       A.   So the light has to make this double

17   journey.  It has to go outside, bounce off the

18   person outside, then come back.  Each of the media

19   that the light goes through, the glass and the

20   plastic, allows light through.  That's what it needs

21   for something to be transparent.

22            Two other things happen.  First of all --

23       MR. CROWE: Objection, narrative.

24       THE COURT: Overruled.

96

1        THE WITNESS:  Absorb some of the light and also

2    those media reflects light.  So what this means, as

3    the light passes through those two things, once on

4    the way out and then again on the way back, the

5    light will have gone through four different things

6    which means it will have had four different chances

7    to be absorbed by these things and lost.

8            Second, light reflects off those media.

9    The light will reflect off both the door as it

10   leaves the room going outside and then it will

11   reflect off the glass and the plastic again on its

12   way back.

13           The most important sequence of this reflex

14   issue is that from the witness's perspective, what

15   he'll see is partly what's outside being illuminated

16   by the lamp.  Partly he'll see a reflex off the

17   window and off the plastic of what's inside.

18           So the witness will essentially wind up

19   with sort of a double exposure.  Actually, a triple

20   exposure since there's plastic as well from reflexes

21   coming from inside the apartment and also what is

22   outside.

23           So the reflexes from the witness's

24   perspective of off the glass of what's inside of the

97

1  apartment will interfere with his ability to

2  perceive anything like the appearance of a person

3  who's outside of the door.

4      Q.   With respect to -- let me ask you this:

5  How would lighting outside of the building impact

6  this triple exposure that you just referred to?

7      A.   It depends on where the light is.  So if

8  there is a light that is, let's say, affixed to the

9  apartment building that is illuminating the face of

10  the person outside, that will help for one thing.

11  That light has to make a one way journey into the

12  apartment.

13      Q.   How about if there was a light post in

14  addition to a light on the building?

15      A.   This light post that you're talking

16  about --

17      Q.   Behind the squawk area.

18      A.   Right.  So in that case, that light will

19  have the effect of illuminating the portion of the

20  person outside who is away from the witness leaving

21  whatever portion is facing the witness that would be

22  for the witness to be able to perceive and memorize

23  appearance in shadow.

24

98

1            And, in fact, the brighter the light is the

2    more the witness would be light adapted, blinded, so

3    to speak, by the light; and would essentially, if it

4    were the only thing, that would cause the witness to

5    see the person outside only in silhouette.

6        Q.   Were you also given information with

7    respect to the clothing of the person that Angel

8    Herrera said he saw?

9        A.   I believe, yes.

10       Q.   Do you recall what that was?

11       A.   My recollection was that the witness

12   reported that he was wearing a hoody.

13       Q.   Was the hoody up or down?

14       A.   The hoody was up, as I recall.

15       Q.   Would that have any impact with respect to

16   what you were just describing as far as what shadows

17   and illumination of the individual that Angel

18   Herrera was perceiving?

19       A.   First of all, the hoody itself would secure

20   part of the answer of the person being looked at.

21   Second, any part of the hoody that is flapping

22   around would cause shadows from whatever light is

23   outside.

24       Q.   How does duration and/or attention impact

1   a person's ability to perceive an event?

2       A.   So duration will come as no shock effect

3   how much information a person is able to get from an

4   event by upon just experience into their memory.   So

5   to the degree that the event lasts a longer time,

6   the witness has a greater opportunity to pay

7   attention to various aspects of whatever it is

8   they're looking at, a person's appearance, let's

9   say, and accurately memorize it.

10      Q.   So if the duration is shorter, perhaps

11  seconds, would that impact their ability to

12  correctly make a memory that you just talked about?

13      A.   Sure.   But what is critical here in terms

14  of assessing duration is not the total physical

15  duration that an event takes but what is referred to

16  as functional duration.

17      Q.   What do you mean by functional duration?

18      A.   Function signal duration presupposes that

19  there is something important that is going on like

20  who is this person, which means that the witness

21  needs to spend some time if they will know it later

22  on trying to perceive and memorize what the person

23  looks like.

24

100

1          Functional duration refers to that period

2    of time during which several things are

3    simultaneously through that the person that the

4    witness is looking at is in the witness's field of

5    view, that there is sufficient light for the witness

6    to be able to make out any of the details of the

7    person's facial appearance, the time that the person

8    is close enough to the witness to be able to

9    accurately make out what he looks like, and the time

10   that the witness is actively paying attention to

11   what the person looks like.

12          It's only during that period that all those

13   things are simultaneously true that the witness can

14   use the time to perceive and memorize what the

15   person looks like.

16          So the time that all those things are

17   simultaneously true is what we refer to as function

18   signal duration.  So even if, as you say, an event

19   takes a couple of seconds, the functional duration

20   for memorizing a person's appearance could be as

21   short as zero.

22     Q.  Did you also learn from your review of this

23   case, that Angel Herrera said initially the person

24   was walking along the sidewalk and turned in his

1    direction and turned back and continued on the path

2    the person was walking?

3        A.    That's my recollection.

4        Q.    How about with respect to movements in the

5    pocket area or waistband area of the person that

6    Angel Herrera said he saw?

7        A.    Sorry.   What were you asking me about?

8        Q.    Did you learn through your review of this

9    case that Angel Herrera had indicated to the police

10   that he was watching the individual's hands near

11   their pocket or waistband area?

12       A.    I do recollect that he said that, yes.

13       Q.    How would that impact the functional

14   duration of that perception?

15       A.    Well, to the degree that the witness is

16   paying attention to that aspect of the person

17   walking by, he's not paying attention to the

18   persons's appearance.   So that would subtract from

19   whatever functional duration was available to the

20   witness.

21       Q.    How does expectations impact a person's

22   ability to create a memory?

23       A.    Well, we have already eluded to expectation

24   over here when we talked about pre-event

1    information.  So one common aspect of pre-event

2    information is a person's expectations about how a

3    particular event might unfold.

4         And as I indicated in my diagram over

5    there, one of the effects of pre-event information

6    in the form of expectations is that to some degree

7    it could influence what a person's conscious

8    experience is of what is going on.

9         Just as in the experiments I described, a

10   person's expectations that the ace of spades is

11   going to be black will influence his perception of

12   an ace of spades that show it's actually red.

13        Q.  So in the information you were provided

14   with respect to Jose Angel Herrera and any

15   expectation he might have with respect to Marco

16   Lopez, what did you determine with the information

17   you were provided?

18        A.  This is the kind of information that could

19   influence the witness to falsely believe that the

20   witness he saw walking was the person he might

21   reasonably expect to be there, mainly, the defendant

22   as opposed to any stranger.  It's a reasonable

23   explanation as far as his sense organs are concerned

24   of who it is that he's looking at.

1        Q.    You also touched a little bit earlier on

2    inferences.

3            How would Jose Angel Herrera's pre-event

4    information he had with respect to a conversation

5    with Marco Lopez cause him to maybe later inform

6    that Marco was the person out there that night?

7        MR. CROWE: Objection.

8        THE COURT: Sustained.

9    BY MS. GLENNON:

10       Q.    Through the course of your review of this

11   file, I believe you testified earlier that you

12   learned of a conversation between Marco Lopez and

13   the eyewitness Angel Herrera, correct?

14       A.    Yes.

15       Q.    I believe you characterized that as some of

16   pre-event information you're referring to that could

17   create those false memories?

18       A.    Yes.

19       Q.    Is there some sort of inferences that could

20   be drawn from that pre-event information on the part

21   of Angel Herrera?

22       MR. CROWE: Objection.

23       THE COURT: Sustained.  I don't think he's

24   testified about inferences yet.

1   BY MS. GLENNON:

2        Q.   What does an inference have in perception

3   and memory?

4        A.   So an inference is a form of post-event

5   information.   It's self-generated post-event

6   information.

7        Q.   Can you give me an example?

8        A.   I could give you an example by describing

9   briefly an experiment from a laboratory.   So there

10  have been lots of experiments showing inferences.

11            There this one experiment that I will use

12  as an example.   Subjects in the experiments saw a

13  slide show.   In this slide show, there were many of

14  them.   I will use an example, a slide show that

15  depicted a pretty boring event, namely, a woman

16  walking up and down the aisles of a supermarket

17  doing her shopping.

18            So there were a bunch of slides depicting

19  the sequence of events.   That was phase one of the

20  experiments.   There was also a phase two.

21            In phase two, subjects were shown a whole

22  bunch of slides, some of which were the ones that

23  they saw in phase one and others were pictures from

24  the supermarket; but the subjects hadn't seen in

105

1    phase one.  The subjects were asked to distinguish

2    which pictures they had seen before versus which

3    pictures they hadn't seen before.

4        Q.   Did all of the individuals view that same

5    thing, two separate clips, for lack of a better

6    word?

7        A.   Phase One was the study phase and phase

8    two.

9        Q.   What did you see as a result of the second

10   slide show? Or

11       A.   I have to describe the critical aspect of

12   the test phase which was then.  In study phase,

13   there were two successive slides that were critical.

14            The first slide in this example showed the

15   woman, the shopper contemplating a pile of oranges

16   neatly stacked, piles of oranges.

17            The very next slide showed a woman looking

18   very embarrassed.  The oranges were scattered all

19   over the floor.  So that's what the subjects in the

20   experiment actually saw in the test phase, that

21   there was a slide that showed the woman picking an

22   orange from the bottom of the pile; and it turned

23   out that subjects were very sure that they had seen

24   that exact slide before in the test phase.

1          So the explanation for this finding is that

2     when the subject saw the two successive slides in

3     the study phase, the oranges neatly stacked in the

4     first slide, next slide, oranges scattered all over

5     the floor.  The subjects made an inference that what

6     had happened is that the woman picked an orange from

7     the bottom of the pile and apparently stored that

8     inference as if it were true as part of their memory

9     which is why in the test phase they were so sure

10    that they had seen that very slide.

11         So, in other words, the inference they

12    made --

13         MR. CROWE: Objection, narrative.

14         THE COURT: Sustained.

15    BY MS. GLENNON:

16         Q.  Doctor, was there an inference from slide

17    one to slide two based on a slide that they had

18    actually seen or was it based on something else?

19         A.  Well, based on those two slides, the

20    witnesses evidently made the inference that the

21    woman had picked an orange from the bottom of the

22    pile.  It explained what happened in the two

23    successive slides that they saw and stored that

24    inference in part of their memory.

1     Q.   Even though they hadn't actually seen that

2   occur?

3     A.   Yes.

4     Q.   How does that relate to this case?

5     A.   So earlier I described, in answer to your

6   questions, how pre-event information could affect

7   the witness's conscious experience of who he was

8   looking at in accord with his expectations of who it

9   might be.

10        Even if that hadn't happened or in addition

11   to that happening, the witness may make the

12   inference after the fact based on the various

13   pre-event information that the person he saw was the

14   defendant.  It sort of makes sense.  It's just

15   post-event information rather than a false memory

16   that is formed by a pre-event information.

17        In either event, he would be in a position

18   to use his pre-existing knowledge of what the

19   defendant looked like in order to reconstruct his

20   memory of the person he saw walking by the door such

21   that his eventual memory of the person he saw

22   walking by the door came to resemble the defendant,

23   the person he thought likely would have been more

24   than had been warranted by the physical data that

1   was available to him at the time the event was

2   unfolding, the lack of light, lack of time, so on.

3       Q.   Now, Doctor, we talked a little bit about

4   competency and accuracy of a witness such as Angel

5   Herrera expresses high confidence in some memory.

6           Should we use that confidence as some

7   evidence that their memory is accurate?

8       MR. CROWE: Objection.

9       THE COURT: Sustained.

10  BY MS. GLENNON:

11      Q.   Is there a correlation between a high

12  confidence in memory and accuracy?

13      MR. CROWE: Objection.

14      THE COURT: That will be allowed.

15      THE WITNESS:  The correlation between confidence

16  and accuracy, in other words, the general idea that

17  a high confident witness is more accurate than a low

18  confident witness has been investigated in a

19  multitude of study.  So for the last -- over the

20  last 50 or 100 years.

21      Q.   What do those study shown?

22      A.   Those studies have shown -- my answer will

23  be a little complicated.  So you will have to bear

24  with me.  So the answer is, it depends.

1        If a person gives a highly confident

2   account of their memory of something they

3   experienced, in order to determine whether this high

4   confidence is associated with high accuracy or

5   reflects high accuracy, you have to go back and look

6   at the circumstances that led up to that confident

7   report on the witness's part.

8        If you go back and you discover that the

9   circumstances for forming the original memory were

10  poor, not enough light, not enough time, attention

11  not on what should be relevant and if there is some

12  source of potentially false either pre-event

13  information or post-event information, under those

14  circumstances, contrary to sort of intuition or

15  common sense, high confidence does not necessarily

16  apply to accuracy.

17       If on the other hand, you go back and

18  discover that the circumstances for forming the

19  originally memory require were good, any attention

20  appropriately directed and so on and there is not

21  any potentially falsifying either pre-event

22  information or post-event information, if that is

23  true, then, again, just as a your common sense or

24  intuition would lead you to believe, there is a

1    correlation between confidence an accuracy.

2            If that is the way that the things unfolded

3    under those circumstances, a person who is highly

4    confident is more likely to be --

5        MR. CROWE: Objection, narrative.

6        THE COURT: Sustained.

7    BY MS. GLENNON:

8        Q.   Doctor, you have already talked about

9    pre- and post-event information specific to Angel

10   Herrera the witness in this case, correct?

11       A.   Yes.

12       Q.   And because he had that pre- and post-event

13   information provided to him, how would that impact

14   his confidence or proclamation of confidence?

15       MR. CROWE: Objection.

16       CTHE COURT: Sustained.

17   BY MS. GLENNON:

18       Q.   You testified that pre- and post-event

19   information was provided in this case, correct?

20       A.   My understanding was that it was available,

21   yes.

22       Q.   And would that impact the confidence and

23   accuracy of that witness or could it --

24       MR. CROWE: Objection.

111

1          THE COURT: That will be allowed.

2          THE WITNESS:   Yes.   It could certainly impact

3     the confidence that the witness expresses.   As for

4     the accuracy, I can't really say.   All I could say

5     is that irrespective of the accuracy, the kind of

6     pre- and post-event information that you have

7     described would have the effects of increasing the

8     witness's confidence that the person that he saw was

9     the defendant.

10    BY MS. GLENNON:

11          Q.   Even if those memories were false memories?

12          MR. CROWE:   Objection.

13          THE COURT: Sustained.

14    BY MS. GLENNON:

15          Q.   Based on the information that you have with

16    respect to Angel Herrera, a witness in this case and

17    his expressions of confidence, must we assume that

18    he's lying?

19          MR. CROWE: Objection.

20          THE COURT: Sustained.

21    BY MS. GLENNON:

22          Q.   Suppose that a witness testifies under oath

23    to an identification and they falsely identify

24    someone --

1       MR. CROWE: Objection.

2       THE COURT: Sustained.

3   BY MS. GLENNON:

4       Q.   In your opinion, could Angel Herrera be

5   mistaken in his identity?

6       MR. CROWE: Objection.

7       THE COURT: Sustained.

8   BY MS. GLENNON:

9       Q.   Is it possible for a person to have a false

10  memory that seems very real to them?

11      MR. CROWE: Objection.

12      THE COURT: That's overruled.

13      THE WITNESS:  Yes, yes, and I have already

14  described the circumstances under which that would

15  -- that there are circumstances under which the

16  ability to form --

17      MR. CROWE:  Objection, narrative.

18      THE COURT: Sustained.

19      MS. GLENNON: No.  I have nothing further.

20      THE COURT: State, you may cross-examine.

21              CROSS EXAMINATION

22              BY

23              MR. CROWE:

24      Q.   Now, Doctor, you are not a neurologist,

113

1   correct?

2        A.   Correct.

3        Q.   And you are not an opthalmologist, are you?

4        A.   No.

5        Q.   Opthalmologists study eyes?

6        A.   I study eyes, but I am not a an

7   opthalmologist.

8        Q.   You're not a medical doctor at all,

9   correct?

10       A.   That's correct.

11       Q.   You don't see any patients?

12       A.   That's correct.

13       Q.   And you're not a physicist?

14       A.   Well, I know a lot about physics.

15       Q.   You don't have a degree in physics?

16       A.   That's correct.

17       Q.   You're not an engineer?

18       A.   Correct.

19       Q.   And you have no knowledge of who committed

20   the murder of Luis and Segundo Reynoso?

21       A.   That's correct.

22       Q.   It is entirely possible that Marco Lopez

23   shot two people, correct?

24       A.   Sure.

114

1    Q.   Let's talk about the conscious experience.

2    That's one of those green boxes up there, right?

3    A.   Yes.

4    Q.   And that's what you experience with your

5    senses during an event, correct?

6    A.   Yes.

7    Q.   That's what you see and feel during the

8    event, correct?

9    A.   Correct.

10   Q.   It's hearing a gunshot, correct?

11   A.   Yes.

12   Q.   It's hearing a person sneak down creaky

13   front steps, correct?

14   A.   True.

15   Q.   It's hearing a front door open right next

16   to you, correct?

17   A.   That would be an example of conscious

18   experience, yes.

19   Q.   It would also be seeing a man walk out of

20   that front door right in front of you?

21   A.   Yes.

22   Q.   And seeing a man you know turn and face

23   directly at you from eight to ten feet away,

24   correct?

1     A.   Seeing a person you believe you know
2   turning and facing you or at least having a memory
3   of that.
4     Q.   It would be making a recognition of a
5   person you see practically every day, correct?
6     A.   What would be?
7     Q.   Him turning from eight feet away to face
8   you.
9     A.   I am not understanding.  What is your
10  question exactly?
11    Q.   Now, with regard to those perceptions, of
12  course you have interviewed Jose Angel Herrera about
13  his perceptions of what he saw that night?
14    A.   I never interviewed anybody in this case.
15  I never interviewed anybody in any case I
16  participated in, including this one.
17    Q.   You never talked to him about what his
18  perception of those events was, correct?
19    A.   I never interviewed anybody in this case
20  about anything.
21    Q.   You never talked to him about how he viewed
22  the event, correct?
23    A.   I never interviewed anybody in this case
24  about anything.

1        Q.   Let's talk a little bit about post-event

2    information.

3             Now, Jose Angel Herrera never viewed any

4    movies in this case, right?

5        A.   Not to my knowledge.

6        Q.   Never saw, was never introduced the word

7    smashed or the word shot or anything like that,

8    correct?

9        A.   Correct.

10       Q.   And it's also true that the very first

11   person that he told the police immediately about

12   this that he spoke to an officer by the name of

13   Craig Stout immediately on the scene, correct?

14       MS. GLENNON:   Objection.

15       THE WITNESS:   Correct.

16       THE COURT: Please phrase it in terms of what he

17   relied upon and if that is something he would

18   typically rely upon in this case.

19   BY MR. CROWE:

20       Q.   You have a copy of the police reports,

21   correct?

22       A.   Yes.

23       Q.   You are aware that Mr. Herrera immediately

24   reported his identification of Marco Lopez, correct?

1          MS. GLENNON:  Objection to the form of the

2    question.

3          THE COURT: Overruled.

4          THE WITNESS:  Yes.

5    BY MR. CROWE:

6          Q.  And that the first person that he

7    identified Marco Lopez to was a police officer by

8    the name of Craig Stout, correct?

9          A.  Well, I don't remember his name, but I will

10   take your word for it.

11         Q.  That was within minutes of his making his

12   observation of Mr. Lopez?

13         MS. GLENNON: Objection.

14         THE COURT: Please conform your question to what

15   this witness took into account in formulating his

16   opinions.

17   BY MR. CROWE:

18         Q.  And based upon your examination of the

19   records, you know that Marco -- that Jose Herrera

20   wasn't asked any questions by any police officers

21   prior to making his disclosure to Officer Stout,

22   correct?

23         A.  Yes.

24         Q.  So no police officer interviewed before he

1   made his disclosure, correct?

2       A.   Correct.

3       MS. GLENNON:   Objection.

4       THE COURT: Sustained.

5   BY MR. CROWE:

6       Q.   You're aware that he made his

7   identification immediately, correct?

8       A.   Yes.

9       Q.   There were no identification procedures

10  intervening between his observation and his

11  identification to the police, correct?

12      MS. GLENNON:   Objection to the form of the

13  question.

14      THE COURT: Sustained.

15  BY MR. CROWE:

16      Q.   Mr. Herrera told the police he saw Marco

17  immediately, correct?

18      A.   Correct.

19      Q.   Of course you talked to Officer Stout to

20  make sure you had the accurate circumstances of his

21  initial disclosure, correct?

22      A.   As I mentioned earlier several times, I

23  haven't interviewed or talked to anybody in this

24  case.

1        Q.   Of course you talked to Detective McCarthy?

2        MS. GLENNON: Objection.

3        THE COURT: Sustained.  He said he did not

4    interview anybody.  We will not go through the whole

5    list.  He did not interview anybody.  That's his

6    testimony.

7    BY MR. CROWE:

8        Q.   All you did was review some notes that were

9    provided to you by the defense, correct?

10       A.   Correct.

11       Q.   Let's talk about pre-event information.

12            Nobody showed Jose Herrera any cards,

13   correct?

14       A.   Not to my knowledge, no.

15       Q.   Marco Lopez isn't the ace of spades, is he?

16       MS. GLENNON:  Objection.

17       THE COURT: Sustained. Please conform to what is

18   relevant with this witness.

19   BY MR. CROWE:

20       Q.   Pre-event information, that's stuff you

21   know about what is going on before you perceive the

22   event, correct?

23       A.   Yes.

24       Q.   If you don't see the event, you can't have

1   any pre-event information, correct?

2        A.   Pre-event information could come from

3   numerous sources.  It could come from hearing,

4   seeing, could come from reading.  It does not have

5   to require seeing.

6        Q.   Now, in this case, the information that you

7   provided related to Jose Herrera is that he heard a

8   shot, correct?

9        A.   Yes.

10       Q.   That he saw a Marco Lopez coming out of the

11  building shortly thereafter, correct?

12       A.   Yes.

13       Q.   You have no information about what he knew,

14  about what happened upstairs, do you?  There's no

15  information about that whatsoever, correct?

16       MS. GLENNON: Objection.

17       THE COURT: Sustained.

18  BY MR. CROWE:

19       Q.   You do not know what Jose Herrera knew

20  about what happened upstairs when he observed Marco

21  Lopez?

22       MS. GLENNON: Objection.

23       THE COURT: Sustained.

24

                        121

1  BY MR. CROWE:

2      Q.  Let's talk a little bit about lack of

3  attention or functional duration.

4          You would agree that when you hear a shot,

5  your attention is drawn to determining its source,

6  correct?

7      A.  Yes.

8      Q.  When you hear a person sneaking down the

9  creaky stairs, your attention is drawn to that

10  person, correct?

11      A.  One would imagine, yes.

12      Q.  When he walks right in front of you, your

13  attention is focussed on him, correct?

14      A.  To some degree.

15      Q.  When he turns and looks right at you from

16  eight to ten feet away, your attention is focussed,

17  correct?

18      A.  Sure, possibly, or you might be focussed on

19  where the gun was and whether it's present now or

20  whether this person might be dangerous because he's

21  carrying a gun or any number of other things.

22      Q.  In this case, there is no question of a gun

23  being pointed at anyone, correct?

24      A.  I understand that, yes.

1    Q.   So Jose Herrera wasn't focussed on any gun,

2 was he?

3    A.   No.   What I said in answering your question

4 was that he might have if he were a normal person

5 trying to figure out, given he had just heard a

6 gunshot, whether his life was in danger because the

7 person he was seeing was carrying the gun, even if

8 there were no gun visible.

9    Q.   Now, it is easier to identify someone you

10 know than a stranger, correct?

11    A.   Yes.

12    Q.   And as before, you're not a physicist or

13 engineer?

14    MS. GLENNON:

15    Q.   Objection?

16    THE COURT: Sustained.

17 BY MR. CROWE:

18    Q.   You're not a lighting designer, are you?

19    MS. GLENNON: Objection.

20    THE COURT: Sustained.

21 BY MR. CROWE:

22    Q.   You never went to this particular scene,

23 did you?   You never went to 1948 on Green Lane in

24 Palatine, correct?

123

1      A.   Correct.

2      Q.   And you only reviewed the photographs

3   provided to you by the defense, correct?

4      A.   Yes.

5      Q.   The reports and notes provided by the

6   defense, correct?

7      A.   The reports?  What are you referring to by

8   notes?

9      Q.   Investigator notes.

10     A.   Yes.

11     Q.   You don't know exactly what lights there

12  were in that parking lot on March 19, 2014, do you?

13     A.   Correct.

14     Q.   You don't know what light bulbs were used?

15     A.   Correct.

16     Q.   You don't know if they're candle power?

17     A.   Correct.

18     Q.   You never went into Jose's apartment,

19  correct?

20     A.   I did not.

21     Q.   You never saw where Jose was standing,

22  correct?

23        MS. GLENNON: Objection.

24        THE COURT: Sustained.

1    BY MR. CROWE:

2        Q.   You don't know what view he had, correct?

3        A.   You mean apart from knowing the

4    configuration of his apartment and outside?

5        Q.   You don't know where he was standing?

6        MS. GLENNON:   Objection

7        THE COURT: Sustained.

8    BY MR. CROWE:

9        Q.   You don't know -- you never inspected the

10   glass on the door, did you?

11       A.   Correct.

12       Q.   You don't know what the thickness is?

13       A.   Correct.

14       Q.   Or its clarity?

15       A.   Correct.

16       Q.   You never saw what the lighting was like

17   inside, correct?

18       A.   Correct.

19       Q.   You don't know where the lamps were placed

20   or which ones were on or off, do you?

21       A.   Correct.

22       Q.   You never interviewed any of the other

23   witnesses in this case either?

24       MS. GLENNON:   Objection; asked and answered.

1          THE COURT: Sustained.

2   BY MR. CROWE:

3          Q.   How much are you getting paid?

4          A.   I charge $250 an hour for casework that I

5   do here in Cook County.

6          Q.   How many hours have you billed on this

7   case?

8          A.   Well, let's see.  You mean for this trip or

9   for the whole case?

10         Q.   For the whole thing.  How much are you

11  getting paid?

12         A.   It will probably be around 40 hours,

13  $10,000.

14         Q.   It's still possible that Jose Angel Herrera

15  was 100 percent accurate when he identified Marco

16  Lopez as the person who emerged from the front door

17  of that building?

18         A.   It's either accurate or not, so he could be

19  accurate.

20         Q.   Now, as much as we made about the

21  conversation that Jose had with the defendant, Marco

22  Lopez, isn't it true that that conversation was like

23  a month before this occurrence?

24         A.   Yes.

1          MS. GLENNON: Objection.

2          THE COURT: If he knows.

3          THE WITNESS:  To be honest, I don't remember

4    when the conversation was relative to the shooting.

5    BY MR. CROWE:

6          Q.   You don't know the timing of that

7    conversation?

8          A.   I don't remember it, right.

9          MR. CROWE: I have nothing further.

10         THE COURT: Redirect.

11                    REDIRECT EXAMINATION

12                    BY

13                    MS. GLENNON:

14         Q.   Doctor, whose job is it to determine

15    whether Jose was accurate or inaccurate?

16         A.   The jury.

17         MR. CROWE:  Objection.

18         THE COURT: Sustained.

19    BY MS. GLENNON:

20         Q.   It's entirely possible that Jose Angel

21    Herrera misidentified Marco Lopez?

22         MR. CROWE: Objection.

23         THE COURT:  You opened the door.  That's

24    allowed.

1          THE WITNESS:  Yes, it is.

2     BY MS. GLENNON:

3          Q.   It's entirely possible that Marco Lopez did

4     not shoot the two people in that building; is that

5     correct?

6          MR. CROWE:   Objection.

7          THE COURT: Overruled.

8          THE WITNESS:   That's correct.

9     BY MS. GLENNON:

10         Q.   Now, as an expert, do you typically go to a

11    scene and interview witnesses?

12         A.   No.

13         MR. CROWE: Objection.

14         THE COURT: Overruled.

15    BY MS. GLENNON:

16         Q.   You were provided photographs, right?

17         A.   Yes.

18         Q.   The photograph I showed you today was a

19    police photograph, right?

20         A.   Yes.

21         Q.   Taken by the police in this case?

22         A.   Right.

23         Q.   You were also provided with witness

24    statements with respect to hearing gunshots and what

1   was seen right afterwards, correct?

2        A.   Yes.

3        Q.   You are aware that there is conflicting

4   information about the front stairs and back stairs,

5   correct?

6        A.   Yes.

7        Q.   Angel said the front stairs?

8        A.   Yes.   That's my understanding.

9        Q.   And there are also conflicting accounts

10  about the lighting, correct?

11       A.   That was also my understanding, yes.

12       Q.   It's not your job to determine which one of

13  those people is telling the truth, is it?

14       A.   Correct.

15       Q.   It's the jury's job to determine that?

16       A.   Yes.

17       Q.   You're aware through your review of the

18  reports that Jose Angel Herrera was spoken to in the

19  police station immediately following everything that

20  occurred out at 1948 North Green?

21       A.   Yes.

22       Q.   He was interviewed for hours by police?

23       A.   Yes.

24       Q.   Doctor, just so I am clear, the reports and

129

1    the witness interviews that I gave you were

2    documents tendered to me from the police, correct?

3        A.   Yes.

4        Q.   Police reports?

5        A.   That was my understanding.

6        Q.   Police interviews?

7        A.   Correct.

8         MS. GLENNON: I have nothing further.

9        THE COURT: Any recross?

10       MR. CROWE:  No.

11        THE COURT: Ladies and gentlemen, we will take

12   our lunch break.  We will reconvene at 1:30.  Please

13   do not discuss this case amongst yourselves.

14                          (Whereupon the jury left

15                          the courtroom and the

16                          following proceedings

17                          were had:) (WHICH WERE

18                          ALL THE PROCEEDINGS HAD)

19                          *****

20

21

22

23

24

STATE OF ILLINOIS  )
                   )  SS:
COUNTY OF C O O K  )

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
   MUNICIPAL DEPARTMENT–THIRD MUNICIPAL DISTRICT

I, JENNIFER ZANICHELLI, an Official Court Reporter in the Circuit Court of Cook County, County Department, Third Municipal District, do hereby certify that I reported in shorthand the proceedings had at the hearing of the aforementioned cause; that I thereafter caused the foregoing to be transcribed, which I hereby certify to be a true and accurate transcript taken to the best of my ability of the proceedings had before the Honorable Marc Martin, Judge of said Court.

_____
Official Court Reporter
CSR# 084-003129

Dated this __7th__ day of September 2016

131