

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

NB:JAM/MEM/MG  *271 Cadman Plaza East*
F. #2017R00509  *Brooklyn, New York 11201*

February 27, 2023

By ECF

The Honorable LaShann DeArcy Hall
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. Karl Jordan, Jr., et al.
                 Criminal Docket No. 20-CR-305 (S-1) (LDH)

Dear Judge DeArcy Hall:

      The government respectfully submits this second supplement to its October 19, 2022 motion in limine and January 11, 2023 supplement, which are incorporated by reference. See Gov. Mot., ECF No. 113 (the "Motion"); Gov. Supp. Mot., ECF No. 134 (the "Supplemental Motion").[1]

      During the January 13, 2023 status conference, the Court afforded the government the opportunity to supplement the following issues: (i) admissibility of firearms and ammunition as direct evidence and/or under Fed. R. Evid. 404(b); (ii) admissibility of instances of witness intimidation and tampering; and (iii) admissibility of portions of the "Aim for the Head" music video and rap lyrics.

I.    Evidence Regarding Firearms and Ammunition

      As discussed during the January 13, 2023 status conference, the government recognizes that certain pieces of evidence may be better analyzed under Rule 404(b) rather than

---

[1] The government respectfully requests permission to redact limited information in this motion to ensure witness safety. See, e.g., United States v. Amodeo, 44 F.3d 141, 147 (2d Cir. 1995) (need to protect the integrity of an ongoing investigation, including the safety of witnesses, and to prevent interference and other obstruction, may be compelling reason justifying redaction). Witnesses have been anonymized using numbers that correspond to those used in the government's prior filings.

as direct evidence. Accordingly, the government has endeavored to separate the evidence by the purpose for which it seeks admission and to describe each piece in greater detail.

    A.    <u>Direct or Circumstantial Evidence</u>

The government seeks to introduce only the following testimony as direct evidence of the charged offenses, or in the alternative, pursuant to Rule 404(b):

1. <u>Fall 2002 Jordan's .40 Caliber Pistol:</u>  Witness 2 will testify that around the time of Mizell's murder, a .40 caliber pistol (the same type of caliber pistol that was used to murder Mizell) was hidden in a van parked outside of Jordan's residence at ███████████, and that the pistol went missing around the time of Mizell's murder. Witness 2 and Jordan both had access to this van and would also keep firearms and drugs in it.[2] See Mot. at 9.

2. <u>February 3, 2003 Shooting:</u>  During an argument with a relative of Washington in front of ███████████, Jordan struck the relative in the face, produced a .40 caliber semi-automatic pistol, fired one shot in the air, and secreted the weapon inside of ███████████. The spent .40 caliber shell casing was recovered, which was the same make and model as the shell casings recovered from Mizell's murder, and an additional 83 live .40 caliber rounds were recovered from inside ███████████.[3] Jordan admitted to the offense during a post-<u>Miranda</u> statement, was indicted for possession of ammunition, and pled guilty to disorderly conduct. See id. 10-11.

---

[2] During the January 13, 2023 conference, the government stated that Witness 2's additional testimony that Jordan was selling approximately 20 to 30 grams of cocaine at the time of Mizell's murder was part of separate drug trafficking conduct and would be considered Rule 404(b) evidence. See Jan. 13, 2023 Status Conference Tr. 28:1-21. However, that testimony is also admissible as direct evidence to explain the development of the relationship among the co-conspirators, namely, to explain why Mizell would have recruited Jordan to assist with cocaine distribution—because he was already in the business of selling cocaine. See, e.g., United States v. Smothers, 2023 WL 348870, at *4-5 (E.D.N.Y. Jan. 20, 2023) (summarizing case law that admits evidence of drug trafficking activities prior to the start of the conspiracy to establish the background of the conspiracy and relationships among co-conspirators); United States v. Christie, 2010 WL 286617, at *1 (S.D.N.Y. Jan. 14, 2010) (admitting as direct evidence of narcotics conspiracy testimony that defendant and cooperating witness imported narcotics into the United States prior to timeframe charged in the indictment). Indeed, as outlined in the Supplemental Motion, testimony from Witness 10 will establish that Mizell had previously provided Jordan with a quantity of cocaine as a "test" to see if Jordan could handle larger quantities, and that Mizell had planned to involve Jordan in the Baltimore venture in part to Jordan's reputation as a narcotics trafficker. See Supp. Mot. at 5-6.

[3] Ballistics comparison of the shell casings from Mizell's murder and the February 3, 2003 shooting determined that they were the same make and model of ammunition, but fired from different weapons.

> 3. <u>May 14, 2003 Shooting</u>: After Mizell's nephew accused Jordan of murdering Mizell in a rap song, Jordan fired several shots at Mizell's nephew, striking him once in the leg. Two .40 caliber discharged bullets were recovered from the scene. No shell casings were recovered and agents were unable to perform a ballistics comparison, as the discharged bullets were not suitable for comparison. Jordan was arrested for the shooting but it was dismissed when Mizell's nephew refused to cooperate with law enforcement. <u>See id.</u> at 11.

As discussed during the January 13, 2023 status conference, the government moves to introduce this testimony as direct evidence of Jordan's murder of Mizell using a .40 caliber firearm and/or using .40 caliber ammunition. In the alternative, the government offers this evidence under Rule 404(b) to show Jordan's access to and knowledge of .40 caliber firearms and ammunition, as well as for identity purposes.

Evidence of an uncharged crime is not considered "other act" evidence if it: (1) "arose out of the same transaction or series of transactions as the charged offense"; (2) "is inextricably intertwined with the evidence regarding the charged offense"; or (3) "is necessary to complete the story of the crime on trial." <u>United States v. Gonzalez</u>, 110 F.3d 936, 942 (2d Cir. 1997) (internal quotations); <u>see</u> <u>United States v. Carboni</u>, 204 F.3d 39, 44 (2d Cir. 2000). Here, the defendants are charged with the murder of Jason Mizell, and specifically in Count Two, with using one or more firearms to murder Mizell. The government's theory is that Jordan used a .40 caliber firearm and .40 caliber ammunition to shoot and murder Mizell, while Washington held the receptionist at gunpoint with a firearm or pellet gun and blocked the studio exit.

The recovery of a .40 caliber shell casing during the February 3, 2003 Shooting that matched the make and model of the shell casing used in Mizell's murder, committed only months prior, is "inextricably intertwined with the evidence regarding the charged offense" of Mizell's murder. <u>Gonzalez</u>, 110 F.3d at 942; <u>see, e.g.</u>, <u>United States v. Robinson</u>, 560 F.2d 507, 512 (2d Cir. 1977) (admitting evidence of defendant's possession of a gun similar to that used in an earlier robbery). Similarly, the fact that Jordan, again, used a .40 caliber firearm during the May 14, 2003 Shooting in which the discharged bullets matched the caliber of the firearm used to murder Mizell is also probative for the same reason.[4]

Witness 2's testimony that a firearm of the same caliber as the murder weapon was kept in a van and that that firearm was not in said van at the time of Mizell's murder, explains the whereabouts of the murder weapon and Jordan's access to it. <u>See</u> <u>United States v. Riccardi</u>, 620 F. App'x 11, 14-15 (2d Cir. 2015) ("The government's theory at trial was that Riccardi supplied the guns used in the robbery . . . . Thus, Riccardi's later possession of guns and ammunition in his home was direct evidence supporting this theory."); <u>United States v. Ashburn</u>, 2015 WL 136098, at *4 (E.D.N.Y. Jan. 9, 2015) (the later recovery of firearm that matched the firearm from the murder "clearly constitute[d] circumstantial proof of [defendant]'s involvement in a charged crime [of murder]"); <u>cf.</u> <u>United States v. Marmolejas</u>, 112 F. App'x 779, 783 (2d

---

[4] Moreover, the context of this shooting is significant—Jordan shot the victim's nephew with the .40 caliber firearm after the nephew produced a rap song that accused Jordan of murdering Mizell. <u>See</u> Mot. at 11.

3

Cir. 2004) (guns recovered from defendant's van after the murder supported the government's theory that defendant was a hitman).

    B.    <u>Rule 404(b)</u>

The government seeks to offer the following incidents as evidence of defendants' access to and knowledge of firearms, ammunition and narcotics, Jordan's identity as the shooter with the .40 caliber firearm, to explain the relationship between the defendants and among co-conspirators, and to corroborate key prosecution witnesses:

1. <u>August 9, 2002 Robbery:</u> Washington committed a gunpoint robbery in Hollis, Queens, New York. The .40 caliber shell casing was recovered, which was a different make and model than the casing recovered from the scene of Mizell's murder. See Mot. at 9.

2. <u>Fall 2002 Washington's Pellet Gun:</u> Witness 2 will testify that Washington stole a pellet gun from him that Witness 2 believed Washington used to commit robberies; Witness 1 will provide corroboration, testifying that Witness 1 observed Washington procure a pellet gun from Witness 2 a day or two prior to Mizell's murder. The pellet gun was recovered by officers in December 2002 incident to Washington's arrest for an armed robbery. Furthermore, Witness 2 will testify that he/she saw Washington with firearms on numerous occasions around the time of Mizell's murder. See id. A witness will testify that Washington held a receptionist at gunpoint with a real or imitation pistol at the time of Mizell's murder. See Jan. 13, 2023 Status Conference Tr. 46:4-5.

3. <u>Fall 2002 & January 2003 Stash House:</u> Witness 4 will testify that a Mutual Associate of Jordan, Washington and Coconspirator 1 resided at ▮▮▮▮▮▮, which was also used by neighborhood narcotics traffickers in 2002 and 2003 as a location to, <u>inter alia</u>, exchange firearms. Witness 4 will testify that Jordan and Coconspirator 1 frequented that address in 2002 and 2003. Witness 1 will testify that Washington visited ▮▮▮▮▮▮ in the days preceding Mizell's murder in 2002.[5] See Mot. at 9-10.

    In or about January 2003, Witness 4 observed the Mutual Associate and other individuals in possession of firearms at ▮▮▮▮▮▮, including a .40 caliber handgun that he/she observed on the kitchen table. Witness 4 had also

---

[5] The government moves to admit this paragraph—the 2002 portion of the testimony—as direct evidence of narcotics trafficking as it explains the relationship between the coconspirators and is inextricably interwoven with the charged crime and is necessary to complete the narrative, as described further in footnote 2. See supra. In the alternative, the government moves to admit this portion of the testimony pursuant to Rule 404(b) because it demonstrates the defendants' access to firearms by virtue of their visits to that address.

    seen Coconspirator 1 in possession of a firearm on at least one occasion.  See id. at 10.

4. <u>December 2004 Jordan's Firearms & Subsequent Search</u>:  In or about December 2004, Witness 5 resided at ▮▮▮▮▮▮▮▮ with Jordan. Witness 5 will testify that Jordan used the van parked outside of ▮▮▮▮▮▮ to secrete narcotics and firearms—like Witness 2's testimony about that van being used to hold firearms, including a .40 caliber firearm, around the time of Mizell's murder in 2002.  As outlined in the Supplemental Motion, Jordan made several incriminating statements in Witness 5's presence regarding Jordan's participation in Mizell's murder.  See Supp. Mot. at 4-5.  Witness 5 will further testify that Witness 5 observed Jordan threaten an individual with a gun and to kill the individual like he did Mizell—an event that prompted Witness 5 to contact law enforcement and report Jordan's gun possession and narcotics trafficking.  Following controlled purchases of narcotics from Jordan by law enforcement, a December 15, 2004 search of ▮▮▮▮▮▮▮▮ recovered two loaded firearms (not .40 caliber), a loaded 9mm magazine, a bulletproof vest, cocaine, marijuana and glassine envelopes used for packaging narcotics.  See Mot. at 11-12.

<u>First</u>, in response to the Court's question during the January 13, 2023 status conference, the government intends to offer some of this evidence during its case-in-chief as to Jordan.

Jordan intends to present an alibi defense and argue that he was not the shooter because he was at another individual's home at the same time as Mizell's murder.  See ECF No. 67 (notice of alibi defense).  Where a defendant disputes committing the alleged crime, evidence to prove the defendant committed the crime may be offered during the government's case-in-chief.  See <u>United States v. Dore</u>, 2013 WL 3965281, at *10 (S.D.N.Y. July 31, 2013) (Sullivan, J.) (where defendant disputed committing the crimes, admitting rap video showing staged armed robbery to establish identity and common scheme); see also <u>United States v. Figueroa</u>, 618 F.2d 934, 939 (2d Cir. 1980) ("If the evidence is offered to prove that the defendant committed the act charged in the indictment, for example, by proving identity or common scheme, the evidence may be offered during the prosecution's case-in-chief, unless the defendant's commission of the act is not a disputed issue.").  The testimony regarding Jordan's possession of a .40 caliber firearm and ammunition is offered to establish his identity as the individual who murdered Mizell with a .40 caliber firearm and .40 caliber ammunition.  Should Jordan also challenge that he was unable to procure a firearm, ammunition or narcotics, or lacked a reason to have or was unfamiliar with these items, the government would also seek to admit the evidence pertaining to his opportunity to access and his knowledge of firearms, ammunition and narcotics.  See, e.g., <u>United States v. Taylor</u>, 767 F. Supp. 2d 428, 438 (S.D.N.Y. Dec. 1, 2010) (admitting defendant's prior possession of firearms in connection with another offense to show knowledge and intent to use a firearm during a charged robbery and opportunity to access firearms); <u>United States v. Bailey</u>, 800 F. App'x 35, 37 (2d Cir. 2020) (affirming district court's

admission of victim testimony about armed robbery during case-in-chief to show access to firearms and identity of the person who carried firearms).[6]

Moreover, even Rule 404(b) evidence not challenged by a defendant may be admissible during the case-in-chief as background information for the events alleged in the indictment. See United States v. Townsend, 2007 WL 1288597, at *6 (S.D.N.Y. May 1, 2007), aff'd sub nom. United States v. Mercado, 573 F.3d 138 (2d Cir. 2009) (reserving whether to admit Rule 404(b) evidence for intent or knowledge purposes, but admitting same evidence as "relevant background information"); United States v. Pipola, 83 F.3d 556, 566 (2d Cir. 1996) (admitting Rule 404(b) evidence "to explain how a criminal relationship developed; this sort of proof furnishes admissible background information in a conspiracy case. Such proof may also be used to help the jury understand the basis for the co-conspirators' relationship of mutual trust"); Christie, 2010 WL 286617, at *1 (admitting prior narcotics trafficking under Rule 404(b) to "show the existence, nature, and development of the criminal relationships among the co-conspirators"). For example, the government expects that: Witness 1 will testify Jordan and Washington hung out together in 2002; Witness 2 will testify that he/she knew both Jordan and Washington, that Jordan was selling cocaine and carried a firearm at the time of Mizell's murder in 2002, and that he/she saw Washington with firearms at the time of Mizell's murder; Witness 4 will testify that Jordan and Coconspirator 1 frequented ▇▇▇▇▇▇▇ in 2002 and 2003; and Witness 1 will testify that Washington also visited ▇▇▇▇▇▇▇ in the days preceding Mizell's murder—placing the three co-conspirators at the same drug and firearm stash house around the time of Mizell's murder. The relationship between the defendants is further corroborated by Jordan's own post-arrest statement that he knew Washington and that Washington asked him to commit "shootings and robberies" with him.

The contours of Washington's defense remain unknown. The government would move to admit the Rule 404(b) evidence should it become apparent that Washington's defense intends to challenge opportunity and knowledge, or other potentially relevant issues listed in Rule 404(b). See Fed. R. Evid. 404(b) (admitting evidence to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident"). That said, "as the Second Circuit has made clear, if a defendant seeks to exclude evidence because it is probative of issues not in dispute, the defendant has an obligation to inform the court of this fact both with 'sufficient clarity' and at the appropriate time." Dore, 2013 WL 3965281, at *10; see Figueroa, 618 F.2d at 942 ("When the Government offers prior act evidence to prove an issue, counsel must express a decision not to dispute that issue with sufficient clarity that the trial court will be justified (a) in sustaining objection to any subsequent cross-examination or jury argument that seeks to raise the issue and (b) in charging the jury that if they find all the other elements established beyond a reasonable doubt, they can resolve the issue against the defendant because it is not disputed.").

---

[6] See also United States v. Bailey, No. 16-CR-396 (S.D.N.Y. Sept. 1, 2017), ECF No. 427 at 6-7 (gov't motion in limine reply describing opportunity and identity); id. (Aug. 22, 2018 Trial Tr.), ECF No. 671 at 387:8-404:11 (eliciting trial testimony about defendant's commission of an armed robbery on direct) ond 424:5-162 (summarizing 404(b) evidence elicited on direct).

Second, in addition to evidence of opportunity and knowledge, the government moves to admit these other acts "for corroboration purposes, provided that the corroboration is direct and the matter corroborated is significant." United States v. Williams, 577 F.2d 188, 192 (2d Cir. 1978); see Mot. at 18, 20-21. The matter corroborated here—the defendants' possession of firearms and ammunition, access to firearms, access to narcotics and Jordan's own possession of narcotics—is significant.

With respect to Witness 5's testimony about Jordan's possession of firearms in his residence and his van in December 2004 and the subsequent search, such testimony serves to corroborate Witness 2's testimony about firearms in the van at the time of Mizell's murder. As described herein and in the Motion, Witness 2 will testify that, around the time of Mizell's murder in 2002, he/she and Jordan secreted firearms in a van parked outside Jordan's residence at ▮▮▮▮▮▮▮▮▮▮, that a .40 caliber firearm used to be hidden in that van and that the firearm went missing around the time of Mizell's murder. See Mot. at 9. Witness 5 will similarly testify that Jordan kept firearms at the same residence and in the van outside, but occurring in or about December 2004, and also that Jordan threatened an individual with a gun and stated in substance that he would kill him/her like he had killed Mizell.[7] See id. at 11-12; Supp. Mot. at 4-5. Moreover, the search of ▮▮▮▮▮▮▮▮▮▮ on December 15, 2004 that recovered firearms and narcotics further corroborates both Witness 2 and Witness 5's testimony that Jordan possessed firearms and narcotics. The Second Circuit has held that corroboration of government witnesses is an appropriate, non-propensity purpose for admitting other acts evidence. See, e.g., United States v. Everett, 825 F.2d 658, 660-61 (2d Cir. 1987) ("Under Rule 404(b) evidence of 'other crimes' has been consistently held admissible to corroborate crucial prosecution testimony.") (citations omitted); accord United States v. Scott, 677 F.3d 72, 81 (2d Cir. 2012).

Third, with respect to the testimony about ▮▮▮▮▮▮▮▮▮▮, that testimony is critical to understanding how the defendants would have had access to guns at that location by explaining the relationships amongst the defendants and individuals selling narcotics, specifically through Witness 4's testimony that ▮▮▮▮▮▮▮▮▮▮ was used as a location to exchange firearms, that Jordan and Coconspirator 1 frequented that address in 2002 and 2003 and that Witness 4 saw firearms at that location in 2003, and Witness 1's testimony that Jordan and Washington were associates and that Washington also visited that same location days before the murder. See Mot. at 19-21.

In conspiracy cases, "other acts" evidence may be admitted under Rule 404(b) "to inform the jury of the background of the conspiracy charged, to complete the story of the crimes charged, and to help explain to the jury how the illegal relationship between the participants in the crime developed." United States v. Pitre, 960 F.2d 1112, 1119 (2d Cir. 1992) (affirming admission under Rule 404(b) of testimony of two co-conspirators regarding heroin transactions between them and the defendant in order to elucidate the relationship among the conspirators);

---

[7] Testimony about Witness 5's relationship with Jordan—first as a narcotics purchaser and later as a facilitator who steered customers to Jordan and drove Jordan to resupply—will also be essential context for the jury to understand why Jordan would make incriminating statements about Mizell's murder in front of and to Witness 5. See Supp. Mot. at 4-5 (moving to admit Jordan's inculpatory statements made to Witness 5 in 2004).

7

United States v. Roldan–Zapata, 916 F.2d 795, 804 (2d Cir. 1990) (affirming admission of Rule 404(b) evidence of prior cocaine transactions between co-conspirator and defendant where testimony about their pre-existing relationship "furthered the jury's understanding of how the instant transaction came about and their role in it").

Additionally, the Second Circuit has also upheld the introduction of evidence of other acts dissimilar to the charged conduct, where the evidence would nevertheless establish "the development of the relationship" and "the basis for the trust" between co-conspirators. United States v. Mercado, 573 F.3d 138, 141 (2d Cir. 2009) (affirming admission of 404(b) evidence of prior gun sales between defendant and co-conspirator to provide background for crack cocaine conspiracy alleged in the indictment); see United States v. Williams, 205 F.3d 23, 33-34 (2d Cir. 2000) (affirming admission under Rule 404(b) of evidence of defendant's participation with two co-conspirators in marijuana deal, credit card fraud, and the filing of false assault charges as relevant background information for subsequent cocaine conspiracy charges).

Fourth, the seized firearms evidence in 2002 and 2004 are also admissible as evidence of "tools of the trade" in the charged narcotics conspiracy in 2002 and the uncharged narcotics activity in 2004, respectively. United States v. Muniz, 60 F.3d 65, 71 (2d Cir. 1995). The Second Circuit has "long recognized the connection between drug trafficking and firearms, repeatedly permitting firearms into evidence as proof of narcotics conspiracies because drug dealers commonly keep firearms on their premises as tools of the trade." United States v. Mitchell, 328 F.3d 77, 83 (2d Cir. 2010); accord United States v. Vegas, 27 F.3d 773, 778 (2d Cir. 1994); see also United States v. Soto, 959 F.2d 1181, 1187 (2d Cir. 1992) ("[F]irearms are as much tools of the [narcotics] trade as are commonly recognized articles of narcotics paraphernalia."); Roldan–Zapata, 916 F.2d at 804 (testimony regarding seizure of revolver properly admitted under Rule 404(b) as tool of narcotics trade). Nor does the government have to introduce evidence directly connecting the firearms and the narcotics trafficking for the firearms to be admissible as evidence of that trafficking. See United States v. Woolaston, 2020 WL 91488, at *11 (S.D.N.Y. Jan. 7, 2020) (Nathan, J.), aff'd, 2022 WL 905404 (2d Cir. Mar. 29, 2022) (rejecting argument that government must link recovered firearms to drug trafficking). "Rather, the firearms are themselves standalone evidence of the existence of the narcotics conspiracy." Id.

The seized ammunition and testimony about the defendants' possession of and access to firearms and ammunition in 2002 is evidence of their narcotics trafficking at that time, as will also be corroborated by witness testimony about their involvement in the charged narcotics conspiracy at that time. Similarly, the seizure of firearms, ammunition and narcotics from Jordan's residence in 2004 is evidence of his narcotics trafficking two years after Mizell's murder. And as stated supra at 7, the probative value of the testimony about firearms and narcotics in Jordan's van and the evidence seized in 2004 is that it corroborates testimony that Jordan kept firearms and narcotics in his van in 2002.

Fifth, incidents that post-date charged conduct are still admissible as Rule 404(b) evidence. See United States v. Germosen, 139 F.3d 120, 128 (2d Cir. 1998) ("The fact that the evidence involved a subsequent rather than prior act is of no moment. 'Subsequent act' evidence may be admitted under Rule 404(b)."). Indeed, the Second Circuit has upheld the admission of evidence concerning other act evidence that occurred months, even years, after the charged

8

conduct. See United States v. Arroyo, 600 F. App'x 11, 13-14 (2d Cir. 2015) (seven months); see also Riccardi, 620 F. App'x at 14-15 (admitting guns and ammunition recovered one year after charged robbery, including guns that matched the caliber used in the robbery); United States v. Ramirez, 894 F.2d 565, 568-69 (2d Cir. 1990) (allowing evidence of narcotics involvement nine months after the charged offense to show knowledge of contraband possession); United States v. Rutkoske, 506 F.3d 170, 178 (2d Cir. 2007) (approving the admission of other act evidence occurring four years after the events at issue to show knowledge where the charged and later uncharged fraud schemes were similar).

II.  Witness Intimidation and Threats as Consciousness of Guilt

The government moves to admit instances of witness intimidation and threats as consciousness of guilt, specifically as to Witnesses 1, 2 and 7. See Mot. at 26-32.

The government would also seek to admit these statements, as well as Witness 6's fear, to rehabilitate witnesses should that become necessary. See United States v. Panebianco, 543 F.2d 447, 455 (2d Cir. 1976) (affirming introduction where "the evidence of the threats served to rehabilitate the witness by supplying a justification for her actions at the time"); Bohan v. Kuhlmann, 234 F. Supp. 2d 231, 269 (S.D.N.Y. 2002), aff'd, 66 F. App'x 277 (2d Cir. 2003) (noting the "federal law that allows redirect testimony about subjective fears where 'cross-examination has been used to elicit an incomplete picture which gives a distorted impression of a witness's credibility'") (quoting Panebianco, 543 F.2d at 455); see also Fed. R. Evid. 801(d)(1)(B).

A.  Witness 6's Fear of Jordan and Jordan's Father

Witness 6 has repeatedly refused to cooperate with law enforcement during the investigation due to fear of Jordan and Jordan's father.[8] Recently, in September 2020, Witness 6's attorney told the government that Witness 6 was afraid of Jordan's father; this statement was repeated in a meeting with Witness 6 to which Witness 6 responded by nodding vigorously in the affirmative. Indeed, in a November 23, 2020 jail call, Jordan states that Witness 6 "put me at the scene" and discusses Witness 6 and other possible witnesses implicating Jordan. Witness 6, again, told the government in 2021 that Witness 6 was afraid of Jordan's father. Witness 6 said he/she only had two options: cooperate and be killed, or not cooperate and lie at trial. In fact, Witness 6 has told the government that after Mizell's murder, Witness 6 immediately left New York because the people who murdered Mizell were close to Mizell and Witness 6 wanted to "escape." Witness 6 said that if Witness 6 cooperated, Witness 6 thought he/she would be killed.

---

[8] In addition, the government moves to introduce Witness 6's statements about his/her fear in order to explain his/her refusal to cooperate, pursuant to Rule 803(3). See United States v. Quinones, 511 F.3d 289, 309 (2d Cir. 2007) (admitting statement to "establish[] [the witness]'s then-fearful state of mind, which explained [the witness]'s future actions").

9

B.  Intimidation of Witness 1 by Jordan, Jordan's Father and Washington

In 2003, a group of individuals who Witness 1 described as the "Hollis Crew," which included Jordan, his father and Coconspirator 2 (a co-conspirator in Mizell's homicide), encircled and confronted Witness 1. Jordan's father asked Witness 1 what he/she had told police about the murder; said, "What goes on in Hollis, stays in Hollis"; called Witness 1 a "snitch"; and reminded Witness 1 that he knew where Witness 1's family lived. There is no innocent explanation for why Jordan's father, standing with Jordan, would remind Witness 1 that he knew where Witness 1 lived immediately after asking Witness 1 what she had said to the police about Mizell's murder—that reminder, in Jordan's presence, was undoubtedly meant to frighten Witness 1 in connection with providing information he/she possessed to law enforcement regarding the murder.[9]

Since 2006, Washington has also repeatedly and persistently threatened Witness 1 in connection with both the instant case and during his Hobbs Act robbery trial. Witness 1, who aided and abetted robberies with Washington, testified against Washington during Washington's Hobbs Act robbery trial, United States v. White, 05-CR-558 (E.D.N.Y.). During the pendency of the case, Washington sought to intimidate Witness 1 by sending Witness 1 a letter, postmarked December 14, 2006, reading, "Happy Birthday. I Never Stopped Loving You. Strength and Honor" (the "Threat Letter").

Witness 1 testified at trial, in April 2007, that Witness 1 received the Threat Letter just "months" after signing a cooperation agreement with the government in the Hobbs Act robbery case to cooperate against Washington. Witness 1 detailed that the envelope in which the Threat Letter was sent listed "White Mark[,]" a play on one of Washington's aliases "Mark White," listed in the return address. The Threat Letter was signed with another Washington alias – "Tinard." Witness 1 further recounted that the Threat Letter was sent to Witness 1's home address approximately three days before Witness 1's birthday. Notably, Witness 1 testified that in all the years Witness 1 had known Washington, he had never wished Witness 1 a "happy birthday." In fact, Witness 1 testified that Witness 1 was unaware Washington even knew

---

[9] Moreover, in the context of forfeiture by wrongdoing, the conduct procuring a witness's unavailability "may be performed by the defendant himself or by others acting on his behalf." Perkins v. Walsh, 2006 WL 3498285, at *2 (E.D.N.Y. Dec. 5, 2006) (denying habeas challenge where witness received calls threatening to kill him and his family if he testified that originated from payphones and the investigation had not discovered who placed the calls); cf. United States v. Miller, 116 F.3d 641, 668 (2d Cir. 1997) (Rule satisfied if defendant was involved in the death of the witness through "knowledge, complicity, planning or in any other way," including "[b]are knowledge of a plot to kill and a failure to give warning") (quoting United States v. Mastrangelo, 693 F.2d 269, 273 (2d Cir. 1982)); Breazil v. Superintendent Artis, 2015 WL 9581816, at *7 (E.D.N.Y. Dec. 30, 2015) ("[T]he Second Circuit has suggested that a defendant's mere knowledge of efforts undertaken by others on his behalf plus a failure to report them is a sufficient basis to warrant forfeiture by misconduct."); Geraci v. Senkowski, 23 F. Supp. 2d 246, 258 (E.D.N.Y. 1998), aff'd, 211 F.3d 6 (2d Cir. 2000) (stating "the fact that efforts to buy [the witness]'s silence (as opposed to obtaining it by intimidation) were attributed to the petitioner's uncle did not require a trial judge to ignore them").

10

Witness 1's birthday. Finally, Witness 1 testified that Witness 1 interpreted the phrase, "strength and honor[,]" contained in the Threat Letter to mean that Witness 1 should "be strong and have honor to the streets . . . [to] just be quiet." Witness 1 said the Threat Letter caused him/her to be "scared," particularly given Washington's reputation for violence and the fact that Witness 1 had observed Washington commit numerous armed robberies and other acts of violence.

The timing of the Threat Letter was relevant and admissible evidence at Washington's first trial; however, it is also relevant to the murder of Mizell. At the time the Threat Letter was sent, not only had Witness 1 supplied law enforcement information on Washington's robberies, but Witness 1 had also disclosed Washington's admissions relating to other very serious acts of violence, including Mizell's murder. More specifically, Witness 1 had already told law enforcement:

- Washington admitted to being involved in the killing of Mizell.

- Coconspirators of Washington in the Mizell murder had approached Witness 1 in regard to Mizell's murder and told Witness 1 that Witness 1 should not cooperate with law enforcement. Further, Witness 1 stated that the coconspirators pointed out that they knew where a family member of Witness 1 resided. Witness 1 understood this to mean that if he/she cooperated with law enforcement Washington's coconspirators in the Mizell murder would hurt his/her family.

- 

- 



Indeed, Washington had significant reasons to be concerned that Witness 1 would implicate him in                                                              Moreover, Washington knew he was being investigated for Mizell's murder at the time he sent the Threat Letter. Prior to sending the Threat Letter, law enforcement had spoken to Washington about Mizell's murder on at least two occasions, in March 2003 and June 2006. The Threat Letter was relevant and admissible in Washington's first trial and remains relevant and admissible in the murder of Mizell.

More recently, Washington has also had third parties reach out to Witness 1 on Washington's behalf. In recorded phone conversations, Washington has instructed a third party (the "Third Party") to reach out to Witness 1, including over the Facebook platform.

For example, in a recorded phone conversation on December 1, 2020, Washington asked the Third Party to "look someone up on Facebook real fast" and then stated and spelled Witness 1's first and last name. The Third Party responded that he "just did it [looked up

---

10

Witness 1]," and Washington asked, "can you tell where [Witness 1] is at? Like are they still in New York? Do they show a picture of [Witness 1]?" Washington later asked, "could you get in touch with [Witness 1]?" When the Third Party responded in the affirmative, Washington asked the third party to "holler at [Witness 1] for me, aight? . . . how soon would it take you to get an answer back . . . could you holler at [Witness 1] today?" The Third Party agreed.

Indeed, that same day, on December 1, 2020, the Third Party sent a Facebook message to Witness 1, "Hey," which Witness 1 reported to law enforcement. The profile page, with the username ▆▆▆▆▆▆▆▆ contains a picture of the Third Party, and records from Facebook list the contact phone number as being the same one used by the Third Party in the aforementioned call with Washington. Indeed, on December 3, 2020, Washington told the Third Party he needed to talk to him "face to face" and asked the Third Party "how about [Witness 1] you ever message [them] for me?" The Third Party said that he had, but that he received no answer.[11] Washington attempted to minimize possible ramifications for this, telling the Third Party on August 31, 2021 that reaching out to witnesses "wouldn't be to no benefit of mine" because if "[they] go back and tells them people [law enforcement] that you approached them, that's tampering with witnesses . . . just wish [them] the best . . . I wish them all the best."

More recently, on or about April 3, 2022, Witness 1 received a Facebook message from an unknown user with the profile name ▆▆▆▆▆▆▆▆ asking "Hello this is [Witness 1]?" The message was immediately followed by a request that Witness 1 add ▆▆▆▆▆▆▆▆ as a contact and featured a photograph of two wolves eating a bloody animal carcass. When Witness 1 did not respond to the posting, the following day, ▆▆▆▆▆▆▆▆ wrote "Hey it's tinard I'd like to talk."[12] Witness 1 viewed this series of communications as threatening and contacted law enforcement to report the messages. Per records from Facebook, the ▆▆▆▆▆▆▆▆ contained minimal subscriber information that did not resolve to any actual person, address or phone number.

C.   Intimidation of Witness 7 by Jordan

At Mizell's funeral, Jordan and two other individuals approached Witness 7 and repeatedly asked Witness 7 if Witness 7 knew who shot Mizell in a threatening manner. Based on this interaction, Witness 7 believed that Jordan was attempting to intimidate him/her and determine if Witness 7 had recognized Jordan during the murder. Witness 7 was frightened and told Jordan that he/she had not seen who shot Mizell. Shortly thereafter, while still at the funeral, Witness 7 relayed to Witness 13 that Jordan had just threatened Witness 7. According to Witness 13, Witness 7 was visibly shaken and said that "Jordan walked up to [Witness 7] at the

---

[11] In the same call, Washington questions the Third Party extensively about other witnesses, including defendant Jordan's ["Noid's"] noticed alibi witnesses, complaining that one of the alibi witnesses is "in my [Washington's] paperwork . . . I know [his/her] shit is in there" and planning to testify against Washington, calling it "indefensible." The Third Party confirmed that he spoke to the alibi witness and that this was not the case—that the witness had "only spoken to the feds" to say that "Noid . . . wasn't there." Washington has repeatedly asked third parties to contact this same alibi witness in other calls.

[12] As stated above, "Tinard" is one of Washington's aliases.

12

funeral and said to [him/her] in front of [his/her] mother, [Witness 7], who the F killed Jay" and "Little D said I will kill you and this your mother, I'll kill you and your mother. Watch what you say." Witness 13 also said that later on, Witness 7 "wanted to go talk to Little D and tell Little D that [Witness 7] won't tell on him [to law enforcement]. That's how afraid [Witness 7] was."

    D.    <u>Intimidation of Witness 2 by Jordan and Washington</u>

In recorded jail conversations, both Jordan and Washington have repeatedly speculated about the possible witnesses who will testify against them and who may be cooperating. Specifically, both Jordan and Washington have discussed possible damaging testimony that Witness 2 could provide at trial and have taken steps to prevent Witness 2 from testifying.

The jail calls about Witness 2 and their timeline are consistent with Witness 2 being intimidated from testifying. For example:

- On September 17, 2020, Witness 2 was interviewed by the government with an attorney present. Witness 2 provided extensive information about Jordan and Washington, including that Washington obtained a pellet gun from Witness 2 around the time of the murder—which is corroborated by Witness 1—and that Witness 2 and Jordan kept narcotics and a .40 caliber firearm secreted in a dilapidated van, and that the .40 caliber firearm went missing shortly before Mizell's murder.

- In a series of calls between September 1, 2020 and September 29, 2020, Jordan repeatedly asks the a counterparty with whom he discussed Witness 6 to do a three-way call and dial in additional parties. Jordan discussed how he has heard "rumors" about Witness 2 and repeatedly asked who has seen or spoken to Witness 2.

- On or about October 19, 2020, the government was informed that Witness 2 refused to speak to the government again, would refuse to testify, and would deny that the interview had ever taken place if called as a witness.

- In an October 24, 2020 call, Washington said on a jail call that "[Witness 2] is in the building . . . everybody talking." Washington spells out Witness 2's first and last name so it can be determined if Witness 2 has been arrested or is in custody.

- In an October 28, 2020 call, Washington instructed Coconspirator 2 to get Witness 2 on a "three way call."

- In a November 7, 2020 call, Jordan stated to a counterparty that Witness 2 is "wilding again," insinuating that Witness 2 is cooperating with the government. The counterparty tells Jordan that Witness 2's family is "fucked up" by "the jack up [Witness 2's arrest]" and that Witness 2 may drag them in to something.

- In a February 10, 2021 call, Jordan and the counterparty discuss Witness 2 being in "paperwork" for another case, indicating that Witness 2 is cooperating with law enforcement, and noting that Witness 2's "statement" to law enforcement regarding Jordan and others has been seen by multiple people.

13

- In a February 22, 2021 call, Jordan asked an associate if Jordan's lawyers would be contacting him today. Jordan then inquired about several possible witnesses, including using a pseudonym for Witness 2. Jordan instructed the associate to put $50 on Witness 2's commissary account.

- In a February 24, 2021 call, Jordan stated that he thinks Witness 2 is the "informer." Jordan discusses how Witness 2 is "dumb" and that "they [law enforcement] lied to [him/her] and forced [him/her] to say something," and that "[he/she]'s so stupid . . . [he/she]'s always been stupid. [He/She] don't know or [he/she] probably don't like me no more, so [he/she] probably don't care."

- In a March 21, 2021 call, Jordan's associate reported to Jordan that "shit looking like [Witness 2] is a liar . . . the worst type [a cooperator]. . . trying to figure it out now":

    Associate: "Shit lookin' like [he/she] is a liar.."
    Jordan: "yea but everybody is a liar, man"
    Associate: "But this is the worst type"
    Jordan: "Damn…ah man"
    Associate: "The worst type, yea. Not for sure yet but trying to figure it out now."

- In an April 20, 2021 call, Jordan asked, "is [Witness 2] still sizzling?" suggesting that Witness 2 was not faring well in prison and was at risk of cooperating to obtain release. The counterparty remarked that he "had no idea" but "there is a lot going on."

- In a June 19, 2021, Jordan asked if anyone had spoken to Witness 2, and on August 4, 2021, Jordan is told by the same counterparty that "the lawyer spoke about [Witness 2]" and that "its [him/she] [cooperating]" for "one part of the case, but for the other he's not sure." Jordan responds that he will pray on it and that its going to fix itself.

Per other recorded jail calls, Jordan uses one individual as a go-between himself and an associate incarcerated for murder in a state facility (the "State Inmate"), primarily to share information about Witness 2's possible cooperation in the instant case. For example, in a May 26, 2021 call, Jordan asked the individual "what up with [Witness 2]" and asked the individual to say hi to the State Inmate. The individual then asked Jordan if he got the State Inmate's last message, and Jordan confirmed that he had.

Notably, in the State Inmate's email communications, Witness 2 is frequently mentioned as being a cooperating witness against Jordan and the State Inmate, who Witness 2 has implicated in an unrelated murder. On July 14, 2021 alone, the State Inmate sent at least nine emails to different people discussing Witness 2's possible cooperation with law enforcement in the instant case and in the unrelated murder. For example:

- In one July 14, 2021 email, the State Inmate refers to Witness 2 making "some shit up about me 2 so [he/she] could try n save [him/her]self especially after that [he/she] did to [Jordan] . . . if [he/she]'ll throw [Jordan] under the bus then I shoudve known."

- In another email on July 14, 2021, the State Inmate wrote that "[Witness 2] was doing some bullshit b4 n i didn't wanna believe them but 4 them 2 come at me with some

14

      bullshit like that [be approached by law enforcement] [he/she]'s 4sure n there just tryna do any and everything possible 2 save [him/her]self."

- In still another email on July 14, 2021, the State Inmate explicitly referenced Witness 2's possible testimony in the instant case, writing "I know 4 a fact this n-gga [Witness 2]. . . is tryna put my name n some bullshit 2 try n save [him/her]self from the time [he/she]'s facing cause [he/she]'s 2 weak 2 do [his/her] own time smh from what i heard [he/she] already agreed 2 testify against [his/her] own brother [Jordan] for that jmj shit which is a total lie."

      These calls, however, represent only jail calls, which inmates are warned are recorded. The evidence reveals that defendants have had access to contraband cellphones while in custody: Jordan was found in possession of a contraband cellphone in August 2021, as was his cellmate on October 25, 2022, and Washington's jail calls also indicate that he had a contraband cellphone while in custody. Access to contraband phones has provided the opportunity for the defendants or their associates to engage in witness interference.

      The frequency, tenor and content of these jail communications evince more than simply idle chatter about the case. Combined with Witness 2's complete reversal about speaking with the government or testifying, the evidence—including Jordan's reference to Witness 2 with a pseudonym and subsequent instruction to put money on Witness 2's commissary account; discussions between Jordan and his associate about Witness 2 cooperating and "trying to figure it out now"; and statement indicating that there is "a lot going on" behind the scenes—indicates that Witness 2 has been intimidated from testifying. Cf. Breazil, 2015 WL 9581816, at *7 ("Intimidation is rarely carried out face to face, especially when the intimidator is in custody, and even the agents of the intimidator rarely expressly state that they are agent acting on the intimidator's behalf.").

### III.    "Aim for the Head" Music Video and Rap Lyrics

      During the January 13, 2023 status conference, the Court afforded the government the opportunity to provide further detail about the factual nexus between the crimes charged and the lyrics in the music video, "Aim for the Head." [13] See Jan. 13, 2023 Status Conference Tr. 66:8-68:24.

      Jordan has specifically claimed the authenticity of his music by proclaiming that what makes him different from other rappers is that he "can speak on real life experiences." In a publicly available interview uploaded to YouTube in 2012 in which Jordan discusses his music, he states that, "I can speak on real life experiences, and I can make em make sense. I'm not just, like, you know a drug-dealer rapper or a gangster killer rapper, I rap about reality. So that's what you hear coming through my music, what I'm going through, or what I've been through."

---

[13] The government supplements information only about the admissibility of the "Aim for the Head" music video and lyrics, and not Jordan's interview which the government has also moved to admit under Rule 801(d)(2)(A)—a publicly-available videotaped interview where Jordan states, "the motto for 2010 is aim for the head, no body shots…that don't count…ya'll n-ggas that shoot n-ggas in the legs, the stomach and all that, we ain't respecting that." See Mot. at 35-36.

15

By his own admission, Jordan raps about his own real-life experiences, and his raps include lyrics about murdering individuals by shooting them in the head. See United States v. Carpenter, 372 F. Supp. 3d 74, 77 (E.D.N.Y. 2019), aff'd, 2022 WL 16960577 (2d Cir. Nov. 16, 2022) (admitting lyrics where defendant admitted in an interview that "every single thing I'm talking about, I've been through it").

In the music video "Aim for the Head," which was uploaded by Jordan's rap group "Rich Fly Gee$" to Reverbation in 2011,[14] Jordan raps that he aims only for head shots, which ensures that "the body drop[s]." Specifically, the lyrics stated, "Look at what you made me do. We aim for the head, no body shots, and we stick around just to see the body drop" and "I aim for the head, I ain't a body shooter." The government's theory is that the defendants murdered Mizell after he cut them out of a narcotics transaction that later went wrong—the lyrics refer to murder in response to what someone "made [Jordan] do." The music video cycles between images of firearms, crime scene officers carrying body bags, and extremely graphic images of individual men laying on the ground with gunshot wounds to their heads or faces.[15] The music video also shows various kinds of firearms, including Heckler & Koch USP and SIG SAUER brand firearms; although the caliber of the firearms is not identifiable in the video, those brands manufacture .40 caliber firearms, among others. Finally, the lyrics make reference to using a Glock, which is one of the brands of firearms that an ATF firearm examiner concluded has general rifling class characteristics like those present on the .40 caliber bullet and bullet fragment recovered from Jordan's May 14, 2003 shooting.[16]

In United States v. Wilson, 493 F. Supp. 2d 460, 462 (E.D.N.Y. 2006), the court admitted rap lyrics in which the defendant rapped those who wished to "test" him need to be armed with a Glock firearm and bulletproof vest (equipment commonly used by police officers), and he bragged about shooting his victim in the head while "getin dat money" and about taking his victim's guns. See No. 04-cr-1016 (E.D.N.Y. Nov. 22, 2006), ECF No. 449 at 2 (gov't letter describing rap lyrics). There, the government had alleged that the defendant murdered two officers by shooting them in the head in the course of attempting to rob them and that he stole one of their firearms. See also United States v. Stuckey, 253 F. App'x 468, 482 (6th Cir. 2007) (defendant's rap lyrics relevant where they described shooting and disposal of bodies in a manner that mirrored the charged crime).

At a minimum, the government would seek to introduce excerpts of the music video and lyrics pursuant to Rule 404(b) to show knowledge of firearms and narcotics. Videos offered to show a defendant's "familiarity with firearms and the drug trade . . . are plainly relevant." United States v. Herron, 762 F. App'x 25, 30 (2d Cir. 2019). The rap lyrics demonstrate Jordan's knowledge about firearms, murder ("My gun's Benadryl"), and exposure to drugs ("Trap or die, yeah, that's the motto on my block."). See United States v. Foster, 939

---

[14] The rap video shows a photograph of Jordan posing with another individual at two minutes and 17 seconds.

[15] The government agrees that the images of the body bags and victims with gunshot wounds are gratuitous and would not be shown to the jury.

[16] A copy of the ATF firearm examinations report has been disclosed as part of the government's discovery.

F.2d 445, 456 (7th Cir. 1991) (admitting rap lyrics for limited purpose of showing defendant's "knowledge of narcotics trafficking, and in particular drug code words").

IV. Conclusion

For the reasons stated herein and in the government's prior submissions, the government respectfully requests the Court grant the Motion.

Respectfully submitted,

BREON PEACE
United States Attorney

By:       /s/
Artie McConnell
Mark E. Misorek
Miranda Gonzalez
Assistant U.S. Attorneys
(718) 254-7000

cc: Clerk of Court (LDH) (by ECF)
    All Counsel of Record (by ECF)