# MICHAEL HUESTON
ATTORNEY AT LAW

16 COURT STREET  
35TH FLOOR  
BROOKLYN, NEW YORK 11241

Tel: (718) 246-2900  
Fax: (718) 246-2903  
Email: mhueston@nyc.rr.com

ADMITTED NY

March 28, 2023

**BY ECF**  
The Honorable LaShann DeArcy Hall  
United States District Court  
Eastern District of New York  
225 Cadman Plaza East  
Brooklyn, New York 11201

Re:   *United States v. Jordan, et al.*, 20-CR-305 (S-1)(LDH)

Your Honor:

We submit this letter in opposition to the government's supplemental motions *in limine* dated February 27, 2023, wherein it again seeks to introduce specific evidence of 1) firearms and ammunition, 2) witness intimidation and tampering, and 3) rap music videos and lyrics. At the outset, for the reasons discussed in Mr. Jordan's submission dated November 9, 2022, this evidence is inadmissible, and this Court should deny the government's motion in its entirety.

**I.  Evidence Regarding Firearms, Ammunition and Drugs is Inadmissible as Direct Evidence or Pursuant to Federal Rule of Evidence 404(b)**

With respect to firearm and ammunition evidence, the government seeks to introduce the following testimony as direct evidence of the charged conduct, or in the alternative, pursuant to Rule 404(b):

1. In Fall 2002, a .40 caliber pistol was hidden in a van parked outside of Mr. Jordan's residence, that the pistol went missing around the time of Mizell's murder and that Mr. Jordan and others had access to this van;

2. On February 3, 2003, during an argument with a relative of Washington, Mr. Jordan struck the relative, produced a .40 caliber semi-automatic pistol, fired one shot in the air, and secreted the weapon inside of his residence, and;

3. On May 14, 2003, Mr. Jordan shot Mr. Mizell's nephew (based on a rap song the nephew allegedly made about Mr. Jordan committing the murder), and two .40 caliber discharged bullets were recovered from the

scene.

In addition, the government seeks to admit pursuant to Rule 404(b), evidence that:

4. In Fall 2002 and January 2003, a witness observed a "Mutual Associate" of the defendants and others in possession of firearms, including a .40 caliber handgun observed on the kitchen table in another person's residence that was frequented by Mr. Jordan and Mr. Washington, and;

5. In or about December 2004, a government witness observed Mr. Jordan use a van parked outside in Queens to hide drugs and guns; that Mr. Jordan threatened to kill a person with a gun, and; that search of that location by law enforcement resulted in the recovery of two guns (not .40 caliber), 9mm ammunition, drugs and drug paraphernalia.

Since this evidence is inadmissible under any theory, this Court must deny the government's motion in its entirety.

At the outset, the government maintains that the evidence described in its motion constitutes direct substantive proof of the charged murder. That is not so. With respect to the aforementioned criminal conduct, the government has failed to make the requisite showing that these acts were related to Mr. Jordan's participation in the crimes charged in this indictment. "The fact that the defendant may have committed similar . . . acts in close temporal proximity to the charged crimes" is not direct evidence of charged conduct where it "furnishes an element of context, but it is certainly not crucial information without which the jury will be confused." *United States v. Townsend*, No. 06 Cr. 34, 2007 U.S. Dist. LEXIS 32639, 2007 WL 1288597, at *2 (S.D.N.Y. May 1, 2007), aff'd sub nom. *United States v. Mercado*, 573 F.3d 138 (2d Cir. 2009) (internal quotation omitted). This criminal activity is not "inextricably intertwined" with the charged conduct such that it provides direct evidence of identity or the relationship of the coconspirators, or is necessary to complete the story of the charged crimes.

Further, while this criminal behavior involves conduct that may be generally similar to the conduct underlying the offenses charged in the indictment, the similarity is not so marked as to warrant admitting it as direct proof of the charged offenses. Rather, the above proffered "other acts" incidents are inadmissible under FRE 403 since the volume of evidence about guns, violence and narcotics is exceptionally prejudicial and extends the timeline of the violent allegations against Mr. Jordan. In addition, it must be noted that there is absolutely no nexus between the above-referenced .40 caliber handgun(s) and the October 2002 killing of Mr. Mizell.

The government's reliance on *United States v. Gonzalez*, 110 F.3d 936 (2d Cir. 1997), *United States v. Robinson*, 560 F.2d 507, 513 (2d Cir. 1977), *United States v. Riccardi*, 620 Fed. Appx. 11, 14, 2015 U.S. App. LEXIS 10826, *5, 2015 WL 3916101, and *United States v. Ashburn*, 2015 U.S. Dist. LEXIS 2607, 96 Fed. R. Evid. Serv. (Callaghan) 409, 2015 WL 136098 in support of its motion is misplaced.

The *Gonzalez* court concluded that the trial court properly admitted limited evidence concerning an ***attempted robbery that took place just before the defendants were arrested for possessing firearms***. The court found that, among other factors, evidence of that crime

2

"provide[d] crucial background evidence that gave coherence to the basic sequence of events that occurred on the night" of the defendants' arrests. *Gonzalez* at 942.

In *Robinson*, evidence that the defendant **possessed the same or a similar gun** – a .38 caliber handgun – ten weeks after the charged offense was held admissible under Rule 404(b) to prove opportunity and identity. *Robinson*, 560 F.2d at 513 (emphasis added).

Further, in *Ricciardi*, the district court admitted evidence that over a year after the charged robbery, law enforcement recovered one 9-millimeter firearm, one .38 caliber revolver (the same type of guns used in the robbery), and related ammunition from ***Ricciardi's residence***. *Ricciardi,* 620 Fed. App'x at 14 (emphasis added). Similarly, in *Ashburn*, the trial court admitted evidence that a .9 mm Smith & Wesson handgun was found in and seized from ***defendant's bedroom two days after the charged murder***. *Ashburn*, 2015 U.S. Dist. LEXIS 2607 at 24-30 (emphasis added).

Here, the government's proffered evidence does not provide crucial background evidence; at no time from Fall 2002 to May 2003 were firearms recovered from Mr. Jordan or seized from his residence, and Mr. Jordan's alleged possession of guns on February 3, 2003, May 14, 2003, and in December 2004, occurred well after the charged murder. While evidence that Mr. Jordan possessed firearms during the period of the charged murder, as well as in connection with any uncharged acts committed as part of the events that led up to it would be admissible, any testimony about handguns observed in the defendant's possession months and years later serves no legitimate purpose other than to leave the jury with the unduly prejudicial impression that Mr. Jordan was a danger to the community, who possessed "tools of the trade" where murder and conspiracy to commit murder are concerned. *See United States v. Marmolejas*, 112 Fed. App'x 779, 783 (2d Cir. 2004).

In sum, none of the government's proffered evidence listed above serves any legitimate purpose other than to indicate that Karl Jordan has criminal propensities and is likely to have acted in conformity therewith. This is especially true for the acts and incidents occurring after the October 2002 murder charged here. Indeed, each of the government's proffered acts, to the extent that they occurred after the October 2002 killing of Mr. Mizell, should not be admissible since they are beyond the scope of the indictment, both temporally and substantively.

**II.     The Court Should Deny Admission of Alleged Witness Intimidation and Threats as "Consciousness of Guilt"**

The government seeks to admit so-called instances of witness intimidation and threats as "consciousness of guilt" as to Witnesses 1, 2, and 7. The government also seeks to admit Witness 6's alleged "fear" to rehabilitate witnesses should that become necessary. Instead of supplementing its original motions with useful facts, the government has merely repeated the same alleged information which falls short of anything that would be allowed in at trial.

As described below, the government has not shown a single credible allegation of intimidation or threat as it relates to Mr. Jordan personally. The government's continued, strained efforts to dirty Mr. Jordan's reputation and character should not be permitted. Indeed, these so-called "threats" have only continued to have the real effect of infecting the potential jury pool with prejudice against Mr. Jordan through the government's public filing of these far-fetched allegations.

3

Evidence of a party's consciousness of guilt may be relevant only if reasonable inferences can be drawn from it and if the evidence is probative of guilt.  *See 2 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence*, § 401.08 (2d ed. 1997).  Such evidence is only admissible if the court: 1) determines that the evidence is offered for a purpose other than to prove the defendant's bad character or criminal propensity; 2) decides that the evidence is relevant and satisfies Rule 403; and 3) provides an appropriate instruction to the jury as to the limited purposes for which the evidence is introduced if a limiting instruction is requested.  *See United States v. Mickens*, 926 F.2d 1323, 1328-29 (2d Cir. 1991).  For the reasons set forth below, the Court should deny the government's motion.

### A. Witness 6's Alleged "Fear" of Jordan's Father

First, the government seeks to introduce evidence that "Witness 6 has repeatedly refused to cooperate with law enforcement during the investigation due to fear of Jordan and Jordan's father."  While the government pairs "Jordan and Jordan's father" as one entity, this is not the case.  According to the government, Witness 6, in various ways at various times, has said he/she is afraid of Jordan's father.  As Your Honor commented at the January 13, 2023, conference:

> When I was talking about the ruling on the anonymous jury I used the language, the question of whether it was at the behest versus on behalf of. So just because I am doing something, you know, I could decide I want to protect Mr. DeMarco from his own folly and I run off and go do something. That does not, in my mind, speak to Mr. DeMarco's consciousness of guilt, but rather my loyalty to Mr. DeMarco.

*See* 1/13/23 Transcript at 56.  Despite the Court's indication that an inference would not be drawn between Mr. Jordan's father's actions and Mr. Jordan's own consciousness of guilt, the government continues to attempt to place blame on Mr. Jordan for the alleged actions of his father and his father alone.

In an attempt to try and tie Mr. Jordan to Witness 6 and "witness intimidation," the government cites to a November 23, 2020, jail call where "Jordan states that Witness 6 'put me at the scene' and discusses Witness 6 and other possible witnesses implicating Jordan." Again, as Your Honor observed at the January 13, 2023, conference,[1] defendants who are incarcerated awaiting trial are going to discuss their case and what potential witnesses may testify and what those potential witnesses may say at their trial.  There is nothing wrong with that – and it is certainly not "witness tampering" to discuss what could happen at your trial.

The government also seeks to introduce "Witness 6's statements about his/her fear in order to explain his/her refusal to cooperate, pursuant to Rule 803(3)."  The government cites to a single case "admitting statement to 'establish[] the witness]'s then-fearful state of mind, which explained [the witness]'s future actions[,]" namely *United States v. Quinones*, 511 F.3d 289, 308 (2d Cir. 2007).  However, *Quinones* is entirely distinguishable as it concerned ***Quinones's [the defendant's] statements***.  Here, the government has not alleged Mr. Jordan

---

[1] *See* 1/13/23 Transcript at 64.

has done anything wrong as it relates to Witness 6, and it does not cite a single case where such testimony has been allowed based on a witness's failure to *cooperate.*

Further, according to the government, Witness 6 will "reluctantly" testify at trial,[2] which belies the purported purpose of the testimony.

Accordingly, as there is nothing – besides a surname – to tie any of the conduct alleged here to Mr. Jordan. Allowing Witness 6 to testify about his/her perceived fear of Mr. Jordan's father or the reasons why Witness 6 did/did not cooperate would be highly prejudicial and that prejudice far outweighs any probative value at trial.

### B. Alleged Intimidation of Witness 1 by Jordan's Father

Again, as it pertains to the allegations regarding Witness 1, there is no tie whatsoever to Mr. Jordan himself.[3] The government masquerades vague allegations against Mr. Jordan's father as proof against him. The government does not cite to a single case or legal authority that suggests that a relationship (father and son here) alone is sufficient to establish that the conduct is sufficiently tied to the defendant such that it can constitute consciousness of guilt as to that defendant. This testimony should not be allowed at trial.

### C. Alleged Intimidation of Witness 7 by Jordan

The government seeks to admit that "[a]t Mizell's funeral, Mr. Jordan and two other Individuals approached Witness 7 and repeatedly asked Witness 7 if Witness 7 knew who shot Mizell in a threatening manner." As the Court noted at the January 13, 2023 conference:

> I can imagine a scenario where, based on this vague description, you could have something that is menacing. I could also imagine a scenario where it is not. I do not know who the seven individuals were, I do not know how close they stood to each other. I do not have any of the facts so that I can understand what necessarily tips this from threatening and menacing to, at least as the defendant has advanced, an innocent encounter.[4]

The government has not given additional, identifying information to supplement this interaction, which is vague and harmless. Mr. Jordan allegedly asking Witness 7 "who killed Jay" is probably what many people at the funeral were asking as well. This vague statement has an innocent explanation and any other attempt to display it as threatening is unduly prejudicial to Mr. Jordan and has no probative value at the trial.

Moreover, in a puzzling display of evidentiary gymnastics, the government now adds that Witness 13 spoke to Witness 7 at the funeral and Witness 13 told the government, "Little D said I will kill you and this your mother, I'll kill you and your mother. Watch what you say."

---

[2] *See* 1/13/23 Transcript at 55.

[3] For the purposes of Mr. Jordan's response, we will not address any allegations made by the government against Mr. Washington.

[4] *See* 1/13/23 Transcript at 57.

5

So the government is seeking to put on Witness 13 to testify to what Mr. Jordan allegedly said to Witness 7 at the funeral, when Witness 7 never told the government that Mr. Jordan said any of these things at the funeral – only that Mr. Jordan asked, "who killed Jay." This is clearly improper prejudicial non-party multiple hearsay, not lawful evidence.

### D. Alleged Intimidation of Witness 1 by Jordan

The government seeks to admit recorded jail conversations where "both Jordan and Washington have repeatedly speculated about the possible witnesses who will testify against them and who may be cooperating." Again, as discussed above, Mr. Jordan is a defendant charged with serious crimes sitting in jail for years awaiting trial while presumed innocent. It would be unfathomable if Mr. Jordan was not allowed to discuss his case – what evidence there is, who the witnesses may be, and what the witnesses may say at trial. As a detained person awaiting trial, Mr. Jordan's access to speak about these matters is limited to phone calls and limited jail visits. It is Mr. Jordan's right to not only have these discussions, but it is also the responsible thing to do in preparing a defense to have these discussions while awaiting trial. Without discussing each specific bullet point listed by the government and belaboring this point, the response remains the same – the government continues to attempt to damage Mr. Jordan's reputation by twisting normal facts into nefarious conduct, and this, in turn, serves to taint the potential jury pool. The attempt to distort these jail calls is highly prejudicial evidence against Mr. Jordan and should be kept out of the trial.

Further, the government again makes the same reference to "State Inmate 2" without supplement. There is no allegation of proof that Mr. Jordan has anything to do with the State Inmate's communications. The government states that this individual is a go-between, with no evidence to corroborate that assertion other than the State Inmate talking about who may testify against Jordan and that Mr. Jordan's participation in the crime is a total lie.

Finally, the government states that Witness 2's decision not to cooperate further is evidence of witness intimidation. The government fails to account for various innocent explanations for an individual's change of heart in deciding not to cooperate with the federal government other than vague assertions like money being added to his commissary. Therefore, this evidence should not be allowed in as it is highly prejudicial and based on vague assertions by the government.

"[T]he central issue when threat testimony is sought to be introduced is the balance of probativeness and prejudice required by Fed. R. Evid. 403." *United States v. DeLillo*, 620 F.2d 939, 946 (2d Cir.), cert. denied, 449 U.S. 835, 101 S.Ct. 107, 108, 66 L.Ed.2d 41 (1980); *United States v. Qamar*, 671 F.2d 732, 735 (2d Cir. 1982). *See also United States v. Williams*, 596 F.2d 44, 50 (2d Cir.), cert. denied, 442 U.S. 946 (1979) ("District judges must carefully scrutinize both the basis for the claimed relevance of [other crimes] evidence and the balance between its probative value and prejudicial effect. The key to a fair trial in such cases is careful determination by the trial judge of both issues, particularly the latter.").

Because of the inflammatory nature of the evidence the government seeks to admit at trial, it should not be admitted. This is clearly "propensity evidence in sheep's clothing." *United States v. McCallum*, 584 F.3d 471, 476 (2d Cir. 2009). Accordingly, any probative value – which, at best, is minimal – is far outweighed by the risk of overwhelming prejudice to Mr. Jordan. These dubious, vague allegations of alleged threats or intimidation will only serve

as improper propensity evidence. If any of this evidence is permitted, no limiting instruction will suffice to protect Mr. Jordan as it will be like "holdin' up a red flag in front of 'em." *See United States v. Morgan*, 786 F.3d 227, 230 (2d Cir. 2015).

**III.    Rap Music Videos and Lyrics**

Rap lyrics have become increasingly attractive items of distraction misused by prosecutors. The government has attempted to argue, in cases all over the country, that lyrics should be admitted at trial as evidence of a defendant's guilt. Similarly, here, the government has argued that Mr. Jordan's rap lyrics, specifically in a song titled "Aim for the Head," are admissible to show knowledge of firearms, narcotics, and murder. We supplement our motion with the following additional arguments.

In 2019, a book titled *Rap on Trial: Race, Lyrics, and Guilt in America*, was published and explained the origins of the racial impact of using black music, black poetry, blues music, jazz music, and finally, rap music in the criminal justice system. "[R]ather than acknowledging that these lyrics are the result of creative license, the criminal justice system has effectively denied rap music the status of art, allowing police and prosecutors to present it to juries as autobiography rhymed over a beat – often with devastating consequences. Erik Nielson and Andrea Dennis, *Rap on Trial: Race, Lyrics, and Guilt in America*, The New Press, 2019. The authors state, "no other fictionalized form, musical or otherwise, is treated this way in court." *Id*.

In its motion, the government argues that it should be allowed to introduce the "Aim for the Head" music video and lyrics in which Mr. Jordan raps about aiming for the head and is pictured with firearms because it claims that the video and lyrics are relevant to the crimes charged. Specifically, the government argues that the lyrics make reference to using a Glock, "which is one of the brands of firearms that an ATF firearm examiner concluded has general rifling class characteristics like those present on the .40 caliber bullet and bullet fragment recovered from Jordan's May 14, 2003 shooting."

This argument is weak. Mentioning firearms in rap songs is common and does nothing more than appeal to the prospective audience. Following the gangsta rap form that has been commercially successful, Mr. Jordan's lyrics contained violent images, drug and gun language, and curse words. Allowing the Government to display these images and lyrics is prejudicial because of the high probability that the jury will misconstrue them as authentic insight into Mr. Jordan's character and use them as proof of the acts charged rather than what they were: music produced for commercial purposes in the "gangsta rap" genre.

The government argues that the lyrics "[l]ook at what you made me do. We aim for the head, no body shots…" explain the government's theory of the case, that Mr. Jordan essentially confesses to the murder charged in the indictment and therefore, should be admissible. The danger that the jury will view the images and lyrics as evidence of Mr. Jordan's propensity to commit the crimes charged, or worse – as quasi-confessions – is enormous. The government argues that the rap lyrics are, in effect, Mr. Jordan's "own admission" and "own real-life experiences" based on an interview uploaded to YouTube in 2012.

Initially, we point out that the government parses what Mr. Jordan said in the interview. Mr. Jordan stated that rap "can speak on real life experiences." The government added the

7

word "own." Mr. Jordan spoke about the art form, not his "own" conduct. The government should be more forthright.

This shows why the government's reliance on *United States v. Carpenter*, 372 F. Supp. 3d 74, 77 (E.D.N.Y. 2019), *aff'd*, 2022 WL 16960577 (2d Cir. Nov. 16, 2022) is so misplaced. There, a court added rap lyrics where a defendant admitted in an interview that "every single thing I'm talking about, I've been through it." The Second Circuit affirmed the admittance of the lyrics because the "rap lyrics and rap music videos speak with specificity to the precise conduct with which [the defendant] was charged." *Id*. at *3. The lyrics, in that case, referred to specific individuals involved in narcotics trafficking with Carpenter, referenced quantities that Carpenter sold, and included direct evidence of Carpenter being armed in connection with his drug dealing and specifically mentioned the precise model of the firearm identified in the indictment. *See* 2d. Cir. Dkt. 21-837, Doc. No. 67 at 67-68. Here, Jordan does not reference the Mizell homicide. The rap is generic and typical.

Similarly, the government cites *United States v. Wilson*, 493 F.Supp.2d 460, 462 (E.D.N.Y. 2006), in which a court admitted rap lyrics by a defendant that referenced firearms and vests commonly associated with police officers, where the defendant was charged with murdering two officers. The court found that the central crime alleged in that case was no more inflammatory than the lyrics and, therefore, would not prejudice the defendant. *Id*. at 462-63. There, the lyrics specifically referenced details regarding what the defendant was charged with; that is not the case here. Indeed, the fact that Mr. Mizell was shot in the head is insufficient to show that the perpetrator used a "signature" of shooting victims in the head because there is only one victim. Moreover, Mr. Mizell's murder was not committed using a silencer or any other apparent props that appear in the video.

The government plays with evidentiary fire and invites error by minimizing the rap song's inflammatory and prejudicial nature when weighed against its trivial probative value. *United States v. Figueroa*, 618 F.2d 934, 943 (2d Cir. 1980); Weinstein's Federal Evidence § 403.04 [1]; *United States v. Awadallah*, 436 F.3d 125, 131 (2d Cir.2006); *United States v. Salameh*, 152 F.3d 88, 110 (2d Cir.1998) (per curiam) ("To avoid acting arbitrarily, the district court must make a "conscientious assessment" of whether unfair prejudice substantially outweighs probative value.") (quoting *United States v. Birney*, 686 F.2d 102, 106 (2d Cir.1982)).

The lyrics are also superfluous to the government's case, and their admission would violate FRE 403, which bars the "needless presentation of cumulative evidence." *Cf. United States v. McCallum*, 584 F.3d 471, 477 (2d Cir. 2011). The lyrics should also be prohibited under FRE 403, which bars evidence when there is a danger that it will confuse the issues or mislead the jury, as there is a substantial risk that the jury will equate the character and stories portrayed in the videos by Mr. Jordan with the actual conduct he is charged with.

In *State v. Skinner*, 218 N.J. 496, 521, 95 A.3d 236 (2014), the New Jersey Supreme Court overturned a conviction where the government's case at trial relied heavily on violent rap lyrics, observing that the lyrics were artistic, and not literal, in intent: the court observed that "[o]ne would not presume that Bob Marley, who wrote the well-known song 'I Shot the Sheriff,' actually shot a sheriff." *Id*. The same caution applies here as there is no connection or nexus to the rap song and the Mizell homicide. The lyrics are an attempt to invoke the jury's

8

most negative reactions and prejudices against Mr. Jordan, and for the government to plug in the holes in their case with fantasy and fiction.

                                              Respectfully,

                                              _____/s/_____

                                              Michael Hueston
                                              Mark Demarco
                                              John Diaz
                                              Monica Nejathaim

cc:     Counsel of Record