# LAW OFFICES OF SUSAN G. KELLMAN
25 EIGHTH AVENUE • BROOKLYN, NEW YORK 11217
(718) 783-8200 • FAX (718) 783-8226 • SGK@KELLMANESQ.COM
FELLOW, AMERICAN COLLEGE OF TRIAL LAWYERS

March 29, 2023

Via ECF
The Honorable LaShann DeArcy Hall
United States District Court
Eastern District of New York
225 Cadman Plaza East
New York, New York 10007

Re:   *United States v. Karl Jordan et al.*, No. 20 Cr. 305 (LDH)

Dear Judge DeArcy Hall:

On behalf of Ronald Washington, we write in response to the government's letter supplementing its motions in limine. At the January 13, 2023, status conference, the Court gave the government the opportunity to supplement the motions in limine it filed on October 19, 2022. The government's supplemental arguments add little to its original arguments as to Mr. Washington. In the interest of not repeating arguments he has already made, Mr. Washington relies on the objections proffered in his original response filed on November 9, 2022, Dkt. 123. For the reasons stated in this letter and in Mr. Washington's original response, the government's motions should be denied.

Access to Firearms

With respect to the government's motion to admit evidence of Mr. Washington's access to firearms, the government concedes that such evidence is inadmissible absent a defense that Mr. Washington lacked such access. Dkt. 141 at 6. Unlike the defendants in *Arroyo*, *Zappola* and *Slaughter*, which the government cited in its original brief, Dkt. 113 at 16, the defense does not intend to affirmatively deny Mr. Washington had access to a firearm.

Evidence that Mr. Washington had a pellet gun is insufficiently connected to the Mizell murder. No witness will testify that Mr. Washington used a pellet gun to hold the receptionist down during the shooting. At the January 13 conference, the counsel for the government conceded: "There will not be testimony that anybody was able to determine at the time whether it was an imitation pistol or not." Tr. at 46.

Alleged Intimidation of Witness 1

The government seeks to offer a so-called "Threat Letter" as consciousness-of-guilt evidence. The characterization of the message "Happy Birthday. I Never Stopped Loving You. Strength and Honor" as the "Threat Letter" is laughable. In addition to not being objectively intimidating to any degree, the letter was also from sixteen years ago. According to the government, Judge Gershon deemed the letter, postmarked December 14, 2006, relevant at trial in 2007, but the government does not indicate whether Judge Gershon limited the evidence or found it marginally or centrally relevant or relevant for some other purpose, like proof of

association between Witness 1 and Mr. Washington. What is clear is that, whatever relevance Judge Gershon may have found in 2007, it has no relevance at trial in 2024 on separate charges.

Critically, the associated testimony whereby Witness 1 would explain to the jury why she found the letter to be threatening is far more prejudicial than probative. As Mr. Washington argued in his response brief in another context, Dkt. 123 at 4-5, it is totally improper to bolster Witness 1's subjective impression of the letter by her perception of "Washington's reputation for violence and the fact that Witness 1 had observed Washington commit numerous armed robberies and other acts of violence," Dkt. 141 at 11. Testimony of someone's violent reputation is self-evidently propensity evidence.

Next, the government points to a phone conversation that took place on December 1, 2020, as evidence of Mr. Washington's corrupt intent with respect to Witness 1. But, in that call, Mr. Washington expressed no intention of intimidating Witness 1. It is common knowledge that to "holler at" someone is merely to express a neutral greeting, not a sign of aggression. If anything, the term has a flirtatious connotation.[1] To the extent that the government ascribes a nefarious purpose to an accused speculating about possible witnesses against him, such discussions are common and imply nothing further than one's interest in his own case.[2]

We have already responded at length to the government's motion regarding the April 3, 2022, Facebook message. Under *United States v. Vayner*, 769 F.3d 125, 131-35 (2d Cir. 2014), the message is inadmissible because anyone could have sent Witness 1 the message and signed it "Tinard." Dkt. 123 at 10-11. That Mr. Washington is sometimes known as "Tinard" is a matter of public record[3] and has received ample press coverage.[4] It may be that an unknown person who was a supporter of Mr. Washington's, an enemy of Witness 1's or antagonistic to cooperation in general, could have sent the Facebook message in a misguided attempt to intimidate Witness 1 from testifying. But there is no evidence that it was Mr. Washington who did so or someone operating at his behest.

---

[1] "Holla at (one)," The Free Dictionary, https://idioms.thefreedictionary.com/Holla+at+Me. *See also* D.J. Khaled, "Holla at Me," on *Listennn... the Album* (Terror Squad Prod. 2006) ("Holla at me, what it do, what it is, You ain't never seen a playa like this. Holla at me, baby.").

[2] We note that the "Third Party," whose handle is "DaiDai Castro," is Mr. Washington's adult son who has no criminal record or gang affiliations.

[3] *E.g.*, Indictment, ECF 1 (case caption reflects Tinard as one of Mr. Washington's AKAs).

[4] *E.g.*, Noah Goldberg and Leonard Greene, *Two arrested in 2002 cold-case killing of Run-DMC's Jam Master Jay*, N.Y. Daily News (Aug. 18, 2020), https://www.nydailynews.com/new-york/nyc-crime/ny-rundmc-jam-master-jay-murder-20200817-3zmympyx55ff5nl3a5klykkb3i-story.html.

Hon. LaShann DeArcy Hall                                                                                     March 29, 2023
                                                                                                                    Page 3 of 3

Alleged Intimidation of Witness 2

      The government seeks to offer evidence of Mr. Washington's desire to intimidate Witness 2. Mr. Washington purportedly mentioned Witness 2 in recorded phone calls only twice. In neither of the calls did Mr. Washington express an intention to intimidate Witness 2 or even that he wished Witness 2 would not testify.

      The October 24, 2020, call contains a strong indication that Mr. Washington did *not* intend to have any contact with Witness 2. At about the 6:00 mark, Mr. Washington and the other party to the call discussed Witness 2 being housed at the MDC Brooklyn. Mr. Washington then stated, in sum and substance, that he will ask his lawyer to "check on it," that "lawyers are supposed to do that" and that he has been "dealing with his lawyer for years." The government omits this crucial portion of the call in its briefing. But it is clear from the omitted portion of the call that Mr. Washington had no intention of intimidating or even contacting Witness 2. Rather, Mr. Washington expressed his intent to have his legal team conduct a lawful investigation of the potential witness.

      As to the October 28, 2020, conversation in which Mr. Washington allegedly asked the other party to the call to initiate a three-way call with Witness 2, we could not locate the portion of the call that the government was referring to. But it is likely that the government is mistaken. People detained at the MDC cannot make outgoing calls. The only way for a person housed at the MDC to communicate by telephone is if the inmate initiates the call. Inmates cannot receive calls.[5] If Witness 2 were housed at the MDC as Mr. Washington apparently suspected he was, there would be no way for the other party to three-way call Witness 2. As a practical matter, the government's assertions of the facts of this call do not hold water. *See* Fed. R. Evid. 104 ("When the relevance of evidence depends on whether a fact exists, proof must be introduced sufficient to support a finding that the fact does exist. The court may admit the proposed evidence on the condition that the proof be introduced later.").

      The Court's consideration of these arguments is appreciated.

                                                     Respectfully submitted,

                                                     *Susan G. Kellman*

                                                     Susan G. Kellman
                                                     Ezra Spilke
                                                     Jacqueline Cistaro

---

[5] Possession by inmates of contraband cellphones at the MDC is well known. But, for the government's interpretation to work, Witness 2 would have needed a contraband cellphone and either Mr. Washington or the other party to the call would have needed to know Witness 2's number. This theory, which, to be clear, was not advanced by the government, is implausible.