## *United States v. Jordan et al* (20-cr-305)

Rulings on the Government's Motion in Limine dated October 19, 2022, as supplemented on January 11, 2023, February 27, 2023, and August 25, 2023.

| **Motions to Admit Uncharged Acts as Direct Proof of the Charged Crimes or as Rule 404(b) Evidence** | | |
|---|---|---|
| **Motion Number** | **Evidence** | **Ruling** |
| 1. (MIL at 8.) | Testimony that Washington was feared in Hollis, Queens and was known for possessing firearms, committing armed robberies, and engaging in narcotics trafficking. | DENIED. |
| 2. (MIL at 8.) | Testimony that younger individuals, such as Jordan, respected and looked up to Washington. | DENIED. |
| 3. (MIL at 8.) | Testimony that shortly before Mizell's murder, Washington returned to Hollis after serving a ten-year sentence in Baltimore, Maryland for narcotics trafficking. | DENIED. |
| 4. (MIL at 8.) | Testimony that shortly before Mizell's murder, Washington and Jordan would work out and otherwise consort together. | GRANTED as direct evidence. |
| 5. (MIL at 8.) | A statement by Washington in a September 5, 2020 phone call that Jordan "was his little man." | GRANTED as direct evidence. |
| 6. (MIL at 8.) | A statement Washington in a September 5, 2020 phone call that he and Jordan were charged together. | DENIED. |
| 7. (MIL at 8.) | Testimony that Jordan was involved in narcotics trafficking and firearms offenses "at that time," and that Jordan had previously asked that Mizell "put | GRANTED, as direct evidence, subject to clarification that the conduct occurred within the relevant |

1

| | | |
|---|---|---|
| | him on." Mizell subsequently provided Jordan with a small quantity of cocaine to determine if Jordan could handle selling larger quantities. | time period. |
| **8. (MIL at 9; Feb. 27 Supp. at 2 n.2.)** | Testimony from Witness 2 that Jordan was selling approximately 20-30 grams of cocaine per day. | DENIED. |
| **9. (MIL at 9.)** | Testimony from Witness 2 that Jordan frequently carried a firearm around the time of Mizell's murder. | GRANTED pursuant to Rule 404(b). |
| **10. (MIL at 9; Feb 27 Supp at 2.)** | Testimony from Witness 2 that both Jordan and Witness 2 would secrete drugs and firearms in a van parked outside of a particular dwelling in Queens. And a .40 caliber pistol used to be hidden in the van, and the same firearm went missing around the time of Mizell's murder. | GRANTED pursuant to FRCP 404(b). |
| **11. (MIL at 9.)** | Testimony that Washington and Jordan were not "cool" after Mizell's murder. | DENIED. |
| **12. (MIL at 9; Feb. 27 Supp. at 4.)** | Testimony that Washington stole a pellet gun from Witness 2. | GRANTED pursuant to FRCP 404(b), subject to clarification that the conduct occurred during the relevant time period. |
| **13. (MIL at 9; Feb. 27 Supp. at 4.)** | Testimony that Witness 2 believed Washington used the pellet gun to commit robberies. | DENIED. |
| **14. (MIL at 9.)** | Testimony from Witness 2 that Witness 2 saw Washington with firearms on numerous occasions | GRANTED pursuant to FRCP 404(b). |

2

| | | |
|---|---|---|
| | around the time of Mizell's murder. | |
| **15. (MIL at 9; Feb. 27 Supp. at 4.)** | Testimony from Witness 1 that Witness 1 observed Washington procure a pellet gun from Witness 2 prior to Mizell's killing. | GRANTED pursuant to FRCP 404(b), subject to clarification that the conduct occurred during the relevant time period. |
| **16. (MIL at 9.)** | Testimony that Washington asked another mutual associate of Washington and Mizell ("Witness 3") if Witness 3 could get Washington .40 caliber rounds shortly before Mizell's killing. | GRANTED as direct evidence. |
| **17. (MIL at 9; Feb. 27 Supp. at 4.)** | Testimony that on August 9, 2022, Washington committed a gunpoint robbery in the vicinity of 204-19 Hollis Avenue. Washington struck the victim on the head with a firearm, demanded money and jewelry and fired at the victim when he tried to chase Washington. One spent .40 caliber shell casing was recovered, which was different from the casings later recovered at the murder scene. | GRANTED, in part, pursuant to FRCP 404(b) to show access to the firearm. |
| **18. (MIL at 9–10.)** | Testimony that Jordan, Washington, and another participant in the alleged murder conspiracy ("Coconspirator 1") had a mutual associate (the "Mutual Associate") who, in 2002, resided at a particular dwelling in Queens. | DENIED. |
| **19. (MIL at 10.)** | Testimony that a family member of Mutual Associate was involved in a separate, nationwide narcotics syndicate that also supplied Mizell | DENIED. |

3

| | | |
|---|---|---|
| | with cocaine. | |
| **20. (MIL at 10.)** | Testimony that Jordan and Coconspirator 1 were both close with Mutual Associate and frequented a particular dwelling in Queens, which was used by neighborhood narcotics traffickers as a hang out and as a location to exchange firearms. | DENIED. |
| **21. (MIL at 10.)** | A November 29, 2020, recorded phone call, wherein Washington discussed knowing Mutual Associate. | DENIED. |
| **22. (MIL at 10.)** | Testimony from Witness 4 that in or about January 2003, Witness 4 was present inside a particular dwelling in Queens and observed Mutual Associate and several other individuals in possession of firearms, including a .40 caliber handgun that was on the kitchen table. | DENIED. |
| **23. (MIL at 10.)** | Testimony that Witness 4 saw Washington at a particular dwelling in Queens on unspecified dates. | DENIED. |
| **24. (MIL at 10; Feb. 27 Supp. at 2.)** | Testimony that, on February 3, 2003, Jordan argued with one of Washington's relatives. Jordan struck the relative in the face, produced a .40 caliber semi-automatic pistol, fired one shot into the air, and secreted the weapon inside his home. Responding police officers recovered a spent .40 caliber shell casing and additional 83 live .40 | GRANTED pursuant to FRCP 404(b). |

4

|  | caliber rounds, along with two live shotgun rounds, from inside the residence. Witnesses on the scene identified Jordan as the shooter. |  |
|---|---|---|
| **25. (MIL at 11.)** | Testimony that Jordan made a post-*Miranda* statement admitting striking Washington's Relative and was initially charged with a felony, but Washington's Relative refused to cooperate and failed to respond to a subpoena to testify before a grand jury. As a result, the grand jury indicted Jordan for possession of ammunition, a misdemeanor. Jordan eventually pleaded guilty to a disorderly conduct violation. The pistol Jordan used was eventually recovered from Jordan's friend. | DENIED. |
| **26. (MIL at 11.)** | Testimony that on May 14, 2003, Jordan fired several shots at Mizell's nephew in the vicinity of 203-11 Hollis Avenue, striking him once in the leg. Two .40 caliber discharged bullets were recovered from the scene. | GRANTED pursuant to FRCP 404(b). |
| **27. (MIL at 11.)** | Testimony that the criminal case related to the May 14, 2003 incident was subsequently dismissed when the victim refused to cooperate with law enforcement. The dispute between the two involved Mizell's nephew accusing Jordan of Mizell's murder in a rap song. | DENIED. |
| **28. (MIL at 11–12.)** | Testimony that on one occasion, Jordan threatened Witness 5 with a gun and stated in substance that he would kill Witness 5 like he had | GRANTED as direct evidence. |

5

| | | |
|---|---|---|
| | killed Mizell. | |
| **29. (MIL at 11.)** | Testimony that in or about 2004, Jordan lived at a particular dwelling in Queens owned by Jordan's father. Witness 5 also lived at that residence during that period, frequently purchased narcotics from Jordan, assisted Jordan in trafficking narcotics, and observed Jordan carrying firearms at that location and elsewhere, with Jordan often using the aforementioned van in the driveway to secrete narcotics and firearms. | DENIED. |
| **30. (MIL at 12; Feb. 27 Supp. at 5.)** | Testimony that, a search warrant was executed at Jordan's residence on or about December 15, 2004. During the search, law enforcement recovered a loaded 9mm semi-automatic pistol, a loaded 9mm magazine, a loaded .32 caliber revolver, and a bullet proof vest. Also in the residence were over 150 bags of marijuana, various bags and foil wraps containing cocaine, and hundreds of glassine envelopes used for packaging narcotics. Jordan and six other individuals were inside at the time and arrested, and the case resulted in a plea to disorderly conduct. | DENIED. |

| Motions to Admit Evidence of Witness Intimidation and Tampering as Consciousness of Guilt[1] | | |
|---|---|---|
| **Motion Number** | **Evidence** | **Ruling** |
| 31. (MIL at 26.) | Testimony that Witness 6 has refused to speak with police, view photo arrays, or view a lineup with Jordan previously, despite telling third parties that Jordan shot Mizell. Witness 6 has also expressed a generalized fear of Washington due to his reputation for violence. | DENIED. |
| 32. (MIL at 27; Feb. 27 Supp. at 12.) | Testimony from Witness 7 that Jordan and two other individuals approached Witness 7 and one of Witness 7's family members at Mizell's funeral. They repeatedly asked Witness 7 if Witness 7 knew who shot Mizell in a manner Witness 7 interpreted as threatening. Witness 7 was frightened and told Jordan that he/she had not seen who shot Mizell. | GRANTED. |
| 33. (Feb. 27 Supp. at 12.) | Testimony from witness 13 that Witness 7 relayed to Witness 13 that Jordan threatened Witness 7, Witness 7 was shaken, and stated to Witness 13 that "Jordan walked up to Witness 7 at the funeral and said to [him/her] in front of [his/her] mother, [Witness 7], who the F killed Jay" and "Little D said I will kill you and this your mother, I'll kill you and your mother. Watch what you say." | DENIED. |

---

[1] In its February 27, 2023 Supplemental filing, the Government states that it "would also seek to admit these statements, as well as Witness 6's fear, to rehabilitate witnesses should that become necessary." (Feb. 27 Supp. at 9, ECF No. 141.) The Court reserves any decision as to the admissibility of this evidence until trial.

| | | |
|---|---|---|
| | Testimony from Witness 13 that Witness 7 stated that he/she "wanted to go talk to Little D and tell Little D that [Witness 7] won't tell on him [to law enforcement]." | |
| **34. (MIL at 27; Feb. Supp. at 10.)** | Testimony that in 2003, Jordan, Jordan's father, Coconspirator 2 and several other individuals confronted Witness 1, with Jordan's father asking if Witness 1 had spoken to anyone about the murder; what Witness 1 had told the police; and reminding Witness 1 that they knew where Witness 1's family lived. | GRANTED. |
| **35. (MIL at 27; Feb. Supp. at 12.)** | Testimony that Washington had instructed a third party to contact Witness 1, including over Facebook. Witness 1 subsequently received numerous anonymous unsolicited friend requests over Facebook, including at least two messages from one of Washington's family members. One of the messages featured a photograph of two wolves eating a bloody animal Carcass with the message "Hey its Tinard I'd like to talk." | GRANTED, in part, DENIED as to the message: "Hey its Tinard I'd like to talk." |
| **36. (MIL at 27; Feb. Supp. at 12.)** | Testimony that Witness 1 testified against Washington during Washington's Hobbs Act robbery trial. During the pendency of that case, Washington sought to intimidate Witness 1 by sending Witness 1 a letter reading, "Happy Birthday. I Never Stopped Loving You. Strength and Honor." | DENIED. |

8

| Motions to admit Jail Calls as Witness Intimidation and/or as Admissions of a Party Opponent | | |
|---|---|---|
| **Motion Number** | **Evidence** | **Ruling** |
| 37. (Feb. 27 Supp. at 13.) | An October 24, 2020 jail call, wherein Washington stated that "[Witness 2] is in the building . . . everybody talking." Washington spells out Witness 2's first and last name so it can be determined if Witness 2 has been arrested or is in custody. | GRANTED. |
| 38. (Feb. 27 Supp. at 13.) | An October 28, 2020 jail call, wherein Washington instructed Coconspirator 2 to get Witness 2 on a "three way call." | GRANTED, subject to review of the call transcript. |
| 39. (Feb. 27 Supp. at 13.) | A November 7, 2020 jail call, wherein Jordan stated to a counterparty that Witness 2 is "wilding again," insinuating that Witness 2 is cooperating with the government. The counterparty tells Jordan that Witness 2's family is "fucked up" by "the jack up [Witness 2's arrest]" and that Witness 2 may drag them in to something. | DENIED. |
| 40. (Feb. 27 Supp. at 13.) | A February 10, 2021 jail call, wherein Jordan and a counterparty discussed Witness 2 being in "paperwork" for another case, indicating that Witness 2 is cooperating with law enforcement, and noting that Witness 2's "statement" to law enforcement regarding Jordan and others has been seen by multiple people. | DENIED. |
| 41. (Feb. 27 Supp. at 14.) | A February 22, 2021 jail call, wherein Jordan asked an associate if Jordan's lawyers would be | DENIED. |

9

| | | |
|---|---|---|
| | contacting him that day. Jordan then discussed several possible witnesses, including using a pseudonym for Witness 2. Jordan instructed the associate to put $50 on Witness 2's commissary account. | |
| **42. (Feb. 27 Supp. at 14.)** | A February 24, 2021 jail call, wherein Jordan stated that he thinks Witness 2 is the "informer." Jordan discussed how Witness 2 is "dumb" and that "they [law enforcement] lied to [him/her] and forced [him/her] to say something," and that "[he/she]'s so stupid . . . [he/she]'s always been stupid. [He/she] don't know or [he/she] probably don't care." | DENIED. |
| **43. (Feb. 27 Supp. at 14.)** | A March 21, 2021 call, wherein Jordan's associate reported to Jordan that "shit looking like [Witness 2] is a liar . . . the worst type [a cooperator] . . . trying to figure it out now":<br><br>Associate: "Shit lookin' like [he/she] is a liar."<br><br>Jordan: "yea but everybody is a liar, man."<br><br>Associate: "But this is the worst type"<br><br>Jordan: "Damn . . . ah man"<br><br>Associate: "The worst type, yea. Not for sure but trying to figure it out now." | DENIED. |

10

| 44. (Feb. 27 Supp. at 14.) | An April 20, 2021 jail call, wherein Jordan asked "is [Witness 2] still sizzling?" suggesting that Witness 2 was not faring well in prison and was at risk of cooperating to obtain release. The counterparty remarked that he "had no idea" but "there is a lot going on." | DENIED. |
|---|---|---|
| 45. (Feb. 27 Supp. at 14.) | A June 19, 2021 jail call, wherein Jordan asked if anyone had spoken to Witness 2. | GRANTED. |
| 46. (Feb. 27 Supp. at 14.) | An August 4, 2021 jail call, wherein Jordan was told by the same counterparty that "the lawyer spoke about [Witness 2]" and that "its [him/she] [cooperating]" for "one of the case, but for the other he's not sure." Jordan responded that he would pray on it and that it would to fix itself. | DENIED. |
| 47. (Feb. 27 Supp. at 14.) | Other recorded jail calls, wherein Jordan used one individual as an intermediary between himself and an associate incarcerated for murder in a state facility (the "State Inmate"), primarily to share information about Witness 2's possible cooperation in the instant case. For example, in a May 26, 2021 call, Jordan asked the individual "what up with [Witness 2]" and asked the individual to say hi to the State Inmate. The individual then asked Jordan if he got the State Inmate's last message, and Jordan confirmed that he had. | DENIED. |
| 48. (Feb. 27 Supp. at 15.) | A July 14, 2021 email, wherein the State Inmate refered to Witness 2 | DENIED. |

| | making "some shit up about me 2 so [he/she] could try n save [him/her]self especially after that [he/she] did to [Jordan] . . . if [he/she]'ll throw [Jordan] under the bus then I shoudve known." | |
|---|---|---|
| **49. (Feb. 27 Supp. at 14.)** | A July 14, 2021 email, wherein the State Inmate wrote that "[Witness 2] was doing some bullshit b4 n i didn't wanna believe them but 4 them 2 come at me with some bullshit like that [be approached by law enforcement] [he/she]'s 4sure n there just tryna do any and everything possible 2 save [him/her]self." | DENIED. |
| **50. (Feb. 27 Supp. at 14.)** | A July 14, 2021 email, the State Inmate explicitly referenced Witness 2's possible testimony in the instant case, writing "I know 4 a fact this n-gga [Witness 2]. . . is tryna put my name n some bullshit 2 try n save [him/her]self from the time [he/she]'s facing cause [he/she]'s 2 weak 2 do [his/her] own time smh from what i heard [he/she] already agreed 2 testify against [Jordan] for that jmj shit which is a total lie." | DENIED. |
| **51. (Aug. 25 Supp. at 2.)** | A February 26, 2023 text message exchange between Witness 2 and an unknown individual. | DENIED. |
| **52. (Aug. 25 Supp. at 3.)** | A March 8, 2023 text message exchange between Witness 2 and a second unknown individual. | DENIED. |

12