UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Government,<br>v.<br><br>KARL JORDAN, JR., and RONALD WASHINGTON,<br><br>Defendants. | **MEMORANDUM AND ORDER**<br><br>20-CR-305 (LDH) |

LASHANN DEARCY HALL, United States District Judge:

Defendant Karl Jordan, Jr. is charged in a superseding indictment with the murder of Jason Mizell while engaged in narcotics trafficking and firearm related murder. (ECF No. 45.) The Government moves in limine to admit as evidence at trial rap videos and interview videos portraying Jordan and his music. (Mem. L. Supp. Gov.'s Mot. in Limine ("Mot. in Limine"), ECF No. 113.)

## BACKGROUND

A little over fifty years ago, Bronx-based DJ Kool Herc brought to the world the musical innovation that we know as rap. Kat Lonsdorf, Juana Summers, & Patrick Jarenwattananon, *50 years ago, teenagers partied in the Bronx — and gave rise to hip-hop*, NPR (July 11, 2023).[1] In that half-century, hip hop—as it is often called—has provided a platform for expression to many who had largely been voiceless. Hip hop is now more than just music—indeed it has become its own culture. The "fashion, vernacular, attitudes, and body language" of hip hop culture "have been adopted" by the world—"spanning ethnic, linguistic and geographic boundaries." Dr.

---

[1] https://www.npr.org/2023/07/11/1186407223/50-years-ago-teenagers-partied-in-the-bronx-and-gave-rise-to-hip-hop.

Marcus Collins, *How 50 Years Of Hip-Hop Provided 50 Years Of Marketing Game*, Forbes

(Aug. 11, 2023).[2]

From the genre's nascence as an oral tradition, rap artists have played the part of

storytellers, providing a lens into their lives and those in their communities.  Take for example

Grand Master Flash's early hit *The Message*, which described the pressures of poverty through

lyrics that transported the listener to the realities of life in the 1980s South Bronx—a place that

many would never have the occasion to visit.  *See* Grandmaster Flash and the Furious Five, *The*

*Message*, *on The Message* (Sugar Hill Records 1982).  Arrested Development opened hearts and

ears to the stories of everyday people with messages of peace and love.  *See generally* Arrested

Development, *3 Years, 5 Months and 2 Days in the Life Of...* (Chrysalis/EMI 1992).  Rappers

have also dedicated their musical talents to political activism.  The rap duo Public Enemy drew

from Patrick Henry's famous proclamation at the Second Virginia Convention to remind

listeners that "our freedom of speech is freedom or death" in a call "to fight the powers that be."

Public Enemy, *Fight the Power, on Fear a Black Planet* (Def Jam/Columbia 1990).  The activist

and entertainer, Common, used his success to exhort listeners to "stay peaceful" in an effort to

"right the wrongs in history."  Common & John Legend, *Glory* (*From the Motion Picture Selma)*

(Paramount Music 2014).  Still, others used rap to preserve culture and tradition.  No song

embodied that role more than A Tribe Called Quest's *Can I Kick It?*, which featured African

American vernacular and a catchy refrain that borrowed from the call-and-response musical

tradition brought to North America by enslaved Africans.  *See African American Song*, Library

---

[2] https://www.forbes.com/sites/marcuscollins/2023/08/11/how-50-years-of-hip-hop-provided-50-years-of-marketing-game/?sh=1fb481b51b93.

of Congress;[3] A Tribe Called Quest, *Can I Kick It?, on People's Instinctive Travels and the Paths of Rhythm* (Jive/RCA Records 1990).  Queen Latifah, an early pioneer of the genre, used rap to condemn misogyny and domestic violence, and called for unity within the Black community.  Through her lyrics, she celebrated the strength of Black women, reminding us that strength and femininity are not mutually exclusive.  *See, e.g.*, Queen Latifah, *U.N.I.T.Y., on Black Reign* (Motown 1993) (recounting that she "punched [] dead in [the] eye" a man who touched her inappropriately).

"Gangsta rap" ascended as well.  It served as a portal for others to see into America's urban centers.  N.W.A.'s controversial album *Straight Outta Compton*, for instance, offered listeners first-hand accounts of the fallout from gang violence in 1980s Los Angeles and the Los Angeles Police Department's ("LAPD") sometimes misguided response.[4]  N.W.A. and other rap artists were, as rapper Chuck D put it, "CNN of the ghetto"—they broadcasted lyrical representations of real violence experienced by Los Angeles residents to stereos around the

---

[3] https://www.loc.gov/item/ihas.200197451 (last visited Jan 16, 2024).

[4] Just before the album's release, the LAPD executed "Operation Hammer," a sweep of southwest Los Angeles that left in its wake beaten residents, property damage, and even graffiti authored by LAPD officers.  John L. Mitchell, *The Raid that Still Haunts L.A.*, L.A. Times (Mar. 14, 2001), https://www.latimes.com/archives/la-xpm-2001-mar-14-mn-37553-story.html.  Events like Operation Hammer undoubtedly inspired N.W.A.'s infamous track holding a metaphorical criminal trial against police officers who engaged in various abuses against civilians.  *See* N.W.A. *F\*ck Tha Police*, *on Straight Outta Compton* (Ruthless/Priority 1988).

world.[5]  Charles F. Coleman Jr., *Hip-hop and the criminal justice system have repeatedly put one another on trial*, MSNBC (Aug. 9, 2023).[6]

Notably, rap music has yielded material success for many rap artists, often providing an escape from poverty and other circumstances of misfortune.  The Notorious B.I.G. spoke of this phenomenon when he rhymed that he "never thought that hip-hop would take it this far" and that he was "in the limelight" because he "rhyme[d] tight."  The Notorious B.I.G., *Juicy, on Ready to Die* (Bad Boy/Arista 1994).  Self-made hip-hop mogul Master P used a rap career to turn his humble beginnings in New Orleans into generational wealth.  Rodney Carmichael, *How Master P Gamed The Music Industry And Laid A Path To Generational Wealth Similarly*, NPR (Sept. 21, 2017).[7]  Similarly, Dr. Dre—a former member of N.W.A.—found long-term success through business ventures within the hip-hop industry, such as his Beats by Dre brand.  Zack O'Malley Greenburg, *Dr. Dre's $3 Billion Monster: The Secret History Of Beats*, Forbes (Mar. 8, 2018).[8]  Of course, there is Jay-Z, who grew up in Brooklyn's Marcy Projects with limited opportunities.

---

[5] The Court appreciates that many listeners are discomforted by the violent lyrics of N.W.A. and others.  The Court cannot help but note that odious themes—including racism, misogyny, and homophobia—can be found in a wide swath of genres other than rap music.  For example, the hard rock single *Brown Sugar* exploited the abuses of African women forced into chattel slavery.  The Rolling Stones, *Brown Sugar*, *on Sticky Fingers* (Rolling Stones 1971).  Hank Williams Jr. once sang, "Well, gay guitar pickers don't turn me on."  Hank Williams, Jr., *Dinosaur*, *on Habits Old and New* (Elektra/Curb 1980).  And, Jason Aldean threatened violence from "good ol' boys" ready to fight anyone who "cross[ed the] line" in a small town.  Jason Aldean, *Try that in a Small Town*, *on Highway Desperado* (Broken Bow Records 2023).  In any event, whether anyone would choose to consume this music or include it on a playlist is not a question for the Court.  The issue courts must confront is whether certain lyrics, no matter how objectionable to one's sensibilities, are relevant trial evidence.  In fact, because music lyrics can have great potential to offend, courts are duty-bound to be circumspect in permitting their use in the prosecutions of artists.  *See United States v. Wiley*, 610 F. Supp. 3d 440, 446 (D. Conn. 2022) (observing that rap music can sometimes contain "offensive messaging which makes its introduction into evidence potentially highly prejudicial").

[6] https://www.msnbc.com/opinion/msnbc-opinion/hip-hop-criminal-justice-50th-anniversary-rcna98636.

[7] https://www.npr.org/2017/09/21/552449582/how-master-p-gamed-the-music-industry-and-laid-a-path-to-generational-wealth.

[8] https://www.forbes.com/sites/zackomalleygreenburg/2018/03/08/dr-dres-3-billion-monster-the-secret-history-of-beats-3-kings-book-excerpt/?sh=7e6dbb258d12.

He's rap's first billionaire and sits at the helm of an empire, which includes his own music streaming platform, a record label, and an art collection boasting works from Andy Warhol and Jean-Michel Basquiat.  Dale Eisinger, *Estimating the Net Worth of Jay Z's Art Collection*, Complex (Nov. 16, 2013);[9] Kate Sheehy, *Jay Z snaps up $4.5M Basquiat painting*, N.Y. Post (Nov. 20, 2013).[10]

In its five-decade development, rap music has only become more accessible.  Not just that, but *rappers* have become more prevalent.  Technology allows anyone with a cellphone and the ability to rhyme to publish their music with the dream of fame on the other end.  For the rapper Soulja Boy, that dream became reality when he inked a record deal as a teenager after music videos that he posted to his YouTube account gained wide popularity.  Slava Pastuk, *Five Things Soulja Boy Invented*, VICE (Aug. 5, 2013).[11]  TikTok sensation Ice Spice leveraged her internet stardom in much the same way, going from an unknown college student from the Bronx to an artist with over thirty-million streams on the Spotify music streaming platform.  Mariah Espada, *Why Rapper Ice Spice Is Suddenly Everywhere*, Time (Feb. 23, 2023).[12]

The abundance of rap music, particularly songs depicting criminal conduct, has invited even greater scrutiny of rap artists—not only from the public, but also from law enforcement.  As a result, the admissibility of rap lyrics has become the subject of dispute in courtrooms across the country.  And, it is the subject of this opinion.

---

[9] https://www.complex.com/style/a/dale-eisinger/jay-z-art-collection; *see also* https://www.rocnation.com/music/jay-z/.

[10] https://nypost.com/2013/11/20/jay-z-buys-basquiat-painting-for-4-5m/.

[11] https://www.vice.com/en/article/r3pmb6/five-things-soulja-boy-invented.

[12] https://time.com/6257685/ice-spice-tik-tok-billboard/.

**DISCUSSION**

At trial, the Government seeks to introduce two songs—*Aim for the Head* and *Silver Spoon*—performed by Defendant Jordan under the pseudonym "Yadi" or "Young Yadi" and posted on the internet. (Mot. in Limine at 34.) Some of the lyrics in those songs describe criminal conduct. In *Aim for the Head*, Jordan boasts about shooting people in the head. (*Id.* at 35.) In *Silver Spoon*, Jordan raps about "breaking down bricks," which the Government claims is a reference to Jordan's alleged drug distribution activities. (*Id.* at 35, 37.) The Government also seeks to admit statements by Jordan that his music reflects his lived experience. (*Id.* at 36.) According to the Government, this "proposed evidence speaks directly to the issues in the case and are not 'simply rap vides or lyrics with merely a tenuous connection to the defendant or issues in the case.'" (*Id.* at 37 (internal citation omitted).).) The Court disagrees.

The Second Circuit has already held that rap lyrics may be properly admitted at trial. *United States v. Pierce*, 785 F.3d 832, 841 (2d Cir. 2015). As with other evidence, in deciding whether any given rap lyric will be introduced at trial, the Court must assess whether the evidence is relevant and whether its probative value is not substantially outweighed by the danger of unfair prejudice. *See* Fed. R. Evid. 403 (providing for the exclusion of relevant evidence if "its probative value is substantially outweighed by the danger of . . . unfair prejudice"). Determining how to strike a balance between these potentially competing considerations is not always clear. As a general matter, evidence is relevant when "it has any tendency to make a fact more or less probable than it would be without the evidence" and if "the fact is of consequence in determining the action." *United States v. Monsalvatge*, 850 F.3d 483, 494 (2d Cir. 2017) (quoting Fed. R. Evid. 401). In the context of rap music, however, the Court must remain cognizant that "hip hop is fundamentally an *art form* that traffics in hyperbole,

6

parody, kitsch, dramatic license, double entendres, signification, and other literary and artistic conventions to get it point across."  Michael Eric Dyson, Forward, *That's the Joint!: The Hip-Hop Studies Reader*, xii (Forman & Neal eds. 2004).

Of particular relevance here, rap artists have become increasingly incentivized to create music about drugs and violence to gain commercial success, and will exaggerate or fabricate the contents of their music in pursuit of that success.  Indeed, a number of celebrated rap artists have said as much.  The artist Future, for example, continues to portray himself as a drug abuser through his lyrics, even after proclaiming sobriety because, according to him, it is what his fans want to hear.  *See* Jessica McKinney, *Future Keeping His Sobriety A Secret Says More About You than Him*, VIBE (Jan. 17, 2019).[13]  Similarly, A$AP Ferg's *Trap Lord* album makes multiple references to drug distribution and violence, but in an interview, the rapper admitted that he does not engage in that activity.  The Beat with Ari, *A$AP Ferg on trapping, drugs & why rap beefs 'aren't real'*, MSNBC (last visited Jan. 12, 2024).[14]  And, Fat Joe has rapped, "Why you think m*'f*ckers nicknamed me Cook Coke sh*t.  Shoulda been called armed robbery, extorsion, or maybe grand larceny . . . I did it all."  Terror Squad, *Lean Back*, *on True Story* (Terror Squad/SRC/Universal 2004).  No, he hasn't done it all.  In a recent interview Fat Joe made this plain when he stated:

> I've been rapping professionally for 30 years.  I've lied in almost 95 percent of my songs . . . .  I write like I feel that day.  I'm just being creative. You know you . . . you couldn't build the jail high enough for the lyrics I've said on songs, which are all untrue.  What I am is a family man, the person who gives back to my community all the time, open businesses in my community.  So, the music would never amount to the actual person Joseph Cartagena.

---

[13] https://www.vibe.com/features/opinion/future-sobriety-secret-toxic-fan-culture-630778/.

[14] https://www.msnbc.com/the-beat-with-ari-melber/watch/a-ap-ferg-on-trapping-drugs-why-rap-beefs-aren-t-real-1409571907970.

King Charles, *Transcript of Interview with Fat Joe*, CNN (aired Nov. 29, 2023).[15]  Against this backdrop, it may not be surprising that nearly every rap album in the Billboard Top 200 today contains references to drug use, drug sales, violence, or some combination of the three.  It follows that one cannot necessarily infer criminality simply from a rapper's reference to violence, drug dealing, and the like.  *See Wiley*, 610 F. Supp. 3d at 446 ("[A]lthough rap music often contains first-person accounts of the speaker's lifestyle and activities—including criminal activities—the lyrics are not always autobiographical statements.").  There must be more.

The Second Circuit has not provided specific guidance as to how courts should address the admissibility of rap lyrics.  However, a rule-of-thumb has emerged from court decisions that have considered this issue—the relevance of rap lyrics as trial evidence depends on the existence of a specific factual nexus between the content of rap music and the crimes alleged. [16]  *See, e.g.*, *id.* (admitting lyrics "only where the Government can point to lyrics that communicate specific details related to the charged conduct"); *United States v. Sneed*, 3:14 CR 00159, 2016 WL 4191683, at *5–6 (M.D. Tenn. Aug. 9, 2016) (excluding a rap video, which "depict[ed] men (including Defendant Sneed) rapping about selling drugs" but did not include any "reference to a specific gang or group of individuals working in concert to sell those drugs"); *see also United States v. Gamory*, 635 F.3d 480, 493 (11th Cir. 2011) (holding a rap video irrelevant because there was no evidence that the defendant "authored the lyrics or that the views and values reflected in the video were, in fact, adopted or shared by" the defendant).

---

[15] https://transcripts.cnn.com/show/kc/date/2023-11-29/segment/01.

[16] The New York State legislature is considering proposed legislation that would codify a similar approach to the admissibility of rap lyrics in state court proceedings.  That is, under the New York "Rap Music on Trial" Bill, a party proffering rap music evidence to prove by clear and convincing evidence "(a) literal, rather than figurative or fictional, meaning . . . ; (b) a strong factual nexus indicating that the creative expression refers to the specific facts of the crime alleged; (c) relevance to an issue of fact that is disputed; and (d) distinct probative value not provided by admissible evidence."  S.B. S1738, 2023-2024.

The authority the Government cites bears this view.[17]  In *United States v. Carpenter*, for

example, the defendant argued that rap videos were not relevant to his charges, which included

heroin and cocaine distribution and firearm-related charges.  372 F. Supp. 3d 74, 76–77

(E.D.N.Y. 2019).  One video showed the defendant carrying a firearm and singing about selling

drugs.  *See id.* at 77.  In another, the defendant brandished a firearm that the government argued

was the firearm recovered in connection with the defendant's arrest.  *See id.*  Finally, in an

interview, the defendant asserted that "every single thing [he is] talking about, [he has] been

through it.  [He] did it.  [He] has seen it with [his] own eyes."  *Id.*  The court agreed that the

videos and song lyrics—which the court neither summarized nor outlined—were relevant to the

crimes charged.  *Id.*  Specifically, the court observed that "the videos and lyrics refer[ed] to

individuals involved with the [d]efendant in drug trafficking; explain[ed] the [d]efendant's

preferred process for preparing and delivering drugs; . . . and refer[ed] to the minimum quantity

of illegal drugs that the [d]efendant sold to a given customer."  *Id.*  In other words, the court was

satisfied that the government demonstrated a sufficient nexus between the proffered evidence

and the conduct alleged.

In *United States v. Stuckey*, the Sixth Circuit likewise required a sufficient factual nexus

between the crimes charged and the lyrics admitted.  253 F. App'x 468 (6th Cir. 2007).  There,

the defendant was charged with murder to prevent a person from providing information

---

[17] The Court expressly departs, however, from the Seventh Circuit's holding in *United States v. Foster*, 939 F.2d 445 (7th Cir. 1991).  The district court, over the defendant's objection, admitted the following lyrics against him:  "Key for Key, Pound for pound I'm the biggest Dope Dealer and I serve all over town.  Rock 4 Rock self 4 self.  Give me a key let me go to work more dollars than your average business man."  *Id.* at 449.  The Seventh Circuit affirmed that the lyrics were relevant because the lyrics "made it more probable that [the defendant] had knowledge (and, therefore, more probable that he was guilty of the crime charged.").  *Id.* at 455.  In the court's view, the lyrics "indicated, at a minimum, that [the defendant] was familiar with drug code words and, to a certain extent, narcotics trafficking, a familiarity that made it more probable that he knew that he was carrying illegal drugs."  *Id.*  For the reasons discussed, Court rejects the notion that lyrics demonstrating a defendant's knowledge of the drug trade is sufficient to establish a sufficient nexus between music lyrics and charged conduct.

concerning a federal crime to federal authorities.  *Id.* at 473.  The district court admitted the

following lyrics:  "I expose those who knows; fill they bodys with ho[l]es; Rap em up in blankit;

Dump they bodys on the rode."  *Id.* at 475.  The Sixth Circuit affirmed the district court's

decision, holding that the lyrics were "precisely what the Government accused [the defendant] of

doing to [the victim] in this case."  *Id.* at 482.  That is, the lyrics were admissible because they

described with specificity the alleged criminal conduct.  *See id.* at 482–83.

        Also in line with the Court's view is *United States v. Wilson*, 493 F. Supp. 2d 484

(E.D.N.Y. 2006).  *Wilson* was a capital murder case where the court admitted the following

lyrics:  "Come teast Rated U Better have that vast and dat Golock/ Leavea 45 slogs in da back of

ya head cause I'm getting dat bread I ain't goin stop to I'm dead."  *Id.* at 488–89.  Critically, the

defendant wrote the lyrics "in the two days following the murders of the victims and at a time

when [the defendant] knew he was wanted by the police for the[] crimes."  *Id.* at 490.  And, the

lyrics referenced carrying a vest and a Glock, both of which are issued to police officers, who

were the defendant's alleged victims.  *See id.* at 488 n.2.  The temporal proximity between the

lyrics and the crime, as well as the references to details that resembled the facts of the case,

demonstrated the relevance of the lyrics.  *Id.* at 489–90.[18]

---

[18] Similarly, in *United States v. Dore*, a Hobbs Act robbery case, the district court admitted at trial a music video depicting "a staged armed robbery."  No. 12-cr-45, 2013 WL 3965281, at *7 (S.D.N.Y. July 31, 2013).  The district court found that the video was admissible pursuant to Rule 404(b) because "the video demonstrated (1) [the defendant's] possession and control over the same Mercedes-Benz that the evidence at trial showed was used in the commission of various robberies charged in the conspiracy; (2) the relationship between individuals involved in the charged conspiracy; . . . and (4) their possession of or access to firearms."  *Id.*  These are all factual connections between the charged conduct and the video.  The court also determined that the video showed the defendants' "modus operandi, such as the use of masks in committing robberies."  *Id.* at *8.  In *United States v. Herron*, a RICO case, the court admitted rap lyrics and videos showing the defendant "identifying as a member of the [enterprise], conversing with alleged [enterprise] associates, firing weapons, vowing retaliation after an alleged associate is shot by a rival, and bragging that other people will do his bidding."  No. 10-cr-615, 2014 WL 1871909, at *4 (E.D.N.Y. May 8, 2014).  The factual nexus was clear in each case.

Here, as evidence of his guilt, the Government seeks to admit Jordan's lyrics: "I aim for the head, I ain't a body shooter" and "we aim for the head, no body shots, and we stick around just to see the body drop." (Mot. in Limine at 35.) Ultimately, Jordan's lyrics do not include any specific facts that might relate to his participation in the murder alleged in this case. *Cf. Stuckey*, 253 F. App'x at 482 (admitting lyrics where they described "precisely" the murder the Government accused the defendant of committing). Jordan's lyrics do not mention Mizell, the recording studio in which Mizell was killed, the other shooting victim, or any alleged accomplices. Nor does the Government claim that Jordan wrote or performed these lyrics around the time of the alleged murder. *Cf. Wilson*, 493 F. Supp. 2d at 490 (admitting lyrics where the defendant wrote them "in the two days following the murders of the victims and at a time when [the defendant] knew he was wanted by the police for the[] crimes"). These lyrics merely contain generic references to violence that can be found in many rap songs.

Nas, in the song *Shootouts*, rapped, "two in the dome, he's laid down." Nas, *Shootouts, on It Was Written* (Columbia 1996). Ice Cube, in the song *Dead Homiez*, rapped, "two shots hit him in the face when they blasted." Ice Cube, *Dead Homiez*, *on Kill at Will* (Lench Mob/Priority 1990). ScHoolboy Q, in the song *Gangsta*, rapped, "knock knock knock, your brain on the doormat." ScHoolboy Q, *Gangsta*, *on Oxymoron* (TDE/Interscope 2014). And, Vince Staples, in the song *Blue Suede*, rapped, "ask where he from then leave his dome roofless." Vince Staples, *Blue Suede, on Hell Can Wait* (ARTium/Def Jam 2014). Those songs, like Jordan's, describe shooting a person in the head. Yet, seemingly, the sole reason those songs are not probative of the alleged conduct in this case is that Jordan did not write or perform them. By the same token, the lyrics from Jordan's song have the same nexus to any other headshot murder that took place before the lyrics were written. But, of course, Jordan is not on trial for those crimes.

11

The Government's request to admit lyrics discussing "breaking down bricks" fares no better. (Mot. in Limine at 35.) That is, "breaking down bricks" does not bear a specific nexus to the underlying offense conduct alleged in this case. Nevertheless, the Government argues that these lyrics describe Jordan's role in the drug distribution conspiracy that, as the Government alleges, precipitated the alleged murder. (*Id.* at 37.) However, rap songs frequently reference the concept of "breaking down bricks," that is, repackaging kilograms of drugs to distribute in smaller quantities. Patricia Holland, *The Meaning Behind The Song: Break a Brick by Future*, OldTimeMusic.[19] The rap group Migos, for instance, rhymed, "break a brick down, n****, break a brick down, n****" throughout their song *Modern Day*. Migos, *Modern Day*, *on Culture III* (Motown/Quality Control 2021); *see also, e.g.*, Juvenile, *Break a Brick Down*, *on Reality Check* (UTP/Atlantic 2006). The members of Migos, however, do not stand accused of drug trafficking in this or any other case. Jordan's lyrics are simply too imprecise, unlike lyrics that have been found to explain a defendant's "preferred process for preparing and delivering drugs" or "refer[ed] to the minimum quantity of illegal drugs" that the government alleged a defendant sold. *Carpenter*, 372 F. Supp. 3d at 77.

At bottom, none of the lyrics the Government seeks to admit as evidence of Jordan's guilt bear any nexus to the criminal conduct alleged in this case. And, Jordan's statement that he raps about his lived experience cannot alone serve as a substitute for the requisite nexus. Because the proffered lyrics do not have a sufficient nexus to the charged drug conspiracy, they are inadmissible.

None of this is to say that music lyrics cannot be probative, even compelling, evidence of guilt. Consider an example from Kendrick Lamar's 2012 song *The Art of Peer Pressure* to

---

[19] https://oldtimemusic.com/w2/the-meaning-behind-the-song-break-a-brick-by-future/.

illustrate the point. Lamar narrates the beginnings of a home invasion when he states that its "me

and my n****s four deep in a white Toyota." Kendrick Lamar, *The Art of Peer Pressure, on*

*Good Kid M.A.A.D. City* (TDE/Aftermath/Interscope 2012). According to the song, he and his

companions "pull in front of the house that we been campin' out for like two months. The sun is

goin' down as we take whatever we want." *Id.* And then he divulges what happens next in stark

detail:

> Ay, ay, n****, jackpot, n****, pop the safe
> Ay, n****, I think it's somebody in this room
> Wait, what?!
> N****, it's somebody in this room
> I hit the back window in search of any Nintendo
> DVD's, plasma-screen TV's in the trunk
> We made a right, then made a left, then made a right
> Then made a left, we was just circlin' life
> My mama called, "Hello? What you doin'?", "Kickin' it"
> I shoulda told her I'm probably 'bout to catch my first offense
> With the homies
> But, they made a right, they made a left
> Then made a right, then another right
> One lucky night with the homies.

*Id.* If the Government wished to admit these lyrics into evidence at a subsequent trial accusing

Lamar of burglarizing an occupied residence with his friends at sunset, there would be a more

than sufficient basis to do so.

*            *            *

A final note is in order. Courts should be wary of overly permissive rules allowing the

use of rap lyrics and videos against criminal defendants at trial. Some of the themes of violence

and criminality have become so prevalent within the genre that they have little, if any, probative

value at trial. Music artists should be free to create without fear that their lyrics could be unfairly

used against them at a trial. Juries, too, should not be placed in the unenviable position of

divining a defendant's guilt, in whole or in part, from a musical exposition with only a tenuous

13

relationship to the criminal conduct alleged.  Individuals who choose to confess unmistakable details of their crimes should be held to those statements, to be sure.  It is critical, however, that resolution of guilt and innocence emerge from evidence with a close relationship to a specific criminal act, and not be based on perceptions born from the commercial and artistic promotion of a criminal lifestyle.

## CONCLUSION

For the foregoing reasons, the Government's motion to admit Jordan's rap lyrics and videos is DENIED.

SO ORDERED.

Dated: Brooklyn, New York                                   /s/ LDH_____
       January 30, 2024                                   LASHANN DEARCY HALL
                                           United States District Judge