UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ x

UNITED STATES OF AMERICA,

                                                    20 Cr. 305 (LDH)

                        -against-

KARL JORDAN, JR., et al.,

                                    Defendants.

------------------------------------------------------------------------ x


**DEFENDANT KARL JORDAN, JR.'S
MEMORANDUM IN SUPPORT OF HIS
RULE 29 AND 33 MOTIONS**


MICHAEL HUESTON, ESQ.
MARK DEMARCO, ESQ.
JOHN DIAZ, ESQ.
EMILEE SAHLI, ESQ.
*Counsel for Defendant Karl Jordan, Jr.*


Dated:  April 5, 2024

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................ ii

PRELIMINARY STATEMENT ..................................................................... 1

RULE 29 MOTION ........................................................................................ 1

    A. Government's Opening Statement .................................................... 1

    B. Trial Evidence of The Narcotics Conspiracy ................................... 2
        1. Detective John Roberts............................................................ 2
        2. Eric James............................................................................... 3
        3. Ralph Mullgrav ....................................................................... 6
        4. Chris Burrell ........................................................................... 7
        5. William Marshall..................................................................... 8
        6. Special Agent Andrew Tummino................................................ 9

    C. Rule 29 Oral Argument .................................................................... 9

    D. A Judgment Of Acquittal Should Be Entered On Counts One And Two ............................................................................................... 13
        1. Applicable Law ..................................................................... 13
        2. Count One............................................................................. 17
            a. There Was No Evidence That Jordan Was A Participant In A Drug Conspiracy At The Time Of The Murder .... 18
            b. There Was No Evidence Of A Drug-Related Motive For The Murder Or That The Murder Furthered The Conspiracy's Goal ....................................................... 23
        3. Count Two ............................................................................. 27

RULE 33 MOTION ...................................................................................... 29

    A. Applicable Law............................................................................... 29
    B. Jay Bryant's Confession And DNA Evidence Justify A New Trial ................................................................................................. 29
    C. Trial Juror No. 12 Was Impaired Juror And Likely Tainted The Jury ................................................................................................. 34

CONCLUSION ............................................................................................ 39

# TABLE OF AUTHORITIES

**CASES**                                                                **Page**

*Carpenters & Joiners v. United States*,
    330 U.S. 395 (1899) ........................................................... 15

*Fong Foo v. United States*,
    369 U.S. 141 (1962) ........................................................... 14

*In re Winship*,
    397 U.S. 358 (1970) ........................................................... 13

*Jackson v. Virginia*,
    443 U.S. 307 (1979) ....................................................... 14, 15

*Kendrick v. United States,*
    No. 22-CV-6510-FPG,
    2023 U.S. Dist. LEXIS 99456 (W.D.N.Y. June 7, 2023) ................. 23

*Kuntze v. United States*,
    109 S. Ct. 324 (1988) ....................................................... 19

*Lockhart v. McCree*,
    476 U.S. 162 (1986) ........................................................... 35

*McDonough Pwr. Equip v. Greenwood*,
    464 U.S. 548 (1984) ....................................................... 38, 39

*Smith v. Lightning Bolt Prods*,
    861 F.2d 363 (2d Cir. 1988) ............................................... 29

*Smith v. Phillips*,
    455 U.S. 209 (1982) ........................................................... 35

*United States v. Aguilar,*
    585 F.3d 652 (2d Cir. 2009) .................................... 14, 25, 26

*United States v. Aina-Marshall*,
    336 F.3d 167 (2d Cir. 2003) ............................................... 14

ii

*United States v. Archer*,
  977 F.3d 181 (2d Cir. 2020) .................................................................. 33

*United States v. Atehortva*,
  17 F.3d 546 (2d Cir. 1994) ........................................................... 21, 24

*United States v. Blasini-Lluberas*,
  169 F.3d 57 (1st Cir. 1999) ......................................................... 15, 16

*United States v. Blondet*,
  No. S13 16-CR-387 (JMF),
  2022 U.S. Dist. LEXIS 217762 52 (S.D.N.Y. Dec. 2, 2022)............. 16

*United States v. Broadus*,
  664 F. Supp. 592 (D.D.C. 1987) ...................................................... 14

*United States v. Canady*,
  126 F.3d 352 (2d Cir. 1997) ............................................................ 14

*United States v. Capers,*
  20 F.4th 105 (2d Cir. 2021) ............................................................. 28

*United States v. Ceballos*,
  340 F.3d 115 (2d Cir. 2003) ............................................................ 22

*United States v. Clark*,
  740 F.3d 808 (2d Cir. 2014). .......................................................... 15

*United States v. Clemente*,
  2004 U.S. Dist. LEXIS 627 (S.D.N.Y. 2004) .................................... 34

*United States v. Columbo*,
  869 F.2d 149 (2d Cir. 1989) ............................................................ 39

*United States v. Concepcion*,
  983 F.2d 369 (2d Cir.1992) ....................................................... 23, 24

*United States v. Coplan*,
  703 F.3d 46 (2d Cir. 2012) .............................................................. 15

*Unites States v. Cote*,
  544 F.3d 88 (2d Cir. 2008) ......................................................... 29, 32

*United States v. Crowley,*
    318 F.3d 401 (2d Cir. 2003) ............................................................. 14

*United States v. D'Amato,*
    39 F.3d 1249 (2d Cir. 1994) ............................................................. 15

*United States v. Desimone,*
    119 F.3d 217 (2d Cir. 1997) ............................................................. 22

*United States v. Desinor,*
    525 F.3d 193 (2d Cir. 2008) ....................................................... 26, 28

*United States v. Dhinsa,*
    243 F.3d 635 (2d Cir. 2001) ............................................................. 26

*United States v. Dworken,*
    855 F.2d 12 (1st Cir. 1988) ............................................................. 20

*United States v. Farmer,*
    583 F.3d 131 (2d Cir. 2009) ............................................................. 23

*United States v. Ferguson,*
    246 F.3d 129 (2d Cir. 2001) .................................... 23, 24, 29, 32, 33

*United States v. Florez,*
    447 F.3d 145 (2d Cir. 2006) ............................................................. 32

*United States v. Friedman,*
    300 F.3d 111 (2d Cir. 2002) ............................................................. 21

*United States v. Gaviria,*
    740 F.2d 174 (2d Cir. 1984) ............................................................. 22

*United States v. Glenn,*
    312 F.3d 58 (2d Cir. 2002) ............................................................. 15

*United States v. Goff,*
    847 F.2d 149 (5th Cir. 1988) ............................................................. 19

*United States v. Gomez,*
    210 F. Supp. 2d 465 (S.D.N.Y. 2002) ............................................. 27

*United States v. Heath*,
260 F.2d 623 (9th Cir. 1958) ............................................................. 14

*United States v. Iennaco*,
893 F.2d 394 (D.C. Cir. 1990) ...................................................... 10, 19

*United States v. Irving*,
682 F. Supp. 2d 243 (E.D.N.Y. 2010) .............................................. 16

*United States v. Jackson*,
335 F.3d 170 (2d Cir. 2003) .............................................................. 14

*United States v. Jones*,
393 F.3d 107 (2d Cir. 2004) .............................................................. 14

*United States v. Jones*,
765 F.2d 996 (11th Cir.1985) ............................................................ 20

*United States v. Jones*,
291 F. Supp. 2d 78 (D. Conn. 2003) ................................................. 24

*United States v. Kemp*,
No. 21-1684-cr (CON),
2023 U.S. App. LEXIS 2009 (2d Cir. Jan. 26, 2023) ....................... 28

*United States v. Landau*,
155 F.3d 93 (2d Cir. 1998) ................................................................ 29

*United States v. Leslie*,
102 F.3d 1093 (2d Cir. 1997) ............................................................ 14

*United States v. Lorenzo*,
534 F.3d 153 (2d Cir. 2008) .............................................................. 16

*United States v. Malpeso*,
115 F.3d 155 (2d Cir. 1997) .............................................................. 23

*United States v. Martin Linen Supply Co.*,
430 U.S. 564 (1977) .......................................................................... 14

*United States v. McCourty*,
562 F.3d 458 (2d Cir. 2009) .............................................................. 33

*United States v. McGriff,*
 287 F. App'x 916 (2d Cir. 2008) ......................................................... 39

*United States v. Melchor–Lopez,*
 627 F.2d 886 (9th Cir.1980) .............................................................. 19

*United States v. Muyet,*
 994 F. Supp. 501 (S.D.N.Y.1998) ...................................................... 23

*United States v. Nusraty,*
 867 F.2d 759 (2d Cir. 1989) .............................................................. 21

*United States v. Palmer,*
 203 F.3d 55 (1st Cir. 2000) ............................................................... 20

*United States v. Parker,*
 903 F.2d 91 (2d Cir. 1990) ................................................................ 32

*United States v. Pauling,*
 256 F. Supp.3d 329 (S.D.N.Y. 2017) ................................................. 15

*United States v. Pinckney,*
 85 F.3d 4 (2nd Cir.1996) ................................................................... 18

*United States v. Podolsky,*
 798 F.2d 177 (7th Cir.1986) .............................................................. 20

*United States v. Polanco,*
 145 F.3d 536 (2d Cir. 1998) .............................................................. 23

*United States v. Price,*
 No. 05-CR-492 (NGG),
 2010 U.S. Dist. LEXIS 45935 (E.D.N.Y. May 10, 2010).................. 26

*United States v. Rahman*,
 189 F.3d 88 (2d Cir. 1999) ................................................................ 21

*United States v. Rea*,
 958 F.2d 1206 (2d Cir. 1992) ............................................................ 16

*United States v. Rodriguez,*
 162 F.3d 135 (1st Cir. 1998) ............................................................. 25

*United States v. Ross*,
 33 F.3d 1507 (11th Cir. 1994) ............................................................ 14

*United States v. Samaria,*
 239 F.3d 228 (2d Cir. 2001) ............................................................. 21

*United States v. Sanchez*,
 969 F.2d 1409 (2d Cir. 1992) .................................................. 29, 32

*United States v. Santos,*
 541 F.3d 63 (2d Cir. 2008) ...................................................... 25, 28

*United States v. Shaoul,*
 41 F.3d 811 (2d Cir. 1994) ............................................................. 38

*United States v. Sharif,*
 817 F.2d 1375 (9th Cir.1987) ...................................................... 19, 20

*United States v. Soto-Beniquez,*
 356 F.3d 1 (1st Cir. 2003) ............................................................. 25

*United States v. Steinberg,*
 525 F.2d 1126 (2d Cir. 1975) ........................................................ 19

*United States v. Taylor,*
 464 F.2d 240 (2d Cir. 1972) ...................................................... 15, 16

*United States v. Thai,*
 29 F.3d 785 (2d Cir.1994) ............................................................. 23

*United States v. Thomas,*
 116 F.3d 606 (2d Cir.1997) ............................................................. 39

*United States v. Tocco,*
 135 F.3d 116 (2d Cir. 1998) ............................................................. 14

*United States v. Valle*,
 807 F.3d 508 (2d Cir. 2015) .................................................. 10, 15, 20

*United States v. Van Putten*,
 2005 U.S. Dist. LEXIS 10456 (S.D.N.Y. May 31, 2005) .................. 23

*United States v. Vargas*,
   986 F.2d 35 (2d Cir. 1993) .............................................................. 22

*United States v. Wallace*,
   447 F.3d 184 (2d Cir. 2006) ............................................................ 28

*United States v. Wallach*,
   935 F.2d 445 (2d Cir. 1991) ............................................................ 20

*United States v. Wheat*,
   988 F.3d 299 (6th Cir. 2021) ........................................................... 20

*United States v. Wieschenberg*,
   604 F.2d 326 (5th Cir.1979) ............................................................ 19

*United States v. Wilson*,
   663 F. Supp. 3d 259 (W.D.N.Y. 2023) ...................................... 18, 25

*United States v. Young*,
   745 F.2d 733 (2d Cir. 1984) ............................................................ 22

*Wainwright v. Witt*,
   469 U.S. 412 (1985) ........................................................................ 35

## CONSTITUTIONAL PROVISIONS AND STATUTES

U.S. Const. amend. VI ................................................................. 35

18 U.S.C. § 2 ..................................................................................... 1

18 U.S.C. § 924 ............................................................................ 1, 28

21 U.S.C. § 848 ................................................................ 1, 18, 25, 26, 28

Fed. R. Crim. P. 29 ...................................................................... 1, 13

Fed. R. Crim. P. 33 ...................................................................... 1, 29

Fed. R. Evid. 804 .............................................................................. 3

## PRELIMINARY STATEMENT

This memorandum of law is submitted on behalf of Karl Jordan, Jr. in support of his trial motion for a judgment of acquittal on Counts One and Two pursuant to Fed. Rule Crim. P. Rule 29, and his motion for a new trial pursuant to Fed. Rule Crim. P. Rule 33. On February 27, 2024, the jury convicted Jordan and his co-defendant Ronald Washington of Counts One, 21 U.S.C. § 848(e)(1)(A), and 18 U.S.C. § 2; and Two, 18 U.S.C. §§ 924(j)(1) and 2 of the superseding indictment. *See* S-2 Indictment, Doc. No. 151, 2/7/24 Minute Entry.

Regarding the Rule 29 motion, the evidence at trial was insufficient to prove to a rational juror beyond a reasonable doubt that: (1) Jordan murdered Jason Mizell while engaged in a narcotics conspiracy on or about October 30, 2002 (Count One); and (2) Jordan used a firearm during and in relation to that conspiracy on or about October 30, 2002 (Count Two).

Regarding the Rule 33 motion, we argue that co-defendant Jay Bryant's Confession and DNA evidence mandate a new trial and that Trial Juror No. 12 was not impartial and tainted the jury.

Jordan joins in the post-trial motions made by Washington to the extent they benefit him.

## RULE 29 MOTION

### A.  Government's Opening Statement

The government stated in its opening:

Jason Mizell began acting as a middleman between drug buyers and sellers across the country. The way it worked was simple: Jason would get the cocaine and then tap into his connections to sell it.

\* \* \*

Now, one of the individuals who sold for Jason Mizell was a childhood friend who had established himself as a drug trafficker in Baltimore, Maryland. In August of 2002, Jason Mizell traveled to Washington, D.C. where he would pick up cocaine and bring it to Baltimore to sell through his friend. With him on the trip was the defendant, Ronald Washington.

* * *

Now, Washington wanted in on this lucrative Baltimore deal and given his experience in Baltimore, Jason Mizell agreed. Jordan also wanted a piece of the Baltimore deal. You'll hear that Jordan and Washington were friends and just like Washington, Jordan had asked Jason Mizell to supply him with cocaine to sell, which he did in small amounts, but Jordan wanted a bigger piece. So Jason planned to include him in this Baltimore deal as well.

But the Baltimore deal, it didn't go as planned. After Jason Mizell and Washington drove the cocaine to Baltimore, the Baltimore dealer refused to work with Washington. So Jason sent Washington home. He cut him out of this Baltimore deal which meant that Jordan was also out. On a deal worth almost $200,000, Jordan and Washington were left with nothing.

Trial Transcript (Tr.) at 18-19.

The government also advanced:

Other witnesses will tell you about the relationships between the defendants and [codefendant Jay] Bryant and you will hear from witnesses who were part of and knew about the cocaine conspiracy. You will hear from witnesses who knew that Jason Mizell had given cocaine to Jordan and Washington to sell; witnesses who spoke to Jason Mizell about the defendants' involvement in the Baltimore deal. And you'll learn that Washington himself admitted the drug conspiracy and the Baltimore deal, and finally you will hear about these defendants' own statements made throughout the 20 years after the murder in which they admitted their participation.

Tr. 23.

At trial, witnesses Detective John Roberts, Eric James a/k/a Shake, Ralph Mullgrav a/k/a Yakim, Chris Burrell, William Marshall, and Special Agent Andrew Tummino testified regarding the conspiracy.

## B.    Trial Evidence Regarding The Narcotics Conspiracy

### 1.    <u>Detective John Roberts</u>

Detective Roberts testified about Washington's interrogation. *See* Tr. 2079-2118. He testified that Washington said that in August 2002, Washington, Mizell, and Chris Burrell went to Washington, D.C. to meet a man called "Unc". Tr. 2087-88. Roberts testified that Washington

indicated that the "plan was to take possession of 10 kilos of cocaine." Tr. 2088. Roberts

testified that Washington said that he, Mizell, and Burrell met with "Unc" at the Wyndham Hotel

in Washington D.C. where they discussed the terms of the drug deal including the price per kilo.

*Id.* Roberts testified that Washington had doubts that an agreement could be made:

> Mr. Washington stated that he was skeptical or concerned about this part of the deal because him and Yakim did not get along, so he wasn't sure that [it] would work out.

Tr. 2089. Roberts testified about Washington's role:

> He was there to take possession of the drugs, and then once they had received them, the plan was for them to take them to Baltimore to be sold.

Tr. 2097. Roberts did not testify that Washington claimed that Jordan had any role in the

Baltimore conspiracy.

### 2.  **Eric James**

Eric James testified about his observations of the conspiracy[1] and his own narcotics

trafficking. *See* Tr. 1743-1823. James testified that in 2002, Mizell connected James to a supplier

named "Unc." Tr. 1754. James testified that he overheard Mizell in a phone conversation in

October 2002 where Washington's name was mentioned by Mizell and Mizell appeared

"agitated." Tr. 1786. James testified that he had one conversation with Jordan about the price of

narcotics and that Jordan asked James to tell Mizell to "put him on." Tr. 1755-57. After

prompting by the government, James said: "Yeah, you might be right, maybe 2001, 2002, yeah."

Tr. 1755. Specifically, James testified:

> Q And can you tell us about that conversation, please?
> A It was just a bunch of us standing around. [Jordan] just asked me what was the prices, you know, he's like basically what is it going for.

*   *   *

---

[1] The Court admitted the statement by Mizell as a statement against Mizell's penal interest, pursuant Fed. R. Evid. 804(b)(3). Tr. 1725-38.

Q You said that he asked you what it was going for.
A Yes.
Q What did you understand that to mean?
A Cocaine.

Tr. 1756. But James told the jury he never got back to Jordan:

Q Now, when [Jordan] asked you about the prices of drugs, you didn't give him a
price, correct?
A No.
Q I mean, in fact, you never even pursued it any further, right?
A No.
Q That was -- he asked you and it just kind of brushed [him] off and that was the
end of it, right?
A Yes.
Q And you never addressed it with him ever again?
A No.

Tr. 1806-07.

James also testified about Jordan asking Mizell to "put" him on, and the times he saw

Jordan at the studio:

Q And did Little D say anything else at that time?
A Not right behind, but probably like five minutes later he nudged me and told me
to tell Jay to look out for him.
Q What did you understand that to mean?
A Give him cocaine.
Q What were the exact words he used, if you remember?
A He said "tell him to put me on".
Q What did you understand "put me on to mean"?
A Give me cocaine.

Tr. 1756-57.

Q And did you ever see [Mizell] in there with Little D?
A Yes.
Q About how many times?
A Once or twice. He was young. I wasn't really paying attention to him like that.

Tr. 1761.

Q Now that you your recollection is refreshed, can you tell the members of the
jury about that conversation?
A Jay had told me that he gave him an ounce.

4

Q And what did he say -- what else did he say about that?
A That he sold it.
Q And did he say why he gave it to him?
A To try him out.
Q And what did you understand that to mean?
A I mean, to try -- to see if he was good, I guess, you know, try him out.

Tr. 1769-70.

James testified that he never saw Jordan or Washington with any controlled substances:

Q Now, did you ever observe Tinard or Little D in possession of drugs?
A No.

Tr. 1770.

James also testified that in early 2002 Mizell told James that he had given Washington

drugs and "Tinard messed it up."  Tr. 1767-68. James testified that the plan to sell in Baltimore

hinged on Ralph Mullgrav a/k/a Yakim's approval:

Q And what did he say he was planning on doing with the 10 kilos?
A He said he was going to set up shop in Baltimore with Yakim and Tinard and Little D.
Q And you mentioned someone named Yakim.
Did you know who he was referring to?
A I heard his name around, but I don't know him.
Q And when Jason told you he was going to set up shop with Yakim, Tinard and Little D, what did you understand that to mean?
A You know, set up distribution for drugs that he had.
Q And did Jason say why this was going to happen in Baltimore?
A He said Yakim already pals down there. And then he said he could make more.

Tr. 1770-71.

Q You can answer the question.
A Yeah, he told me that he could make more money selling it there and it was wide open.
Q And that -- and the three of them had discussed that?
A Yes.
Q Okay. How many times?
                                        * * *
Q About how many times did you and Jason discuss this deal in Baltimore where he would set up shop with Little D, Tinard, and Yakim prior to his death?

A Maybe six, seven.
Q And based on those conversations, was it your understanding that this was like a one-shot deal or an ongoing thing?
A Ongoing.

Tr. 1777. However, James did not know what became of the Baltimore deal:

Q Did [Mizell] ever tell you what had happened with the Baltimore deal specifically?
A No.

*Id.* James also testified that after Mizell's death, "Unc" told James that Mizell no longer owed him any money.

Q Did you ever speak with Unc after Jason's murder? Yes or no, please?
A Yes.
Q And without getting into anything else that was said, did he mention anything about -- well, what did he say about Jason's death?
A He couldn't believe it.  He was in shock, like everybody else.
Q Did he say anything about money?
A He said -- he said whatever Jay owed died with him.

Tr. 1788.

### 3.  **Ralph Mullgrav**

Ralph Mullgrav a/k/a Yakim testified about the Baltimore deal. Tr. 884-894. When asked about the Baltimore deal where Mizell had asked Mullgrav about moving 10 kilograms of cocaine, the government asked whether there was a "problem with the plan", and Mullgrav responded: "He wanted me to involve another guy I grew up with named Tinard. We both grew up with, Tinard. He wanted me to work with Tinard and I told him no."  Tr. 886.

Mullgrav testified that Mizell told him that Mizell was getting the cocaine from the Midwest. Tr. 887.  Mullgrav testified that prior to August 2002 he had sold smaller quantities of cocaine for Mizell a "few times". Tr. 888. There is no testimony from Mullgrav that either Washington or Jordan participated in these prior transactions. Mullgrav did not testify about Jordan.

On cross-examination, Mullgrav, once again, stated that there was "No deal":

Q And he came to you for permission to put Tinard in Baltimore; am I right?
A Yes.
Q And you said no, right?
A Yes.
Q So no deal, right?
A No deal.

Tr. 894. The government never asked Mullgrav about what happened between him and Mizell

after he said there was, "No deal."

### 4. **Chris Burrell**

Chris Burrell testified about the Baltimore deal, Mizell, and the defendants. Tr. 1207-

1301. Burrell testified that in the summer of 2002 while driving from Queens to Manhattan with

Mizell and Washington he overheard a conversation where Mizell said that "if he gets his hands

on" drugs he would have "Tinard work it off or whatever." Tr. 1224.

Burrell also testified about his trip to Baltimore in the summer of 2002 with Mizell and

Washington. He testified that when he and Mizell found Yakim, Yakim approached and engaged

in what Burrell described as "small talk" and Yakim "jokingly" mentioned buying abandoned

buildings in Baltimore to be used as "crack houses." Tr. 1227-28.

Burrell also testified about their trip to Washington, D.C. in August 2002, stating that the

purpose of the trip was to deliver "jewelry" to "Unc", which Burrell confirmed he saw, Tr.1229-

30, so "jewelry" was not a code for drugs. Burrell said he never saw any drugs during the trip.

Tr. 1234. Burrell also testified that while driving from Washington D.C. to Baltimore, Burrell

overheard a conversation about Mizell setting up Washington in Baltimore: "A Well, [Mizell]

was going to put him somewhere. I'm not sure exactly where he was going to put him up. But

from my understanding, he was going to stay down there for a little while, I guess." Tr. 1233.

And Burrell testified that while in a car with Mizell and Washington, he overheard a call from

Yakim to Mizell where Yakim stated he would not deal with Washington, and indeed he would

kill him:

> Well, the conversation was basically about him finding out that Tinard was with
> Jason.  And he stated about, you know, like, he didn't like him or whatever and he
> gonna, like -- -- kill him on sight.

Tr. 1234-35.

> Q Mr. Burrell, just to back up. Could you hear this conversation while it was
> going on or is this what Jason told you after he hung up?
> A Jason didn't tell me anything. I just overheard it.
> Q Okay. And who else was -- the three of you were all in the car when Jason had
> this conversation with Yakim?
> A Yes.
> Q And you heard Yakim say: If I see Tinard, I'm going to kill him?
> A Yeah.

Tr. 1237. Burrell also testified that he and Washington returned to New York City because he

had an ear infection and Mizell remained in Baltimore. Tr. 1237. Burrell did not testify that

Washington held Mizell responsible for Yakim's decision to stop the deal or wanted revenge

against Mizell. Burrell did not testify about Jordan being involved in the Baltimore deal or

narcotics trafficking. Burrell testified that he never saw Jordan in the studio in 2002. Tr. 1294.

### 5.  **William Marshall**

William Marshall testified about his membership in the "Black Mafia Family," and Terry

Flenory who he claimed was also called "Unc," a leader of the "Black Mafia Family."  Tr. 1901-

20. Marshall did not testify about any drug dealing in Washington, D.C., Baltimore, Mizell,

Yakim, or the defendants. Tr. 1918. He never conspired to deal drugs for the "Black Mafia

Family" and "Unc" in Washington D.C. or Baltimore. Tr. 1919. He did not know who Mizell

was:

> Q Okay. Now, did you ever meet a person by the name of Jason Mizell?
> A Not that I can recall.
> Q Did you ever sell a car to Jason Mizell?

A No, sir.
Q Were you ever in the same room with a person named Jason Mizell?
A Without a picture recognition, I cannot say, sir.
Q So as you sit here today, you don't know who I'm referring to when I say Jason Mizell, correct?
A This is correct.

*Id.*

### 6. **Special Agent Andrew Tummino**

Special Agent Andrew Tummino testified about evidence collected that indicated Mizell was in Baltimore in August 2002 and Milwaukee in October 2002, Mizell's calendar, an itinerary for the "Rusty Waters Promo Tour", and contacts found in Mizell's phone. Tr. 1999-2012. He discussed a bank statement regarding a business account for "Erotic Money Entertainment, LLC care of Jason Mizell" at GX 606. Tr. 1999-2001. The bank records showed purchases occurring in Baltimore, Washington D.C., and Maryland, and a $22,666.33 deposit that was not attributed to drug dealing. Tr. 1999-2000.

Tummino discussed a calendar found at the studio at GX 607. Tr. 2003. The calendar listed "Milwaukee" on October 28, 2002, and "CT" on November 1, 2002. Tr. 2003. No evidence was ever provided to the jury that Mizell was involved in narcotics distribution in Connecticut. Tummino also discussed an extraction of a phone belonging to Mizell at GX 601A. Tr. 2005-08. No calls were introduced from the phone, but contacts attributed to James, "Yack" with Baltimore area codes, and other numbers with Los Angeles, California area codes were identified. Tr. 2007-08. No phone number belonging to Jordan was identified.

### C. **Rule 29 Oral Argument**

After the government's case, the defense requested a directed verdict dismissing both counts. Tr. 2260-75. The defense argued that the conspiracy could be defined as the "10 kilo

conspiracy or the Baltimore conspiracy, but either way, it's the same." Tr. 2263. The defense pointed out that after Mullgrav would not agree to the deal – though Mizell remained in Baltimore – no evidence was introduced showing Mizell tried to resuscitate the deal or planned a new deal with new players. Tr. 2265. Citing *United States v. Iennaco*, 893 F.2d 394, 397–98 (D.C. Cir. 1990) and *United States v. Valle*, 807 F.3d 508, 513(2d Cir. 2015), the defense argued that the deal was either not consummated or ended since Washington and Jordan were out. Tr. 7 ("And that means that even if there is a conspiracy … Washington isn't involved, the players aren't involved at that point."). The Court was more receptive to this argument regarding Washington, than Mr. Jordan, but the defense underscored that James described that the defendants were a "package deal." Tr. 2269-70.

The Court pressed the defense: "Even if you defined it narrowly as the Baltimore conspiracy, for sake of argument, and I am not saying for certain that that's what I'm concluding, but even if you define it as the Baltimore conspiracy, by what you have represented as what has come in, the Baltimore conspiracy was ongoing even after Washington's rejection from it." Tr. 2272. Respectfully, the defense explained, "The plan was for it to be ongoing.… But Yakim stops it from forming. [It's exactly the situation] that we see in cases like *Iennaco* and then cases from all of the circuits, but the *Valle* case, at least, gives us the proposition that if there's a condition that needs to be met that can't be met, then no conspiracy[.]" *Id.*

The Court further expressed: "There is a reasonable inference. It is absolutely reasonable to conclude that Mr. Mizell -- the fact that Mr. Mizell remained in Baltimore after Washington was sent back to New York, it is reasonable to infer that he did so to continue with the efforts to cement this deal." Tr. 2273. The defense replied there was no evidence that the deal continued after Washington left but if that was the case then it was "a separate conspiracy." Tr. 2273-74.

10

Respectfully, there is no evidence to infer that the conspiracy continued. This is because Mullgrav – who was in charge of Baltimore – testified at our trial, and the government solicited no testimony from Mullgrav that he continued to deal with Mizell.  This omission is telling.

Next, the defense argued, "Now, assuming for the sake of argument that a conspiracy was formed, it's broken by the time – by the time of the shooting.  All right? Yakim says no deal. New deal. That -- we were saying it's a different conspiracy.  If Your Honor finds that it's not a different conspiracy, even then, no – there's no deal as to these defendants."  Tr. 2274. The defense argued further, "Now, how could it be in furtherance? If, like Your Honor says, the deal's done in Baltimore and that's really the only evidence we have of any kind of deal that involves those three players, those three necessary players, then it's done.  The object has been met. There's no – it's both not during and not in furtherance of the conspiracy."  Tr. 2274-75. The defense also argued, "And related to that is: What's the idea? Is it for killing him that's in furtherance?  Is it the idea that these guys would now take over as Jay's role and they would be the middleman? There's no evidence of that."  Tr. 2275. Thus, the defense concluded, "So these are the four sort of interrelated – I'm not giving up on the first, but these are the four interrelated bases for finding that: [A], either the conspiracy isn't made out, [B] the underlying drug conspiracy isn't made out; [C] or it's not – it's not during or ongoing; or [D] it's not in furtherance." *Id.*

In reply, the government argued – contrary to its opening statement: "But Baltimore has never been characterized as the conspiracy by the Government. It's a part of the conspiracy, it is not the conspiracy. And as Your Honor pointed out, even if we define it as such for the sake of argument, there are sufficient facts for which to consider -- to infer that the conspiracy continued."  Tr. 2276.

The Court asked the government, "I am curious about the Government's response to Mr. Spilke's argument with respect to the 'in furtherance of' component of the Government's case." Tr. 2276-77. The government responded, "So I think it's quite clear that by killing Jason Mizell, there's an inference that they could be looking to get drugs, money, get around him, get to the supplier. All of these are–"). Tr. 2277. But the Court was skeptical of the assumptions, "…I'm not convinced that that's necessarily a reasonable inference to be drawn from the evidence that's come in." *Id.*

The Court posited: "And so arguing from the evidence as opposed to this inference which needs to be based, obviously, on known facts. So let's start off with the known facts that would provide the basis, then, for us to move towards an inference, but with respect to how it is that Mr. Mizell's murder with respect to Count One, in particular, operated to further the conspiracy." *Id.*

The government replied, "First, I would say that the fact the murder happened is -- is proof that this was a drug-related murder, and it was that it was in furtherance of. There is simply no other evidence in the record of any kind of animosity, issues, or anything else with these defendants –"). *Id.* In a colloquy, the Court pointed out, "Well, that's actually -- well, with these defendants. And so that's a little tautological, right?" Tr. 2277-79. Again, the Court pressed the government to answer its question: "I really want to get to the 'in furtherance' question that Mr. Spilke raised. That's the one I want to focus on." Tr. 2279.

The government then offered, "I think that the way that we get there is through making reasonable inferences. There simply is no other reason for this. And the facts, I think, allow us to make that inference." Tr. 2280. And the government then offered, "I don't know that we need to say, oh, well they were going to steal drugs, or they were going to steal money, or they were going to cut him out of supply chain and go directly to Unc. I don't know that the law requires

us to articulate a particular motive with that degree of specificity." *Id.* To which the Court rejoined, "It doesn't, but the law does require you to demonstrate and prove beyond a reasonable doubt that it was in furtherance of the conspiracy. And I – I'm not clear that I am clear as to the government's theory as to how the murder furthered the conspiracy." *Id.*

There was further discussion that this argument concerned Count One, and the government ended: "So, Your Honor, obviously in a conspiracy situation such as this where we are not offering testimony of a cooperating witness who is part of the conspiracy, these facts and these motivations have to be inferred from the surrounding circumstances. And so what I would say is that the law recognizes this and it says that the narcotics-related motive need not be the sole motive, it need not even be the primary motive for the murder." Tr. 2281.

This avoided answering the Court's question.

The Court reserved the decision. Tr. 2282.

## D.    A Judgment Of Acquittal Should Be Entered On Counts One And Two

### 1.    <u>Applicable Law</u>

In a paradox, the government argues that the defendants were cut out of the drug conspiracy but that the conspiracy was ongoing and Mizell's murder furthered the conspiracy's goals. This is nonsensical.

The rule of constitutional sufficiency instructs that a conviction cannot be obtained "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime . . . charged." *In re Winship*, 397 U.S. 358, 364 (1970). "[T]he court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). The rule permits a court to review a jury's irrational or erroneous determination that may have been based on emotion, passion, sympathy, the severity

of the crime charged, or other facets of the trial that could lead a jury astray. *United States v. Martin Linen Supply Co.*, 430 U.S. 564, 573 (1977) ("Rule 29 merely replaces the directed-verdict mechanism employed in [*Fong Foo v. United States*, 369 U.S. 141 (1962)]"). *See also United States v. Heath,* 260 F.2d 623, 626 (9th Cir. 1958); *United States v. Broadus*, 664 F. Supp. 592, 598 (D.D.C. 1987). One of the facets that could lead a jury astray is the anonymous jury in this case. *Cf., United States v. Ross,* 33 F.3d 1507 (11th Cir. 1994) ("An anonymous jury raises the specter that the defendant is a dangerous person from whom the jurors must be protected, thereby implicating the defendant's constitutional right to a presumption of innocence.")

In order to succeed, the defendant must demonstrate that "no rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt." *United States v. Leslie*, 102 F.3d 1093, 1100 (2d Cir. 1997) (citations omitted); and *United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); accord *United States v. Aguilar*, 585 F.3d 652, 656 (2d Cir. 2009) and *United States v. Aina-Marshall*, 336 F.3d 167, 171 (2d Cir. 2003) (citing *United States v. Tocco*, 135 F.3d 116, 123 (2d Cir. 1998). A court must evaluate the evidence in the light most favorable to the government, *United States v. Crowley*, 318 F.3d 401, 407 (2d Cir. 2003), and resolve all issues of credibility in the government's favor. *United States v. Canady*, 126 F.3d 352, 356 (2d Cir. 1997). A conviction must be allowed to stand if the reviewing court finds that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, *Virginia*, 443 U.S. at 319, but the defendant's burden "is not an impossible one." *United States v. Jones*, 393 F.3d 107, 112 (2d Cir. 2004).

For instance, if the evidence "gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt." *United States v. Coplan*, 703 F.3d 46, 69 (2d Cir. 2012). In other words, where the evidence is "in equipoise," a judgment of acquittal is required. *Id.*; *see also United States v. Glenn*, 312 F.3d 58, 70 (2d Cir. 2002); *United States v. D'Amato*, 39 F.3d 1249 (2d Cir. 1994). And "in our system . . . the application of the beyond-a-reasonable-doubt standard to the evidence is not irretrievably committed to jury discretion." *Virginia*, at 318 n.10.  The Constitution prohibits a jury from convicting a defendant if no reasonable jury could have found each element proven beyond a reasonable doubt. *Id.* at 319. Although the jury is "permitted to enter an . . . unreasonable verdict of 'not guilty,' "it does not have the "power to enter an unreasonable verdict of guilty." *Id.* (citing *Carpenters & Joiners v. United States*, 330 U.S. 395, 408 (1899)).

As one district court stressed, "'if courts are to be faithful to the constitutional requirement that no person may be convicted unless the Government has proven guilt beyond a reasonable doubt, we must take seriously our obligation to assess the record to determine . . . whether a jury could reasonably find guilt beyond a reasonable doubt.'" *United States v. Pauling*, 256 F. Supp.3d 329, 334 (S.D.N.Y. 2017)*, aff'd* 924 F.3d 649 (2d Cir. 2019) (alteration in the original) (citing *United States v. Valle*, 807 F.3d at 513, 515, and *United States v. Clark*, 740 F.3d 808, 811 (2d Cir. 2014)).

So, "juries do not have carte blanche," *United States v. Blasini-Lluberas*, 169 F.3d 57, 62 (1st Cir. 1999), and "[t]he jury may not be permitted to conjecture merely, or to conclude upon pure speculation or from passion, prejudice or sympathy," *United States v. Taylor*, 464 F.2d 240, 243 (2d Cir. 1972)  And while the court is not entitled to second-guess the jury's assessments,

*United States v. Rea*, 958 F.2d 1206, 1221-22 (2d Cir. 1992), the court is required to "take a hard look at the record and to reject those evidentiary interpretations and illations that are unreasonable, insupportable, or overly speculative." *Blasini-Lluberas*, 169 F.3d at 62 (internal citations and quotation marks omitted); *see also United States v. Lorenzo*, 534 F.3d 153, 159 (2d Cir. 2008) (internal citation, quotation marks and alterations omitted) ("[S]pecious inferences are not indulged, because it would not satisfy the Constitution to have a jury determine that the defendant is probably guilty"). "If the evidence is such that reasonable jur[ors] must necessarily have . . . a [reasonable] doubt, the judge must require acquittal, because no other result is permissible within the fixed bounds of jury consideration." *Taylor*, 464 F.2d at 243. *See, e.g.*, *United States v. Irving*, 682 F. Supp. 2d 243, 249 (E.D.N.Y. 2010) ("Defendant, an attorney, worked for her codefendant, a prominent criminal defense attorney…. In response to defendant's motion, the court concluded that the evidence was insufficient to support the conviction for conspiracy to obstruct justice, as there was no evidence defendant knew codefendant was attempting to influence or prevent the testimony of witnesses through intimidation or threats. The evidence was also insufficient to support the eavesdropping conviction…[.]"); and *United States v. Blondet*, No. S13 16-CR-387 (JMF), 2022 U.S. Dist. LEXIS 217762, at *51-52 (S.D.N.Y. Dec. 2, 2022) ("In the final analysis, the Government is correct that '[t]he key inquiry is whether Blondet believed, *at the time* [*of the murder*], that his conduct would maintain or increase his position.' The problem for the Government is that, on the trial record, inferring such a belief depends on 'pure speculation. While a defendant's § 1959 conviction is to be affirmed if a motivation to maintain or increase his position may be reasonably inferred from the evidence, such a conviction may not be affirmed where, as here, that inference is based on no more than guesswork.'") (internal citations omitted) (emphasis in original).

2. **Count One**

In order to prove the charge in Count One, the government had to prove:

First, the defendant was engaged in a conspiracy to distribute controlled substances in violation of 21 U.S.C. §841(b)(1)(A).

Second, the conspiracy involved at least five kilograms of a mixture or substance containing cocaine.

Third, while engaged in that conspiracy, the defendant either knowingly and intentionally killed Jason Mizell, or knowingly and intentionally counseled, commanded, induced, procured, or caused the killing of Jason Mizell.

Fourth, the killing of Jason Mizell actually resulted from the actions of the defendant or a person the defendant aided and abetted.

Tr. 2554. The Court explained to the jury: "What this means is that, to find that the Government has established the first element, you must determine whether the Government has proven beyond a reasonable doubt a conspiracy to distribute five or more kilograms of cocaine that existed on October 30, 2002."  Tr. 2555. The Court instructed:

> To show that the killing of Jason Mizell occurred while the defendant was engaged in a drug conspiracy, the Government must prove more than simply a temporal connection between the killing and the drug conspiracy. The Government must show that a substantive connection existed between the alleged conspiracy and the killing, in other words, that the alleged conspiracy was one purpose of the killing. Now, if you find that the murder was wholly unconnected to the alleged drug conspiracy or was simply coincidental to it, then this element will not be satisfied.  However, the Government has no burden to establish that a drug-related motive was the sole purpose, the primary purpose or even that it was equally as important to any non-drug related purpose as long as it was one purpose.  The Government must also prove that the drug conspiracy was ongoing at the time of the killing. But the Government does not need to prove that the killing happened simultaneously with the specific narcotics transaction.

Tr. 2557-58.

17

### a.  There Was No Evidence That Jordan Was A Participant In A Drug Conspiracy At The Time Of The Murder

"To convict a defendant of engaging in a narcotics conspiracy resulting in murder, or engaging in a narcotics conspiracy while engaging in a conspiracy to murder, under 21 U.S.C.S. § 848(e)(1)(A), the government had to prove beyond a reasonable doubt that one motive for the killing was related to the drug conspiracy." *United States v. Wilson*, 663 F. Supp. 3d 259, 265 (W.D.N.Y. 2023). As detailed above, Eric James did not know the outcome of the Baltimore scheme. Tr. 1776-777. But we know that Mullgrav would not work with Washington. Tr. 894. There was no evidence from Mullgrav, or any other source, that the conspiracy continued after Mullgrav said, "No deal." Even if Mizell came up with another scheme with a new array of conspirators, the government chose not to ask Mullgrav what happened after Washington left Baltimore, which supports our position that it is improper to draw an inference that the deal continued. *See, e.g.*, *United States v. Pinckney*, 85 F.3d 4, 7 (2d Cir. 1996) (The *Pinckney* court found that the government failed to prove the interstate-commerce element, showing only that workers in a Brooklyn scrap metal lot distributed car parts to auto body shops in New York. The court noted: "That question could have—and should have—been put squarely to [the witness].").

The record clearly shows there was no other cognizable conspiracy other than the Baltimore conspiracy or the conspiracy to sell 10 kilograms. Tr. 1770-71 ("Q And what did he say he was planning on doing with the 10 kilos? A He said he was going to set up shop in Baltimore with Yakim and Tinard and Little D….). James provided no evidence that Mizell conspired with Jordan to sell drugs apart from the Baltimore deal or New York, as the ounce Jordan sold was only to test Jordan out for Baltimore. Tr. 1769-70.

James did not describe an "ongoing" drug organization or enterprise operated by Mizell with moving players and locations and means of delivery. Rather, James described Mizell's

aspiration to be a middleman and preliminary plans to create a narcotic distribution chain in Baltimore. Tr. 1777. But the conspiracy ended when Mullgrav said, "No deal." Again, the government asked no questions about, what if any, interactions Mizell had with Mullgrav to revive the deal. A search for the truth should have prompted that inquiry since he appeared at trial. This was the government's burden and it sidestepped it.

As advanced at oral argument, *United States v. Iennaco*, 893 F.2d at 397-98, provides persuasive authority discussing that failed negotiations do not amount to an ongoing conspiracy. In *Iennaco*, the government's evidence showed only negotiations, solicitations, and counter-offers, but no agreement between the parties. *See also United States v. Goff*, 847 F.2d 149, 167-68 (5th Cir.) (1988), modified on another point, 847 F.2d 178 (1988), cert. denied sub nom ("Exploratory and inconclusive" or "preliminary" discussions and negotiations are not sufficient to establish an agreement."); *Kuntze v. United States*, 109 S. Ct. 324 (1988); *United States v. Melchor–Lopez*, 627 F.2d 886, 892 (9th Cir.1980); and *United States v. Wieschenberg*, 604 F.2d 326, 334–36 (5th Cir.1979) (no agreement to import munitions without a license where parties "just discussed how [they] could possibly do it"); *United States v. Steinberg*, 525 F.2d 1126, 1134 (2d Cir. 1975) (no conspiracy where defendant's statements regarding agreement were "equivocal").

Since the Baltimore plan failed, it was the government's burden to show – through credible evidence – that Mizell initiated a new scheme, which the defendants joined. That never happened. There are no reasonable inferences to support a contrary finding. While we agree that there need not be a specific agreement as to price, quantity, and time, place, and manner of delivery to prove a conspiracy, *see United States v. Sharif*, 817 F.2d 1375, 1378 (9th Cir.1987), there must be an agreement to commit some offense. No such agreement exists if the parties to

the alleged conspiracy raise objections and impose unaccepted preconditions on their agreement, as Mullgrav did. *See Sharif*, 817 F.2d at 1378; *United States v. Jones*, 765 F.2d 996, 1002 (11th Cir.1985); *see also United States v. Podolsky*, 798 F.2d 177, 178 (7th Cir.1986) (holding that unaccepted precondition to agreement would have defeated conspiracy but upholding conspiracy conviction based on district court's finding that agreement existed, although performance was subject to certain conditions). *See also United States v. Valle*, 301 F.R.D. 53, 95-97 (S.D.N.Y. 2014), *aff'd in part, rev'd in part*, 807 F.3d 508 (2d Cir. 2015) ("Where an alleged participant in a conspiracy sets conditions for his participation, 'the relevant question is whether the alleged conspirator[ ] subjectively believed that the condition[ ] necessary for attaining the objective [was] likely to be fulfilled…. This approach appropriately focuses on the actual intent of the alleged part[y] to the conspiracy.'[*United States v. Wallach*, 935 F.2d 445, 471 (2d Cir. 1991)]; *see also United States v. Palmer*, 203 F.3d 55, 64 (1st Cir. 2000) ('In *United States v. Dworken*, 855 F.2d 12, 19 (1st Cir.1988), we suggested that the test for conditional conspiratorial liability should focus on the likelihood that the condition precedent will be fulfilled…. Because there is no evidence that Valle ever believed that he could commit a kidnapping and 'get away with it,' his assurances to Aly Khan that he would commit a kidnapping if he was 'guaranteed to get away with it' do not assist the Government in demonstrating either a criminal agreement or Valle's specific intent to commit a kidnapping."); *see also Jones*, 765 F.2d at 1003 (11th Cir. 1985) (no conspiratorial agreement arises when a party offers proposals that are never accepted by the other party); and *United States v. Wheat*, 988 F.3d 299, 309-10 (6th Cir. 2021) ("To be sure, the government presented a 'slam-dunk' case that Wheat committed a crime: He distributed a heroin sample to Reels in violation of 21 U.S.C. § 841(a)(1)…. But it did not charge Wheat

20

with distributing to Reels; it charged him with conspiring with Reels.") (internal citations omitted).

There was no evidence that Jordan joined any revived narcotics distribution conspiracy involving 5 kilograms or more of cocaine after Yakim said, "No deal[,]" in August 2002. *See United States v. Rahman,* 189 F.3d 88, 123 (2d Cir. 1999), *cert. denied,* 528 U.S. 1094 (2000) (Once the existence of a conspiracy has been established, the government must prove that the person charged "knew of the existence of the scheme alleged in the indictment and knowingly joined and participated in it.").

There was no evidence from which to reasonably infer that Jordan knew of or joined any new conspiracy, or that the conspiracy, described by James continued, with Jordan being involved. Indeed, isn't the government's theory he had been cut out? The Second Circuit has overturned conspiracy convictions for insufficiency of evidence where the government presented insufficient evidence from which the jury could reasonably infer that the defendant had knowledge of the conspiracy charged. *See United States v. Friedman,* 300 F.3d 111, 126 (2d Cir. 2002), *cert. denied,* 538 U.S. 981 (2003); *United States v. Samaria,* 239 F.3d 228, 236-38 (2d Cir. 2001); *United States v. Atehortva*, 17 F.3d 546, 551 (2d Cir. 1994); *United States v. Nusraty,* 867 F.2d 759, 765 (2d Cir. 1989). For example, in *Atehortva,* a defendant was hired to commit a kidnaping for ransom, the purpose of which was to enforce a drug debt. *Atehortva,* 17 F.3d at 548. The Second Circuit concluded that the evidence was insufficient to support a conviction for a narcotics conspiracy because the government failed to prove that the defendant, although he knowingly joined and participated in the kidnaping plot, "knew of the existence of the . . . debt, or that he knew or should have known that the debt resulted from a narcotics transaction." *Id.* at 551 (footnote omitted).

Even if Jordan knew about a new conspiracy, that would be insufficient. The Second Circuit has overturned conspiracy convictions where, although the defendant had knowledge of the conspiracy, there was insufficient evidence from which the jury could reasonably have inferred that the defendant intended to join it. *See United States v. Ceballos,* 340 F.3d 115, 127-28 (2d Cir. 2003); *United States v. Young,* 745 F.2d 733, 764 (2d Cir. 1984), *cert. denied,* 470 U.S. 1084 (1985); *United States v. Gaviria,* 740 F.2d 174, 184 (2d Cir. 1984).

In the absence of an explicit agreement to join a conspiracy, the Second Circuit typically looks for evidence that the defendant, in addition to knowing the essential nature of the plan, has "associated himself with the venture in some fashion, participated in it as something that he wished to bring about, or sought by his action to make it succeed." *United States v. Vargas,* 986 F.2d 35, 39 (2d Cir.) (citation, internal quotation marks, and alterations omitted), *cert. denied,* 510 U.S. 827 (1993); *see also United States v. Desimone,* 119 F.3d 217, 223 (2d Cir. 1997) ("An individual defendant's membership in a conspiracy may not be established simply by his presence at the scene of a crime, nor by the fact he knows that a crime is being committed. Instead, membership requires proof of purposeful behavior aimed at furthering the goals of the conspiracy.").

The government argued at summation that the conspiracy continued while knowing it chose not to ask Mullgrav what transpired after Washington left Baltimore. Tr. 2311 ("So what happened? Jason sent Ronald Washington home with Chris Burrell and Jason stayed down there."). It persisted: "Jason had contracted for a hundred kilograms of cocaine, he had possession of ten.  And until [] that cocaine is sold, until 'Unc' the supplier is paid back, the conspiracy is not over."  Tr. 2314. But James did not testify about any "contract" for "a hundred kilograms of cocaine" – no one did. James did not even testify as to what, if anything, Mizell and

22

"Unc" planned after Mullgrav said no to the Baltimore deal. James merely testified that "Unc" absolved Mizell of any debt after learning of Mizell's death. Tr. 1788.

Thus, the government failed to prove that Jordan joined a subsequent conspiracy after Yakim said no, or that the Baltimore conspiracy continued. *Cf., Kendrick v. United States*, No. 22-CV-6510-FPG, 2023 U.S. Dist. LEXIS 99456, at *52-53 (W.D.N.Y. June 7, 2023) ("Therefore, the Court's instructions made clear to the jury that it could only find Defendant guilty … if the requisite conspiracy existed [to possess with intent to distribute and to distribute 5 kilograms or more of cocaine, 280 grams or more of cocaine base] at the time of the murders.").

### b.  There Was No Evidence Of A Drug-Related Motive For The Murder Or That The Murder Furthered The Conspiracy's Goals

Even assuming a conspiracy existed, the government failed to prove that Mizell's murder furthered the conspiracy's goals. *Cf. United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001); *United States v. Thai*, 29 F.3d 785, 817 (2d Cir.1994); *United States v. Concepcion*, 983 F.2d 369, 381 (2d Cir.1992); *see also United States v. Farmer*, 583 F.3d 131, 143-44 (2d Cir. 2009).

As the Second Circuit cautioned in *Ferguson* (which involved an analysis involving a racketeering conspiracy), "for criminal liability … to attach, there must be evidence that [the defendant] acted with the expectation of gaining membership, or in furtherance of an intimate involvement with the enterprise."  246 F.3d at 136, *citing United States v. Polanco*, 145 F.3d 536, 540 n. 2 (2d Cir. 1998); *United States v. Malpeso*, 115 F.3d 155, 159 n. 1, 164 (2d Cir. 1997); *United States v. Muyet*, 994 F.Supp. 501, 516 (S.D.N.Y.1998), *aff'd*, 225 F.3d 647 (2d Cir. 2000).

The case of *United States v. Van Putten*, 2005 U.S. Dist. LEXIS 10456, (S.D.N.Y. May 31, 2005) also illustrates this point. In *Van Putten*, which charged murder in furtherance of a

narcotics conspiracy, the government entered testimony that the defendant worked as a manager, supervising employees selling crack cocaine, sold crack cocaine to customers, and allowed his apartment to be used as a "stash house." *Id.*, at \*6-8. The government also provided evidence that nearly two years after the murder the defendant was arrested for selling crack cocaine to an undercover police officer and evidence demonstrating that the defendant's dispute with the victim and murder were drug-related. Such evidence is lacking here.

Ours is not a case where the government provided evidence of the use of violence to maintain the defendants' control of drug trafficking and threats to its operations. *Cf., Jones*, 291 F. Supp.2d at 88, 89 ("[T]here is no evidence to support the government's strained inference that [the defendants] had a generalized need to use violence in response to all acts of disrespect – regardless of whether the disrespect was directed at him personally or was related to the affairs of the Enterprise – in order to maintain his position in the Enterprise or to further the Enterprise's objectives."). As the Court in *Jones* concluded, "[w]ithout such evidence[]" of the nexus to the enterprise, an "inference [to that effect] is based only on speculation." *Id.; see also Concepcion*, 983 F.2d at 381, and *Ferguson*, 246 F.3d at 134.

The government's arguments at summation: "Only conflict over the drugs could have [led] to Jason Mizell's murder." (Tr. 2317), and "There was no other animosity, nothing else going on.") (Tr. 2506) ignored an equally plausible theory that the murder was personal. For example in *Jones*, 291 F. Supp. 2d 78 (D. Conn. 2003), a court pointed out that "the government's theory of VICAR motive essentially ignores the personal nature of [the deceased's] allegedly disrespectful conduct and the dearth of evidence that [the deceased's] conduct posed a threat to the Enterprise or to [the defendant]'s leadership role." *Id*. at 92. Violence furthers a conspiracy when used to collect debts directly as discussed in *Atehortva*, 17

F.3d at 546, or "by sending the message that those suspected of stealing from the conspiracy would be treated harshly." *United States v. Soto-Beniquez,* 356 F.3d 1, 32 (1st Cir. 2003) (citing *United States v. Rodriguez*, 162 F.3d 135, 143 (1st Cir. 1998).

There is no evidence of Jordan's specific intent to further the conspiracy's goals by murdering Mizell. This is a necessity to support a 21 U.S.C.S. § 848(e)(1)(A) conviction as discussed in *United States v. Santos*, 541 F.3d 63, 73 (2d Cir. 2008) (Defendant raised questions of statutory interpretation, and a related challenge to the sufficiency of the evidence pertaining to his drug-related murder conviction under 21 U.S.C.S. § 848(e)(1)(A)): "In addition to proving that Santos knew his acts would enable Medina to further the goals of the conspiracy, the government was required to prove that Santos had the specific intent to do so.") (citation omitted).

This case is also unlike *United States v. Wilson*, 663 F. Supp. 3d 259, 275 (W.D.N.Y. 2023) where, "the evidence presented at trial established that [the murder] was related to the drug conspiracy, including because it occurred during the drug sale and … the evidence further established that Defendant intended to take the cocaine from [the victim's] against her will, which ultimately resulted in her murder." *Id.* Here, there was no evidence of any contemporaneous drug deal or that the defendants tried to rob Mizell of narcotics or drug proceeds. None of the witnesses at the studio testified about drugs or money.

The case of *United States v. Aguilar*, 585 F.3d 652 (2d Cir. 2009) also demonstrates how the government failed to prove the "engaging in" element. The opinion discussed a sufficiency challenge, and the Circuit articulated that the "substantive connection" requirement implied in the "engaging in" element of § 848(e)(1)(A) can be satisfied not only by proof that at least one of the purposes of the killing was related to an ongoing drug conspiracy, as it held in *United States*

*v. Desinor*, 525 F.3d 193, 202 (2d Cir. 2008), but also by proof that the defendant used his position in or control over such a conspiracy to facilitate the murder. *Aguilar, 585 F.3d*. There the Second Circuit concluded that evidence demonstrating that the defendant induced his drug associates to participate in Fernandez's murder through promises to forgive drug-related debts and to engage in future drug transactions was sufficient to sustain his § 848(e)(1)(A) conviction. *Id.* at 653. Here, there is no evidence of any promises or consideration to forgive a debt or future business, or that Jordan was in the position to induce or control others, or that he had a position in a drug organization.

The analysis in *United States v. Price*, No. 05-CR-492 (NGG), 2010 U.S. Dist. LEXIS 45935 (E.D.N.Y. May 10, 2010) also shows how the government failed. In *Price*, there was evidence of "drug sales" Price made in conjunction with Chavis and Brown that were integrated with the larger enterprise and a dispute that precipitated the shooting which was related to the enterprises drug business. *Id.*, at *20-22. Here, there is no such evidence.

Importantly, while Cherubin Bastien testified that Jordan admitted to Mizell's murder, Tr. 1845 (A They were talking about Jay. They said something and Little D said, if I get to kill him, I'll kill him again"); and 1847, 48 ("A He said I'll do you exactly just like him. Q Like who? A Like Master Jay."), Bastien did not relate any motive or purpose for the shooting. His testimony provided the jury with no context to their understanding as to the purpose for the murder, including that it was expected of Jordan because of his role in an organization. *Cf. United States v. Dhinsa*, 243 F.3d 635, 671 (2d Cir. 2001) ("[t]he motive requirement is satisfied if the jury could properly infer that the defendant committed his violent crime because he knew it was expected of him by reason of his membership in the enterprise or that he committed it in furtherance of that membership."). Neither the supposed confession nor any other evidence

provided the jury with information that Jordan was acting as a hitman to further the goals of the operation the conspiracy. *Cf. United States v. Gomez*, 210 F. Supp. 2d 465, 470 (S.D.N.Y. 2002) (the evidence showed that the organization had been robbed of heroin, money, and a beeper, the organization hired hitmen to get the beeper back and to punish those who stole the beeper, the organization was willing to spend $ 37,000 to do so, and the beeper was obviously important to the organization's drug activities).

Accordingly, there was no evidence of a meaningful connection between any conspiracy and the murder.

### 3.    **Count Two**

In order to prove the charge in Count Two, the government had to prove beyond a reasonable doubt each of the following four elements of the crime:

> First, the defendant committed the underlying drug trafficking crime, in other words, a conspiracy to distribute cocaine.

> Second, on or about October 30, 2002, the defendant knowingly and intentionally used a firearm during and in relation to the commission of the drug trafficking crime, or aided and abetted another person doing so.

> Third, the defendant knowingly and intentionally caused or aided and abetted another to cause the death of Jason Mizell by use of that firearm.

> Fourth that the death of that person qualifies as murder under federal law as I will define the term for you in a moment.

Tr. 2561.

The Court explained: "Now, the first element the Government must prove beyond a reasonable doubt that the defendants committed a drug trafficking crime. …  The drug trafficking crime during which and in relation to the defendant is charged with using a firearm was that conspiracy to distribute cocaine."). Tr. 2561-62. The Court also instructed: "The second element of Count Two that the Government must prove beyond a reasonable doubt is that, on or

about October 30, 2002, the defendants knowingly used a firearm during and in relation to the above-described drug trafficking crime or that he aided and abetted another person in doing so." Tr. 2562. The Court furthered instructed: "Now, to prove that the firearm was used 'during and in relation' to the commission of the drug conspiracy, the Government must prove that it was an integral part of the commission of the crime, and that it furthered or facilitated the crime; it is not sufficient if the use was inadvertent, coincidental, or for some purpose other than furthering and facilitating the crime."  Tr. 2563.

The term "drug trafficking crime" includes "any felony punishable under the Controlled Substances Act (21 U.S.C. 801 et seq.)." 18 U.S.C. § 924(c)(2). The government has alleged that defendant participated in a drug trafficking crime, to wit: a conspiracy to distribute and possess with intent to distribute 5 kilograms or more of cocaine.

As already discussed, because the government has failed to prove beyond a reasonable doubt is that Jordan committed a drug trafficking crime, he could not be found guilty of using a firearm in relation to that crime. *See*, e.g, *United States v. Kemp*, No. 21-1684-cr (CON), 2023 U.S. App. LEXIS 2009, at *9 (2d Cir. Jan. 26, 2023) ("Accordingly, to convict a defendant under Section 924(j), the government must prove that he used or carried a firearm in relation to a drug trafficking offense and used that firearm to murder the victim.  *See United States v. Capers*, 20 F.4th 105, 115 (2d Cir. 2021); *United States v. Wallace*, 447 F.3d 184, 187 (2d Cir. 2006). Similarly, a conviction under Section 848(e)(1)(A) requires 'a meaningful connection between the killing and the drug offense.' *Santos*, 541 F.3d at 69. To establish that connection, 'the government need only prove beyond a reasonable doubt that *one* motive for the killing . . . was related to the drug conspiracy.' *United States v. Desinor*, [525 F.3d at 202] (emphasis in original). 'The government has no burden to establish that a drug-related motive was the sole

28

purpose, the primary purpose, or even that it was equally as important as any non-drug-related purpose, as long as it was one purpose.'" *Id.*

## RULE 33 MOTION

### A.    Applicable Law

Rule 33 provides that, "[u]pon a defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "The rule by its terms gives the trial court 'broad discretion . . . to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice.'" *Ferguson*, 246 F.3d at133 (quoting *United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992)).  Thus, a court may properly grant a motion under Rule 33 when it "is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice."  *United States v. Landau*, 155 F.3d 93, 104 (2d Cir. 1998) (quoting *Smith v. Lightning Bolt Prods.*, 861 F.2d 363, 370 (2d Cir. 1988)).  Generally, the court has broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29. *United States v. Cote*, 544 F.3d 88, 101 (2d Cir. 2008).  This Court has held that district courts must exercise Rule 33 authority "sparingly," and only in "the most extraordinary circumstances." *Id.* (quoting *Sanchez*, 969 F.2d at 1414).

### B.    Jay Bryant's Confession And DNA Evidence Justify A New Trial

Credible and uncontested evidence was presented that Jay Bryant, not Jordan, shot Mizell. Bryant's uncle, Raymond Bryant testified:

> Q Do you recall anything else about that conversation?
> A That he wouldn't have did it if he didn't go for his gun or something pertaining to that.
> Q Who are the "he's" in your sentence?
> THE COURT: Who are you saying went for their gun?
> THE WITNESS: Jam Master Jay, yes.
> THE COURT: And when you said, He wouldn't have done

it, who was it -- who wouldn't have done it?
THE WITNESS: Jay.

Tr. 1374-75.

Q And the first time that Jay Bryant told you he killed Jam Master Jay was in 2003, 2004; isn't that correct?
A Yes.
Q And this happened at your niece's house in the Bronx, correct?
A Yes.
Q And it may have been inside the house or outside the house, right?
A Yes. I'm not sure, yes.
Q And as far as you can recall, you were the only one present when this conversation took place?
A Well, we were talking on the side.
Q But he was talking to you, correct?
A Yes, yes.
Q He was confiding to you, correct?
A Yes.
Q And he told you, he did it, right?
A Yes.
Q He shot Jam Master Jay?
A Yes.
Q And he said he would not have killed Jason Mizell if Jason Mizell didn't reach for a gun, that's what he told, right?
A Yes.

Tr. 1377-78.

Q And then you had a subsequent conversation around 2016, about maybe five years ago, correct?
A Yeah, give or take.
Q And this is after the -- a hat was found or he told you about a hat –
A Right.
Q -- that had been found at the murder scene that had DNA on it, correct?
A Yes.
Q And he said it was his hat that was at the murder scene, correct?
A Yes.

Tr. 1378.

Tanya Davis corroborates Jay Bryant's confession describing a person matching his description entering the building and going to the studio shortly before shooting then leaving after shooting. Tr. 1302-35.

Q Okay. And so, you see them on the screen at the same time, correct?
A Yes.
Q There comes a time when the woman opens the door, correct?
A Yes.
Q And she holds the door open for that man, correct?
A I think he just held the done open for himself.

Tr. 1322

Q Almost within feet, would that be fair to say?
A Yes.
Q He was able to grab that door before it closed, correct?
A Yes.
Q Now, this was the man you described as the African-American man, correct?
A Yes.

Tr. 1323

Q Very tall, right?
A Yes.
Q Much taller than the woman, correct?
A Yes.
Q He had braids. His hair was braided, correct?
A Yes.
Q He had braids. His hair was braided, correct?
A Yes.
Q And he was pretty large in stature, correct?
A He was tall and lanky.
Q Tall and lanky. Like a basketball player, right?
A Yes.

*Id.*

Q Yeah. And you told the officers that he was holding something close to his body. Do you remember telling them that?
A Yeah, his hands was like, his hands wasn't, like, moving with him. His hands was close to his body at that time.
Q Okay. And you told that to the officers at the time that his hands were close to his body, correct?
A Yes.

Tr. 1332.

Bryant's confession was supported by other credible evidence of a single shooter. Uriel

Rincon testified that he told police the night of the shooting that an unknown man killed Mizell.

31

Tr. 535-36. ("Q And then there -- do you remember telling them there was a struggle between Mr. Mizell and an unknown man? Do you remember telling them that? A Yes."). Lydia High testified that there was a single shooter inside the studio. Tr. 955 ("Q And you were very clear in the Grand Jury that when you were sitting in the area where you were sitting with – with Jay, that you only saw a single person enter the studio, correct? A Correct."). At DX-D, Mike Rapley wrote in a police statement, "Also when I got up I looked into the monitor and saw a black guy wearing black stocking cap black leather jacket." At DX-E, Randy Allen, wrote in his police statement: "I turned and looked at the monitor and saw a black male heavy set short hair seemed to be tall wearing a dark jacket going down the stairs.  I only saw this male from behind on the monitor."   Ballistics evidence confirmed that only a single gun was fired during the incident, Tr. 1649, and police found Bryant's hat at the crime scene, DX-B, which was tested for DNA, resulting in a profile matching Bryant. GX 208, p. 16.

"The law is well established that a federal conviction may be supported 'by the uncorroborated testimony' of even a single accomplice witness 'if that testimony is not incredible on its face and is capable of establishing guilt beyond a reasonable doubt.'" *United States v. Florez*, 447 F.3d 145, 155 (2d Cir. 2006) (citing *United States v. Parker*, 903 F.2d 91, 97 (2d Cir. 1990)). "It is only where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment." *Sanchez*, 969 F.2d at 1414. An example of exceptional circumstances is where testimony is "patently incredible or defies physical realities," although the district court's rejection of trial testimony by itself does not automatically permit Rule 33 relief. *Cote*, 544 F.3d at 101 (citing *Sanchez*, 969 F.2d at 1414); and *Ferguson*, 246 F.3d at 134 (citing *Sanchez*, 969 F.2d at 1414).

This case presents that "exceptional circumstance" because Jordan has been found guilty of shooting Mizell, notwithstanding the fact that Bryant confessed to being the killer, which is corroborated by DNA evidence and eyewitnesses. "The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice." *Ferguson*, 246 F.3d at 134. And this is a situation where there is a real concern that the jury erred in finding Jordan guilty. *See United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009) (explaining that "a district court must find that there is a real concern that an innocent person may have been convicted") (internal quotation and citation omitted)).

In *United States v. Archer*, the Second Circuit reiterated: "While we have held that a district court may grant a new trial if the evidence does not support the verdict, we have emphasized that such action must be done sparingly and in the most extraordinary circumstances." 977 F.3d 181, 187 (2d Cir. 2020) (internal quotations omitted). The court clarified that "a district court may not grant a Rule 33 motion based on the weight of the evidence alone unless the evidence preponderates heavily against the verdict to such an extent that it would be 'manifest injustice' to let the verdict stand." *Id.* at 188. The court went on to further explain:

> We stress that, under this standard, a district court may not "reweigh the evidence and set aside the verdict simply because it feels some other result would be more reasonable." To the contrary, absent a situation in which the evidence was "patently incredible or defies physical realities," or where an evidentiary or instructional error compromised the reliability of the verdict, a district court must "defer to the jury's resolution of conflicting evidence." And, as it must do under Rule 29, a district court faced with a Rule 33 motion must be careful to consider any reliable trial evidence as a whole, rather than on a piecemeal basis.

*Id.* at 188-89 (citations omitted and alteration in original).

The record in this case demonstrates a situation that is "patently incredible" or "defies physical realities," since two fingers could not have pulled the trigger. This is not a situation

33

where the evidence that Jordan was the shooter was overwhelming or even strong. There was only one purported eyewitness, Uriel Rincon, who identified Jordan as the shooter, Tr. 513-16, and he claimed he couldn't tell the truth about Jordan's role until years later because he was afraid and so he lied to the police, reporters and everyone else, except apparently Randy Allen, that he did not know the shooter's identity.  Tr. 525-65. Bastien was the only other witness who claimed to have direct evidence that Jordan was the shooter when he overheard Jordan on two occasions. Tr. 1845-48. But Bastien had credibility problems. The government provided Bastien with "assistance funds" and helped him relocate from Haiti to the Dominican Republic. Tr. 1856. Further, Bastien had been deported to Haiti after being convicted and was a heroin addict at the time he supposedly overhead Jordan.  Tr. 1860-61. Furthermore, the ballistic comparison of ordinance recovered from Jordan on separate incidents showed inclusive and exclusionary results. GX 301.

Accordingly, the court should grant Jordan a new trial. *See, e.g.*, *United States v. Clemente*, 2004 U.S. Dist. LEXIS 627, at *21-22 (S.D.N.Y. 2004) ("Where a court concludes that despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently [and] heavily against the verdict that a serious miscarriage of justice may have occurred, it may set aside the verdict, grant a new trial, and submit the issues for determination by another jury.  Here, we conclude that permitting that verdict to stand under the facts of this case would result in a manifest injustice to the Defendant.") (internal citations omitted).

## C.    Trial Juror No. 12 Was Impaired Juror And Likely Tainted The Jury

A separate basis for a new trial is that Trial Juror No. 12 was impaired and should not have served as a juror, and likely tainted the jury.

The Sixth Amendment guarantees the right to be tried "by an impartial jury." U.S. Const. amend. VI. "The safeguards of juror impartiality, such as *voir dire* and protective instructions from the trial judge, are not infallible; it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote." *Smith v. Phillips*, 455 U.S. 209, 217 (1982). To that end, "[a]n impartial jury consists of nothing more than 'jurors who will conscientiously apply the law and find the facts.'" *Lockhart v. McCree*, 476 U.S. 162, 178, 106 S. Ct. 1758, 1767, 90 L. Ed. 2d 137 (1986) (quoting *Wainwright v. Witt*, 469 U.S. 412, (1985)).

After jury deliberations began, the jury sent out a note:

> THE COURT: All right, now moving on. The Court is in receipt of a note from the jury that has been marked as Court Exhibit 11, and it reads: Good morning, Your Honor. Juror Number 12 is asking to be excused from deliberations. He felt like he is too connected being that he works in Hollis, Queens, and he is a regular in the barber shop. Signed: The foreperson. Thanks in advance.

Tr. at 2600. Having reviewed the juror's questionnaire, the Court noted that a barbershop was not among the places listed in the questionnaire. Witnesses, such as Mike Rapley, and Eric James had discussed a local barbershop. Tr. 816, 826, 1756-57. The Court and the parties considered the issue, and the Court sent a note back to the jury, Court Exhibit 12, asking that the juror identify the barbershop. Tr. 2606-07. The jury then sent back Court Exhibit 13, under seal, which the parties discussed. Tr. 2608-13 (Sealed). The Court decided:



Tr. at 2611-12 (Sealed). In-camera, ███████████████████████████████

███████ Tr. 2615-20 (Sealed). Without the juror present, the parties discussed the ramifications, Tr. 2620-25 (Sealed), with counsel for Washington, noting: ███████████

████████████████████████████████████████████████████████████

████████████████████████████████████████ Tr. 2620 (Sealed).

The government added: ██████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

Tr. 2623 (Sealed). The juror was brought back in-camera:



Tr. 2626-27 (Sealed). The Court ████████████████████████████

███████████████████████████████

███████████████████ Tr. 2627-28 (Sealed). The colloquy

continued ██████████████████████████████

████████████████████████████████

███████████████████ Tr. 2629 (Sealed) (emphasis added). The Court

████████████████████████████████

██████████████████████████

█████████████ Tr. 2630 (Sealed).

█████████████████████████████

████████████████████████████████

███████████████████████████████

████████████████████████████████

███████████████████████████████

████████

There was also a concern █████████████████████████

███████████████████████████████

████████████████████████████████

████████████████████████████████

███████████ Tr. 2631 (Sealed). The Court █████████████

█████████████ Tr. 2632 (Sealed). The Court ████████████



██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████ Tr. 2632-33, 36. The

Court noted ███████████████████████████████████

██████████████████████████████████████████████████

██████████ Tr. 2634 (Sealed). Washington's counsel pointed out: ██████████

███████████████████ *Id.* The Court stated: ████████████ *Id.* And

Washington's counsel stated: ████████████████████████

████████████████ *Id.* And the Court determined: ████████████████

██████████████████████████████████████████████████

██████████ Tr. 2634-35 (Sealed).

Based on this record, it is clear Trial Juror No. 12 was adversely impacted by ████

████████████████████ he purposely failed to disclose during *voir dire*. This is jury misconduct.

When information comes to light that a juror misrepresented or failed to disclose material

information during *voir dire*, the defendant must satisfy a two-part test to be entitled to a new

trial. It has been satisfied here. First, the defendant must show that the juror "failed to answer

honestly a material question on *voir dire*." *McDonough Pwr. Equip v. Greenwood*, 464 U.S.

548, 556 (1984).

Clearly, the juror made a deliberately false statement on his questionnaire when he said

his prior jury experience would not affect him, minimizing the experience, instead of stating ████

██████████████████████████████████████████████████

████████████ There is no justification for this omission; and it cannot be considered an "honest

mistake" given its magnitude. *See United States v. Shaoul*, 41 F.3d 811, 815-16 (2d Cir. 1994).

Second, the defendant must show "that a correct response would have provided a bases for a challenge for cause." *McDonough*, 464 U.S. at 556; *cf. United States v. Columbo*, 869 F.2d 149, 152 (2d Cir. 1989) (suggesting that intentionally false statement by juror would require reversal even if undisclosed fact would not require disqualification). Clearly, it would have.  For instance, during *voir dire*, the following jurors were removed for cause: Prospective Juror No. 2 ("JUROR NO. 2: Yes, I, I think I might be afraid.") JTr. 25-26; Juror No. 46 (JTr. 134-141) (cumulative issues, including at JTr. 136: "So to me anything that's violent is negative.); and Juror No. 49 (JT. 152-68, 174: COURT: "I think that I agree with Mr. Spilke that you cannot untether my responses to the juror's questions about her safety from the anonymous jury as my responses implicated the anonymous jury as a means by which the Court employed to address security concerns.  That is contrary to what I indicated I would do at the time that I ruled on the anonymous jury; and, therefore, I'm going to strike Juror No. 49 for cause.").

Accordingly, Mr. Jordan is entitled to a new trial. *C.f. United States v. Thomas*, 116 F.3d 606, 613 (2d Cir. 1997) ("In particular, Rule 23(b) dismissals have been upheld repeatedly in cases where the trial court found that a juror was no longer capable of rendering an impartial verdict. These cases have involved instances of jurors who felt threatened by one of the parties."); *Cf. United States v. McGriff*, 287 F. App'x 916, 917-18 (2d Cir. 2008) ("McGriff argues that this fear tainted the jury, and that a mistrial should have been declared. '[A] trial judge's handling of alleged juror misconduct or bias is only reviewable for abuse of discretion.'").  *McGriff*, 287 F. App'x at 917-18.

## CONCLUSION

For the reasons set forth herein, Mr. Jordan's motions should be granted.

Dated:      Brooklyn, New York
             April 5, 2024

                      Respectfully submitted,

                      _____/s/_____

                      MICHAEL HUESTON, ESQ.
                      MARK DEMARCO, ESQ.
                      JOHN DIAZ, ESQ.
                      EMILEE SAHLI, ESQ