AB:JAM/MEM/MG
F. #2017R00509

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

       - against -                   20-CR-305 (S-2) (LDH)

KARL JORDAN, JR.,
       also known as "Little D"
       and "Noid," and
RONALD WASHINGTON,
       also known as "Tinard,"

              Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

THE GOVERNMENT'S MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANTS' POST-TRIAL
MOTIONS FOR ACQUITTAL OR A NEW TRIAL

BREON PEACE
UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Artie McConnell
Mark E. Misorek
Miranda Gonzalez
Assistant U.S. Attorneys
    (Of Counsel)

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................... 1

BACKGROUND ........................................................................................................................... 1

    I.   Relevant Procedural History ................................................................................................ 1

        A.  The Charges ................................................................................................................ 1

        B.  Motions in Limine ...................................................................................................... 2

        C.  Trial Exhibit Disclosures ........................................................................................... 3

        D.  Anonymous and Partial Sequestered Jury .................................................................. 3

        E.  Excusal and Replacement of Juror No. 12 ................................................................. 4

    II.  The Trial Evidence .............................................................................................................. 5

        A.  The Defendants Murdered Jason Mizell on October 30, 2002 ................................... 6

            i.   Eyewitnesses Testified That Jordan Shot Jason Mizell As Washington Guarded the Studio Exit .......................................................................................................... 6

            ii.  Witnesses Testified That the Defendants Admitted to Murdering Jason Mizell .... 8

            iii.  The Physical Evidence and Other Testimony Corroborated the Eyewitness Testimony and Identifications ............................................................................... 10

        B.  The Defendants Were Involved in a Narcotics Conspiracy ..................................... 14

            i.   Jason Mizell's Role as a Middle Man in the Narcotics Conspiracy .................... 15

            ii.  Relationship Between Mizell, Jordan and Washington ........................................ 17

            iii.  Testimony That the Defendants Joined the Narcotics Conspiracy Prior to The Baltimore Deal in August 2002 ............................................................................ 18

            iv.  Testimony About the Baltimore Deal in August 2002 ......................................... 19

            v.  Testimony About the Continuing Narcotics Conspiracy Through Jason Mizell's Death ..................................................................................................................... 22

ARGUMENT ............................................................................................................................. 24

    I.   The Defendants' Rule 29 Motions for Acquittal Should be Denied ................................. 25

        A.  Standard of Review .................................................................................................. 25

        B.  The Evidence at Trial Was Sufficient to Sustain The Convictions on Count One: Murder While Engaged in a Narcotics Conspiracy .................................................. 27

            i.   The Defendants Were Part of The Ongoing Narcotics Conspiracy At The Time of Mizell's Murder ................................................................................................... 28

ii. At Least One Motive For Mizell's Murder Was Related to the Narcotics Conspiracy ............................................................................................ 46

C. The Evidence at Trial Was Sufficient to Sustain the Convictions on Count Two: Firearm-Related Murder ................................................................... 57

II. The Defendants' Rule 33 Motions Should be Denied .................................................. 61

A. Standard of Review ............................................................................................ 61

B. The Defendants' Alternate Perpetrator Theory Was Rejected By the Jury and Does Not "Preponderate Heavily" Against the Verdict ........................................ 63

C. There Was No Juror Misconduct or Jury Taint ................................................. 65

CONCLUSION ................................................................................................................ 69

TABLE OF AUTHORITIES

Cases

Aller v. United States,
    646 F. App'x 21 (2d Cir. 2016) ................................................................. 50
Atkins v. New York City,
    143 F.3d 100 (2d Cir. 1998)..................................................................... 62
Blumenthal v. United States,
    332 U.S. 539 (1947)................................................................................. 37
Bruton v. United States,
    391 U.S. 123 (1968)................................................................................... 9
Cavazos v. Smith,
    565 U.S. 1 (2011)............................................................................. 47, 51
Holland v. United States,
    348 U.S. 121 (1954)................................................................................. 26
Jackson v. Virginia,
    443 U.S. 307 (1979)..................................................................... 25, 54, 56
McDonough Power Equipment, Inc. v. Greenwood,
    464 U.S. 548 (1984)................................................................................. 66
Richardson v. United States,
    526 U.S. 813 (1999)........................................................................... 49, 50
Rushen v. Spain,
    464 U.S. 114 (1983)................................................................................. 65
Smith v. Carpenter,
    316 F.3d 178 (2d Cir. 2003)..................................................................... 62
Smith v. United States,
    508 U.S. 223 (1993)................................................................................. 57
Thomas v. United States,
    No. 04-CR-801 (PKC), 2018 WL 4006785 (S.D.N.Y. Mar. 9, 2018)............ 48
United States v. Abelis,
    146 F.3d 73 (2d Cir. 1998)....................................................................... 57
United States v. Abrams,
    137 F.3d 704 (2d Cir. 1998).............................................................. 65, 68
United States v. Acosta,
    833 F. App'x 856 (2d Cir. 2020) ....................................................... 48, 52
United States v. Aguilar,
    585 F.3d 652 (2d Cir. 2009)............................................................. passim
United States v. Aiello,
    771 F.2d 621 (2d Cir. 1985)..................................................................... 65
United States v. Alehortva,
    17 F.3d 546 (2d Cir. 1994)....................................................................... 45
United States v. Anderson,
    747 F.3d 51 (2d Cir. 2014)......................................................... 27, 31, 35, 57
United States v. Aquart,
    912 F.3d 1 (2d Cir. 2018) ................................................................. 47, 54

United States v. Archer,
   977 F.3d 181 (2d Cir. 2020)..................................................................... 62, 63
United States v. Arrington,
   941 F.3d 24 (2d Cir. 2019)............................................................................. 35
United States v. Autuori,
   212 F.3d 105 (2d Cir. 2000)................................................................. 25, 27, 50
United States v. Barret,
   No. 10-CR-809 (KAM), 2012 WL 3229291 (E.D.N.Y. Aug. 6, 2012)................... 25
United States v. Berger,
   224 F.3d 107 (2d Cir. 2000)...................................................................... 29, 43
United States v. Best,
   219 F.3d 192 (2d Cir. 2000)........................................................................... 25
United States v. Bonventre,
   646 F. App'x 73 (2d Cir. 2016) ...................................................................... 48
United States v. Borelli,
   336 F.2d 376 (2d Cir. 1964)........................................................................... 36
United States v. Bufalino,
   576 F.2d 446 (2d Cir.1978)............................................................................ 65
United States v. Cambindo Valencia,
   609 F.2d 603 (2d Cir. 1979)........................................................................... 37
United States v. Campbell,
   850 F. App'x 102 (2d Cir. 2021) ......................................................... 38, 51, 59
United States v. Cancelmo,
   64 F.3d 804 (2d Cir. 1995)............................................................................. 32
United States v. Ceballos,
   340 F.3d 115 (2d Cir. 2003)...................................................................... 25, 54
United States v. Cedeno,
   756 F. App'x 24 (2d Cir. 2018) ...................................................................... 54
United States v. Chartier,
   No. 17-CR-0372 (JS), 2021 WL 3795352 (E.D.N.Y. Aug. 26, 2021) ................. 53
United States v. Coppola,
   671 F.3d 220 (2d Cir. 2012)........................................................................... 61
United States v. Cox,
   324 F.3d 77 (2d Cir. 2003)........................................................................ 65, 68
United States v. Crespo,
   834 F.2d 267 (2d Cir.1987)............................................................................ 34
United States v. Desinor,
   525 F.3d 193 (2d Cir. 2008)...................................................................... 46, 48
United States v. Diaz,
   176 F.3d 52 (2d Cir. 1999)............................................................................. 38
United States v. Djibo,
   850 F. App'x 52 (2d Cir. 2021)................................................................... 31, 32
United States v. Edwards,
   342 F.3d 168 (2d Cir. 2003)........................................................................... 48
United States v. Eppolito,
   543 F.3d 25 (2d Cir. 2008)............................................................................. 57

United States v. Escalera,
    536 F. App'x 27 (2d Cir. 2013) ................................................ 29
United States v. Espaillet,
    380 F.3d 713 (2d Cir. 2004) ................................................ 26
United States v. Evans,
    293 F. App'x 63 (2d Cir. 2008) ................................................ 43
United States v. Faltine,
    No. 13-CR-315 (KAM), 2016 WL 1700385 (E.D.N.Y. Apr. 26, 2016) ................ 40
United States v. Feola,
    651 F. Supp. 1068 (S.D.N.Y. 1987) ................................................ 32
United States v. Ferguson,
    246 F.3d 129 (2d Cir. 2001) ................................................ 47, 62, 65
United States v. Finley,
    245 F.3d 199 (2d Cir. 2001) ................................................ 57
United States v. Flaharty,
    295 F.3d 182 (2d Cir. 2002) ................................................ 29
United States v. Florez,
    447 F.3d 145 (2d Cir. 2006) ................................................ 26
United States v. Gadsden,
    300 F. App'x 108 (2d Cir. 2008) ................................................ 35
United States v. Gaggi,
    811 F.2d 47 (2d Cir. 1987) ................................................ 65
United States v. Gagliardi,
    506 F.3d 140 (2d Cir. 2007) ................................................ 63
United States v. Garcia,
    291 F.3d 127 (2d Cir. 2002) ................................................ 32
United States v. Giovanelli,
    464 F.3d 346 (2d Cir. 2006) ................................................ 63
United States v. Glenn,
    312 F.3d 58 (2d Cir. 2002) ................................................ 51, 54, 56, 60
United States v. Glynn,
    686 F. App'x 51 (2d Cir. 2017) ................................................ 40
United States v. Goff,
    847 F.2d 149 (5th Cir. 1988) ................................................ 42
United States v. Goldberg,
    401 F.2d 644 (2d Cir. 1968) ................................................ 30
United States v. Gracesqui,
    730 F. App'x 25 (2d Cir. 2018) ................................................ 38, 45, 48
United States v. Gracesqui,
    No. 10-CR-74 (PKC), 2016 WL 11259074 (S.D.N.Y. June 3, 2016) ................ 52, 55
United States v. Greer,
    285 F.3d 158 (2d Cir. 2002) ................................................ 67
United States v. Guadagna,
    183 F.3d 122 (2d Cir. 1999) ................................................ 38
United States v. Heinemann,
    801 F.2d 86 (2d Cir. 1986) ................................................ 53

United States v. Heras,
  609 F.3d 101 (2d Cir. 2010)..................................................................... 31
United States v. Huezo,
  546 F.3d 174 (2d Cir. 2008)..................................................................... 39
United States v. Hunt,
  573 F. Supp. 3d 779 (E.D.N.Y. 2021) ..................................................... 48
United States v. Iennarco,
  893 F.2d 394 (D.C. Cir. 1990)................................................................. 41
United States v. Irving,
  452 F.3d 110 (2d Cir. 2006)..................................................................... 26
United States v. Jackson,
  335 F.3d 170 (2d Cir. 2003)............................................................... 26, 39
United States v. Jenkins,
  419 F.3d 614 (7th Cir. 2004) ................................................................... 51
United States v. Jones,
  291 F. Supp. 2d 78 (D. Conn. 2003) ................................................. 47, 60
United States v. Khalupsky,
  5 F.4th 279 (2d Cir. 2021) ....................................................................... 43
United States v. Landesman,
  17 F.4th 298 (2d Cir. 2021) ............................................................... 27, 32
United States v. Leslie,
  658 F.3d 140 (2d Cir. 2011)............................................................... 29, 42
United States v. Lorenzo,
  534 F.3d 153 (2d Cir. 2008)..................................................................... 26
United States v. MacPherson,
  424 F.3d 183 (2d Cir. 2005)............................................................... 26, 47
United States v. Maldonado-Rivera,
  922 F.2d 934 (2d Cir. 1990)............................................................... 36, 53
United States v. Martinez,
  54 F.3d 1040 (2d Cir. 1995)..................................................................... 26
United States v. McCourty,
  562 F.3d 458 (2d Cir. 2009)........................................................ 62, 64, 65
United States v. McGriff,
  287 F. App'x 916 (2d Cir. 2008) .............................................................. 65
United States v. Middlemiss,
  217 F.3d 112 (2d Cir. 2000)..................................................................... 62
United States v. Mitchell,
  328 F.3d 77 (2d Cir. 2003)................................................................. 34, 43
United States v. Murray,
  618 F.2d 892 (2d Cir. 1980)..................................................................... 37
United States v. Nerlinger,
  862 F.2d 967 (2d Cir. 1988)..................................................................... 29
United States v. Nina,
  734 F. App'x 27 (2d Cir. 2018) .......................................................... 57, 58
United States v. Nusraty,
  867 F.2d 759 (2d Cir. 1989)..................................................................... 40

United States v. Page,
  657 F.3d 126 (2d Cir. 2011)........................................................................ 34, 43
United States v. Panebianco,
  543 F.2d 447 (2d Cir. 1979)................................................................................ 29
United States v. Payton,
  159 F.3d 49 (2d Cir. 1998).................................................................................. 25
United States v. Peter,
  No. 17-CR-054 (NRB), 2019 WL 2918226 (S.D.N.Y. July 8, 2019) ............................... 57, 59
United States v. Peterson,
  385 F.3d 127 (2d Cir. 2004)........................................................................ 65, 67, 68
United States v. Pierce,
  785 F.3d 832 .................................................................................................. 45
United States v. Pitre,
  960 F.2d 1112 (2d Cir. 1992)............................................................................... 35
United States v. Ramirez,
  320 F. App'x 7 (2d Cir. 2009) ...................................................................... passim
United States v. Rea,
  958 F.2d 1206 (2d Cir. 1992)............................................................................... 25
United States v. Reifler,
  446 F.3d 65 (2d Cir. 2006).................................................................................. 46
United States v. Robertson,
  110 F.3d 1113 (5th Cir. 1997) ............................................................................. 62
United States v. Rodriguez,
  392 F.3d 539 (2d Cir. 2004)................................................................................ 26
United States v. Rosenthal,
  9 F.3d 1016 (2d Cir. 1993).............................................................................. 26, 46
United States v. Sabhnani,
  599 F.3d 215 (2d Cir. 2010)................................................................................ 55
United States v. Sanchez,
  969 F.2d 1409 (2d Cir. 1992)............................................................................... 62
United States v. Santiago-Ortiz,
  No. 17-CR-0149 (LAK), 2018 WL 4054859 (S.D.N.Y. Aug. 23, 2018) ................... 52, 54, 59
United States v. Santos,
  541 F.3d 63 (2d Cir. 2008)........................................................................... passim
United States v. Scales,
  No. 19-CR-96 (JSR), 2022 WL 673258 (S.D.N.Y. Mar. 7, 2022) ................................ 34, 43
United States v. Shaoul,
  41 F.3d 811 (2d Cir. 1994)............................................................................. 66, 67
United States v. Sisca,
  503 F.2d 1337 (2d Cir. 1974)......................................................................... 30, 31, 32
United States v. Snow,
  462 F.3d 55 (2d Cir. 2006)............................................................................. 58, 59
United States v. Soto-Beniquez,
  356 F.3d 1 (1st Cir. 2003)............................................................................. 51, 59
United States v. Steinberg,
  525 F.2d 1126 (2d Cir. 1975)............................................................................... 42

United States v. Stewart,
    433 F.3d 273 (2d Cir. 2006)..................................................................................... 67

United States v. Sureff,
    15 F.3d 225 (2d Cir. 1994)............................................................................... 43, 54

United States v. Temple,
    447 F.3d 130 (2d Cir. 2006)..................................................................................... 27

United States v. Valle,
    301 F.R.D. 63 (S.D.N.Y. 2014) ............................................................................. 44

United States v. Valle,
    807 F.3d 508 (2d Cir. 2015)............................................................................... 26, 44

United States v. Vargas,
    No. 02-CR-1388 (HB), 2003 WL 21659359 (S.D.N.Y. July 14, 2003) ................... 39

United States v. Velasquez,
    271 F.3d 364 (2d Cir. 2001)..................................................................................... 32

United States v. Vernace,
    811 F.3d 609 (2d Cir. 2016)............................................................................... 52, 59

United States v. Walker,
    142 F.3d 103 (2d Cir. 1998)..................................................................................... 61

United States v. Wallace,
    447 F.3d 184 (2d Cir. 2006)..................................................................................... 58

United States v. Wexler,
    522 F.3d 194 (2d Cir. 2008)..................................................................................... 27

United States v. White,
    7 F.4th 90 (2d Cir. 2021) .......................................................................... 25, 47, 61

United States v. Wieschenberg,
    604 F.2d 326 (5th Cir. 1979) ................................................................................... 42

United States v. Williams-Bey,
    No. 20-CR-00172 (MPS), 2023 WL 5286799 (D. Conn. Aug. 17, 2023).............. 59

United v. Melchor-Lopez,
    627 F.2d 886 (9th Cir. 1980) ................................................................................... 42

PRELIMINARY STATEMENT

Following a four-week trial between January 29, 2024 and February 27, 2024, a jury convicted defendants Karl Jordan, Jr. and Ronald Washington for the drug and firearm-related murder of Jason "Jam Master Jay" Mizell, as charged in the second superseding indictment (the "Indictment").  The jury determined that the defendants murdered Mizell in connection with a narcotics conspiracy on October 30, 2002, and convicted the defendants of murder while engaged in a narcotics conspiracy (Count One) and firearm-related murder (Count Two).

Defendants now seek the extraordinary remedy of having this Court overturn the jury's verdict.  They move for a judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure ("Rule 29") or alternatively for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure ("Rule 33").  See ECF No. 293 (hereinafter "Jordan Mot."); ECF No. 294 (hereinafter "Washington Mot").  For the reasons set forth below, the defendants' motions should be denied in their entirety.

BACKGROUND

I.    Relevant Procedural History

A.    The Charges

On August 13, 2020, a grand jury in the Eastern District of New York returned an indictment charging Jordan and Washington with one count of murder while engaged in a narcotics conspiracy, in violation of 21 U.S.C. § 848(e)(1)(A) (Count One), and one count of firearm-related murder, in violation of 18 U.S.C. § 924(j)(1) (Count Two), for the murder of Mizell.

Jordan was also charged with one count of conspiracy to distribute cocaine and seven counts of cocaine distribution, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(C).  On March 4, 2021, the grand jury returned a superseding indictment, which charged Jordan with one count of conspiracy to distribute 280 grams or more of cocaine base, in violation of 21 U.S.C. §§ 846

and 841(b)(1)(A)(iii), and one additional count of use of firearms in connection with a narcotics trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i).

On September 19, 2022, the Court granted Jordan's motion to sever Counts One and Two, which pertained to Mizell's murder, from Counts Three through Eleven, holding that those counts were improperly joined pursuant to Federal Rule of Criminal Procedure 8(b).  ECF No. 107.  The Court denied the defendants' motion to sever their trials on Counts One and Two.  Id.

On May 30, 2023, a grand jury returned a second superseding indictment to add Jay Bryant as a defendant to Counts One and Two.  On October 13, 2023, the Court granted Bryant's motion to sever his trial on those counts from Jordan and Washington.  ECF No. 184.

B.    Motions in Limine

The government filed numerous motions in limine, seeking admission of, inter alia, prior instances of narcotics trafficking and firearm possession (particularly access to and knowledge of .40 caliber firearms and ammunition and Jordan's identity as the shooter), pursuant to Rule 404(b); instances of witness intimidation and threats as consciousness of guilt; and co-conspirator statements and statements against penal interest.  ECF Nos. 113, 134, 141, 174, 205.  On January 11, 2024, the Court issued an omnibus ruling on the government's motions, granting and denying admission on 52 different proposed pieces of evidence and testimony.  ECF No. 215.  The Court also made additional rulings on January 17, 2024, in response to the government's request for clarification.  ECF No. 220.  During trial, on February 3, 2024, the government made a Rule 404(b) motion based on newly disclosed information provided by a witness on February 2, relating to Jordan's "target practice" with a semi-automatic pistol in the two months preceding Mizell's murder and Jordan's unexplained wealth immediately following

2

Mizell's death.  ECF No. 244.  The Court denied this motion.  Tr. 876-80.[1]

     C.    <u>Trial Exhibit Disclosures</u>

     The government produced potential trial exhibits six weeks before the start of trial, on December 20, 2023.  ECF No. 198.  The government produced additional trial exhibits—mostly in the form of sub-exhibits to exhibits that had already been produced—on January 8 and 16, 2024. ECF Nos. 212, 221.

     The defendants did not produce any trial exhibits in advance of trial, despite the government's repeated demand for such materials.  At the final pretrial conference, the defendants claimed to not have any additional defense exhibits and were "done"; "[u]nless things change, and if they do, we'll provide it."  Final Pretrial Conf. Tr. 24:11-12 (Jan. 17, 2024).  During trial, the defendants moved into evidence seven exhibits (two ultimately marked as court exhibits), which consisted of government 3500 material, one of the government's trial exhibits, a Google maps screenshot (DX-F), and a death certificate that was certified on January 25, 2024 (Court Exhibit 2)—the latter two documents had never been produced to the government.  To support Court Exhibit 2, Jordan also presented new prison records that had been certified on January 17, 2024— the same day as the final pretrial conference.

     D.    <u>Anonymous and Partial Sequestered Jury</u>

     The Court granted the government's motion for an anonymous and partially sequestered jury.  To prevent undue prejudice to the defendants, the Court stated it would provide "a neutral explanation as to the security measures.  Specifically, I will tell the jurors that all the measures here are to protect their privacy from the media and public attention that the trial is expected to receive, in light of the fame of Mr. Mizell."  Status Conf. Tr. 10:3-13 (Jan. 13, 2023).

---

[1]     "Tr." refers to the trial transcript unless otherwise indicated.

E.    <u>Excusal and Replacement of Juror No. 12</u>

███████████████████████████████████████████

████████████████████

The jury reached a unanimous verdict the following day and found both defendants guilty on all counts.

II.     The Trial Evidence

At trial, the government presented considerable proof that the defendants murdered Jason Mizell with a firearm and in connection with a narcotics conspiracy in his music studio inside 90-10 Merrick Boulevard, Queens, New York (the "Studio").  The evidence consisted of the testimony of 38 civilian, law enforcement and expert witnesses, as well as physical evidence.

Notably, the jury heard testimony from eyewitnesses Uriel Rincon and Lydia High, who each identified Washington guarding the Studio exit with a firearm during the murder.  Rincon identified Jordan as the shooter and High described an individual matching Jordan's appearance who shot Mizell.  The jury also heard testimony regarding Rincon and High's prior identifications of the defendants to multiple individuals pursuant to Rule 801(d)(1)(c).  Additional evidence, including the testimony of Tanya Davis, established Jay Bryant's role as an accomplice to the murder, which the government argued was to assist Jordan and Washington's covert entry into the building through the fire escape.  The jury also heard testimony from witnesses who recounted how Jordan and Washington admitted to committing the murder.  The jury also heard extensive testimony from witnesses Eric James, Chris Burrell, Ralph Mullgrav (hereinafter "Yakim"),[2] John Roberts, Daynia McDonald and Sean Gardiner who testified about the narcotics conspiracy and the roles of Mizell, Jordan, Washington and the cocaine supplier Terry "Unc" Flenory.

---

[2]     Mullgrav testified that he goes by the name "Yakim" and that is the name by which other trial witnesses referred to him.  Tr. 889:5-6 (Mullgrav).

In addition, the evidence presented at trial included numerous exhibits, <u>inter alia</u>, crime scene photographs and diagrams, surveillance video, news video, individual photographs, autopsy photographs and reports, ballistics reports, gunshot residue reports, DNA reports, financial records, scheduling records, a cell phone extraction, recorded phone calls, social media records and physical evidence, including .40 caliber shell casings and a hat containing Jay Bryant's DNA.

A.   <u>The Defendants Murdered Jason Mizell on October 30, 2002</u>

i.   <u>Eyewitnesses Testified That Jordan Shot Jason Mizell As Washington Guarded the Studio Exit</u>

The two surviving eyewitnesses to Mizell's murder—High and Rincon—each provided powerful testimony that established Jordan and Washington were the gunmen (and that Jordan shot Rincon in the leg).[3]  Rincon described "Mr. Jordan come towards Jay . . .  and then almost kind of gave a—like, a potential handshake [to Mizell] . . . and at the same time that's when I hear a shot . . .  During that time, I had seen Tinard [Washington] at the door of the studio . . . he said to Lydia to stay down."  Tr. 513:4-18.  Rincon further described how, immediately following the shooting, "Little D [Jordan] kind of shrugged Jay off of him, he turned the other way, turned towards his left and then just kind of went out.  It was probably ten or fifteen seconds."  <u>Id.</u> 513:20-23.  Rincon was clear that he had no trouble seeing Washington or Jordan's face and was even able to see "a little bit of [Jordan's] tattoo on his neck."  <u>Id.</u> 516:24-517:2.  Rincon also described his prior relationships with both Jordan and Washington, having seen and interacted with both defendants both in and out of the Studio, and identified both defendants in the courtroom during his direct examination.  <u>Id.</u> 518-21.  Rincon also testified that he confided in Randy Allen that Jordan and Washington were the gunmen days after the murder.  <u>Id.</u> 525:17-25.  This was

---

[3]   Michael Rapley, Randy Allen and Yarrah Concepcion testified that they were in the control room in the Studio (the room with the recording equipment) during the murder and did not see the murder occur.

corroborated by Allen's testimony.  Tr. 1074:19-1075:6.  Under cross-examination, Rincon did not waver in his account, and testified that he had previously identified both Jordan and Washington under oath during grand jury testimony.  He stated that he had "no doubt" that Jordan shot Mizell and that Washington ordered Lydia to the ground.  Id. 592:16-21.

High testified that she observed a "fair-skinned . . . African-American man" with a "tattoo on his neck"—consistent with Jordan's description—shoot Mizell after giving Mizell "a pound."  Tr. 955:20-958:4-13.  Immediately thereafter, High attempted to flee and was stopped by Washington, who ordered her to the ground at gunpoint.  Id. 956:8-22.  High described how she saw Washington clearly and had known him "for years" as he "grew up on the block that I lived on when I was a child."  Id. 957:3-25.  High was distraught during her testimony and was not asked to identify either of the defendants in court, though she did identify a photograph of Washington.  Id. 960:2-9.  High testified that she had no doubt in her mind that Washington was the person who pointed the gun at her when she tried to leave the Studio.  Id. 1016:3-6.  The jury also heard testimony that, on July 31, 2003, High identified Washington as one of the gunmen to police and picked him out of a photo array, a copy of which was entered into evidence.  Tr. 327:6-331:3; GX 519.  The jury also heard evidence of High's prior identifications to Allen and Derrick Parker. Specifically, High had told Allen that Washington ordered her to the ground at gunpoint and described the shooter's neck tattoo.  Tr. 1076:1-5. Derrick Parker, who acted as High's bodyguard and assisted her in her interactions with law enforcement after the murder, testified that High had identified both Washington and Jordan as being the perpetrators.  Tr. 920:10-24, 923:3-9.

In testifying to their observations and identifications, High and Rincon offered highly consistent accounts.  Additionally, the jury heard and saw photographs of the crime scene, which depicted a small, well-lit room, entirely free from obstructions that would impede either

witness's ability to perceive events or make an accurate identification. Neither High nor Rincon observed anyone else enter the Studio at the time of the murder, never described seeing anyone that resembled Jay Bryant, and Rincon did not recognize photographs of Bryant. Tr. 524:2-14 (Rincon shown GXs 501 and 502).

ii.    <u>Witnesses Testified That the Defendants Admitted to Murdering Jason Mizell</u>

The government called witnesses who testified to various admissions by the defendants. With respect to Jordan, the government called Cherubin Bastien, who previously lived with Jordan in 2004.[4] Bastien testified that he rented a room in Jordan's house and identified pictures of Jordan and Jordan's father. Tr. 1841:24-1842:24. On one occasion when he was driving Jordan and his friends in 2004, Bastien testified that he overheard a conversation about "Jam Master Jay," testifying that "They were talking about Jay. They said something and Little D [Jordan] said, if I get to kill him, I'll kill him again." Id. 1845:25-1846:14. Bastien also recounted a second conversation at their shared residence where Jordan was arguing with a woman in the driveway. During the conversation, Jordan told the woman that he would "do [kill] you exactly just like him," referring to "Master Jay." Id. 1847:16-1848:3, 1866:14-17.

With respect to Washington, the jury heard testimony from several witnesses who recounted highly incriminating statements—indeed, confessions—Washington made incident to the murder. Daynia McDonald, who was Washington's girlfriend at the time, testified that

---

[4]    The Court denied the government's motions <u>in limine</u> to permit Bastien to testify that in 2004, <u>inter alia</u>, Bastien purchased narcotics from Jordan; Bastien observed Jordan with a firearm on several occasions; Bastien participated in Jordan's narcotics trafficking by steering customers to Jordan and by driving Jordan and his associates to obtain resupplies of cocaine in upper Manhattan; and that, after Jordan threatened Bastien with a firearm, Bastien made a police report that led to the recovery of firearms, narcotics and narcotics paraphernalia from Jordan's residence. ECF No. 215 (Nos. 29 and 30).

Washington admitted to participating in the killing.   Tr. 1482:7-18, 1484:9-13, 1526:3-5.
Detective John Roberts, who was present during an interview of Washington, testified how
Washington taunted the interviewing agents that they were "not going to get the shooter . . . just
going to get the guy who stood at the door," and asked if they were going to "put me and another
person on an indictment and see who rats first."[5]  Tr. 2091:19-2092:1.  Stephon Watford, who was
Mizell's cousin and living at Mizell's sister's house (with Washington) at the time of Mizell's
murder, testified that, a day or two before the murder, Washington asked Watford if he had ".40
caliber bullet shells" and warned Watford to not go to the Studio because "something bad is gonna
happen."  Tr. 704:4-11, 724:6-8.   The jury also heard recorded phone calls where Washington
blamed "why the feds got [him]" on his role in Mizell's murder and acknowledged being present
at the scene, stating, "there's nothing they [the feds] can do about it, they trying to pressure me to
tell who was there . . . because I won't say nothing, they did what they did."  GX 809A-T; see also
GX 811A-T; GX 902.  Most pointedly, the jury heard testimony from Yusuf Abdur-Rahman, who
was formerly incarcerated with Washington and recounted how Washington told him that he had
participated in the murder of "Jam Master Jay" and that "there was a black girl in the studio at the
time"—a reference to High—who they did not harm because "that wasn't what we were there to
do."  Tr. 1419:20-1422:13, 1426:3-14.

---

[5]      Washington originally asked law enforcement if they were going to "put me and Noid
[Jordan] on an indictment and see who rats first."   The parties agreed to replace Jordan's name
with "another person" to avoid implicating Bruton v. United States, 391 U.S. 123 (1968).  At no
point in the interview with law enforcement had "Noid" or Jordan been mentioned when
Washington made this statement.

iii.   The Physical Evidence and Other Testimony Corroborated the Eyewitness
Testimony and Identifications

In addition to the defendants' statements, the jury was presented with a variety of other corroborative evidence that supported the eyewitness testimony, their narrative of events and their identifications of the defendants, including, inter alia, the autopsy findings; physical evidence from the crime scene; testimony regarding the relationship between Jordan and Washington and their connection to their accomplice, Jay Bryant; DNA evidence from Jay Bryant; and evidence of the defendants' access to and knowledge of .40 caliber firearms and ammunition.

Significantly, the findings from Mizell's autopsy—most notably the dense stippling pattern around the entrance wound—and the gunshot residue on his clothing conclusively showed that Mizell was killed by a single bullet to the head that was fired from mere inches away.  Tr. 1987:12-1988:4 (Bains, describing a "contact shot" from "less than about two inches" away); Tr. 619:19-620:8 (Ambrosi, noting that the "concentrated" stippling pattern means the gun was "inches" away from Mizell's head).   These irrefutable scientific findings were wholly corroborative of both High's and Rincon's testimony, which had Jordan firing the weapon after giving Mizell an embrace or handshake.  Similarly, the angle of shot through Mizell's head and the location from where the bullet was recovered were entirely consistent with High and Rincon's description of where Jordan and Mizell were positioned at the time of the fatal shot, with Mizell attempting to turn away as the gun was drawn and fired.  Tr. 609:25-610:4 (Ambrosi describing the trajectory of the bullet "between the entrance and exit wound" as "left to right, upward and back to front"); Tr. 1934:13-1936:7 (Rodgers explaining how the bullet that passed through Mizell's head would change shape and direction and lose velocity upon exit).

Daynia McDonald also testified that she was with Washington earlier on the day of the murder and that Washington obtained a firearm from Jordan's brother, Tashawn Burns, which

Washington claimed was fake.[6]  Tr. 1475:22-1476:5.  McDonald also testified that about one month after the murder, Washington said he "had to go meet up with Noid [Jordan]" after the murder and returned "upset."  Id. 1528:1-15.

The government also presented testimony regarding Jay Bryant, his connection to Washington and Jordan, his presence at the crime scene, and his accomplice role in the murder. Notably, several witnesses connected Jordan and Washington to Bryant through Atif Heathington, a mutual associate who had grown up with Jordan in Hollis and then moved around the corner from Bryant's home in Jamaica, Queens.  See, e.g., Tr. 1177:17-22 (Gonzalez stating that Bryant introduced him to Heathington); Tr. 1214:19-24 (Burrell regarding relationship between Jordan, Heathington and Burns); Tr. 1472:5-1474:8 (McDonald regarding seeing Heathington with Jordan and Washington, identifying a photograph of Jay Bryant, GX 501, and seeing Bryant with Heathington, Jordan and possibly Washington); GX 811A-T (recorded phone call where Washington referred to Jordan as "his little man").  The government also introduced photographs of Bryant with Heathington and Jordan with Heathington.  See, e.g., GXs 543, 547.  Conversely, no one close to Mizell recognized photographs of Bryant.  See, e.g., Tr. 692:22-693:12 (Watford); Tr. 818:17-21, 819:5-6 (Rapley); Tr. 524:2-18 (Rincon); Tr. 1748:22-1749:8 (James); Tr. 1054:11-15 (Allen).

Tanya Davis testified that she observed an individual matching Bryant's description enter the front of the building and walk towards the rear fire escape exit shortly before the shooting, and exit through the front immediately thereafter.  Tr. 1313:13-1314:19, 1318:4-10 (describing a

---

[6]     Burns, who was in federal custody on unrelated charges, refused to testify at trial, and the Court denied the government's forfeiture by wrongdoing motion in limine to admit his testimony that, inter alia, he and Jordan kept narcotics and a .40 caliber firearm in a van outside of their home in 2002, and the .40 caliber firearm went missing at the time of Mizell's murder.  ECF Nos. 174, 205.

"very tall" "black" male with "braids," "light skin" and a "shadow beard" who was "dragging his leg" while walking); see also GXs 501, 502 (photographs of Bryant); Tr. 1172:1-4 (Gonzalez describing Bryant as "roughly six four" and walking with a limp); Tr. 1349:9-16 (Raymond Bryant describing Jay Bryant as being "two, three inches" taller than 6'2" and walking with a limp); Tr. 2026:13-17 (Doerner approximating Bryant's height as between 6'3" and 6'5").  Testimony was also introduced about Bryant's DNA profile being part of a mixture of DNA found inside a knit hat recovered from the Studio.  The aggregate of this testimony and evidence established a connection among Jordan, Washington and Bryant; explained the presence of Bryant's DNA at the crime scene; corroborated the observations of Tanya Davis; and supported the government's theory that Bryant assisted Washington and Jordan's surreptitious entry into the building and Studio through the fire escape.  Rincon testified that Jordan and Washington made a left turn out of the Studio after the murder—the direction of the rear fire escape exit and the only other exit out of the building.  Tr. 521:17-21; 806:24-807:3.

The jury was also presented with evidence showing the defendants' consciousness of guilt, both through their own actions and those acting on their behalf.  The defendants stipulated to testimony from Darnell Smith that, on the day of the murder, Washington went into a barbershop in Jamaica, Queens to manufacture an alibi, stating in substance, "if anybody asks where I was all day, I was here at the barbershop."  GX 914.  Rincon described being approached by Jordan "and a couple of friends of his" at Mizell's funeral and being asked "if [he] saw who did it" in a way that made Rincon feel "uncomfortable" and like Jordan was "probing to see if I did see him."  Tr. 526:13-23.  Similarly, McDonald testified that she was approached by Jordan's father and what she referred to as "the Hollis Crew," and that Jordan's father told her "not to say anything to the

f'ing police."[7] Tr. 1528:23-29.  Jordan's father also placed a call to High shortly after the murder

that made her "upset" and start "shaking."  Tr. 921:19-922:9.  The defense even elicited from

Detective Roberts that "Washington told you Big D [Darren Jordan, Sr.] was shooting at him the

day after the murder."  Tr. 2106:6-9.  These attempts by Jordan and Jordan's father to neutralize

potential witnesses against Jordan—including Washington—demonstrated consciousness of guilt.

        The government also introduced ballistic evidence and Rule 404(b) evidence

showing the defendants' access to and knowledge of .40 caliber firearms and ammunition.  Some

of this evidence was introduced through stipulation to comport with the Court's rulings on the

government's motions in limine and minimize prejudice to the defendants.  Specifically, in GX

911, the parties stipulated that on August 9, 2002, Washington possessed a .40 caliber firearm and

a .40 caliber shell casing was recovered from him by law enforcement.[8]  Washington also bragged

to Detective Roberts that, at the time of Mizell's murder, he actually had two .40 caliber firearms,

which he described as an ".80 caliber."  Tr. 2090:1-10.  With respect to Jordan, in GX 912, the

parties stipulated that on February 3, 2003, just three months after Mizell's murder, Jordan was in

possession of a .40 caliber firearm; that a .40 caliber shell casing was recovered from that firearm;

and that an additional 83 .40 caliber rounds were recovered from Jordan's residence.[9]  That shell

casing was recovered, and expert testimony from two government witnesses established that it was

---

[7]     McDonald testified that she recalled Jordan being part of the group that approached her, and there was significant dispute about whether Jordan could have been present for this incident or whether he was incarcerated at the time.  Regardless, there was no dispute that Jordan's father was there and was the protagonist of the encounter.

[8]     This stipulation sanitized an armed robbery during which Washington fired at the victim and the .40 shell casing was recovered.

[9]     This stipulation sanitized an incident where Jordan, during an argument with one of Washington's female relatives, struck her in the face and fired the .40 caliber pistol into the air. The shell casing was recovered, Jordan was arrested, and the 83 rounds were recovered pursuant to a lawful search of his residence.  Jordan also gave a post-Miranda statement where he admitted to possessing and firing the weapon.

not only the same caliber, but the same brand, casing material, primer type and bearing the same text, font and spacing as the two shell casings recovered from the scene of Mizell's murder.  Tr. 1656:21-1659:10 (Moynihan); Tr. 1927:16-1928:23 (Rodgers).[10]  The jury heard further testimony that this type of .40 caliber ammunition was one of approximately seventeen types of .40 caliber ammunition that was commercially available in the United States at the time of Mizell's murder. Tr. 1961:24-1964:7 (Kass).  In GX 913, the parties stipulated that, on May 14, 2003, Jordan again possessed a .40 caliber firearm and a bullet and bullet fragment were recovered.[11]

B.    The Defendants Were Involved in a Narcotics Conspiracy

Testimony and evidence revealed that Jordan joined a conspiracy to distribute cocaine involving Mizell, Unc and Yakim in 2001 or 2002, and Washington joined that conspiracy in 2002.  Mizell had been involved in the cocaine business since the early 1990s, obtaining cocaine on consignment from his cocaine supplier, Unc, and distributing it to others to further distribute, including to Jordan (who sold an ounce in 2001 or 2002), to Washington (who "messed it up" in early 2002, Tr. 1767:21-22), and to Yakim (who sold one to two kilograms of cocaine for Mizell a few times in Baltimore, Maryland, totaling a "little less" than 10 to 20 kilograms, Tr. 885:14-21, 888:14-23).  In summer of 2002, Mizell, Jordan and Washington agreed to distribute 10 kilograms of cocaine in Baltimore through Yakim, but when Mizell and Washington travelled to Baltimore

---

[10]    As he did during his summation, Jordan's brief distorts the ballistics evidence and claims it shows "in[con]clusive and exclusionary results."  Jordan Mot. 34.  This is false.  The "inconclusive" test result related only to a bunter marking examination, which endeavored to determine whether or not the shell casings recovered from the murder scene were manufactured by the same bunter machine as the casing recovered from Jordan on February 3, 2003.  While a positive finding would have been highly incriminating and constituted direct evidence against Jordan, the inconclusive finding on this matter—indeed, even a negative finding—has no bearing on whether Jordan possessed and had access to the same type of ammunition used in the murder, which was the purpose for this evidence's admission.
[11]    This stipulation sanitized an incident in which Jordan shot Mizell's nephew, Rodney Jones, as a result of Mizell's nephew accusing Jordan of killing Mizell in a rap song.

in August 2002 to consummate the deal with Yakim, Yakim refused to work with Washington. Mizell sent Washington back to New York, while he remained in Baltimore with Yakim.  In October 2002, Mizell was scheduled to meet with Unc's associates in New York after which he and Washington had plans for the narcotics conspiracy in Connecticut and Baltimore.  The same day, or day after, that Mizell was scheduled to meet with Unc's associates, Jordan and Washington murdered Mizell.

i.   <u>Jason Mizell's Role as a Middle Man in the Narcotics Conspiracy</u>

Jason Mizell was the deejay of the band Run-D.M.C., which formed in the 1980s. <u>See, e.g.</u>, Tr. 799:16-800:17 (Rapley); Tr. 675:5-20 (Watford); Tr. 1047:8-1048:2 (Allen).  As Run-D.M.C. achieved enormous success, Mizell included his friends in that success and lent money to people around him.  <u>See, e.g.</u>, Tr. 675:5-20, 714:7-17 (Watford); Tr. 800:5-802:6, 800:18-6 (Rapley); Tr. 1048:3-21, 1049:11-20 (Allen).

But as his work with Run-D.M.C. slowed, Mizell began to experience financial difficulties, Tr. 1051:5-13 (Allen), and by the 1990s, Mizell had accumulated significant debt.  For example, in 1989, the New York State Commission obtained a judgment against Mizell in the amount of $64,310.42.  GX 908.  In 1990, the New York State Department of Taxation and Finance also obtained a judgment against Mizell in the amount of $8,36.99.  <u>Id.</u>  In 1991, Mizell's apartment in Manhattan was seized by marshals, and he and Randy Allen were evicted.  Tr. 1048:18-1049:10 (Allen).  And by 1992, Mizell owed $234,776.15 to Citibank for his mortgage on a property on Sawyer Avenue in Queens, New York, and the following year, Citibank purchased that property after its foreclosure.  GX 908.

When Mizell wrote checks, they often bounced.   Tr. 706:3-15 (Watford).  Curiously, though, when a check bounced, Mizell was able to produce cash to pay others.  <u>Id.</u>

15

706:3-15.  Washington confirmed that Mizell "always took care of anyone who was around him."

Tr. 1618:23-25 (Gardiner).

      Trial testimony revealed that at the time Mizell was experiencing financial difficulties, he became involved in the cocaine business.  One of Mizell's best friends, Eric James who lived in Wisconsin, testified that Mizell was not a street dealer, but rather operated as a middle-man between his supplier and distributers.  Tr. 885:3-17, 1751:17-20, 1752:2-12.  James befriended Mizell in the 1980's during a basketball game, and continued to speak with him daily and to visit him in Hollis, Queens, even when James was living in the Midwest.  Id. 1744:14-1745:14, 1797:23-1798:9, 1798:18-1800:13.  At the time he met Mizell, James was selling cocaine for a living in the Midwest, and he testified at trial about the cost of a kilogram of cocaine in 2002, which cost between $18,000 and $23,000 per kilogram to obtain but could result in $15,000 to $20,000 in profit, depending on where it was supplied and sold.  Id. 1749:13-1750:16.[12]  James explained the concept of selling drugs "on consignment," in which a supplier gives an individual drugs on credit and when the individual sells those drugs, they are required to pay money to the supplier.  Id. 1794:24-1795:10.

      James discussed his drug business with Mizell, and later learned in 1992 or 1993 that Mizell had also become involved in selling cocaine.  Id. 1750:10-1751:12, 1751:17-20.  James had been present when Mizell received kilograms of cocaine.  Id. 1752:7-9.  In 2002, James asked Mizell to connect him to his cocaine supplier, who was named Unc, id. 1752:10-12, 1754:3-12, and James ultimately acquired cocaine from Unc and people working for him, id. 1754:17-23.

---

[12]     James testified that he was in the drug business from approximately 1984 to 1985 until the time of Mizell's death in 2002.  Tr. 1783:18-1794:9.

Yakim corroborated Mizell's role in the cocaine business, confirming that Mizell was not a lifestyle drug dealer but rather did it to make ends meet.  Tr. 888:10-13.  Yakim had grown up with Mizell and Washington in Hollis, Queens but moved to Baltimore, Maryland where he sold drugs and later served 12 years in federal prison for doing so.  Id. 885:1-2, 886:7-10, 890:15-891:12; see Tr. 1052:24-1053:9 (Allen).  Mizell had previously employed Yakim to move cocaine for him in Baltimore involving one or two kilograms on each occasion.  Tr. 888:10-23.  In total, prior to August 2002, Mizell had Yakim move a "little less" than 10 to 20 kilograms of cocaine.  Id. 885:14-21, 888:14-23 (Yakim referring to moving for Mizell a "little less" cocaine than the "few keys" of 10 to 20 kilograms Mizell asked him to move in August 2002).

Mizell protected his friends who were not involved in the drug trade by keeping this side business a secret from them and from the public.  Mizell's cousin, Watford, and closest friends and business partners, Allen, Rapley and Rincon, testified that they had never seen Mizell with drugs other than marijuana and never known him to sell drugs, but that they knew he had friends other than those who frequented the Studio, including those that "were involved in different lifestyles and activities that wouldn't be normal for Jay, but he was friends with everybody and he didn't really shun away anybody."  Tr. 503:16-22 (Rincon); see Tr. 1062:12-17 (Allen); Tr. 812:3-15 (Rapley); Tr. 702:10-13 (Watford).

ii.   Relationship Between Mizell, Jordan and Washington

Mizell and Washington grew up together in Hollis, Queens.  At the time of Mizell's murder, Washington was living on the couch at Mizell's family home, having just returned to New York in spring of 2002.  See, e.g., Tr. 694:21-23, 697:17-679:4, 702:14-21 (Watford).  This house was across the street from the home shared by Jordan and Jordan's father, Darren "Big D" Jordan, Sr., who worked with Mizell at times.  Tr. 1747:14-1748:21 (James); Tr 683:11-684:1 (Watford); Tr. 514:17-23 (Rincon).  Big D named Mizell as Jordan's godfather.  Tr. 1805:17-20 (James); Tr.

514:17-23 (Rincon); Tr. 820:14-18 (Rapley).   Jordan was 18 years old at the time of Mizell's

murder.  Tr. 1810:6-7 (James); Tr. 1296:4-6 (Burrell).

Despite their substantial age difference, Jordan and Washington became

acquaintances.  See GX 811A-T (Washington referring to Jordan as his "little man" and Jordan

telling Washington he "got love for [him]").   McDonald, Washington's girlfriend at the time and

who knew Jordan from middle school, testified that she had seen Jordan and Washington together

a couple of times in 2002.   Tr. 1472:19-1473:11 (McDonald).   James had seen Jordan and

Washington together in the Studio and had also seen them together outside of the Studio.   Tr.

1761:2-12, 1799:25-21, 1800:17-1802:21 (James).

### iii.   Testimony That the Defendants Joined the Narcotics Conspiracy Prior to The Baltimore Deal in August 2002

In 2001 or 2002, Mizell, Jordan and James were standing outside a barbershop near

the Studio when Jordan began asking James about the price of cocaine.   Tr. 1755:12-1756:2,

1756:10-13, 1756:22-23, 1757:11-15 (James).[13]   A few minutes later, Jordan nudged James and

told him to tell Mizell to look out for him and "to put me on," which James understood to mean to

give him cocaine.  Id. 1756:24-1757:10.[14]   Mizell later confided to James that he had agreed to

have Jordan distribute cocaine and gave Jordan an ounce to sell in order "to try him out"; Jordan

successfully sold it.  Id. 1768:6-1770:2.   With respect to Washington, Mizell told James that in

early 2002, he had given Washington drugs to sell but that he had "messed it up."   Id.

1767:7-1768:1, 1812:17-1813:2.

---

[13]     James testified that he thought this conversation was "before 2002" and then clarified it was "maybe 2001, 2002, yeah."  Tr. 1755:16-23.

[14]     The Court sustained an objection to James's testimony that Jordan had a firearm during this conversation in the event the conversation took place during 2001 in which case the Court held it would not be admitted as direct evidence.  The government withdrew the question.  Tr. 1757:16-25.

18

In summer of 2002, Mizell told Chris Burrell that he had a deejaying job in Manhattan and asked him to accompany him.  Tr. 1219:24-1220:17 (Burrell).  Burrell had befriended Mizell years earlier and would drive Mizell to performances and help set up equipment on stage.  Id. 1208:19-1209:19.  In the car with Mizell and Burrell was Washington, who Burrell then met for the first time.  Id. 1219:24-1220:17.  Burrell testified that during that ride, Mizell and Washington sat in the front of the car where they discussed the narcotics conspiracy—Mizell agreed with Washington that when he got ahold of more drugs, he would have Washington sell them.  Id. 1224:7-1225:6.

On another occasion that summer, Mizell and Burrell were driving to a show but Mizell stopped in Baltimore along the way to see Yakim, who Burrell had never met before.  Id. 1225:13-1226:10.  Mizell met with Yakim on the street in a residential, rundown area with abandoned houses, and, during their conversation, Burrell heard Yakim say he had purchased some of those houses to use as use as "crack houses or whatever."  Id. 1227:5-1228:3.  Thereafter, Mizell and Burrell drove to the show, which was not in Baltimore.  Id. 1228:13-15.

iv.    Testimony About the Baltimore Deal in August 2002

In 2002, Mizell "had a line" on 100 kilograms of cocaine from Unc, but Unc could only give Mizell 10 kilograms at that moment because there was a drought in the supply.  Tr. 1770:7-20 (James).  Mizell, Jordan and Washington agreed that they would distribute those 10 kilograms in Baltimore because Yakim had connections there and, therefore, they could "make more money" in Baltimore, as opposed to other places.  Id. 1760:8-14, 1770:6-22, Tr. 1771:1-8.  Mizell discussed with James this Baltimore deal involving Jordan, Washington and Yakim on six or seven occasions, and told James that this was supposed to be an ongoing distribution, Tr. 1777:13-23 (James), thus indicating he would be receiving the remaining 90 kilograms of cocaine once they were available.  At that time, Yakim was already selling large quantities of cocaine in

Baltimore, about 30 to 40 kilograms per month, using a team of around 25 people as his distribution network to sell cocaine.  Tr. 890:22-891:7, 893:15-894:4 (Mullgrav).  Washington was skeptical of selling the cocaine with Yakim because he did not get along with Yakim; nonetheless, he travelled to Baltimore to see this transaction completed.  Tr. 2089:10-20 (Roberts).

In August of 2002, Burrell drove Mizell and Washington to Washington, D.C.  Tr. 1228:16-1229:4 (Burrell).  On the way, they made a stop where they met with two individuals who followed them on the drive down to D.C.  Id. 1230:1-21.  Burrell was not part of this transaction and believed the purpose of the trip was to bring jewelry to "a guy named Unc"—i.e., the conspiracy's cocaine supplier, unbeknownst to Burrell.  Id. 1229:12-20.  When they arrived in D.C., Mizell and one of the two unknown individuals entered the Wyndham Hotel to meet with Unc, the cocaine supplier, while Burrell and Washington stayed in the car.  Id. 1230:22-1231:6; Tr. 1999-2000 (Tummino); GX 606.

At trial, witnesses testified that Washington admitted that the purpose of the meeting was to pick up cocaine from Unc, who was a drug dealer.  Tr. 2087:21-2088:14 (Roberts); Tr. 1616:23-1618:4 (Gardiner).  During that meeting, Mizell and Unc discussed the terms of the cocaine deal, including the price per kilogram.  Tr. 2088:19-24 (Roberts).  Washington had advised Mizell that they should take possession of the drugs for $18,000 per kilogram.  Id. 2089:25-2090:9.  Before departing, Mizell obtained the cocaine from Unc, which, according to Washington, would be worth $120,000 in profits.  Tr. 1617:2-1618:4 (Gardiner).  Mizell, Washington and Burrell stayed overnight in the hotel in D.C, Tr. 1232:8-21 (Burrell), as corroborated by Mizell's credit card statements showing a charge for the Wyndham Hotel on August 3, 2002, GX 606.

The next day, Mizell, Washington and Burrell drove to Baltimore.  Tr. 1233:2-4 (Burrell).  During the ride, Mizell and Washington discussed having Washington stay in Baltimore

to sell the cocaine.  Id. 1233:2-24.  When they arrived in Baltimore, they began looking for Yakim.  Mizell received a phone call from Yakim, who said he did not want Washington there and would kill him on sight.  Id. 1234:6-1235:3, 1237:3-14.

At that point, Washington and Burrell left to drive back to New York while Mizell stayed in Baltimore.  Id. 1237:16-13.  As they left Baltimore, Washington instructed Burrell to stop on the street and drive around the corner at which point Washington rolled down the car window and Burrell saw Yakim.  Id. 1238:11-1239:12; Tr. 889:10-890:2 (Mullgrav).  Yakim spotted Washington in the car, and, due to prior animosity with Washington, Yakim ran to grab his firearm to shoot Washington.  Tr. 860:11-17, 886:7-17, 889:10-890:14 (Mullgrav).  Burrell and Washington then sped off.  Tr. 1239:13-18 (Burrell).

While he remained in Baltimore, Mizell approached Yakim again—without Washington this time—and explained that he wanted Yakim to move between 10 and 20 kilograms of cocaine, where each kilogram would be sold for an amount between $15,000 and $20,000, for proceeds of between $150,000 and $400,000.  Tr. 885:3-21, 890:15-21 (Mullgrav).  Teddy Allen, who had grown up with Mizell and Yakim and was the brother of Randy Allen and Lydia High, was with Mizell and Yakim at the time.  Id. 886:22-887:6.[15]  When Mizell asked Yakim also "for permission to put Tinard [Washington] in Baltimore," Yakim said, "no."  Id. 886:7-17, 893:25-894:6.  When defense counsel subsequently confirmed with Yakim, "So no deal, right?" Yakim responded, "No deal."  Id. 894:7-8.  Yakim did not specify, and defense counsel did not

---

[15]     Teddy Allen died before trial due to natural cases. Tr. 1052:17-23 (Allen). Washington suggests that lack of corroboration about Teddy Allen's presence during this meeting casts doubt on Yakim's credibility, see Washington Mot. 5, but Yakim was the only other living witness present at this meeting. And as defense counsel knows, Teddy Allen's grand jury testimony and 3500 material—which was inadmissible at trial—revealed that he was living in Baltimore at that time and was present at this meeting. See 3500-TA-1, 3500-TA-3

ask, whether "no deal" meant no Baltimore deal distributing 10 kilograms for the conspiracy altogether, or just distributing with Washington.

A couple of days later, Mizell traveled back to New York by himself.   Tr. 1239:40-1240:2 (Burrell); GX 606 (credit card statements showing charges in Maryland between August 2 and 9, 2002, with the next charge on August 12, 2002 in New York).

> v.   Testimony About the Continuing Narcotics Conspiracy Through Jason Mizell's Death

Though Washington was not permitted to sell cocaine with Yakim in Baltimore, there was no evidence of Washington's or Jordan's withdrawal from the ongoing cocaine conspiracy with Mizell and Unc.

In October 2002, Mizell visited James in Wisconsin.   Tr. 1780:5-1781:5 (James); see also Tr. 704:15-705:13 (Watford).   Mizell and James were playing video games at James's home when Mizell received a phone call.   Tr. 1780:5-1781:5 (James).   Mizell became agitated and began yelling into the phone, and James overheard Mizell say Washington's name.   Tr. 1781:8-12, 1781:18-1782:1, 1786:7-16, 1815:25-1816:12 (James).

Mizell returned to Hollis, Queens on October 29, 2002.   Tr. 611:7-10 (Ambrosi); 1787:4-8 (James); GX 201.   He was supposed to leave for South Carolina the day after his murder, on October 31, 2002, to deejay as part of a promotional tour for "Rusty Waters."   Tr. 1061:10-20 (Allen); GXs 904, 608.   Rusty Waters was a local music group comprised of Mizell as deejay, Randy Allen, and Mizell's nephew Rodney Jones also known as "Bo Skaggs."   Tr. 802:7-15 (Rapley); Tr. 1052:8-16, 1061:16-20 (Allen).   After South Carolina, Rusty Waters was scheduled to travel to Georgia on November 1, 2002.   GX 608.

At the same time, however, Mizell had plans for the narcotics conspiracy with Washington.   The day before, or of his murder, Mizell was supposed to meet with Unc's associates,

Tr. 1618:5-12 (Gardiner), and Washington told Watford not to go near the Studio.  Tr. 704:4-11, 724:9-23 (Watford).  Washington himself, however, continued to frequent the Studio on the days that Mizell was supposed to meet with Unc's associates, and Washington was also still living on the couch at Mizell's family home at that time.  Tr. 824:1-5, 824:20-22 (Rapley).  The day of the murder, Mizell asked Watford, his cousin, to see his accountant.  Tr. 705:22-25 (Watford).

On October 30, 2002—the day of Mizell's murder—Washington and his girlfriend, McDonald, visited Tashawn Burns, Jordan's brother, where Washington obtained what appeared to be a firearm.  See supra at 10-11.  Washington and McDonald then went to the Studio where they saw Mizell, who already had a firearm on him.  Tr. 1476:6-1477:14.  Mizell appeared surprised to see Washington there.  Id. 1477:16-22, 1548:23-1549:3.  Washington saw the firearm and asked Mizell, "What do you have the gun for?  Why do you need a gun?  You could have always called me if you need anything."  Id. 1477:23-1478:2.  Washington reminded Mizell, "If you have a problem, I have a problem too."  Tr. 1550:16-1551:7.

Washington asked Mizell, "Aren't we supposed to be going to Connecticut for a show?"  Id. 1478:11-16.  Washington also inquired about Baltimore.  Id. 1478:17-20.  As corroboration of these plans, Mizell's calendar had entries for planned trips to "D.C." (near Baltimore and where Mizell and Washington had obtained cocaine from Unc) on October 31, 2002 and "CT" on November 1, 2002.  GXs 904, 607.  Yet Washington had never previously discussed going on tour with Mizell, Tr. 1478:21-24 (McDonald), nor did any witness involved in Mizell's music businesses testify about Washington's having a role in Mizell's music, see, e.g., Tr. 823:13-18 (Rapley); 1056:25-1057:3 (Allen); 957:5-7, 1009:3-6 (High); 519:19-23 (Rincon). Moreover, Mizell was supposed to be in South Carolina and Georgia with Rusty Waters on those

days.  GXs 904, 608.  McDonald could not hear what else Washington and Mizell discussed.  Tr. 1550:21-1551:7 (McDonald).

Mizell then sent Washington and McDonald away from the Studio, asking McDonald to pick up food for them.  Id. 1479:4-20.  On the way back to the Studio, Washington made a phone call during which he gestured wildly, and, thereafter, he told McDonald to grab her belongings from the Studio and that she had to leave.  Id. 1480:1-1482:3.  A few hours later, Jordan and Washington entered the Studio and killed Mizell.

Later that night, Washington confessed to McDonald that he killed Mizell, and the next day, he and McDonald began living in hotels together rather than have Washington continue living at Mizell's family home.  Id. 1482-84, 1526-28.  Also on the day after Mizell's murder, Jordan's father, Big D, shot a firearm at Washington.  Tr. 2106:6-9 (Roberts).

After Mizell's murder, James spoke to Mizell's cocaine supplier, Unc, who appeared shocked over Mizell's death.  Tr. 1788:11-20 (James).  Unc told James that any debt Mizell owed him in connection with the cocaine he had supplied had died with Mizell; in other words, Unc would not seek to collect outstanding debts from Mizell or his family.  Id. 1788:11-20.

## ARGUMENT

Defendants seek judgments of acquittal under Rule 29 or alternatively a new trial under Rule 33.  First, the defendants ask the Court to enter judgments of acquittal on both counts of the Indictment because the evidence presented at trial failed to establish that: (i) with respect to Count One, Jordan and Washington were part of an ongoing narcotics conspiracy at the time of Mizell's murder, or that a motive for the murder was related to the narcotics conspiracy; and (ii) with respect to Count Two, that Jordan and Washington used a firearm in furtherance of the drug conspiracy.  Second, the defendants ask the Court for a new trial because Juror No. 12 "likely" tainted the jury before his dismissal, Jordan Mot. 34, and because, as only Jordan argues, Jay

Bryant was the real shooter.  For the following reasons, these arguments are meritless and the motions should be denied.

I.       The Defendants' Rule 29 Motions for Acquittal Should be Denied

        A.       Standard of Review

        A defendant "challenging the sufficiency of the evidence to support his conviction 'bears a heavy burden.'"   United States v. Ceballos, 340 F.3d 115, 124 (2d Cir. 2003) (quoting United States v. Best, 219 F.3d 192, 200 (2d Cir. 2000)).  The Court "must credit every inference that could have been drawn in the Government's favor, and defer to the jury's assessment of the weight of the evidence and the credibility of the witnesses, and to the jury's choice of the competing inferences that can be drawn from the evidence." Id. (internal citations and punctuation omitted); see also United States v. Autuori, 212 F.3d 105, 117-118 (2d Cir. 2000) (where testimony is in direct conflict, "such a conflict on a Rule 29 motion must be resolved in favor of the verdict"); United States v. Payton, 159 F.3d 49, 56 (2d Cir. 1998) ("Where there is conflicting testimony at trial, we defer to the jury's resolution of the witnesses' credibility."); United States v. Rea, 958 F.2d 1206, 1221-22 (2d Cir. 1992) ("Matters of the choice between competing inferences, the credibility of the witnesses, and the weight of the evidence are within the province of the jury, and [the court is] not entitled to second-guess the jury's assessments."); accord United States v. Barret, No. 10-CR-809 (KAM), 2012 WL 3229291, at *16 (E.D.N.Y. Aug. 6, 2012).

        The Court "must affirm the conviction if, viewing the evidence in the light most favorable to the prosecution, we conclude that, from the inferences reasonably drawn, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. White, 7 F.4th 90, 98 (2d Cir. 2021) (citing cases including Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in Jackson)).  In assessing sufficiency, the Court is "obliged

to view the evidence in its totality and in the light most favorable to the prosecution." United States v. Florez, 447 F.3d 145, 154-55 (2d Cir. 2006).

The "ultimate question" for the Court "is not whether [it] believe[s] the evidence adduced at trial established the defendant's guilt beyond a reasonable doubt, but whether any rational trier could reasonably reach that conclusion." United States v. Valle, 807 F.3d 508, 515 (2d Cir. 2015) (citations omitted). At the end of the day, a trial court can "enter a judgment of acquittal only if the evidence of guilt is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." United States v. Espaillet, 380 F.3d 713, 718 (2d Cir. 2004).

The trial court must review the "evidence in its totality" and "[d]irect evidence is not required; '[i]n fact, the government is entitled to prove its case solely through circumstantial evidence, provided, of course, that the government still demonstrates each element of the charged offense beyond a reasonable doubt.'" United States v. Lorenzo, 534 F.3d 153, 159 (2d Cir. 2008) (quoting United States v. Rodriguez, 392 F.3d 539, 544 (2d Cir. 2004)); see also United States v. Irving, 452 F.3d 110, 117 (2d Cir. 2006) ("A jury may convict on circumstantial evidence alone."); accord Jackson, 335 F.3d at 180; United States v. Martinez, 54 F.3d 1040, 1043 (2d Cir. 1995). Elements going to the operation of a defendant's mind, such as knowledge, intent and willfulness, can often be proved only through circumstantial evidence. See United States v. MacPherson, 424 F.3d 183, 189-90 (2d Cir. 2005) (citing cases). Importantly, when making a case based on circumstantial evidence, the government need not "exclude every reasonable hypothesis other than that of guilt." Holland v. United States, 348 U.S. 121, 139 (1954); see also United States v. Rosenthal, 9 F.3d 1016, 1024 (2d Cir. 1993) ("The government need not eliminate every theory of innocence, and the reviewing court must consider pieces of evidence not in isolation, but in conjunction.").

Even if the Court concludes that the jury <u>could</u> have acquitted, the Court may not disturb the jury's verdict on that ground because "[w]here a court concludes after a full analysis of the evidence in connection with a Rule 29 motion that either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, [the court] must let the jury decide the matter." <u>United States v. Temple</u>, 447 F.3d 130, 137 (2d Cir. 2006); <u>accord</u> <u>Autuori</u>, 212 F.3d at 114.

As the Second Circuit recently explained, this "high degree of deference" given to the jury's verdict "is especially important when reviewing a conviction of conspiracy." <u>United States v. Landesman</u>, 17 F.4th 298, 320 (2d Cir. 2021). "This is so because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel." <u>Id.</u> (quoting <u>United States v. Anderson</u>, 747 F.3d 51, 73 (2d Cir. 2014)). "The 'agreement to participate in the conspiracy may be inferred from the facts and circumstances of the case,' and 'both the existence of the conspiracy and the defendant's participation in it with the requisite criminal intent may be established through circumstantial evidence.'" <u>Id.</u> (quoting <u>United States v. Wexler</u>, 522 F.3d 194, 207-08 (2d Cir. 2008). "Moreover, 'seemingly innocent acts taken individually may indicate complicity when viewed collectively and with reference to the circumstances in general.'" <u>Id.</u> (quoting <u>United States v. Mariani</u>, 725 F.2d 862, 865-66).

B.   <u>The Evidence at Trial Was Sufficient to Sustain The Convictions on Count One: Murder While Engaged in a Narcotics Conspiracy</u>

The defendants were convicted in Count One of violating 21 U.S.C. § 848(e)(1)(A), which applies to anyone who, while "engaging in" a qualifying drug offense, "intentionally kills, or counsels, commands, induces, procures, or causes the intentional killing of an individual and such killing results." A defendant need not be "actively engaged in" drug dealing at the time of the murder. <u>United States v. Santos</u>, 541 F.3d 63, 67 (2d Cir. 2008). Rather, a conspiracy to

distribute drugs may serve as the predicate offense (as it did here), and "[s]o long as the defendant enters into the unlawful agreement before the killing, and the conspiracy is ongoing when the killing occurs," the "engaging in" element is satisfied.  Id. at 68.  In addition to this temporal requirement, the government must prove a "'substantive connection' between the defendant's drug activities and the charged killing."  United States v. Aguilar, 585 F.3d 652, 658 (2d Cir. 2009).

The evidence introduced at trial supported the jury's verdict as to Count One under any reasonable interpretation, but particularly when viewed in the light most favorable to the government.  Nevertheless, the defendants argue that the evidence was insufficient because: (i) the government failed to prove that they were part of the narcotics conspiracy at the time of the murder, and (ii) that even if they were, the government failed to prove that at least one motive for the murder was related to the narcotics conspiracy.[16]  The defendants are wrong on both counts.

      i.     The Defendants Were Part of The Ongoing Narcotics Conspiracy At The Time of Mizell's Murder

        a.     Ronald Washington

The evidence at trial established that Washington joined a conspiracy to distribute cocaine with Mizell in 2002 when Mizell gave him cocaine to sell but he "messed it up," that conspiracy contemplated the distribution of 10 kilograms of cocaine in Baltimore in August 2002, the conspiracy also involved Jordan, Unc and Yakim, and that conspiracy continued through Mizell's death on October 30, 2002.

---

[16]    Because neither defendant opposes the sufficiency of the evidence as to the murder (or the drug weight) in either count under Rule 29, the government does not present arguments about those elements under Rule 29.  However, if the Court were to read the defendants' Rule 33 challenge regarding Bryant's role as the shooter as a backdoor Rule 29 challenge to the murder, the defendants would not prevail under Rule 29: (i) for the same reasons the government argues in its Rule 33 analysis, (ii) based on the trial record recounted by the government here, and (iii) given the deference accorded to the jury's determination that the defendants murdered Mizell.

Washington does not deny that he joined the conspiracy, but he attempts to recharacterize his role in the conspiracy—which the government has never limited to the Baltimore deal—as ending when he was excluded from distributing the cocaine in Baltimore in August 2002. But co-conspirators need not be involved in every transaction to remain a member of the conspiracy. See, e.g., United States v. Escalera, 536 F. App'x 27, 31 (2d Cir. 2013) (defendant's lack of involvement in one drug transaction alone did not indicate that he withdrew from the drug conspiracy). Once an individual joins a criminal conspiracy, he is assumed to be a continuing member until he withdraws—something Washington never did. "[I]t is well-settled that withdrawal from a conspiracy is an affirmative defense for which the defendant bears the burden of proof at trial." United States v. Leslie, 658 F.3d 140, 143 (2d Cir. 2011).

Washington points to the lack of testimony about his particular drug dealings in the period between August and October 2002 as his "affirmative defense" that he withdrew from the conspiracy. But "[h]ibernation for a few months does not necessarily signal the end of a criminal partnership," and "[u]nless a conspirator produces affirmative evidence of withdrawal, his participation in a conspiracy is presumed to continue until the last overt act by any of the conspirators." United States v. Panebianco, 543 F.2d 447, 453 (2d Cir. 1979); see United States v. Flaharty, 295 F.3d 182, 192 (2d Cir. 2002) ("Positive evidence of withdrawal is required in order to provide assurance that the defendant genuinely removed himself from the conspiracy and is not simply attempting an after-the-fact escape from liability."). Even "resignation from a criminal enterprise, standing alone, does not constitute withdrawal as a matter of law; more is required. Specifically, the defendant must not take any subsequent acts to promote the conspiracy, and must not receive any additional benefits from the conspiracy." United States v. Berger, 224 F.3d 107, 118-19 (2d Cir. 2000); see, e.g., United States v. Nerlinger, 862 F.2d 967, 974 (2d Cir.

1988) (resignation plus actions that "disabled [defendant] from further participation" in the conspiracy established withdrawal); United States v. Goldberg, 401 F.2d 644, 649 (2d Cir. 1968) (resignation plus the absence of any subsequent activity in furtherance of the conspiracy established withdrawal).

There was no evidence of Washington's resignation or actions that showed his withdrawal. In fact, the opposite—the evidence at trial showed that Washington believed he was still a member of the narcotics conspiracy and took actions in furtherance of it.

Notably, neither defendant in his motion makes any mention of the evidence that Mizell had plans to meet with an associate of his cocaine supplier, Unc, and that Washington knew about it and visited the Studio the day of or the day after that meeting; a few hours later, Jordan and Washington killed Mizell. Although the killing need not occur simultaneously with narcotics activity to meet the temporal requirement of Section 848(e), Santos, 541 F.3d at 68, the argument that "there was no evidence of any contemporaneous drug deal" with Mizell's murder, Jordan Mot. 25, is belied by the fact that Mizell was going to meet with his cocaine supplier, through whom he had a line on 100 kilograms of cocaine (of which 10 kilograms had been delivered in August 2002). As Gardiner testified, Washington knew about this meeting, and he and Jordan went to the Studio with firearms on what Washington believed was the same day, or the day after, Mizell's meeting with the cocaine supplier.

Any suggestion that Washington would have had knowledge of Mizell's meeting with the cocaine supplier if he were not involved in the narcotics conspiracy "strains credulity." United States v. Sisca, 503 F.2d 1337, 1343 (2d Cir. 1974). There was extensive testimony at trial that Mizell's closest friends who were not involved in the drug business knew nothing of his

30

involvement; in other words, Mizell went to great efforts to keep it secret.[17]  Moreover, there was testimony that Mizell had a line on 100 kilograms of cocaine from Unc, that Mizell expected distribution of the cocaine to be "ongoing" such that Mizell expected the remaining 90 kilograms, and that one kilogram could result in $15,000 to $20,000 in profits, leaving approximately $1.8 million in potential profits still available through the conspiracy.  The jury could, and likely did, credit that.  Mizell would not have trusted Washington with information about his meetings with this lucrative supplier if he were not part of the conspiracy.  Cf. United States v. Ramirez, 320 F. App'x 7, 10 (2d Cir. 2009) ("[C]ommon sense and experience would support an inference that the 'principals in [a large] conspiracy would not have trusted an outsider [ ] with no knowledge of their criminal purpose[ ] to transport' hundreds of thousands of dollars in cash and drugs."); United States v. Djibo, 850 F. App'x 52, 56 (2d Cir. 2021) (defendant's "conduct and his relationship with his co-conspirator[ ] were sufficient to support a reasonable inference that [defendant] knew" about the drugs and as part of the conspiracy); see also Anderson, 747 F.3d at 67.

"While evidence of mere attendance at a meeting or knowledge of a conspiratorial act, without more, may not be sufficient to support an inference of active participation in a conspiracy, here there was far more." Sisca, 503 F.2d at 1343 (internal citations omitted); see also United States v. Heras, 609 F.3d 101, 108 (2d Cir. 2010) ("[A] defendant need not know all the details of a criminal scheme to be guilty of conspiracy or aiding and abetting.").  Washington went to the Studio several hours before Mizell's murder and asked about their plans for the conspiracy while speaking in code.  Specifically, Washington asked about their "shows" in Connecticut and

---

[17]      Indeed, Burrell was on the trip with Mizell and Washington to D.C. and Baltimore in August 2002, had previously met Yakim, saw Yakim with a firearm, and still Mizell told never confided in him that the trip had been about narcotics, but rather lied that it was about transporting jewelry.  See supra at 20-21.

Baltimore—despite testimony that Washington was not part of Mizell's music businesses and despite testimony that when Washington had previously accompanied Mizell to a show, it was to discuss their plans about the narcotics conspiracy.  Such "guarded use of cryptic expressions by members of a narcotics conspiracy has been aptly described as a 'narcotics code.'"  Sisca, 503 F.2d at 1343 ("go downtown with it, you know what I'm talking it" was considered "cryptic expression"); see United States v. Garcia, 291 F.3d 127, 139 (2d Cir. 2002) (recognizing "the attempts of drug dealers to disguise the content of their discussions as legitimate subject matters"); United States v. Velasquez, 271 F.3d 364, 372 (2d Cir. 2001) ("We have recognized that 'drug dealers rarely speak openly about their trade' and instead 'often engage in a so-called narcotics code.'") (quoting United States v. Cancelmo, 64 F.3d 804, 808 (2d Cir. 1995)); Djibo, 730 F. App'x at 55 ("It was not irrational for the jury to credit the government's theory over [defendant]'s implausible suggestion that the messages had some undisclosed exculpatory meaning."); United States v. Feola, 651 F. Supp. 1068, 1096 (S.D.N.Y. 1987), aff'd, 875 F.2d 857 (2d Cir. 1989) ("Our Court of Appeals requires that this Court consider the alleged code language in the context of the entire record."); see also Landesman, 17 F.4th at 320 ("Seemingly innocent acts taken individually may indicate complicity when viewed collectively and with reference to the circumstances in general.").

In response to this evidence, Washington performs a convoluted analysis of Mizell's calendar and bank statements to argue that there can be no inference that Mizell's discussion with Washington about "shows" was code for the narcotics conspiracy.

Washington argues that testimony from Rincon that Mizell had a "few DJ appointments" in D.C. meant that Mizell was in fact going to D.C. for a legitimate show on October 31, Washington Mot. 20, but there was no testimony as to the timing of those deejay appointments

and whether they were to occur on October 31.[18]  In fact, Allen—who was a member of Rusty Waters—testified that Mizell was supposed to be on tour with Rusty Waters on October 31, Tr. 1061:13-20, and the physical Rusty Waters tour schedule corroborated this testimony, GX 608. The schedule indicated that the Rusty Water tour on October 31 would occur in South Carolina, not D.C.  GX 608.  Similarly, the schedule indicated that the Rusty Water tour on November 1 would occur in Georgia, not Connecticut as was marked on Mizell's calendar and discussed between him and Washington.  GXs 607, 608.  Accordingly, when Mizell and Washington discussed their "shows" in Baltimore and Connecticut, the jury could infer that it was code as plans for the narcotics conspiracy, which was to be carried out by Washington.

Even assuming Washington's argument that Mizell could be in D.C. on October 31, the fact that Mizell had appointments in D.C. (which was close to Baltimore) would not preclude an inference that Mizell and Washington would also take the opportunity to travel to Baltimore, as they had been discussing, to engage in the narcotics conspiracy.  Indeed, Mizell and Washington had picked up cocaine in D.C. from Unc before traveling to Baltimore.  And there was also evidence that Mizell used the opportunity of show-related travel to engage in the narcotics conspiracy.  For example, there was testimony from Burrell on the way to a show with Mizell in Manhattan, Washington joined their car ride to discuss the narcotics conspiracy with Mizell, and on another occasion, in the summer of 2002, as Mizell and Burrell were driving to a show, they stopped in Baltimore so that Mizell could meet with Yakim.  Additionally, although Yakim

---

[18]     Washington relies on testimony from Rincon—who was not part of Rusty Waters—as evidence that the group "consisted of only two performers: Randy Allen and Rodney Jones" such that Mizell would not have traveled with Rusty Waters.  Washington Mot. 21.  But Rincon was not part of Rusty Waters, and Allen testified that Mizell deejayed for Rusty Waters, had traveled with Rusty Waters, and was supposed to go on tour with them at that time.  Tr. 1052:8-16, 1061:13-20.

confirmed that there was "no deal" in August 2002 when Mizell asked him to work with Washington, that testimony did not preclude a later Baltimore transaction that would not involve Washington and Yakim distributing directly together (see infra at 35-36). [19]

Furthermore, both Washington and Mizell possessed firearms in the Studio that day, which is additional "proof of [a] narcotics conspirac[y] because drug dealers commonly keep firearms on their premises as tools of the trade." United States v. Mitchell, 328 F.3d 77, 82 (2d Cir. 2003); see also United States v. Page, 657 F.3d 126, 130 (2d Cir. 2011) (explaining that "to prove the existence of a conspiracy to distribute narcotics, the government would have been entitled to offer proof of [the defendant']s possession of a tool of the trade"); United States v. Scales, No. 19-CR-96 (JSR), 2022 WL 673258, at *5 (S.D.N.Y. Mar. 7, 2022) ("[D]efendant's possession of a gun—a tool of the drug trade—is direct evidence of his participation in a narcotics conspiracy."); United States v. Crespo, 834 F.2d 267, 271 (2d Cir. 1987) ("We often have taken judicial notice that, to substantial dealers in narcotics, firearms are . . . tools of the trade[.]").

Upon seeing Mizell's firearm, Washington made an additional overture in support of the narcotics conspiracy when he told Mizell that he did not need to carry a gun because he had Washington, implying he was also the muscle in the conspiracy. See supra at 23 (Washington telling Mizell, "If you have a problem, I have a problem too."). Washington need not be involved in any actual distribution of cocaine to be a member of the conspiracy. "[A]dvancing the aim of a

---

[19]     As an alternative, Washington claims that, because there were some calendar entries for travel that may not have been narcotics-related, none of the entries regarding travel could have related to the narcotics conspiracy. Washington Mot. 21-22. But whether other calendar entries in the past were for legitimate travel has no bearing on the evidence regarding the future narcotics-related plans that Washington and Mizell discussed. Moreover, Washington's reference to the calendar entries for D.C. in August 2002 matching the bank statement for the transactions at the Wyndham hotel in D.C.—where testimony revealed Mizell met with Unc prior to the Baltimore deal—supports the government's theory that some of the past calendar entries were in fact related to the narcotics conspiracy. Id. 22.

narcotics conspiracy can involve performing ancillary functions such as enforcing discipline and chastising rivals." Santos, 541 F.3d at 72; Santos, 541 F.3d at 72; see, e.g., United States v. Arrington, 941 F.3d 24, 37 (2d Cir. 2019) ("[A] reasonable jury could have found that [defendant's] role and offers to serve as 'muscle' assisted his co-conspirators' drug trafficking activities"); United States v. Gadsden, 300 F. App'x 108, 110 (2d Cir. 2008) ("[T]estimony about violent acts and firearm possession during or around the time of a narcotics conspiracy appropriately establishe[s a co-conspirator's] conduct during the charged conspiracy."); United States v. Pitre, 960 F.2d 1112, 1122 (2d Cir. 1992) (citing cases where role as look-out or simple indication of concern with interference from innocent passersby permitted inference of involvement in conspiracy).

The testimony that Mizell was surprised to see Washington, and that when Washington saw Mizell with a gun on the day of, or after, Mizell's meeting with the cocaine supplier, he immediately asked him why he had the gun, is consistent with Washington's role in the narcotics conspiracy. Washington's role was that of distributer or muscle, not to be part of planning meetings between Mizell and the supplier Unc, a role that Washington may have ultimately coveted. Indeed, in D.C., it was Mizell and Unc who discussed the terms of that deal, while Washington stayed in the car and had merely tried to make suggestions to Mizell on pricing. See supra at 20. Thus, ample evidence permitted the inference that Washington had not resigned from the conspiracy after Baltimore but was still part of ongoing narcotics conspiracy with Mizell, Jordan and Unc. See, e.g., Anderson, 747 F.3d at 60 ("The government may prove the defendant's knowing participation in a conspiracy through . . . a defendant's association with conspirators in furtherance of the conspiracy, his presence at critical stages of the conspiracy that cannot be

explained by happenstance, . . . [and] acts that exhibit a consciousness of guilt."). Washington's attempt to recharacterize it otherwise risks usurping the jury's factual determination.

Washington argues that Yakim's refusal to work with Washington on one transaction in Baltimore in August 2002 cut Washington out of the entire narcotics conspiracy, but the trial record, as discussed supra at 18-24, showed that Washington continued in the narcotics conspiracy with Mizell and that Yakim's participation was not a condition necessary to the conspiracy's survival. Yakim's refusal to work with Washington meant only that Washington was not distributing cocaine with Yakim in Baltimore in August 2002. In fact, after Washington left Baltimore, Mizell remained in Baltimore and approached Yakim to ask about him moving the 10 kilograms of cocaine. The jury could infer from the trial record that Yakim—who was already distributing kilograms of cocaine for Mizell prior to 2002—remained in the narcotics conspiracy but worked with Mizell separate from Washington, or alternatively, the jury could infer that Yakim was the one excluded from the narcotics conspiracy in August 2002. There is no requirement that the evidence show that all co-conspirators "agreed on the details of the conspiracy, so long as they agreed on the essential nature of the plan," which, here, was to distribute the cocaine being supplied on consignment by Unc. United States v. Maldonado-Rivera, 922 F.2d 934, 963 (2d Cir. 1990) (internal citations omitted); see, e.g., United States v. Borelli, 336 F.2d 376, 383 (2d Cir. 1964) ("[T]he links at either end [of a chain conspiracy] are likely to consist of a number of persons who may have no reason to know that others are performing a role similar to theirs—in other words the extreme links of a chain conspiracy may have elements of the spoke conspiracy" and over time, "certain links [may] continue to play the same role but with new counterparts").

Whether or not the conspiracy was carried out in different phases and with different members does not alter the overarching goal that pervaded each conspirator's actions: to distribute

cocaine.  Washington was not required to know about Yakim's distribution plans for Mizell in order for Washington to successfully distribute for Mizell—whether in Connecticut, separately from Yakim in Baltimore, or elsewhere.  "[A] single conspiracy is not transposed into a multiple one simply by lapse of time, change in membership, or a shifting emphasis in its locale of operations."  United States v. Cambindo Valencia, 609 F.2d 603, 625 (2d Cir. 1979); see United States v. Murray, 618 F.2d 892, 902 (2d Cir. 1980) (conspiracy alleged extended over six years and involved numerous individuals and locations).  "Hence the law rightly gives room for allowing the conviction of those discovered upon showing sufficiently the essential nature of the plan and their connections with it, without requiring no evidence of knowledge of all its details or of the participation of others."  Blumenthal v. United States, 332 U.S. 539, 557 (1947).  "Otherwise the difficulties, not only of discovery, but of certainty in proof and of correlating proof with pleading would become insuperable, and conspirators would go free by their very ingenuity."  Id..

Washington's remaining arguments fail.  Washington argues that testimony about his initial skepticism about the Baltimore deal being viable is proof that the conspiracy ended, Washington Mot. 12, but there was far more evidence that supported the opposite inference.  If Washington was skeptical about the Baltimore deal, he would not have relied on it as the only source of income from the conspiracy.  Nor did he.  On the day of Mizell's murder, he asked Mizell about their upcoming "shows" in Baltimore and Connecticut.  Washington also characterizes Yakim's rejection as definitive because "the viability of the Baltimore deal depended on him" and "there was no evidence that the conspiracy had an alternative distributer."  Id.; see also id. 14.  This is false.  There was testimony at trial that Mizell had been selling cocaine since the early 1990s, that he had given cocaine to Yakim on multiple occasions in the past, that he had given cocaine to Jordan who sold it (and was therefore an alternative distributer), and that he had also given drugs

to Washington to sell (thus expecting him to serve as a distributer) but that Washington had "messed it up," that Mizell had plans to meet with the cocaine suppler, and that Mizell had future plans with Washington for the conspiracy in Connecticut and Baltimore.  The survival of the narcotics conspiracy was not dependent on Yakim's role.

Moreover, while murder itself cannot itself satisfy the "engaging in" element, it may serve as evidence from which a jury could find that the narcotics conspiracy was ongoing at the time of the murder.  Santos, 541 F.3d at 69.  Thus, the jury could certainly have inferred from the fact of the murder that the narcotics conspiracy was ongoing.  See id. at 69, 74; United States v. Campbell, 850 F. App'x 102, 104 (2d Cir. 2021); United States v. Gracesqui, 730 F. App'x 25, 27 (2d Cir. 2018).

In addition to challenging the jury's inferential primacy, Washington subverts the Rule 29 requirement that the Court must consider the evidence "not in isolation but in conjunction."  United States v. Diaz, 176 F.3d 52, 89 (2d Cir. 1999).  His brief takes the opposite tack: he identifies and then segregates each piece of evidence for analysis in isolation, arguing the limitations of each piece while disregarding the strength of the whole.  But upon Rule 29 review, the Court must direct its inquiry "to the totality of the government's case and not to each element, as each fact may gain color from others."  United States v. Guadagna, 183 F.3d 122, 130 (2d Cir. 1999).  That is especially true where, as here, the various elements of the government's case work in concert.

Viewing this record in the light most favorable to the government, the evidence was more than sufficient for a rational jury to find that Washington was engaged in a narcotics conspiracy at the time of the murder.

b.      Karl Jordan, Jr.

Jordan argues that the Baltimore deal was the only narcotics conspiracy and that it ended when Yakim refused to sell with Washington.  See Jordan Mot. 18 ("The record clearly shows that there was no other cognizable conspiracy other than the Baltimore conspiracy or the conspiracy to sell 10 kilograms.").  He further argues that if there were any later narcotics dealings, they represented a new conspiracy and the government failed to prove Jordan joined it.  Id. 19-23.  These arguments ignore the trial record and the reasonable inferences the jury drew therefrom.

First, the evidence at trial established that even before August 2002, Jordan agreed to distribute cocaine for Mizell on an ongoing basis.  Jordan asked James to have Mizell set him up with selling cocaine, to which Mizell agreed and gave him an ounce to sell as a test run to see if Jordan could handle larger quantities, which Jordan passed.  Mizell agreed to let Jordan to be a part of the 10-kilogram deal to occur in Baltimore in August 2002, and there is no evidence of any issue with Jordan's role.  This record supports the inference that Jordan joined the narcotics conspiracy even before August 2002, and Jordan's role continued when he agreed to distribute the 10 kilograms of cocaine in Baltimore.

Nor was Jordan required to travel to Baltimore in August 2002 to be a member of the narcotics conspiracy.  See United States v. Jackson, 335 F.3d 170, 181 (2d Cir. 2003) ("A member of a conspiracy is . . . liable for an act he agreed to and intended to commit in furtherance of the conspiracy regardless of whether he ultimately committed the substantive act.").  Jordan was also not required to meet with Yakim or Unc to be part of the narcotics conspiracy.  See United States v. Huezo, 546 F.3d 174, 180 (2d Cir. 2008) ("[A] defendant may be a co-conspirator if he knows only one other member of the conspiracy."); United States v. Vargas, No. 02-CR-1388 (HB), 2003 WL 21659359, at *3 (S.D.N.Y. July 14, 2003), aff'd sub nom. United States v. Gaton, 98 F. App'x 61 (2d Cir. 2004) ("[I]t is not necessary, in fact, that all the parties ever have direct

contact with one another, or know one another's identity, or even communicate verbally their intention to agree.") (quoting United States v. Nusraty, 867 F.2d 759, 762 (2d Cir. 1989)).

Second, the evidence permitted the jury to infer that the narcotics conspiracy continued after the Baltimore deal.  There was testimony about the cocaine being sold on consignment, that Mizell "had a line" on 100 kilograms of cocaine from Unc but received 10 kilograms in August 2002, that the distribution of cocaine was meant to be "ongoing," and that in October 2002, Mizell had not yet paid Unc back for cocaine—whether for the 10 kilograms or the remaining 90 kilograms.  The narcotics conspiracy had not ended because the supplier was still owed payment for the drugs he supplied on consignment.  See, e.g., United States v. Faltine, No. 13-CR-315 (KAM), 2016 WL 1700385, at *4 (E.D.N.Y. Apr. 26, 2016) (drug sales on consignment "is a stand-alone factor supporting a conspiracy"); United States v. Glynn, 686 F. App'x 51, 54 (2d Cir. 2017) (purchase of drugs on credit for redistribution showed conspiratorial relationship).  There was also evidence that Mizell had remained in Baltimore after Washington went back to New York, that Mizell was meeting with Unc's associates at the time that Jordan murdered Mizell, and that Mizell carried a firearm at that time.

The jury could also infer that Yakim remained in the narcotics conspiracy but simply did not work together with Washington to distribute in Baltimore.  Jordan claims that the "government chose not to ask Mullgrav what happened after Washington left Baltimore, which supports [its] position that it is improper to draw an inference that the deal continued."  Jordan Mot. 18.  But there was in fact testimony about what happened after Washington left Baltimore. Mizell met with Yakim again and asked him to distribute cocaine with Washington, to which he refused, and Mizell then stayed in Baltimore a few more days before returning to New York.  This testimony could lead the jury to infer that Mizell kept Yakim in the narcotics conspiracy but

separate from Washington, or that Mizell cut Yakim out of the conspiracy but not Washington. Either of these scenarios has no bearing on Jordan's involvement in the narcotics conspiracy.

Third, Jordan argues that his role in the narcotics conspiracy ended when Yakim refused to work with Washington in Baltimore in August 2002, but there was no trial testimony or physical evidence that Jordan's role in the narcotics conspiracy was dependent on Washington's role in Baltimore, or preconditioned on the Baltimore deal at all.  (And Yakim's refusal did not remove Washington from the conspiracy for the reasons discussed supra at 36-38.)  The trial record reflects that Jordan agreed to sell cocaine for Mizell, which he did before Baltimore in August 2002.  Mizell included him in the plan to distribute in Baltimore.  Simply because Yakim did not sell with Washington does not mean that Mizell cut Jordan out of the narcotics conspiracy to distribute cocaine.

Jordan relies on the "persuasive authority" of United States v. Iennarco, 893 F.2d 394, 397-398 (D.C. Cir. 1990), for the principle that "failed negotiations do not amount to an ongoing conspiracy."  Jordan Mot. 19.   In Iennaco, the defendant offered to sell cocaine to a distributer, who responded that he could not accept that offer until he confirmed with his employer, and there was no evidence that the distributer accepted the offer, or that the defendant "at any point actually possessed any cocaine himself or sold any cocaine."  893 F.2d at 398.  Here, there were no failed negotiations between Mizell and Jordan—Jordan agreed to, and did, distribute cocaine for the conspiracy before Baltimore, and James testified that Mizell told him on six or seven occasions about the distribution plan for the 10 kilograms of cocaine in Baltimore, which was meant to be ongoing.  These discussions were not failed or preliminary.  There was an agreement between Mizell and Jordan to sell cocaine, and there was no evidence at trial that Washington's inability to distribute cocaine with Yakim in Baltimore negated Jordan's agreement with Mizell.

Jordan was not required to actually distribute the cocaine in Baltimore to be, and remain, part of the conspiracy.  See, e.g., Santos, 541 F.3d at 71 ("[T]he absence of an actual sale or seizure of narcotics does not render insufficient the proof of a conspiracy to distribute it.").  Jordan's reliance on the preliminary discussion analysis in Iennaco and in United States v. Goff, 847 F.2d 149, 167-68 (5th Cir. 1988), is thus misplaced.[20]

There was no evidence that Jordan was told he could not distribute in Baltimore, nor has Jordan pointed to any evidence in the record that he "affirmatively withdrew" from the narcotics conspiracy, as is required.  See supra at 28-30.  "Mere cessation of the conspiratorial activity by the defendant is not sufficient to prove withdrawal."  Leslie, 658 F.3d at 143.  "The defendant 'must also show that he performed some act that affirmatively established that he disavowed his criminal association with the conspiracy, either the making of a clean breast to the authorities, or communication of the abandonment in a manner reasonably calculated to reach co-conspirators.'"  Id. (quoting United States v. Eppolito, 543 F.3d 25, 49 (2d Cir. 2008)).  There is no evidence that Jordan performed such an act.

Moreover, to continue as members of the ongoing narcotics conspiracy, the defendants were not required to have the same role as other co-conspirators or even required to know of their identity.  They need only have "the required awareness that 'they were involved with a larger organization,'" which they did, because they had previously sold for (or in the case of Washington, was given cocaine to sell for) Mizell, who was not a street dealer but rather sourced

---

[20]    Jordan also relies on cases for the proposition that discussions about how defendants "could possibly do" a transaction or where they used "equivocal" language did not result in a conspiracy. Jordan Mot. 19 (citing United v. Melchor-Lopez, 627 F.2d 886, 892 (9th Cir. 1980); United States v. Wieschenberg, 604 F.2d 326, 334-36 (5th Cir. 1979); United States v. Steinberg, 525 F.2d 1126, 1134 (2d Cir. 1975)).  But there was no testimony that Jordan's discussions about the conspiracy were equivocal.  James testified, unequivocally, that Mizell, Jordan and Washington had agreed to distribute the 10 kilograms of cocaine in Baltimore.  See supra at 19-20.

and obtained the cocaine from elsewhere.  United States v. Khalupsky, 5 F.4th 279, 289 (2d Cir. 2021).  In addition, when Jordan killed Mizell on the day of, or day after, Mizell was to meet with the cocaine supplier, Jordan did so using a firearm, and as discussed supra, a "defendant's possession of a gun — a tool of the drug trade — is direct evidence of his participation in a narcotics conspiracy."  Scales, 2022 WL 673258, at *5; see supra at 34 (noting Washington also carried a firearm that he procured from Jordan's brother, and citing Mitchell, 328 F.3d at 82; Page, 657 F.3d at 130).  Accordingly, Jordan (and Washington) continued in this narcotics conspiracy after Baltimore.

Rather than grapple with these facts, Jordan spends the remainder of his argument claiming that any narcotics conspiracy after Baltimore was a new conspiracy and that there was no evidence he knew of its existence or joined it.

Only one conspiracy was alleged at trial, and the evidence supports the ongoing nature of the narcotics conspiracy as just discussed.[21]  The mere fact that Jordan may not have known or worked with every member of a conspiracy does not mean there were multiple conspiracies or require a multiple conspiracy charge.  See United States v. Sureff, 15 F.3d 225, 230 (2d Cir. 1994) ("[A] single conspiracy may encompass members who neither know one another's identities, . . . nor specifically know of one another's involvement."); Berger, 224 F.3d at 115 ("In the context of narcotics operations, for example, we have held that even where there are multiple groups within an alleged conspiracy, a single conspiracy exists[.]"); United States v.

---

[21]      In the defendants' joint proposed jury instructions submitted before trial, on January 1, 2024, they included as a "defense" a multiple conspiracies jury instruction "if applicable."  ECF No. 204.  At the charging conference, neither defendant requested this jury instruction, thus finding it no longer applied.  See United States v. Hertular, 562 F.3d 433, 444 (2d Cir. 2009); see also Fed. R. Crim. P. 30(d) (providing that failure to object to jury instruction limits appellate review to plain error).

Evans, 293 F. App'x 63, 66-67 (2d Cir. 2008) (the government is not required to prove that each of the conspirators was acquainted with each of the others, but only that they knew from the scope of the operation that others were involved in the performance of functions vital to the success of the business); see also supra at 36-38.

Jordan's analysis of the cases at Jordan Mot. 21-23 for the proposition that he did not join a "new conspiracy" is therefore unproductive.  The facts of those cases also would not apply to Jordan's knowledge of the narcotics conspiracy when he first joined.  For example, Jordan (and Washington at oral argument) relied on United States v. Valle, 301 F.R.D. 63, 96 (S.D.N.Y. 2014), aff'd in part, rev'd in part, 807 F.3d 508 (2d Cir. 2015), which held that the defendant's statement he would commit a kidnapping if he was "guaranteed to get away with it" did not demonstrate a criminal agreement because it was conditional.  On appeal, the Second Circuit affirmed the reversal of conviction, clarifying that the defendant's discussions about the kidnapping did not demonstrate intent because they included "outlandish" and "fantastical elements [that] combined with the impersonal nature of the interactions provide[d] pervasive and unmistakable indica of deep fantasy."  Valle, 807 F.3d at 517.  As already stated, Jordan's agreement to join the narcotics conspiracy was neither conditional nor fantasy.  Mizell had already been selling cocaine for a decade, Jordan wanted to sell cocaine for Mizell and did, Jordan and Mizell had a personal relationship (as did Washington), and within part of that conspiracy, Jordan and Mizell agreed that Jordan and Washington would sell cocaine in Baltimore with Yakim in August 2002 but Yakim would not sell with Washington.  Jordan's role was not preconditioned on Yakim's participation.

Jordan also improperly relies on United States v. Alehortva, 17 F.3d 546, 551 (2d Cir. 1994), which held the evidence had not established that the defendant knew the kidnapping in

which he participated was part of a drug conspiracy, to argue Jordan had no knowledge of the conspiracy.  Jordan Mot. 21; see also id. 22-23.  But in that case, "there was no evidence of past narcotics related activity on [the defendant's] part"—unlike Jordan with Mizell—"nor was there evidence of incriminating conversations between [the defendant] and his alleged co-conspirators"—again, unlike Jordan with Mizell and Washington.  Atehortva, 17 F.3d at 552. Atehortva and the cases that Jordan cites do not support his argument that there are no facts in the record that would lead a reasonable jury to infer that Jordan knowingly joined a conspiracy to distribute cocaine and remained in it through Mizell's death.

Even if Jordan were somehow correct—which he is not—that he was never part of the narcotics conspiracy, he would have joined it when he agreed with Washington to murder Mizell.  Washington was still part of the narcotics conspiracy and as discussed infra with regards to motive under Count One and his use of a firearm under Count Two, Jordan knew the murder of Mizell related to the narcotics conspiracy and his use of a firearm was in furtherance of it.  The trial record demonstrated that Jordan agreed to be part of narcotics conspiracy and the Baltimore deal involving 10 kilograms of cocaine, that Washington knew Mizell was meeting with the cocaine supplier and obtained a firearm from Jordan's brother, that Washington went to the Studio the day of or after that meeting to ask Mizell about their plans for the narcotics conspiracy, that Washington left to make a phone call and, when Washington returned, it was with Jordan to murder Mizell, that Jordan shot and killed Mizell, that Jordan's father shot at Washington the day after the murder, and that Jordan met with Washington after the murder.  When Jordan killed his godfather, the jury could infer he was doing so as Washington's "hired hitman" and as part of the narcotics conspiracy.  See Santos, 541 F.3d at 74; Gracesqui, 730 F. App'x at 27; see also United States v. Pierce, 785 F.3d 832, 839 (2d Cir. 2015 ("That [the defendant] did not participate in the narcotics

conspiracy in some way other than carrying out the murders does not undermine the sufficiency of the evidence that he was a co-conspirator.") (quoting Santos, 541 F.2d at 73).

Accordingly, Jordan has failed to meet his "very heavy burden" in challenging the sufficiency of the evidence.  See United States v. Reifler, 446 F.3d 65, 94-95 (2d Cir. 2006); Rosenthal, 9 F.3d at 1024.

ii.   At Least One Motive For Mizell's Murder Was Related to the Narcotics Conspiracy

Section 848(e)(1)(A) criminalizes the murder by a defendant while "engaging in some offense punishable under Section 841(b)(1)(A)."  21 U.S.C. § 848(e)(1)(A).  Courts have "required a 'substantive connection' between the defendant's drug activities and the charged killing in part to address the concern that, absent such a requirement, § 848(e)(1)(A) would be subject to constitutional challenge on Commerce Clause grounds."  Aguilar, 585 F.3d at 658. Proof of a drug-related motive "fully satisfies [the] 'nexus' requirement" of Section 848(e), id. at 660, but "the government has no burden to establish that a drug-related motive was the sole purpose, the primary purpose, or even that it was equally as important as any non-drug-related purpose, as long as it was one purpose," United States v. Desinor, 525 F.3d 193, 202 (2d Cir. 2008).  Nor must the killing be committed, even in part, "in order to further" the charged drug crime.  Aguilar, 585 F.3d at 660 ("[N]either of the rationales for a judicially implied 'substantive connection' requirement . . . justifies narrowing the scope of § 848(e)(1)(A) to reach only killings motivated by the specified drug offenses.").[22]

---

[22]   Jordan incorrectly states that with respect to Section 848(e), the government must prove that "Mizell's murder furthered the conspiracy's goals."  Jordan Mot. 23.  He cites the legal standard for 18 U.S.C. § 1959, which criminalizes violent crimes in aid of racketeering activity and thus requires proof of the elements of, inter alia, an enterprise engaged in racketeering activity, that the defendant had or was seeking a position in the enterprise, and that the defendant's purpose

Both defendants rely entirely on the "equipoise" theory as their basis for reversal, arguing that reversal is required where evidence gives equal circumstantial support to a theory of guilt and theory of innocence.  But even if there were equal circumstantial support—which there is not—this "equipoise" theory has been severely limited by the Second Circuit, which stated that "[t]he possibility that inferences consistent with innocence as well as with guilt might be drawn from circumstantial evidence is of no matter to [a] sufficiency analysis because it is the task of the jury, not the court, to choose among competing inferences." United States v. Aquart, 912 F.3d 1, 44–45 (2d Cir. 2018) (quoting MacPherson, 424 F.3d at 190 and citing Cavazos v. Smith, 565 U.S. 1, 7 (2011)).  "Thus, [the Second Circuit has] held the equipoise rule to apply only where evidence is nonexistent or so meager as to preclude the inferences necessary to a finding favorable to the government." Id. (emphasis added); accord White, 7 F.4th at 103.  As the Honorable Pamela K. Chen explained in her denial of a Rule 29 motion that was recently affirmed by the Second Circuit:

> Defendant essentially argues that the jury could have drawn each inference advocated by the defense just as easily as (or more easily than) it could have drawn the Government's requested inferences. But, again, it is not for the Court to decide which of the parties' competing inferences is more likely correct; rather, the Court must "credit[ ] every inference that could have been drawn in the government's favor," Pauling, 924 F.3d at 656 (emphasis added) (quotations omitted), and only then determine whether the evidence was sufficient for the jury to find guilt beyond a reasonable doubt. Here, the evidence sufficiently supported the [government's] inference[.] . . . That the jury could have drawn the opposite conclusion does not matter. See, e.g., MacPherson, 424 F.3d at 190 ("[W]here either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, the court must let the jury decide the matter." (quotations omitted)).

---

in committing the violent act was to maintain or increase his position in the enterprise or in consideration for the receipt of anything of value. Id. (citing United States v. Ferguson, 246 F.3d 129 (2d Cir. 2001)).  No such elements are required by either Section 848(e) or Section 924(j). This renders many of Jordan's arguments at Jordan Mot. 23-26 and reliance on Ferguson and United States v. Jones, 291 F. Supp. 2d 78 (D. Conn. 2003) inapplicable to both Sections 848(e) and 924(j).

United States v. Hunt, 573 F. Supp. 3d 779, 813-14 (E.D.N.Y. 2021), aff'd, 82 F.4th 129 (2d Cir. 2023).

Importantly, the evidence gave rise to the inference that there was at least one drug-related motive for the murder of Mizell and no inference consistent with innocence.

Washington's main challenge is that because the evidence gives rise to several drug-related motives, that this therefore creates reasonable doubt as to which one applies.[23]  But the government was not required to prove which of these drug-related motives was the one motive behind the murder.  See Desinor, 525 F.3d at 202 (when relying on a drug-related motive to meet the substantive connection requirement, "the government need only prove beyond a reasonable doubt that one motive for the killing (or conspiracy to kill) was related to the drug conspiracy.  The existence of other motives does not affect the government's ability to satisfy the 'engaging in' element") (emphasis in original); United States v. Acosta, 833 F. App'x 856, 862 (2d Cir. 2020) (same); Thomas v. United States, No. 04-CR-801 (PKC), 2018 WL 4006785, at *2 (S.D.N.Y. Mar. 9, 2018), aff'd, 2022 WL 2446301 (2d Cir. July 6, 2022) ("[E]ven if there was an additional personal motivation for the murders, 'the government need only prove beyond a reasonable doubt that one motive for the killing . . . was related to the drug conspiracy.'") (citation omitted); see also Aguilar, 585 F.3d at 660 (noting "a single drug-related motive for a killing, even among many non-drug-related motives" satisfies Section 848(e)).  That the evidence permitted several

---

[23]     Washington relies on statements by the government not in evidence to argue that the "drug motive has been a moving target."  Washington Mot. 25; see also id. 26-27, 29.  But none of these statements contradicted the government's theory of the drug motive at trial, which has always stemmed from Baltimore deal.  Moreover, statements at a press conference—at the time of arrest and four years before trial—are not evidence and are irrelevant to what was presented to the jury.  Cf. United States v. Bonventre, 646 F. App'x 73, 88 (2d Cir. 2016) ("That defendants disagree with the strength of the government's inferences does not establish prosecutorial misconduct."); United States v. Edwards, 342 F.3d 168, 181 (2d Cir. 2003) ("The government has broad latitude in the inferences it may reasonably suggest to the jury during summation.").

drug-related motives—all of which were interrelated here—does not cast the government's evidence into doubt.

The jury is not required to be unanimous on which drug-related motive applied to the murder, or that only one applied to the murder. "[A] federal jury need not always decide unanimously which of several possible sets of underlying brute facts make up a particular element, say, which of several possible means the defendant used to commit an element of the crime." Richardson v. United States, 526 U.S. 813, 817 (1999). Certain jurors may have found Washington murdered Mizell for one drug-related motive, while others may have found that Jordan murdered Mizell for a different drug-related motive; and even other jurors may have further disagreed about each defendant's respective drug-relative motive. Unanimity as to which drug-related motive applied is not required because a drug-related motive is not an element of Section 848(e) but rather one means of satisfying the "substantive connection" requirement of the "engaging in" element of Section 848(e). See Aguilar, 585 F.3d at 660 ("Proof of a Drug-Related Motive Is Sufficient, But Not Necessary, To Satisfy the 'Substantive Connection' Requirement"). For example, in Aguilar, the Second Circuit held that although the defendant's motive for killing the victim was personal and not drug-related, the defendant satisfied the "substantive connection" requirement when he "used his qualified drug dealings to procure the murder," specifically by inducing others to assist in the murder by promising to forgive past drug debts and to supply them with drugs in the future. Id. at 661-662. The Second Circuit explained that "[n]either Desinor nor Santos [] ruled that only proof of a drug-related motive could satisfy this [substantive connection] requirement" of Section 848(e). Id. at 660. Aguilar thus confirmed that how the substantive connection requirement may be satisfied is a question of means. Here, the government proved the means by showing the motive for the murder was in connection with the narcotics conspiracy.

49

The trial record reflected that there were several drug-related motives, each of which "fully satisfie[d]" the nexus requirement. Id.  So long as the jury was unanimous that the trial evidence satisfied the "substantive connection" requirement of the "engaging in" element of Section 848(e), it need not be unanimous as to which means (i.e., which drug-related motive) satisfied that element.  See Richardson, 526 U.S. at 817 ("disagreement about means" among the jurors as to whether defendant used a gun or a knife "would not matter as long as all 12 jurors unanimously concluded that the Government had proved the necessary related element, namely, that the defendant had threatened force"); Aller v. United States, 646 F. App'x 21, 23 (2d Cir. 2016) (unanimity not required as to which motive applied because motive did not represent an element of the crime of murder in aid of racketeering under 18 U.S.C. § 1959(a)).

Reviewing "in the light most favorable to the government," the evidence allowed for the "reasonable inferences" that when the defendants murdered Mizell around the time he was scheduled to meet with the cocaine supplier, at least one of the motives was related to the narcotics conspiracy.  Autuori, 212 F.3d at 114.  And the evidence permitted several valid motives.

There was evidence that Washington showed up to the Studio the same day as, or the day after, he knew Mizell was scheduled to meet the cocaine supplier and with a firearm; Washington asked Mizell in coded language about their plans for the narcotics conspiracy; both Mizell and Washington carried firearms; when Washington saw Mizell with a firearm, he told him he did not need a gun because he had Washington; when Washington left the Studio, he made a phone call and then told his girlfriend she could not return to the Studio; a few hours later, Jordan and Washington returned to the Studio, with firearms, and murdered Mizell; and Jordan and Washington met up together after the murder.  There was also evidence that Jordan wanted Mizell to establish him as a cocaine distributer and that Mizell had agreed to do so but initially gave him

50

only an ounce to sell, that Mizell agreed to let Jordan and Washington sell in Baltimore with Yakim but Mizell sent Washington home and did not let him sell with Yakim, that Jordan was not on the trip to Baltimore, that the Baltimore deal with Yakim would have been lucrative, that Washington was essentially homeless and sleeping on a couch at the time of Mizell's murder, that Jordan and Washington spent time together inside and outside of the Studio, and that the firearm Washington carried to murder Mizell had been obtained from Jordan's brother.  There was further evidence that Jordan bragged about how he had killed Mizell to two associates and then when he threatened to kill someone else like he had killed Mizell.  See supra at 8-9.

Based on this and the other trial evidence, the jury could reasonably conclude that one drug-related motive was that the defendants wanted retaliation against Mizell for harming the conspiracy when he was unable to immediately secure the lucrative Baltimore deal with Yakim. Had Mizell been able to consummate the Baltimore deal with Yakim, Jordan and Washington could have begun selling the 10 kilograms of cocaine immediately and the money would have started to roll in for the defendants right away.  See United States v. Glenn, 312 F.3d 58, 65 (2d Cir. 2002) (murder of co-conspirator as retaliation for cheating him out of his share of the drugs was valid, and reversing only because identity of murderer was not established) (cited by Aguilar, 585 F.3d at 661 n.5 as example where substantive connection was met); Campbell, 850 F. App'x at 104-05 (evidence that defendant was involved in drug conspiracy, of his participation in the murder, the timing of the murder relative to drug activity, and the fact of defendant's meeting with co-conspirators after the murder permitted to jury to infer murder was related to drug conspiracy); United States v. Soto-Beniquez, 356 F.3d 1, 32 (1st Cir. 2003) ("Advancing the aim of [a narcotics] conspiracy can involve performing ancillary functions such as . . . enforcing discipline[.]") (cited in Santos, 541 F.3d at 72); United States v. Jenkins, 419 F.3d 614, 620 (7th Cir. 2004) ("Different

people play different roles in a drug conspiracy, be it supplier, lookout, courier, or enforcer.") (cited in <u>Santos</u>, 541 F.3d at 72); <u>see also</u> <u>United States v. Gracesqui</u>, No. 10-CR-74 (PKC), 2016 WL 11259074, at *5 (S.D.N.Y. June 3, 2016), <u>aff'd</u>, 730 F. App'x 25 (2d Cir. 2018) (murder was to "mak[e] an example of the person who robbed [co-defendant]"); <u>Santos</u>, 541 F.3d at 74-75 (motive in retaliation for drug-related robbery that occurred two years earlier); <u>Acosta</u>, 833 F. App'x at 862 (noting "the compelling evidence that the motive for the murders was to seek revenge on those responsible for the burglary of Acosta's stash house").

Washington argued during trial that the defendants would have no motive to kill Mizell because it was resistance by Yakim, not Mizell, to Washington's involvement that prevented consummation of the Baltimore deal in August.  But a competing inference from the evidence was that Washington, who was still involved in the conspiracy but still living on Mizell's couch by the time of his murder, had not yet received a large payout from Mizell through the conspiracy and blamed Mizell for the delay in the conspiracy's aims.  Similarly, Jordan had begged Mizell to help establish him as a cocaine distributer, and although Mizell agreed, he initially gave him only one ounce and Jordan did not get to travel with Washington and Mizell to Baltimore in August 2002; a competing inference is that Jordan blamed Mizell for failing to convince Yakim and not utilizing Jordan properly.  These inferences were permissible based on the trial evidence. <u>See</u> <u>United States v. Vernace</u>, 811 F.3d 609, 616 (2d Cir. 2016) (jury could infer that co-murderer "suffered an affront (real or perceived) to himself and to his authority as a Gambino associate" and murdered victim with defendant "to preserv[e] (and even enhanc[e]) the reputation of the Gambino crime family and its members" based solely on evidence that when a drink was spilled on his girlfriend, he responded "This is my place. I do what I want in here" and later murdered the victim with the defendant, another Gambino family member); <u>United States v. Santiago-Ortiz</u>, No. 17-

CR-0149 (LAK), 2018 WL 4054859, at *5 (S.D.N.Y. Aug. 23, 2018), aff'd, 797 F. App'x 34 (2d Cir. 2019) (personal "disrespect[]" could prompt a violent crime "to avenge that disrespect and, in doing so, . . . preserve and strengthen his own reputation and that of the enterprise" and convict under Sections 848(e) and 924(j)).

The defendants could disagree about their respective profits or with how, where and with whom Mizell wanted to distribute the cocaine yet still remain in the conspiracy so long as they agreed on the essential nature of the plan, which was to distribute the cocaine. There is no requirement that the evidence show that the conspirators "agreed on the details of the conspiracy, so long as they agreed on the essential nature of the plan." Maldonado-Rivera, 922 F.2d at 963 (internal citations omitted). It is "irrelevant" that the defendants' "individual goals were limited in scope to their own [drug] activities" because "[c]o-conspirators' goals 'need not be congruent for a single conspiracy to exist, so long as their goals are not at cross-purposes.'" United States v. Chartier, No. 17-CR-0372 (JS), 2021 WL 3795352, at *38 (E.D.N.Y. Aug. 26, 2021); see United States v. Heinemann, 801 F.2d 86, 92 (2d Cir. 1986) ("It is not inconsistent with such an ongoing, unitary conspiracy that disputes might arise . . . and that switches in affiliation might occur from time to time."). Yakim's refusal to work with Washington in August 2002 does not mean Mizell, the defendants' or even Yakim's goals were at "cross-purposes" with distributing cocaine.[24]

The jury could also infer a second drug-related motive for Mizell's murder, which was that the defendants sought to eliminate Mizell as the middle man in the conspiracy to cut costs

---

[24]     Washington argued at trial that if the murder were connected to the failed Baltimore deal, he and Jordan would not wait two months to murder Mizell. But there was testimony that Mizell was traveling before his murder in Puerto Rico, Chicago and Wisconsin, see, e.g., Tr. 1060:25-1061:12, that he was not always in the Studio because of travel, Tr. 497:19-21, and that Mizell was meeting with the cocaine supplier in October. The jury could infer that the defendants waited to murder Mizell until October because it was planned around Mizell's meeting with the cocaine supplier, which is when Washington knew Mizell would be back in New York.

or increase their own respective profits, which would have also benefitted the conspiracy.  See Santiago-Ortiz, 797 F. App'x at 37 (consolidation of conspiracy operations and becoming sole distributer satisfied Sections 848(e) and 924(j)); Glenn, 312 F. at 65 (jury could infer that defendant killed co-conspirator because cheated him out of drugs and therefore profits).  A third, and similar, drug-related motive for Mizell's murder reasonably inferred from the evidence was to steal kilograms of cocaine from Mizell, who they murdered the day of or after he was scheduled to meet with the cocaine supplier, in order to distribute the cocaine more effectively themselves, which also would have benefitted the conspiracy.  See Glenn, 312 F. at 65; Aquart, 912 F.3d at 19-20 (motive was to protect the enterprise's sales through elimination of rival seller); United States v. Cedeno, 756 F. App'x 24, 27 (2d Cir. 2018) (evidence that defendant paid someone to murder victim who also sold crack cocaine in the same area, without evidence as to why he made that payment, permitted inference that payment was related to drug conspiracy).  As Yakim and James testified, Mizell was not a street dealer but his role was as a middle man.  In contrast, Jordan had successfully sold cocaine in the past, Washington had attempted to sell in the past, and both of them wanted to continue selling cocaine.  The jury could infer that the defendants used the opportunity of Mizell's meeting with the cocaine supplier to steal the cocaine stash.

Each of these "competing" inferences is based on the direct and circumstantial evidence, and each is sufficient under Section 848(e).  Ceballos, 340 F.3d at 124; see also Jackson, 443 U.S. at 324 ("From the circumstantial evidence in the record, it is clear that the trial judge could reasonably have found beyond a reasonable doubt that the petitioner did possess the necessary intent at or before the time of the killing."); Sureff, 15 F.3d at 228 ("[C]rimes may be proven entirely by circumstantial evidence.  It is thus established that a prosecution for murder

may succeed without a body having been found or without evidence of the means of death being provided.").  Defendants do not argue that such motives are not valid.[25]

Moreover, evidence of the murder itself can further assist in proving the substantive connection between the narcotics conspiracy and the murder.  See, e.g., Santos, 541 F.3d at 74 (describing "[a]gain" the evidence of the drug conspiracy and stating that "[i]f the jury found that Santos joined the drug conspiracy, then it unquestionably could have found that one motive for the killings was related to that conspiracy"); Gracesqui, 2016 WL 11259074, at *5 (noting that the testimony about the defendant's involvement in the drug conspiracy also could lead a reasonable jury to infer that one purpose behind the murder was to advance that conspiracy).

Jordan argues that there could be no drug-related motive as "there was no evidence of any contemporaneous drug deal," Jordan Mot. 24, but as discussed supra, the defendants murdered Mizell on October 30, 2002—the day of, or after, Mizell was scheduled to meet with the cocaine supplier.  Coupled with evidence of the narcotics conspiracy, Washington's questions about Mizell's plans and the defendants' use of firearms, this evidence permitted the inferences that the defendants went to the Studio and murdered Mizell on that specific day in order to punish Mizell for Baltimore, remove Mizell as the middle man, or to take over or steal the cocaine supply—all of which are all valid drug-related motives.  See supra at 51-55.

Jordan's second argument that there was an "equally plausible theory that the murder was personal," Jordan Mot. 24, would require this Court to "draw a series of improbable

---

[25]     Both defendants imply that without a cooperating witness to reveal the defendants' thoughts and confirm which motive applied, the jury's determination of the defendants' motives constituted mere speculation.  This, however, is not the law.  Rather, "[j]urors are entitled, and routinely encouraged, to rely on their common sense and experience in drawing inferences of a defendant's knowledge and his criminal intent."  United States v. Sabhnani, 599 F.3d 215, 241-42 (2d Cir. 2010) (internal quotation marks omitted).

inferences from the basic facts, prime among them" the inference that the defendants killed Mizell for personal reasons.  <u>Jackson</u>, 443 U.S. at 325.  The evidence at trial did not permit any innocuous competing inference for the defendants' motive for the murder.  There was no evidence in the record about personal animosity or jealousy between Mizell and either Jordan or Washington that could permit the jury to draw that inference.  The evidence showed that Jordan and Washington spent time with Mizell inside and outside of the Studio, that Mizell let Washington live with his family, and that Mizell was Jordan's godfather.  Based on these facts and the evidence introduced at trial, only the narcotics conspiracy could have led the defendants to kill Mizell.  "Only under a theory that the prosecution was under an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt could [these] [defendants]' challenge be sustained," which is a "theory the [Supreme] Court has rejected in the past."  <u>Id.</u> at 326.

   Unlike in <u>Glenn</u>, where testimony from the government's witnesses also revealed that persons other than the defendant had motive to kill his co-conspirator victim because the victim was a "dishonest drug dealer who robbed a major drug dealer at gunpoint in full view of other drug dealers" and another drug dealer had robbed the victim, here, none of the witnesses testified about Mizell having animosity with them or others; in fact, the opposite.  312 F.3d at 65.  James testified that Unc, who was owed money by Mizell for the narcotics conspiracy, was shocked by Mizell's death and forgave his outstanding debt when he was killed.  (That debt also confirmed that the consignment relationship with Unc, and the narcotics conspiracy, was ongoing at the time of Mizell's death.)  Numerous witnesses testified about Mizell's generosity with his money, and even Washington said Mizell still had funds coming in.  And unlike in <u>Glenn</u>, here there was direct evidence that Jordan and Washington killed Mizell—from eyewitnesses and also other witnesses to whom Jordan and Washington made admissions.  312 F.3d at 60-61; <u>see also</u>

United States v. Peter, No. 17-CR-054 (NRB), 2019 WL 2918226, at *16 (S.D.N.Y. July 8, 2019),

aff'd sub nom. United States v. Campbell, 850 F. App'x 102 (2d Cir. 2021 (internal citations

omitted) ("Apart from the relative implausibility of an alternative explanation for [the two

co-defendants'] participation in the murder . . . the nature of their participation gave rise to an

inference that they and [the defendant] shared a common professional purpose.").

      "To sustain the jury's verdict, the government need not disprove 'every possible

hypothesis' of the defendant's innocence." Anderson, 747 F.3d at 60 (quoting United States v.

Abelis, 146 F.3d 73, 80 (2d Cir. 1998)).  Yet that is exactly what the defendants ask this Court to

require of the government.  But when there are "competing inferences," the Court "must defer to

the jury's choice," because "it is the task of the jury, not the court, to choose among competing

inferences that can be drawn from the evidence." Id. (quoting Eppolito, 543 F.3d at 45).

      Accordingly, there was sufficient evidence for a reasonable jury to conclude that at

least one of the motives for Mizell's murder was related to the narcotics conspiracy.

    C.    The Evidence at Trial Was Sufficient to Sustain the Convictions on Count Two:
          Firearm-Related Murder

      Section 924(j) criminalizes causing the death of a person through the use of a

firearm in the course of a violation of Section 924(c).  See, e.g., United States v. Nina, 734 F.

App'x 27, 30 (2d Cir. 2018).  Section 924(c) in turn states that "any person who, during and in

relation to . . . any drug trafficking crime . . . uses or carries a firearm" is guilty of a crime.  18

U.S.C. § 924(c)(1)(A).  "The phrase 'in relation to' is expansive."  Smith v. United States, 508

U.S. 223, 237 (1993).  It " clarifies that the firearm must have some purpose or effect with respect

to the drug trafficking crime; its presence or involvement cannot be the result of accident or

coincidence."  Id. at 238; see United States v. Finley, 245 F.3d 199, 203 (2d Cir. 2001)

(government need only show "some nexus between the firearm and the drug selling operation").

"[T]he ultimate question is whether the firearm afforded some advantage (actual or potential, real or contingent) relevant to the vicissitudes of drug trafficking." United States v. Snow, 462 F.3d 55, 62-63 (2d Cir. 2006) ("[A] drug dealer may be punished under § 924(c)(1)(A) where the charged weapon is readily accessible to protect drugs, drug proceeds, or the drug dealer himself.").[26]

The same evidence outlined above in connection with the narcotics conspiracy provided a sufficient basis for the jury to rationally find that Washington and Jordan used firearms during and in relation to the narcotics conspiracy at the time of Mizell's murder. All of the motives previously described "afforded some advantage (actual or potential, real or contingent)" to the narcotics conspiracy—by eliminating the co-conspirator who had harmed the conspiracy, by eliminating the middle man to streamline the supply and increase profits, or by eliminating the co-conspirator to steal the 10 kilograms of cocaine (or the remaining cocaine on the line of credit) and to distribute it more effectively. Snow, 462 F.3d at 62. The jury need not be unanimous on how the use of the firearms furthered the narcotics conspiracy so long as it found that they did. See supra at 49-50 (discussion of how unanimity required for element of crime and not means to meet that element).

Mizell's failure to consummate the Baltimore deal had hindered the common aim of the conspiracy, which was to distribute cocaine—it delayed distribution, it delayed profits to the conspiracy and co-conspirators like the defendants, it delayed repayment to the supplier, Unc,

---

[26]   Washington incorrectly states that Section 924(j) requires that the murder must be in furtherance of the narcotics conspiracy. See Washington Mot. 28-29 ("The murder did not further or facilitate the defendant's drug trafficking."). Instead, the firearm must be used in furtherance of the narcotics conspiracy. See, e.g., Nina, 734 F. App'x at 30; United States v. Wallace, 447 F.3d 184, 187 (2d Cir. 2006). In any event, as discussed herein, the jury could conclude that the defendants' use of the firearms to kill Mizell was in furtherance of the narcotics conspiracy.

58

and it required the conspiracy to find an alternative role for distributers like Washington, who was not permitted to sell with Yakim in Baltimore.  Use of firearms to eliminate Mizell was in furtherance of conspiracy as "punishment . . . and to send a message that such affronts . . . would not be tolerated." Campbell, 850 F. App'x at 107 (same evidence for Section 848(e) satisfied Section 924(j)); see, e.g., Peter, 2019 WL 2918226, at *14 ("Protecting . . . a narcotics conspiracy furthers the conspiracy's goal as much as selling narcotics does."); Soto-Beniquez, 356 F.3d at 32 (violence furthers a conspiracy by sending a message); accord Santos, 541 F.3d at 72.

Further, eliminating Mizell as the middle man in the conspiracy could streamline the supply, cut out an additional person who would need to be paid, and improve the defendants' profits or reputations—all of which would be in furtherance of the drug conspiracy.  See Vernace, 811 F.3d at 616 (in RICO, murder that furthers own reputation can enable one "to more effectively carry out the activities of the [organization]"); Santiago-Ortiz, 797 F. App'x at 37 (consolidation of conspiracy operations satisfied Section 924(j)); supra at 52-54.  Similarly, when the defendants went to the Studio on the same day, or the day after, Mizell was to meet with the cocaine supplier, attempting to steal the cocaine to distribute themselves, and the use of firearms to do so, would "afford[] some advantage (actual or potential, real or contingent)" to the conspiracy.  Snow, 462 F.3d at 62; see supra at 54-55; see also United States v. Williams-Bey, No. 20-CR-00172 (MPS), 2023 WL 5286799, at *16 (D. Conn. Aug. 17, 2023) (maintaining conviction despite no direct evidence that murder helped the defendant "sell more drugs, or it was intended to send a message to those who would threaten his business" because the "in-furtherance theory of liability is thus satisfied if the Government submits evidence from which a rational juror could infer that . . . the murder afforded some advantage—actual or potential—relevant to the predicate drug offenses").  The defendants, not Mizell, were distributers, and there was evidence that Jordan was eager to sell

cocaine and that Washington had tried to sell in the past and wanted to sell cocaine.  Whether or not they could distribute more effectively than Mizell in reality is irrelevant.  Nor does it matter that Mizell was a member of the same conspiracy if defendants thought his removal would benefit the conspiracy in some way.  See Glenn, 312 F.3d at 65.

Given the evidence, the defendants do not meaningfully challenge their convictions under this Count.  See Washington Mot. 28-29; Jordan Mot. 27-29.  Jordan argues only that because the government failed to prove that he committed a drug trafficking crime, he cannot be found guilty of using a firearm in relation to that crime.  Jordan Mot. 28.[27]  For the reasons already discussed, the evidence proved that Jordan was part of the ongoing narcotics conspiracy at the time of Mizell's murder.

Washington argues that because the drug nexus and "evidence in Aguilar would not support a 924(j) conviction," the drug nexus in the instant case does not support Section 924(j).  Washington Mot. 29.  This argument is nonsensical.  As discussed supra at 49, although the defendant in Aguilar murdered the victim for a personal motive, the Second Circuit affirmed the Section 848(e) conviction because the defendant used the narcotics conspiracy to carry out the murder, thus meeting the "in connection" requirement.  A drug-related motive was neither present nor required.  Here, the defendants murdered Mizell for a drug-related motive as part of the

---

[27]     In his Section 848(e) argument, Jordan relies on racketeering cases that are wholly inapposite.  Jordan Mot. 23-24.  For example, he cites to United States v. Jones, 291 F. Supp. 2d 78, 87 (D. Conn. 2003), in which the defendant, who was the leader of a narcotics trafficking enterprise, shot and killed a victim for flirting with his girlfriend.   That victim had no involvement in narcotics trafficking and in fact, had never met the defendant prior to the murder; the murder thus had no tangible connection to the defendant's leadership of the enterprise under 18 U.S.C. § 1959.  Moreover, unlike perhaps with a conviction for violent crime of racketeering activity under Section 1959, Section 924(j) does not require the government to prove that the murder "was expected of Jordan because of his role in an organization."  Jordan Mot. 26.

narcotics conspiracy so a comparison of the two motives and how they apply to Section 924(j) is inapplicable.

Defendants otherwise fall back on their usual defense that the government's arguments are merely speculative and uncorroborated.  But their view of the record ignores the evidence at trial and the reasonable inferences to be drawn therefrom.  "Nor are the interpretations and inferences urged by the government so speculative as to preclude adoption by a reasonable jury familiar with the totality of the evidence.  Indeed, the inferences are entirely consistent with the totality of the evidence[.]"  United States v. Coppola, 671 F.3d 220, 239 (2d Cir. 2012).  The defendants were "free to argue—and in fact did argue—alternative inferences" to the jury in summation, but the Court "cannot conclude that a reasonable jury was compelled as a matter of law to adopt [their] arguments."  Id.

Viewing the evidence "in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence," the evidence was sufficient for a rational jury to find that the use of the firearm was in furtherance of the narcotics conspiracy.  White, 7 F.4th at 98.[28]

II.     The Defendants' Rule 33 Motions Should be Denied

A.     Standard of Review

Rule 33(a) provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  See Fed. R. Crim. P. 33(a).

---

[28]     For the foregoing reasons, the trial evidence is sufficient to sustain the convictions on Count One and Two for the defendants.  In addition, the defendants were charged as aiders and abettors, and the jury was properly instructed on it.  The same evidence is sufficient to convict either Jordan or Washington as aiding and abetting Counts One and Two.  See, e.g., United States v. Walker, 142 F.3d 103, 113 (2d Cir. 1998) (shooter can be convicted as aider and abettor).

The Second Circuit has held that "[g]enerally, a motion for a new trial 'should not be granted unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice.'" <u>Smith v. Carpenter</u>, 316 F.3d 178, 183 (2d Cir. 2003) (quoting <u>Atkins v. New York City</u>, 143 F.3d 100, 102 (2d Cir. 1998)). "The defendant bears the burden of proving that he is entitled to a new trial under Rule 33," <u>United States v. McCourty</u>, 562 F.3d 458, 475 (2d Cir. 2009), and the crucial question for the court is whether "it would be a manifest injustice to let the guilty verdict stand," <u>United States v. Sanchez</u>, 969 F.2d 1409, 1414 (2d Cir. 1992). A "manifest injustice" occurs where a trial court <u>cannot</u> be satisfied that "competent, satisfactory and sufficient evidence" supports the jury's finding of guilt beyond a reasonable doubt, and where a "real concern" exists "that an innocent person may have been convicted." <u>Id.</u> As the Second Circuit recently clarified, "a district court may not grant a Rule 33 motion based on the weight of the evidence alone unless the evidence preponderates heavily against the verdict to such an extent that it would be 'manifest injustice' to let the verdict stand." <u>United States v. Archer</u>, 977 F.3d 181, 188 (2d Cir. 2020) (quoting <u>Sanchez</u>, 969 F.2d at 1414). Under this standard, a district court "may not 'reweigh the evidence and set aside the verdict simply because it feels some other result would be more reasonable.'" <u>Id.</u> at 188 (quoting <u>United States v. Robertson</u>, 110 F.3d 1113, 1118 (5th Cir. 1997)). A district court must "defer to the jury's resolution of conflicting evidence," absent "a situation in which the evidence was 'patently incredible or defie[d] physical realities.'" <u>Id.</u> (quoting <u>Ferguson</u>, 246 F.3d at 134). As with a Rule 29 motion, "a district court faced with a Rule 33 motion must be careful to consider any reliable trial evidence as a whole, rather than on a piecemeal basis." <u>Id.</u> at 189 (citing <u>United States v. Middlemiss</u>, 217 F.3d 112, 117 (2d Cir. 2000)).

B.     The Defendants' Alternate Perpetrator Theory Was Rejected By the Jury and
       Does Not "Preponderate Heavily" Against the Verdict

The defendants argue that Jay Bryant, the defendants' accomplice, was actually the lone gunman who murdered Mizell, focusing on Bryant's DNA from a hat found in the Studio and Bryant's statement to his uncle, while ignoring all other evidence.  This argument fails to "view the evidence presented in the light most favorable to the government and draw all reasonable inferences in the government's favor," which the Court must do.  United States v. Gagliardi, 506 F.3d 140, 149 (2d Cir. 2007) (internal quotation marks omitted) (quoting United States v. Giovanelli, 464 F.3d 346, 349 (2d Cir. 2006).  Even so, as described herein, the evidence that the defendants murdered Mizell is overwhelming.  The Court should reject the defendants' post-trial invitation to "reweigh" the evidence and "set aside the verdict simply because they contend their theory is "more reasonable," even though the jury did not agree and wholly rejected the defense arguments.  Archer, 977 F.3d at 188.

As demonstrated by the recitation above, the evidence "introduced at trial did not preponderate heavily against the jury's verdict."  Id.  First, the eyewitnesses had "no doubt" in their identifications of Jordan and Washington as the perpetrators, which were made in a small, well-lit indoor space from mere feet away.  Given their differences in size and appearance, it would be impossible for the eyewitnesses to mistake Bryant—who is much taller, had braids, lacked a neck tattoo and walked with a limp—with either Jordan or Washington, who are both approximately 5'10" tall and look nothing like Bryant.  See GX 915 (stipulation that Jordan is 5'9.5" and Washington is 5'10");  compare GXs 501, 502 (photographs of Bryant), with GXs 506, 507 (photographs of Jordan).  The eyewitnesses' prior relationships with Jordan and Washington and lack of familiarity with Bryant makes this even less plausible.  Second, the narrative provided by both Rincon and High, as well as the physical evidence showing a "contact shot," made plain

that Mizell knew his killer—he got up to greet the shooter, smiled and gave him an embrace or handshake immediately before the gunshots.  This is entirely consistent with the shooter being Jordan—Mizell's godson—rather than Bryant, who was unknown to everyone in Mizell's inner circle.  Additionally, the physical evidence is inconsistent with someone of Bryant's size being the shooter.  Specifically, Bryant is approximately seven to nine inches taller than Mizell, and would have had to point the gun down to fire, yet the trajectory of the gunshot through Mizell's skull was upward.  See GX 201 (autopsy report listing Mizell's height as 5'8.3" inches); Tr. 609:25-610:4 (Ambrosi describing the upward trajectory of the bullet).  Third, the reliance on Allen's police statement that he saw a tall black male going down the stairs and Rapley's police statement describing a single male in the hallway—which Allen testified he did not remember and Rapley testified may not have been what he actually told police—is misplaced.  These police statements are still consistent with Bryant fleeing the Studio in the hallway through the front door and entirely consistent with Jordan and Washington having murdered Mizell in the Studio and fleeing out the back fire escape exit.

Regardless, the presence of Bryant's DNA at the crime scene and Bryant's false boast to his uncle, Raymond Bryant, that he was the shooter was evidence that was all put before the jury for their consideration.  This evidence was entirely consistent with the government's theory and reconcilable with Bryant's role as Jordan and Washington's accomplice.  Even if it was not, the Court must "defer to the jury's resolution of conflicting evidence."  United States v. McCourty, 562 F.3d 458, 475-76 (2d Cir. 2009); Sanchez, 969 F.2d at 1414-17 ("Under the circumstances of this case, the differences in testimony presented a credibility question for the jury, at most."); Archer at 188.  The defense interpretation of this evidence was argued during summation and rejected by the jury after nearly three full days of deliberations.  In sum, this is

64

not "a situation in which the evidence was 'patently incredible or defie[d] physical realities.'"

Id.  The defendants cite no case that supports their position, and the government has found none.

Because this is not an "extraordinary circumstance" warranting a new trial, the defendants' Rule 33 motion must be denied.  Ferguson, 246 F.3d at 134.

C.    There Was No Juror Misconduct or Jury Taint



<u>CONCLUSION</u>

For the foregoing reasons, the Court should deny the defendants' motions in their entirety.

Dated:      Brooklyn, New York
            May 10, 2024

                                    Respectfully submitted,

                                    BREON PEACE
                                    UNITED STATES ATTORNEY
                                    Eastern District of New York
                                    Attorney for Plaintiff
                                    271 Cadman Plaza East
                                    Brooklyn, New York 11201


                            By:     _____/s/_____
                                    Artie McConnell
                                    Mark E. Misorek
                                    Miranda Gonzalez
                                    Assistant United States Attorneys
                                    (718) 254-7000

69