UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

                     Government,

        v.

KARL JORDAN, JR., and RONALD
WASHINGTON,

                Defendants.

---

**MEMORANDUM AND ORDER**

20-CR-305-LDH-2

LASHANN DEARCY HALL, United States District Judge:

      Ronald Washington ("Washington"), Karl Jordan, Jr. ("Jordan"), and Jay Bryant were charged in a superseding indictment with two (2) counts:  murder while engaged in narcotics trafficking, in violation of 21 U.S.C. § 848(e)(1)(A); and firearm-related murder, in violation of 18 U.S.C. § 924(j).  (Superseding Indictment ¶¶ 1, 2, ECF No. 151.)  Washington pleaded not guilty to each count.  The Court severed Washington and Jordan's trial on Counts One and Two from the trial of Jay Bryant on each count.

      The Court held a jury trial as to Washington and Jordan commencing January 29, 2024.  At the close of the Government's case, Washington moved for judgment of acquittal, pursuant to Rule 29(b) of the Federal Rules of Criminal Procedure.  The motion was denied.  On February 27, 2024, the jury returned a verdict of guilty on each count.  Washington renews his motion for judgment of acquittal, pursuant to Rule 29(b) of the Federal Rules of Criminal Procedure, and, in the alternative, moves for a new trial, pursuant to Rule 33(a) of the Federal Rules of Criminal Procedure.  (Def.'s Mem. L. Supp. Mot. J. Acquittal and Mot. New Trial ("Def.'s Mem."), ECF No. 294.)

## BACKGROUND

Jason Mizell, also known as Jam Master Jay, was a disk jockey and music producer who, in the 1980s, garnered wide acclaim for his musical successes with the hip-hop group "Run DMC."  As the spotlight on Run DMC dimmed in the 1990s and Mizell's musical career sputtered, he entered the cocaine distribution business to offset his financial losses.  (Tr. 1051:5–13, 888:10–13.)  According to one of Mizell's friends, Eric James, Mizell's role in the drug trade was to act as a middleman:  He obtained cocaine on consignment from his supplier, a man called Unc, then distributed it to others to sell.  (Id. at 1751:17–20, 1752:2–12.)  James, himself, was selling cocaine in the Midwest at the time he met Mizell in the 1980s.  (Id. at 1749:13–1751:12, 1751:17–20.)

In 2001 or 2002, Jordan,[1] Mizell's godson, asked James about the price of cocaine.  (Id. at 1755:16–1756:13, 1756:10–13.)  Jordan asked James to tell Mizell to "put [him] on," which James understood to mean to give Jordan cocaine to sell.  (Id. at 1756:24–1757:10.)  Later, Mizell told James that he gave Jordan an ounce of cocaine to "try him out," and that Jordan sold it successfully.  (Id. at 1768:6–1770:2.)  Separately, in early 2002, Mizell provided Washington,[2] a lifelong friend, with cocaine to sell.  (Id. at 1767:7–1768:1.)  Mizell informed James that Washington "messed it up."  (Id. at 1767:7–1768:1, 1812:17–24.)

Also in 2002, Mizell "had a line" on 100 kilograms of cocaine from Unc.  (Id. at 1770:7–15.)  However, at the time, Mizell only received ten kilograms from him due to a supply shortage.  (Id. at 1770:7–22.)  Mizell told James that he would "set up shop" with Jordan and Washington, to distribute those ten kilograms in Baltimore.  (Id. at 1760:8–14, 1770:6–22,

---

[1] At trial, Jordan was also referred to as "Little D" and "Noid."

[2] At trial, Washington was also referred to as "Tinard."

2

1771:1–8.)  In addition, Mizell stated that he could make more money in Baltimore due to his

relationship with Yakim,[3] a childhood friend who resided in Baltimore and previously sold

cocaine for Mizell.  (*Id.* at 888:10–13, 1770:6–1772:2, 1776:2–1777:4.)  Mizell discussed this

Baltimore deal with James "maybe six, seven" times.  (*Id.* at 1777:13–16.)  And, James testified

that, based on these conversations, he understood that the Baltimore deal was supposed to be an

"ongoing" distribution arrangement.  (*Id.* at 1777:17–20.)  Yakim, however, was unable to recall

at trial whether the Baltimore deal was meant to be one-time or ongoing.  (*Id.* at 886:4–5.)

In August of 2002, Chris Burrell, a friend of Mizell, drove Mizell and Washington to

Washington, D.C., ostensibly for the purpose of bringing jewelry to Unc.  (*Id.* at 1228:16–

1229:4, 1229:12–20.)  Washington later admitted to law enforcement that the purpose of this

meeting was to pick up cocaine from Unc.  (*Id.* at 1616:23–1618:4, 2087:21–2088:14.)  Jordan

did not travel to Washington, D.C., with Mizell and Washington.  (*See id.* at 1228:16–21.)  Prior

to the meeting, Washington advised Mizell that they should acquire the cocaine at $18,000 per

kilogram.  (*Id.* at 2088:19–2089:9.)  After discussing the terms with Unc, Mizell left the meeting

with the cocaine in his possession.  (*Id.*)  According to Washington, this quantity of drugs was

worth $120,000.  (*Id.* at 1617:2–1618:4.)

Mizell and Washington traveled to Baltimore the following day.  (*Id.* at 1233:2–4.)

During the drive, Mizell and Washington discussed the possibility that Washington would stay in

Baltimore to sell cocaine.  (*Id.* at 1233:2–24.)  Upon arrival, Mizell met with Yakim to discuss

his plan to "move"—that is, sell—cocaine in Baltimore.  (*Id.* at 885:3–10.)  During this

conversation, Mizell explained that he wanted Yakim to move between ten and twenty kilograms

of cocaine, for an amount between $15,000 and $20,000 per kilogram.  (*Id.* at 885:3–21, 890:15–

---

[3] At trial, Yakim was also referred to as "Ralph Mullgrav" or "Mr. Mullgrav."

21.)  Moreover, Mizell sought permission for Washington to remain in Baltimore to sell the cocaine.  (*Id.* at 894:2–4.)  Because of animosity between Yakim and Washington, Yakim said, "No" deal, and threatened to kill Washington.  (*Id.* at 886:8–10, 1237:3–12; *see also id.* at 893:25–894:8 (Q[:]  And during [the summer of 2002], Mizell visited you, right? A[:]  Yes. Q[:]  And he came to you for permission to put Tinard in Baltimore; am I right? A[:]  Yes. Q[:]  And you said no, right? A[:]  Yes. Q[:]  So no deal, right? A[:]  No deal.").)  Following this meeting, Washington returned to New York with Burrell.  (*Id.* at 1237:10–1238:13.)  Mizell stayed in Baltimore to negotiate the terms of the deal with Yakim.  (*Id.* at 886:18–887:3.)

Mizell returned to Hollis, Queens, on October 29, 2002, (*id.* at 611:7–10), with plans to travel on October 31, 2002, to deejay as part of a local music group called Rusty Waters.  (*Id.* at 1061:10–20.)  Concurrently, Mizell had plans to meet with Unc's associates.  (*Id.* at 1618:5–8.)  The meeting was scheduled to take place on either the day of or before Mizell's death.  (*Id.* at 1618:5–12.)  On October 30, 2002, Washington and his girlfriend, Daynia McDonald, went to Mizell's studio (the "Studio"), where they met Mizell, who appeared surprised to see Washington.  (*Id.* at 1477:16–22, 1548:23–1549:3.)  Washington noticed that Mizell had a firearm and asked him why he needed the gun, before reminding Mizell, "If you have a problem, I have a problem too."  (*Id.* at 1477:23–1478:2, 1550:16–1551:7.)  While at the studio, Washington also asked Mizell if the two were going to a show in Connecticut and asked about Baltimore.  (*Id.* at 1478:11–20.)[4]  At some point, McDonald and Washington left the Studio, and Washington took a call from an unnamed individual.  (*Id.* at 1480:1–1482:3.)  Thereafter, Washington directed McDonald not to return to the Studio.  (*Id.*)

---

[4] Washington had not previously discussed touring with Mizell, (*id.* at 1478:21–24), and, by all accounts, was not otherwise involved in Mizell's music, (*id.* at 519:19–23, 823:13–18, 1056:25–1057:3).

Later that night, Mizell was shot and killed in the Studio. (*See, e.g.*, *id.* at 140:16–18; 2089:25–2090:2.) In addition to Mizell, there were five other individuals in the Studio: Randy Allen, Yarrah Concepcion, and Mike Rapley, all of whom were in the control room, (*id.* at 779:23–782:15); and Uriel "Tony" Rincon and Lydia High, who were eyewitnesses to Mizell's murder, (*id.* at 514:24–516:23, 955:20–956:5).

Rincon knew Jordan and Washington prior to the murder, having interacted with each of them inside and outside of the Studio. (*Id.* at 518:1–521:11.) Rincon identified Jordan as the individual who fired the fatal shot. (*Id.* at 513:4–18.) He described having a clear view of Jordan's face and part of his neck tattoo during the brief altercation, in which Jordan approached Mizell for an "embrace," after which Rincon heard "two gunshots," felt a shot to his "left leg above the knee," and saw Mizell fall to the floor. (*Id.* at 514:24–517:2.) Rincon testified further that, at the same time of the shooting, Washington was standing at the door of the Studio and told Lydia High to get down on the ground. (*Id.* at 513:13–19.) Rincon also testified that, days after the murder, he confided in Allen that Jordan and Washington were the perpetrators. (*Id.* at 525:17–25.) This statement was corroborated by Allen's testimony. (*Id.* at 1074:19–1075:6.)

Lydia High testified that she saw a "fair-skinned . . . African-American" man with a neck tattoo give Mizell "a pound," at which point she heard Mizell say, "Oh, shit," and heard a gun fire. (*Id.* at 955:20–958:17.) High attempted to escape the Studio but was stopped by Washington, who ordered her to the ground at gunpoint. (*Id.* at 956:3–22.) High and Washington grew up on the same block during their childhood, and she testified that she saw him clearly and had no doubt that he was the one who pointed the gun at her as she tried to leave the Studio. (*Id.* at 957:3–9, 957:23–958:1.) The day after the shooting, High also told Allen that Washington ordered her to the ground at gunpoint. (*Id.* at 1075:23–1076:5.) And, although

High testified that she could not recall whether she previously provided the police with a description of Jordan's neck tattoo, (*id.* at 961:15–969:17, 980:1–982:5), Allen testified that, the day after the shooting, High told him that the shooter had a neck tattoo, (*id.* at 1075:23–25, 1076:9–14). High's bodyguard, Derrick Parker, provided additional testimony that, in November 2002, High identified both Jordan and Washington as the perpetrators. (*Id.* at 920:8–921:5, 923:3–9.)

## DISCUSSION

### I.    Rule 29:  Motion for Judgment of Acquittal

A defendant challenging a jury's guilty verdict "bears a heavy burden," *United States v. Martoma*, 894 F.3d 64, 72 (2d Cir. 2017) (citation omitted). Indeed, the standard of review has been described as "exceedingly deferential." *United States v. Coplan*, 703 F.3d 46, 62 (2d Cir. 2012) (citation omitted). As such, in considering a motion for judgment of acquittal, the court must view the evidence in the light most favorable to the Government, *United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003), "crediting every inference that could have been drawn in the [G]overnment's favor," *Martoma*, 894 F.3d at 72. Most fundamentally, when considering a Rule 29 motion, "courts must be careful to avoid usurping the role of the jury when confronted with a motion for acquittal." *Jackson*, 335 F.3d at 180. That is, the "resolution of the weight of the evidence and the credibility of the witnesses" are "the province of the jury and not of the court." *United States v. O'Connor*, 650 F.3d 839, 855 (2d Cir. 2011) (citations omitted). Notably, "[a] 'jury's verdict may be based entirely on circumstantial evidence.'" *United States v. Berry*, No. 20-CR-84 (AJN), 2022 WL 1515397, at *4 (S.D.N.Y. May 13, 2022) (quoting *United States v. Sureff*, 15 F.3d 225, 228 (2d Cir. 1994)). "[S]o long as . . . inference[s are] reasonable, 'it is the task of the jury, not the court, to choose among competing inferences.'" *United States v. Santos*,

541 F.3d 63, 70 (2d Cir. 2008).  Accordingly, a Rule 29 motion may be granted "only if the evidence that the defendant committed the crime alleged is 'nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt.'"  *United States v. Guadagna*, 183 F.3d 122, 129–30 (2d Cir. 1999) (citation omitted).  It is against this legal backdrop that the Court reviews Washington's Rule 29 motion.

### A.    Count One

#### 1.   Evidence of Ongoing Drug-Related Conspiracy

Pursuant to Count One, Washington was charged with violating 21 U.S.C. § 848(e)(1)(A), which makes it unlawful for anyone who, while "engaging in" a qualifying drug offense, "intentionally kills, or counsels, commands, induces, procures, or causes the intentional killing of an individual and such killing results."  (Superseding Indictment ¶ 1.)  In this case, the qualifying drug offense was "a conspiracy to distribute five kilograms or more of a mixture or substance containing cocaine."  (*Id.*)  Therefore, to meet its burden as to Count One, the Government was required to prove, among other things, that Washington participated in the charged drug trafficking conspiracy.  *See United States v. Desinor*, 525 F. 3d 193, 202 (2d Cir. 2008) (noting as an element of 21 U.S.C. § 848(e)(1)(A) that the conspiracy was ongoing when the killing occurred).  It did.

As set forth in the charge to the jury, to find that a conspiracy existed, the evidence needed to show that "at least two people joined together in a common criminal scheme . . . [and] participated . . . willfully and with knowledge of its unlawful purpose and in furtherance of its unlawful purpose."  (Tr. 2543:21–22, 2545:3–6.)  *See also United States v. Chavez*, 549 F.3d 119, 125 (2d Cir. 2008) ("In order to prove a single conspiracy, the government must show that each alleged member agreed to participate in what he knew to be a collective venture directed

toward a common goal." (citation omitted)).  Here, Washington concedes that he agreed to enter a conspiracy to traffic in cocaine.  That is, according to Washington, as early as January 2002, but no later than March 2002, "Mizell gave [him] an unspecified amount of an unspecified drug" to sell, which Washington "messed . . . up."  (Def.'s Mem. at 11.)  By Washington's own admission, then, he joined Mizell in a drug trafficking conspiracy as early as January 2002, when he agreed to sell narcotics.  (*Id.*)  Washington also acknowledges that, as a part of the drug trafficking conspiracy, he agreed to sell, alongside Jordan, drugs in Baltimore.  (*See id.*)

Washington contends that Yakim's refusal to work with him in Baltimore "ended" the "Baltimore scheme" and that the Government failed to adduce any evidence from which a jury could reasonably infer that he "was in a broader drug conspiracy, with or without Mizell".  (Def.'s Mem. at 11–14.)  And, as Washington's argument goes, because there was no evidence of conspiratorial conduct after Yakim said, "No" deal, there was no ongoing conspiracy when Mizell was murdered months later, or, if such a conspiracy was ongoing, there was no evidence that Washington continued to participate in it.  (*See id.* at 11–13.)  Not so.

As a threshold matter, and as the Government aptly argues, there was only one overarching drug conspiracy, which Mizell conducted in New York and sought to expand to Baltimore.  (Gov't's Mem. L. Opp'n Defs.' Mot. Acquit. ("Gov't's Opp'n") at 39–44, ECF No. 296.)  There were not, as Washington contends, separate conspiracies.  (*See id.* at 12–13, 14–15.)  Tellingly, in advance of trial, Washington proposed that a multiple conspiracies jury instruction be included in the final charge, "if applicable."[5]  (Joint Def. Reqs. Charge at 24.)  However, at

---

[5] Washington and Jordan submitted a joint jury charge, which proposed the following instruction as to multiple conspiracies:

the charging conference, Washington failed to argue for the instruction's inclusion or object to its omission from the final charge.  Presumably, Washington's failure to argue for a multiple conspiracies jury instruction resulted from his determination that, based on the trial record, there was no basis to advance such an argument.

In any event, Washington's argument that the charged drug conspiracy ended when Yakim said, "[N]o" deal, is unconvincing.  It is plain from the evidence that Yakim's refusal to work with Washington does not preclude the conclusion that the drug conspiracy was ongoing or that Washington was a member.  There was simply no evidence that Washington lacked the ability to distribute narcotics on behalf of Mizell outside of Baltimore—including in New York,

---

**Request No 18:  Defenses:  Multiple Conspiracies [If Applicable]**

In this case, the defendants contend that the government's proof as to Count [##] fails to show the existence of only one overall conspiracy. Rather, they claim that there was actually a separate and independent conspiracy involving themselves and other persons.

Whether there existed a single unlawful agreement or many such agreements, or indeed, no agreement at all is a question of fact for you the jury to determine in accordance with the instructions I am about to give you.

When two or more people join together to further one common unlawful design or purpose a single conspiracy exists. By way of contrast, multiple conspiracies exist when there are separate unlawful agreements to achieve distinct purposes.

If you find that the conspiracy charged in the indictment did not exist, you cannot find either defendant guilty of the single conspiracy charged in the indictment. This is so even if you find that some conspiracy other than the one charged in this indictment existed, even though the purposes of both conspiracies may have been the same and even though there may have been some overlap in membership.

Similarly, if you find that the defendant you are considering was a member of another conspiracy and not the one charged in the indictment, then you must acquit that defendant of the conspiracy charges. Therefore, what you must do is determine whether the conspiracies charged in the indictment existed. If they did, you must then determine the nature of the conspiracy and who were its members.

(Joint Def. Reqs. Charge at 24, ECF No. 204.)

where he lived and had already done so.[6]  Put differently, there is no evidence that Washington's involvement in the drug conspiracy was contingent on the success of the Baltimore deal.

Equally unavailing is Washington's contention that there was no evidence of conspiratorial conduct after Yakim said, "No" deal, and therefore, there was no ongoing conspiracy when Mizell was murdered.  (*See* Def.'s Mem. at 12–13, 15–17.)  In fact, a review of the trial record reveals that there was ample evidence of conspiratorial conduct after Yakim said, "No" deal.  There was testimony that Mizell:  remained in Baltimore to negotiate with Yakim, (Tr. 886:18–887:3, 1237:10–1238:10); "had a line" on 100 kilograms of cocaine, which was to be sold on consignment, (*id.* at 1770:13–14; *see id.* at 1794:24–1795:6); intended distribution of the cocaine to be "ongoing," (*id.* at 1777:13–20); and had not paid Unc for any of the cocaine as of October 2002, (*see* Tr. 1788:11–20 ("Q[:]  Did you ever speak with Unc after Jason's murder?  . . . A[:]  Yes . . . . Q[:]  Did [Unc] say anything about money? A[:]  He said – he said whatever [Mizell] owed died with him.").  This evidence was sufficient to establish an ongoing conspiracy to distribute narcotics.  Indeed, the fact that Mizell sold drugs on consignment is, alone, sufficient to allow the inference that the conspiracy did not end in Baltimore.  *See, e.g.*, *United States v. Brock*, 789 F.3d 60, 64 (2d Cir. 2015) (collecting cases where "significant indicia of a conspiratorial purpose existed:  the defendants purchased drugs in significant quantities on credit from the selling organization and took substantial other steps to assist it such as facilitating resales, supplying bail money and recruiting other customers and sellers."); *United States v. Glynn*, 686 F. App'x 51, 54 (2d Cir. 2017) (purchase of drugs on credit for redistribution showed conspiratorial relationship); *United States v. Faltine*, No. 13-CR-315 (KAM), 2016 WL

---

[6] In his papers, Washington concedes that he resided in New York.  (Def.'s Mem. at 14.)  There is evidence that, specifically, Washington was residing with Mizell, sleeping on his couch, at the time Mizell provided him with drugs to sell.  (*See* Tr. 693:25–694:11.)

1700385, at *4 (E.D.N.Y. Apr. 26, 2016) (drug sales on consignment "is a stand-alone factor supporting a conspiracy"). That the cocaine was not ultimately distributed by Mizell in Baltimore is of no consequence. As the Second Circuit has recognized, "the absence of an actual sale or seizure of narcotics does not render insufficient the proof of a conspiracy to distribute it." *Santos*, 541 F.3d at 71.

Washington also maintains that the Government should be foreclosed from arguing that there was an ongoing conspiracy because the Government failed to elicit that fact from the only witness with personal knowledge—Yakim. (Def.'s Mem. at 13–14.) In making this argument, Washington refers the Court to *United States v. Pinckney*, 85 F.3d 4 (2d. Cir. 1996). In *Pickney*, the defendant challenged his convictions for operating a chop shop, in violation of 18 U.S.C. § 2322, and conspiring to operate a chop shop, in violation of 18 U.S.C. § 2321. 85 F.3d at 5. In moving for judgment of acquittal, the defendant argued that the government failed to provide sufficient evidence, through witness testimony or otherwise, supporting a reasonable inference that a sufficient nexus to interstate commerce was established. *See Pinckney*, 85 F.3d at 5–8. The *Pickney* court agreed. Namely, the court concluded that the government failed to ask the witness a question that "could have—and should have—been put squarely to [the witness]" and would have elicited testimony critical to the element. As a result, the court concluded that the evidence was insufficient to prove a sufficient nexus to interstate commerce. 85 F.3d at 6–7. Washington contends that a similar finding is warranted here. (Def.'s Mem. at 13–14.) Washington's argument, however, presupposes that the Baltimore deal was, itself, a standalone conspiracy. It was not. As discussed, *supra*, the Baltimore deal was simply a part of a single drug conspiracy. As such, that the Government did not question Yakim on whether the Baltimore deal ended when he refused to work with Washington is of no consequence.

11

As a last resort, Washington contends that acquittal as to Count One is warranted because the inferences advanced by the Government are "no more likely than other permissible inferences" advanced by Washington. (Def.'s Mem. at 17.) Stated differently, Washington relies on the theory of "equipoise" to support his contention that either the conspiracy was no longer ongoing or that he was no longer a member of the conspiracy after Yakim said, "[N]o" deal. (*See id.*) However, the Second Circuit has severely limited the application of this theory. As the Second Circuit has made plain, that inferences consistent with innocence and guilt may be drawn from circumstantial evidence "is of no matter to [a] sufficiency analysis because it is the task of the jury, not the court, to choose among competing inferences." *United States v. Aquart*, 912 F.3d 1, 44 (2d Cir. 2018) (citation modified). "[O]nly where evidence 'is nonexistent or so meager' as to preclude the inferences necessary to a finding favorable to the [G]overnment," does the equipoise rule apply. *Id.* at 45. Here, in advancing his argument of equipoise, Washington concedes that there is evidence to support the inferences urged by the Government. (*See* Def.'s Mem. at 17.) Specifically, Washington contends that "[t]he inference that the government advanced is simply no more likely than the other permissible inferences." (*Id.*) And, as demanded by law, on a motion made pursuant to Rule 29, the Court "draws all inferences in favor of the Government." *United States v. Preldakaj*, 489 F. App'x 507, 509 (2d Cir. 2012) (quoting *United States v. Henry*, 325 F.3d 93, 103 (2d Cir.2003)).

Certainly, it was theoretically possible for the conspiracy to have continued without Washington. However, once an individual enters a conspiracy, "the only way to exit is for him to affirmatively withdraw from it." *United States v. Leslie*, 658 F.3d 140, 143 (2d Cir. 2011). To withdraw, a defendant must "show that he performed some act that affirmatively established that he disavowed his criminal association with the conspiracy." *United States v. Eppolito*, 543

12

F.3d 25, 49 (2d Cir. 2008).  And, "it is well-settled that withdrawal from a conspiracy is an affirmative defense for which the defendant bears the burden of proof at trial."  *Leslie*, 658 F.3d at 143.  Here, conspicuously absent from Washington's submission is any argument that he affirmatively withdrew from the charged drug conspiracy, which he concedes he entered.  Nor does Washington direct the Court to any evidence that he took affirmative steps to withdraw from the charged drug conspiracy.  Instead, Washington points to the lack of testimony regarding his involvement in drug dealings from August to October 2002.  (Def.'s Mem. at 17–24.)  However, "[h]ibernation for a few months does not signal the end of a criminal partnership," and "[u]nless a conspirator produces affirmative evidence of withdrawal, his participation in a conspiracy is presumed to continue until the last overt act by any of the conspirators."  *United States v. Panebianco*, 543 F.2d 447, 453 (2d Cir. 1979).  Given the trial evidence, Washington's concession that he entered into the conspiracy, and Washington's failure to demonstrate his withdrawal from the conspiracy, the Court concludes that Washington was a member of the charged drug conspiracy at the time of Mizell's murder.  This conclusion does not end the Court's inquiry, however.

### 2.  Proof of Drug-Related Motive

In assessing the sufficiency of a conviction under § 848(e)(1)(A), "[c]ourts [have] universally concluded that a substantive . . . connection" between the killing and continuing criminal enterprise is required to sustain a conviction.  *United States v. Aguilar*, 585 F.3d 652, 658 (2d Cir. 2009) (collecting cases).  Therefore, in addition to proving Jordan's participation in the drug trafficking conspiracy, to meet its burden as to Count One, the Government was required to satisfy what is known as a nexus requirement.  21 U.S.C. § 848(e)(1)(A).  Here, the Government only advances a drug-related motive.  (Gov't Opp'n at 48–54.)  Of course, proof

13

of a drug-related motive for a killing fully satisfies the nexus requirement. *Aguilar*, 585 F.3d at 660. And, where the Government relies on a drug-related motive to establish the requisite nexus, it "need only prove beyond a reasonable doubt that one motive for the killing . . . was related to the drug conspiracy." *Aguilar*, 585 F.3d at 659. Put differently, "the government has no burden to establish that a drug-related motive was the sole purpose, the primary purpose, or even that it was equally as important as any non-drug-related purpose, as long as it was one purpose" for the killing. *Desinor*, 525 F.3d at 202. That said, it is axiomatic that in the absence of sufficient proof of any motive—here, a drug-related motive—the charge cannot be sustained. Washington argues that the Government failed to satisfy Count One's nexus requirement because it did not adduce evidence sufficient to support its theory that Washington had a drug-related motive to kill Mizell. (Def.'s Mem at 26–27.) The Court is unconvinced.

The Government maintains that Washington had at least one of a number of drug related motives. Namely, according to the Government, Washington was motivated to participate in the killing of Mizell: (1) as retaliation against Mizell for harming the conspiracy when he was unable to secure the Baltimore deal with Yakim; (2) to eliminate Mizell as the middleman in the conspiracy, to cut costs or increase his own profits, thereby benefitting the conspiracy; or (3) to steal kilograms of cocaine from Mizell to sell with Jordan. (Gov't Opp'n at 51–54.) According to the Government "each of these 'competing inferences' is based on direct and circumstantial evidence . . . sufficient under Section 848(e)." (*Id.* at 54.) With respect to the Government's first and principal motive—retaliation by Washington for Mizell's failure to consummate the Baltimore deal with Yakim, resulting from Yakim's refusal to work with Washington—the Court agrees.

As set forth in the Government's opposition, the trial evidence from which a drug related motive could be drawn as to Washington can be summarized as follows:  Washington entered a conspiracy with Mizell and Jordan to distribute ten kilograms of cocaine in Baltimore, (Gov't's Opp'n at 51; Tr. 1760:8–14, 1770:6–22, 1771:1–8, 1777:13–23); in August 2002, Mizell and Washington traveled to Baltimore to consummate a deal to distribute ten kilograms of cocaine, (Tr. at 885:3–10, 1228:16–1233:4; *see* Gov't's Opp'n at 51); Yakim refused to work with Washington, (Tr. 885:3–886:17, 893:15–894:8); Washington returned to New York while Mizell remained in Baltimore to continue negotiation discussions, (Tr. 885:3–887:3, 1238:4–10; *see* Gov't's Opp'n at 50–51); the Baltimore deal would have been lucrative, (Gov't's Opp'n at 51; *see* Tr. 1750:1–13, , 1776:12–1777:4); in October 2002, Mizell was scheduled to meet with his supplier, (Gov't's Opp'n at 50; Tr. 1618:5–12); Washington showed up to the Studio with a firearm the same day of the meeting (or the day after), (Gov't's Opp'n at 50; Tr. 1474:9–10, 1475:24–1476:21); when Washington saw Mizell at the Studio, Washington informed Mizell that Mizell did not need a firearm because he had Washington, (Gov't's Opp'n at 50; Tr. 1477:13–1478:2); Washington asked Mizell, in coded language, about his plans for the drug conspiracy, (Gov't's Opp'n at 50; *see* Tr. 1478:11–20); after leaving the Studio, Washington made a phone call and then told his girlfriend not to return to the Studio, (Gov't's Opp'n at 50; Tr. 1479:25–1481:13); the same day of Mizell's meeting with his supplier (or the day after), Mizell was murdered, (Gov't's Opp'n at 50; Tr. 1618:5–12); Washington was sleeping on Mizell's couch at the time of the murder, (Gov't's Opp'n at 51; Tr. 693:25–694:11); Washington and Jordan spent time together inside and outside of the Studio, (Gov't's Opp'n at 51; Tr. 1761:2–12); and Washington and Jordan met up after Mizell's murder, (Gov't's Opp'n at 50; Tr. 1527:18–1528:12).  Based on this evidence, a jury could reasonably infer that Washington was excluded

from a potentially lucrative Baltimore deal and sought to retaliate against Mizell for his exclusion.

Courts have found a substantive connection between a killing and drug trafficking conspiracy where the jury could infer that a defendant killed a co-conspirator for cheating him out of his share of drugs and, therefore, profits. *E.g.*, *United States v. Glenn*, 312 F.3d 58, 65 (2d Cir. 2002). A drug-related motive has also been found where a drug trafficker hired a hit man to kill someone as punishment for robbing his stash house. *United States v. Acosta*, 833 F. App'x 856, 862 (2d Cir. 2020). And, in another case, a court found a drug-related motive where a drug trafficker hired a hit man to kill the men who robbed him of $316,000 in drug proceeds. *Santos*, 541 F.3d at 74–75. In each of these cases, the court found that a threat to the defendant's drug proceeds or supply constituted a motive sufficient to satisfy § 848(e)(1)(A)'s nexus requirement. So too, here, does the trial record support a reasonable inference that Washington possessed such a motive. In the face of this evidence, Washington argues that Mizell did not exclude him from the Baltimore deal; Yakim did. (Def.'s Mem. at 27.) Therefore, Washington would have no motive to kill Mizell. (*See id.*) In their opposition, the Government maintains that there is evidence that "Mizell sent Washington home and did not let him sell with Yakim." (Gov't's Opp'n at 51.) The Court has found no evidence in the record to suggest that Mizell "did not let [Washington] sell with Yakim," (*id.*), but rather that Yakim refused to work with Washington, (Tr. 886:8–10). This fact, however, does not alter the Court's view of Washington's argument. This so because the question before the Court is whether the advanced motive could reasonably be drawn from the evidence, not whether the motive itself was reasonable.

Gaps in proof do, however, pervade each of the remaining purported motives in this case. To be clear, the Court does not question that, in the abstract, each of the advanced motives could

serve as a basis to sustain Count One.  However, a review of trial record reveals that the evidence—direct and circumstantial—purportedly supporting these motives is at most "meager". *Guadagna*, 183 F.3d at 130.  With respect to the second motive—that Washington sought to eliminate Mizell as the middleman in the conspiracy—the Government fails to identify evidence that Washington was dissatisfied by his portion of revenue from drug sales of cocaine, was in contact with any supplier, or otherwise made arrangements to carry on Mizell's operation. Certainly, there is evidence establishing that Mizell functioned as the conspiracy's middleman. (Tr. 885:3–17, 1751:17–20, 1752:2–12).  However, that fact, alone, cannot support an inference that Washington was motivated to consolidate the conspiracy's operations or spearhead an increase in his or the conspiracy's profits.  Moreover, with respect to the third motive—that Washington sought to steal kilograms of cocaine from Mizell—the Government fails to point to any evidence that Washington knew that there would be kilograms of cocaine at the Studio, made arrangements to distribute any additional cocaine himself, or had the means to sell additional kilograms of cocaine.  Incredibly, the Government does not identify a single specific record cite in support of these advanced motives.  To draw the conclusions urged by the Government would exceed the bounds of reason and require plainly impermissible speculation.

In any event, the Court's dim view of these theories is of no consequence.  The Court has already found the evidence sufficient to support a reasonable inference as to a drug-related motive for Defendant's participation in Mizell's murder—namely, retaliation for Mizell's failure to include him in the lucrative Baltimore deal.  And, where a court determines that one motive is legally sufficient, a finding that the other motives are not sufficient does not alter the court's determination.  *See United States v. Aguilar*, 742 F.Supp.3d 322, 331 n. 5 (E.D.N.Y. 2024) ("[W]here there is argument that multiple theories of law and evidence warrant conviction,

sufficient evidence supporting any of these theories is all that is required to uphold the conviction . . . . As a consequence, even if the government had come up short on its evidentiary showing on [its] second . . . theory, [the defendant] would not be entitled to acquittal." (internal citations omitted)).  Accordingly, Washington's argument that the Government failed to adduce evidence supporting a reasonable inference that he had a drug-related motive to participate in Mizell's murder falls flat.[7]

*       *       *

Viewing the evidence in the light most favorable to the Government, Washington has not met his burden to persuade the Court that no reasonable juror "could have found the essential elements of the crime beyond a reasonable doubt" as to Count One.  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

### B.      Count Two

Pursuant to Count Two, Washington was charged with violating 18 U.S.C. § 924(j), which criminalizes causing the death of a person through the use of a firearm in the course of a violation of Section 924(c).  (Superseding Indictment ¶ 2.)  A violation of Section 924(c) occurs when "any person who, during and in relation to any . . . drug trafficking crime . . . uses or carries a firearm . . . ."  18 U.S.C. § 924(c)(1)(A).  "[T]he phrase 'in relation to' is expansive," and it is meant to "clarif[y] that the firearm must have some purpose or effect with respect to the drug trafficking crime; its presence or involvement cannot be the result of accident or coincidence."  *Smith v. United States*, 508 U.S. 223, 238–37 (1993).

---

[7] Washington complains that the Government's theory as to the motive has been a "moving target," noting that, in its opening statement, the Government pointed only to retaliation.  (Def.'s Mem. at 25 (citing Tr. 19).)  As discussed *supra*, this motive, alone, was sufficient to support the claim.

To prove a Section 924(c) violation, "[t]he ultimate question is whether the firearm afforded some advantage (actual or potential, real or contingent) relevant to the vicissitudes of drug trafficking." *United States v. Snow*, 462 F.3d 55, 62 (2d Cir. 2006) (citing *United States v. Lewter*, 402 F.3d 319, 322 (2d Cir. 2005)) (internal quotation marks omitted).  That is, "the test is whether a reasonable jury could, on the evidence presented at trial, find beyond a reasonable doubt that possession of the firearm facilitated a drug trafficking crime." *Lewter*, 402 F.3d at 322.  As is relevant here, courts have determined that a firearm facilitates a drug trafficking crime where the defendant uses a firearm against a co-conspirator in retaliation for the theft of drugs or drug proceeds.  *See United States v. Caraballo*, No. 5:12-CR-105, 2014 WL 3535347, (D. Vt. Mar. 6, 2014) (denying defendant's Rule 29 motion pertaining to his Section 924(c) conviction because "in the course of possessing the Glock firearm, [d]efendant caused the death of [the victim], who was a member of [d]efendant's conspiracy, in retaliation for the stolen drugs"), *on reconsideration*, No. 5:12-CR-105, 2014 WL 3535348, at *6 (D. Vt. July 16, 2014) (concluding upon reconsideration that there was sufficient evidence to convict defendant for a 924(c) violation), *aff'd*, 658 F. App'x 595 (2d Cir. 2016); *United States v. Williams-Bey*, No. 3:20-CR-00172-MPS, 2023 WL 5286799 (D. Conn. Aug. 17, 2023) (explaining "murder alone 'help[s] forward, advance or promote' the crime of possession with intent to sell, at least in a limited sense, by preventing a repeat theft . . . .").

Against this backdrop, Washington argues that because the evidence was insufficient to establish a drug-related motive to satisfy Count One's nexus requirement, the evidence is necessarily insufficient to sustain Count Two's drug nexus requirement.  (Def.'s Mem. at 29.) The Court's rejection of Washington's arguments regarding the sufficiency of the evidence to sustain the conviction as to Count One is fatal to this position.  And, as the Government argues,

19

the same evidence supporting the motive of retaliation provided a sufficient basis for the jury to

find that Washington used a firearm during and in relation to the ongoing drug trafficking

conspiracy in retaliation for his exclusion from a potentially lucrative deal—namely, the

Baltimore deal.  (*See* Govt's Opp'n at 57–61.)  This is because retaliation in the form of

"[v]iolence furthers . . . a conspiracy . . . by sending the message that those suspected of stealing

from the conspiracy would be treated harshly."  *Santos*, 541 F.3d at 72 (internal quotation marks

and citation omitted).

For example, in *Caraballo*, the Court concluded that there was sufficient evidence for the

jury to convict the defendant for violating Section 924(j) because the defendant "threaten[ed] to

kill [his co-conspirator] in an effort to recover . . . stolen drugs."  No. 5:12-CR-105, 2014 WL

3535347, at *10.  Similarly, in *Williams-Bey*, the court found Section 924(j)'s nexus requirement

satisfied by "the connection between [the defendant murdering his co-conspirator] and

[defendant's] drug trafficking because [the defendant] committed the murder in retaliation for the

theft of drugs or drug proceeds."  No. 3:20-CR-00172-MPS, 2023 WL 5286799, at *14.  The

court in *Williams-Bey*, explained that "[a] rational juror could conclude that [the defendant]

intended to murder [his co-conspirator] in reprisal for [his co-conspirator's] theft of [the

defendant's] drugs or drug proceeds, and that this murder furthered [the defendant's] drug

trafficking business by deterring other potential thieves . . . and also by preventing [his co-

conspirator] from stealing from his drug business again."  *Id.* at 17.  This theory of retaliation

equally applies here.

In this case, a reasonable jury could conclude Washington sought to murder Mizell in

reprisal for Mizell's failure to ensure Washington's promised involvement in the Baltimore deal,

as well as to send a message to other co-conspirators.  Or, as put by the Government, the jury

could reasonably infer that the "[u]se of [a] firearm[] to eliminate Mizell was in furtherance of [the] conspiracy as 'punishment . . . and to send a message that such affronts . . . would not be tolerated.'" (Govt's Opp'n at 59 (quoting *United States v. Campbell*, 850 F. App'x 102, 107 (2d Cir. 2021)). There was sufficient evidence for a rational jury to find that Washington's use of the firearm at the time of Mizell's murder furthered the drug trafficking conspiracy.

## II.    Rule 33:  Motion for a New Trial

Under Rule 33 of the Federal Rules of Criminal Procedure, "the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). Rule 33, by its terms, gives the trial court "broad discretion to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice." *United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992); *see also United States v. Robinson*, 430 F.3d 537, 543 (2d Cir. 2005). Indeed, a "trial court has broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29 . . . ." *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001) (quoting *Sanchez*, 969 F.2d at 1414). Notwithstanding, a trial court "must exercise the Rule 33 authority 'sparingly' and in 'the most extraordinary circumstances.'" *Id.* (quoting *Sanchez*, 969 F.2d at 1414).

"In evaluating a Rule 33 motion, the court must examine the entire case, take into account all facts and circumstances, and make an objective evaluation, keeping in mind that the ultimate test for such a motion is whether letting a guilty verdict stand would be a manifest injustice." *United States v. Alston*, 899 F.3d 135, 146 (2d Cir. 2018). Importantly, the court "must strike a balance between weighing the evidence and credibility of witnesses and not wholly usurp[ing] the role of the jury," which is tasked with resolving conflicting evidence and assessing witness credibility. *Ferguson*, 246 F.3d at 133 (citations and quotation marks omitted);

21

*United States v. Landesman*, 17 F.4th 298, 330 (2d Cir. 2021).  Thus, "a district court may not grant a Rule 33 motion based on the weight of the evidence alone unless the evidence preponderates heavily against the verdict to such an extent that it would be 'manifest injustice' to let the verdict stand."  *United States v. Archer*, 977 F.3d 181, 188 (2d Cir. 2020).  That is, "under [Rule 33], a district court may not 'reweigh the evidence and set aside the verdict simply because it feels some other result would be more reasonable.'"  *Id.*  Only in "exceptional circumstances"—where, for example, "the evidence was patently incredible or defie[s] physical realities," or in a case where, for example, "an evidentiary or instructional error compromised the reliability of the verdict" or "the government's case depend[ed] upon strained inferences drawn from uncorroborated testimony"—should a court grant a new trial.  *Id.*; *Landesman*, 17 F.4th at 331; *see also Ferguson*, 246 F.3d at 133–34 ("It is only where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment [under Rule 33]." (internal quotation marks omitted) (citing *Sanchez*, 969 F.2d at 1414)).

Washington moves for a new trial on the ground that "the evidence preponderates heavily against the verdict."  (Def.'s Mem. at 31.)  That is, Washington argues that the jury's verdict was against the weight of the evidence.  (*See id.*)  In moving for a new trial, Washington incorporates by reference the insufficiency-of-evidence arguments he advanced in moving for a judgment of acquittal.  (*Id.*)  Washington does not offer any additional basis to support his arguments.  It is true that "a Rule 33 motion may properly be granted even where a Rule 29 motion is denied."  *Landesman*, 17 F.4th at 331.  However, when a defendant contests the weight of the evidence, "the Rule 33 inquiry requires an objective evaluation of the evidence and an assessment of whether the evidence preponderates heavily against the verdict."  *Id.*  Considering the "reliable trial evidence as a whole" and "defer[ring] to the jury's resolution of conflicting evidence," the

guilty verdict here was not a "manifest injustice." *Archer*, 977 F.3d 188–89.  As the Court's resolution of Washington's Rule 29 motion makes clear, the weight of the evidence supported the jury's finding under both counts.  Accordingly, Washington's motion for a new trial based on the weight of the evidence lacks merit.  *See, e.g.*, *United States v. Napout*, 332 F. Supp. 3d 533, 575 (E.D.N.Y. 2018) (rejecting Rule 29 arguments and weight of the evidence Rule 33 arguments for the same reasons), aff'd, 963 F.3d 163 (2d Cir. 2020); *United States v. Gentile*, No. 21-CR-54, 2025 WL 777090, at *27 (E.D.N.Y. Mar. 11, 2025) (same); *United States v. Phillips*, No. 22-CR-138 (LJL), 2024 WL 1300269, at *29 (S.D.N.Y. Mar. 27, 2024) (same).

## CONCLUSION

For the foregoing reasons, Washington's motions for a judgment of acquittal and, in the alternative, a new trial are DENIED.

SO ORDERED.

Dated: Brooklyn, New York  
      December 19, 2025

/s/ LDH_____  
LASHANN DEARCY HALL  
United States District Judge

23